# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | Case No. 4:24-cv-213 |
| Plaintiffs, |  |
| v. |  |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, |  |
| Defendants. |  |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY

## INJUNCTION

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................. ii

Introduction ............................................................................................................................. 1

Background .............................................................................................................................. 3

   I.   The Authorization of "Penalty Fees" for Late Credit Card Payments ............................... 3

      A.   The Truth in Lending Act and the CARD Act of 2009 ............................................. 3

      B.   The Federal Reserve Board's Rulemaking ............................................................. 4

   II.   The CFPB's New Rule and Its Immediate Harms ........................................................... 6

      A.   The Final Rule ....................................................................................................... 6

      B.   The Irreparable Harms of the Rule to Plaintiffs' Members ..................................... 7

   III.   Procedural History .......................................................................................................... 8

Argument ................................................................................................................................. 8

   I.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims ....................................... 9

      A.   The CFPB promulgated the Final Rule with funds drawn in violation of the
          Appropriations Clause. ........................................................................................... 9

      B.   The Final Rule violates the CARD Act, TILA, and the APA. ................................... 10

   II.   Irreparable Harms to Card Issuers ............................................................................... 20

      A.   Compliance Costs ................................................................................................ 21

      B.   Enforcement Actions ............................................................................................ 23

      C.   Lost Revenue ....................................................................................................... 24

      D.   Collection Costs .................................................................................................... 24

      E.   Changed Economics for Certain Accounts ........................................................... 24

      F.   Loss of Customer Good Will ................................................................................. 25

   III.   Balance of Harms and the Public Interest ..................................................................... 25

Conclusion ............................................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Chamber of Com. of the U.S. v. CFPB*, No. 6:22-CV-00381, _ F. Supp. 3d _,
 2023 WL 5835951 (E.D. Tex. Sept. 8, 2023) ................................................................. 8, 9, 10

*Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023) ................................................................. 8

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) ................................. 9

*Corley v. United States*, 556 U.S. 303 (2009) ................................................................. 15

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
 762 F.2d 464 (5th Cir. 1985) ................................................................. 21

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................................................................. 14, 19

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ................................................................. 12

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940 (D.C. Cir. 1991) ............... 11

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ................................................................. 19

*Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148,
 2023 WL 5983829 (E.D. Ky. Sept. 14, 2023) ................................................................. 10

*NFIB v. OSHA*, 595 U.S. 109 (2022) ................................................................. 10

*NFIB v. Sebelius*, 567 U.S. 519 (2012) ................................................................. 10, 11

*Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593 (5th Cir. 2023) ................................. 8

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ................................................................. 11

*Tex. Bankers Ass'n v. CFPB*, No. 7:23-CV-00144, _ F. Supp. 3d _,
 2023 WL 4872398 (S.D. Tex. July 31, 2023) ................................................................. 9

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ................................................................. 21

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ................................................................. 21

*Tull v. United States*, 481 U.S. 412 (1987) ................................................................. 11

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ................................................................. 14

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021) ................................. 21, 25

**Statutes**

12 U.S.C. § 5512(b)(2)(A)(i) ................................................................................... 6

15 U.S.C. § 1601(a) ................................................................................................ 3

15 U.S.C. § 1602 .................................................................................................. 20

15 U.S.C. § 1604(d) ........................................................................................ 7, 20

15 U.S.C. § 1665d ....................................................................................... passim

15 U.S.C. § 1665d(b) ......................................................................................... 2, 4

15 U.S.C. § 1693o-2(a) ........................................................................................ 18

15 U.S.C. § 1693o-2(a)(2) .................................................................................... 11

15 U.S.C. 1665d(e) .............................................................................................. 14

5 U.S.C. § 706 ..................................................................................................... 10

51 U.S.C. § 60125(a) ........................................................................................... 11

CARD ACT, Pub. L. No. 111-24, § 102(b)(1), 123 Stat. 1734 (2009) ............................. 3

DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, Pub. L. No. 111-203, 124 Stat. 1376, 2036 (2010) ............................................................. 5

**Other Authorities**

CFPB, *Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2022* (Nov. 15, 2022) .................................................................................... 9

Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. (2009) ..................................................................................... 3, 12

**Regulations**

12 C.F.R. § 1026.52(b)(1)(i) ................................................................................ 23

12 C.F.R. § 1026.9(c)(iii)(2) ................................................................................ 22

12 C.F.R. § 226.52(b)(1)(i) ............................................................................. 5, 18

12 C.F.R. § 226.52(b)(1)(ii) .................................................................................. 4

12 CFR § 1026.6(b)(2)(viii) ................................................................................. 22

81 Fed. Reg. 25323 (Apr. 28, 2016) ................................................................................................. 6

Credit Card Penalty Fees (Regulation Z), 88 Fed. Reg. 18906 (Mar. 29, 2023) ...................... 6, 23

Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22, 2011) ......................................... 6

Truth in Lending, 75 Fed. Reg. 37526 (June 29, 2010) .................................................. 4, 5, 16, 18

## INTRODUCTION

The new rulemaking promulgated by the Consumer Financial Protection Bureau ("CFPB"), which upends the way that credit card issuers have assessed late fees for over a decade, is already imposing immediate and irreparable harm on the affected credit card issuers, who account for an estimated 95% of open credit card accounts in this country.[1] Such issuers must dispose of application, marketing, and monthly physical disclosure materials that reflect their existing late fees; design and print new versions; and ensure the accuracy of any periodic digital disclosures that they provide to the millions of customers with credit card accounts. Should such issuers take the CFPB's advice to mitigate the effect of the rule by changing other credit card terms, they would need to provide additional updated disclosures, with at least 45 days' notice to their customers. If such issuers are unable to complete these tasks within 60 days of the rule's publication in the Federal Register, they risk being out of compliance on the effective date, exposing themselves to civil enforcement actions. And they risk all of this for a regulation that both exceeds the CFPB's statutory authority and was issued with funds acquired in violation of our Constitution. Plaintiffs request preliminary injunctive relief to preserve the status quo while they litigate their claims. That status quo has served the interests of American consumers and credit card issuers alike for over a decade.

It is a commonly accepted, commonsense feature of American law that the failure to pay an obligation on time may incur consequences. In the context of credit cards, Congress expressly recognized that issuers may impose "penalty fee[s]" when customers violate their credit card agreements, so long as such fees are "reasonable and proportional to the omission or violation."

---

[1] Unless otherwise noted, references to "issuers" or "card issuers" in this brief refer to the larger card issuers who are subject to the Final Rule.

15 U.S.C. § 1665d(b). And it tasked federal agencies—first the Federal Reserve Board of Governors (the "Board"), and now the CFPB—with establishing standards for ensuring that such "penalty fees" are reasonable and proportional, taking into account the costs incurred by the issuer from such violation, the deterrence effects of a late fee, and the conduct of the cardholder. 15 U.S.C. § 1665d. A decade ago, the Board promulgated, and the CFPB subsequently adopted, a regulatory framework that attempted to incorporate those three statutory criteria into its late-fee safe harbor.

Now, the CFPB has effectively jettisoned two of those criteria and issued a rule that will prevent issuers from collecting the reasonable and proportional penalty fees that the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act") expressly authorize. The new rule will allow issuers to collect only a subset of the costs incurred as a result of late payments. This rule not only exceeds the CFPB's authority, it will also ultimately harm consumers. Issuers will be forced to try to recoup their unrecovered costs either by charging higher interest rates or annual fees to customers who do pay on time, or by restricting credit for customers who are more likely to pay late.

The CFPB (in another violation of federal law) has set the effective date of its regulation at 60 days from the date the rule is published in the Federal Register. That amount of time is inadequate, and it is imposing immediate and irreparable harm on issuers. Issuers respectfully request preliminary injunctive relief within 10 days, or as soon as possible thereafter, to prevent more irrecoverable harm.

## BACKGROUND

I.     **The Authorization of "Penalty Fees" for Late Credit Card Payments**

A.     **The Truth in Lending Act and the CARD Act of 2009**

Congress enacted the Truth in Lending Act ("TILA") in 1968 to make the terms of consumer credit agreements more transparent and thereby enhance competition and the responsible use of credit. *See* 15 U.S.C. § 1601(a). The TILA established a regime that is primarily disclosure-based. Credit card late fees long have been part of that regime.

In 2009, Congress expressly authorized the Board to create and maintain a regulatory regime that includes "penalty fees" for late payments. CARD ACT, Pub. L. No. 111-24, § 102(b)(1), 123 Stat. 1734, 1740 (2009). Specifically, the CARD Act required that "penalty fee[s]" imposed "in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee . . . be reasonable and proportional to such omission or violation." 15 U.S.C. § 1665d(a).

Congress's use of the term "penalty" was no accident. Congress had previously considered and rejected a legislative proposal that would have limited late fees to the costs credit card issuers incur as a result of late payments. *See, e.g.*, Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (2009), available at https://www.congress.gov/bill/111th-congress/senate-bill/414/text?s=2&r=1 (emphasis added) (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related *to the cost to the card issuer* of such omission or violation").

In the CARD Act, Congress not only expressly authorized issuers to collect a "*penalty* fee," it made clear that issuer cost is only one factor relevant to determining what fee is reasonable and

proportional to the violation. Specifically, in directing the Board to establish "standards for assessing whether the amount of any penalty fee or charge . . . is reasonable and proportional to the omission or violation to which the fee or charge relates," Congress required the Board to consider "(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Board may deem necessary or appropriate." 15 U.S.C. § 1665d(b)-(c).

Congress also authorized the Board to set a safe harbor amount—again for "penalty fee[s]"—"that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates." *Id.* § 1665d(e).

### B.     The Federal Reserve Board's Rulemaking

The Board implemented the relevant provision of the CARD Act in Regulation Z, establishing a safe harbor for late fees based on all three criteria and a standard for amounts exceeding the safe harbor based solely on cost. *See* Truth in Lending, 75 Fed. Reg. 37526 (June 29, 2010).

The Board concluded that the best means of taking into account all of the statutory criteria, including deterrence and consumer conduct, was to establish a safe-harbor maximum of $25, and $35 for subsequent late fees within the next six billing cycles, adjusted annually for inflation to account for "changes in issuers' costs and the deterrent effect of the safe harbor amounts." *Id.* at 37543, 37572 (codified at 12 C.F.R. § 226.52(b)(1)(ii)(A)-(B), now codified in 12 C.F.R. Part 1026); *id.* at 37533 ("the Board has revised the safe harbors in proposed § 226.52(b)(3) to better address concerns regarding deterrence and adopted those safe harbors in § 226.52(b)(1)(ii)"); *id.* at 37533 ("the safe harbors in § 226.52(b)(1)(ii) address consumer conduct . . ."). The Board had considered alternative standards, including a provision that would have deemed a penalty fee

4

reasonable and proportional "if the card issuer had determined that the dollar amount of the fee was reasonably necessary to deter that type of violation using an empirically derived, demonstrably and statistically sound model that reasonably estimated the effect of the amount of the fee on the frequency of violations." *See id*. at 37532. But the Board ultimately concluded that its proposal would "not provide card issuers with a meaningful ability to base penalty fees on deterrence," whereas the safe harbors would take deterrence into account while providing clarity and consistency. *Id.* at 37533. Similarly, the safe harbor addressed consumer conduct "by allowing issuers to impose higher penalty fees on consumers who violate the terms or other requirements of an account multiple times, while limiting the amount of the penalty fee for a consumer who engages in a single violation" and capping any penalty fee at the dollar amount associated with the violation. *Id.* at 37533-34. Finally, the Board believed that the amounts would "be generally sufficient to cover issuers' costs." *Id.* at 37532.

In light of its decision about the safe harbors, the Board's costs-based standard for penalty fees exceeding the safe harbor did not provide a mechanism for card issuers to account for deterrence or consumer conduct. Rather, an issuer could proceed outside the safe harbor and impose a higher fee only if the issuer "has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of [the late payment]." *Id.* at 37536, 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)). The Board required the issuer to revisit that determination annually. *Id.*

Soon after the Board promulgated Regulation Z, Congress reassigned the responsibility to regulate late fees to the newly-created CFPB. *See* DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, Pub. L. No. 111-203, §§ 1061(b)(1)(B), 1100A(2), 124 Stat. 1376, 2036, 2107 (2010). Congress required that the CFPB, when promulgating a rule, consider "the

potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." 12 U.S.C. § 5512(b)(2)(A)(i).

The CFPB adopted the Board's earlier regulations, without revision or criticism, and maintained those regulations for ten years, across multiple administrations. *See* Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22, 2011) (interim final rule); 81 Fed. Reg. 25323 (Apr. 28, 2016) (finalizing the 2011 interim final rules, subject to any intervening final rules published by the Bureau); Credit Card Penalty Fees (Regulation Z), 88 Fed. Reg. 18906, 18908 (Mar. 29, 2023). From 2010 through 2023, the regulations were adjusted eight times for inflation and are currently set at $30 for a first violation and $41 for subsequent violations within 6 billing cycles. 88 Fed. Reg. at 18906.

## II.    The CFPB's New Rule and Its Immediate Harms

The CFPB's credit card late fees rule dramatically deviates from the status quo, goes into effect in 60 days, and imposes immediate and irreparable harm.

### A.    The Final Rule

The CFPB's new rule would reduce the late-fee safe harbor applicable to larger card issuers to $8, both for first and subsequent late payments, and would no longer adjust this amount for inflation. *See* Credit Card Penalty Fees (Regulation Z) (released Mar. 5, 2024), https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf [hereinafter "Final Rule" or "Rule"]. The Rule defines larger card issuers as those who, along with their affiliates, had at least one million open credit card accounts in the previous calendar year. Final Rule at 61. For card issuers who choose to set late fees above the $8 safe

harbor using the cost-based standard, the Rule would prohibit them from including post-charge-off collection costs in setting those fees.

The CFPB selected $8 for the reduced safe harbor because it will "cover pre-charge-off collection costs for Larger Card Issuers on average." Final Rule at 123. And the Bureau suggested that issuers could mitigate the harm from the lower safe harbor by increasing "other prices," such as interest rates, "account maintenance fee[s]," or "other card terms." *Id.* at 251-52.

The Final Rule provides only a 60-day effective date after publication in the Federal Register, instead of complying with the statutory requirement that any CFPB rules requiring disclosures different from those previously required "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). The effective date also gives insufficient time to conduct a cost-based analysis, effectively forcing issuers into the new safe harbor. *See* Final Rule at 219 (explaining that larger card issuers choosing to use the cost-analysis provisions must do so by the Rule's effective date or, alternatively, adopt the $8 safe harbor amount while separately conducting a cost analysis).

### B.    The Irreparable Harms of the Rule to Plaintiffs' Members

The Final Rule imposes six types of harm on Plaintiffs' members, one of which is already occurring, and all of which are discussed in more detail *infra*. First, most issuers must immediately begin updating their disclosures and statements for millions of existing and prospective credit card accounts. Second, issuers that cannot come into compliance by the Rule's effective date will risk civil enforcement actions and unrecoverable penalties. Third, the Rule will make consumers more likely to pay late, which will increase costs to issuers and may lead to higher costs for all consumers. Fourth, issuers will lose revenue—including smaller issuers not subject to the Rule but who must lower their late fees to remain competitive—even if they are eventually able to change

other terms and conditions. Fifth, issuers will lose money on accounts that they never would have opened if they were limited to (or had anticipated) an $8 late fee. And finally, issuers face the prospect of losing customer goodwill from needing to change other terms, or from the yo-yo effect if issuers are forced into the safe harbor but are later able to raise late fees again in response to an order vacating the Rule or through annual cost analyses.

## III.    Procedural History

Plaintiffs brought this action under the Administrative Procedure Act ("APA") on March 7, 2024, two days after the Final Rule was released, and moved for a preliminary injunction the same day.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest; with the latter two factors "merg[ing] when the Government is the opposing party." *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *Clarke v. CFTC*, 74 F.4th 627, 643 (5th Cir. 2023). Plaintiffs satisfy all four of these elements: Plaintiffs have a substantial likelihood of success because the Fifth Circuit already has held that the CFPB is unconstitutionally structured. In addition, the CFPB is exceeding its statutory authority with respect to the Final Rule. In light of the Supreme Court's forthcoming decision on the CFPB's funding mechanism, this Court may wish to reach Plaintiffs' statutory challenges to the Rule now, or at least structure any preliminary injunction to afford time to review those challenges at a later date. *See Chamber of Com. of the U.S. v. CFPB*, No. 6:22-CV-00381, _ F. Supp. 3d _, 2023 WL 5835951, at *10 (E.D. Tex. Sept. 8, 2023) (granting summary judgment

against CFPB action on Appropriations Clause and statutory claim and explaining that "[t]he court sees fit to reach the latter claim because the Appropriations Clause issue is on review in the Supreme Court"). The Final Rule imposes immediate and irremediable harm on Plaintiffs' members. And granting a preliminary injunction will protect Plaintiffs' members and their customers from volatility, unnecessary costs, and confusion while the Rule's validity is addressed by this Court.

I.    **Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

   A.    **The CFPB promulgated the Final Rule with funds drawn in violation of the Appropriations Clause.**

The Fifth Circuit has ruled that the CFPB's funding structure, which draws funds from the Federal Reserve without congressional appropriation, violates the Appropriations Clause. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 635-42 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023). When a rulemaking is funded through this mechanism, a plaintiff challenging the rule is entitled to have it set aside. *Id.* at 643; *Chamber of Com.*, 2023 WL 5835951, at *10.

The challenged rulemaking appears to have been funded through the same mechanism as the rule at issue in *Community Financial. See* 51 F.4th at 638 n.11 (establishing that the CFPB has no other funding source for promulgating regulations); CFPB, *Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2022*, at 74-76 (Nov. 15, 2022), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_financial-report_fy2022.pdf (making clear that only funds transferred from the Federal Reserve may be used for the CFPB's regulatory operations). Consequently, as others district courts have recently held, Plaintiffs are likely to succeed on the merits of their constitutional claim and are entitled to a preliminary injunction. *See Tex. Bankers Ass'n v. CFPB*, No. 7:23-CV-00144, _ F. Supp. 3d _, 2023 WL 4872398, at *1 (S.D. Tex. July 31, 2023) (preliminarily enjoining defendants from

implementing and enforcing a final rule based on the Appropriations Clause); *Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148, 2023 WL 5983829, at \*1 (E.D. Ky. Sept. 14, 2023) (same); *see also Chamber of Com.*, 2023 WL 5835951, at \*7 (granting "summary judgment for plaintiffs given the binding force of the Fifth Circuit's decision").

### B.    The Final Rule violates the CARD Act, TILA, and the APA.

Under the APA, agency action must be vacated if it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) & (C). The APA further directs that a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." *Id*. § 706(2)(A). Here, the CFPB's Final Rule rests on an unlawful interpretation of the CARD Act. It also has an effective date that violates TILA.

### 1.    The Final Rule violates the CARD Act.

In addition to the constitutional problem of its funding, the CFPB's Final Rule runs aground on its purported statutory authority. "[A]gencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). "[T]he best evidence of Congress's intent is the statutory text." *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). In the CARD Act, Congress authorized issuers to collect a "penalty fee" that is "reasonable and proportional to [an] omission or [a] violation" of the cardholder agreement, and it allowed the CFPB to create a safe harbor for such a "penalty fee." 15 U.S.C. § 1665d. The CFPB's Final Rule is inconsistent with that text in at least three ways.

### a.    The Final Rule misconstrues a "penalty fee" for the "violation of the cardholder agreement."

First, the Final Rule does not allow issuers to collect a reasonable and proportional "penalty fee" for the violation of a cardholder agreement. Although at first blush this standard might seem

malleable, statutory text and context reveal that the CFPB has exceeded its authority. To begin, Congress expressly denominated a late fee a "penalty fee" for a "violation," which is by its plain meaning a fee that deters the violation and accounts for the conduct of the violation; it is not solely compensatory, but is more akin to special damages. *See Tull v. United States*, 481 U.S. 412, 422-23 (1987) (discussing how civil penalties should consider conduct and deterrence); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 947 (D.C. Cir. 1991) ("A fine or penalty, in contrast, is not understood to be dollar-for-dollar recompense. Rather, it is a pecuniary form of punishment for the commission of an act society finds repugnant and seeks to deter."); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (noting that special damages are aimed at deterrence).

Congress's enumeration of statutory criteria for the CFPB confirms that a "penalty fee" is not a "cost fee." In identifying what is relevant to assessing the reasonableness and proportionality of such a fee, Congress specifically listed not only the "cost incurred by the creditor from [an] omission or [a] violation" of the cardholder agreement, but also "deterrence of such omission or violation by the cardholder" and "the conduct of the cardholder." 15 U.S.C. § 1665d(c). "Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *NFIB v. Sebelius*, 567 U.S. at 544.

Indeed, the very same Congress that enacted the CARD Act directed an agency to focus on cost—and cost alone—in determining whether a different fee is reasonable and proportional. The Durbin Amendment provided that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be *reasonable and proportional to the cost incurred by the issuer* with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2) (emphasis added); *see also* 51 U.S.C. § 60125(a) ("The Secretary, pursuant to this

11

subchapter, may license such system if it meets all conditions of this subchapter and (1) the system operator agrees to reimburse the Government in a timely manner for all related costs incurred with respect to such utilization, including a reasonable and proportionate share of fixed, platform, data transmission, and launch costs . . . .") (also enacted by the 111th Congress). In contrast, the same Congress directed the CFPB in the CARD Act to set a standard for credit card late fees that ensures they are "reasonable and proportional to the violation or omission," requiring that the CFPB consider deterrence and cardholder conduct in addition to cost. If Congress had wanted credit card late fees to be tied only to costs, it knew how to say so.

Notably, Congress also considered but declined to enact an earlier version of the CARD Act, which would have authorized late fees "reasonably related *to the cost* to the card issuer of such omission or violation." Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb. Affs., Apr. 29, 2009) (emphasis added) (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related *to the cost to the card issuer* of such omission or violation"). The Supreme Court has rejected efforts by agencies to adopt a position that Congress has previously considered and rejected. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147-48 (2000).

The statutory text and context is thus clear: Congress intended to authorize issuers to collect a "penalty fee" that is reasonable and proportional to the omission or violation. By its nature, such penalty fee must thus deter the violation, account for the conduct of the violation, and compensate the issuer for its costs. That makes sense, as such fees incentivize timely payment and ultimately encourage responsible credit use, which is critical for banks' ability to engage in credit card lending

12

in a safe and sound manner. Indeed, paying at least the minimum payment on a credit card at the time prescribed for doing so is at the core of a cardholder's responsibilities. Issuers would not lend credit if they did not reasonably expect that money to be repaid in accordance with their agreements. Congress too would not have authorized issuers to collect penalty fees for violations of those agreements if they did not agree that such violations were worthy of penalty.

Yet the CFPB's Final Rule does not allow issuers to collect such penalty fees. Instead, the Final Rule would allow only much lower fees to recoup (a subset of) issuers' costs from late payments. Specifically, the CFPB narrowed the cost-analysis standard and lowered the safe harbor to $8 because it believed that amount will "cover pre-charge-off collection costs for Larger Card Issuers on average." Final Rule at 123. This is no accident: the CFPB explicitly stated that its new rule includes a "safe harbor amount set based on costs." *Id.* at 124. As the CFPB put it, "costs are the best guide to what constitutes a 'reasonable and proportional' fee" and, indeed, other factors such as "deterrence and consumer conduct" can only "help corroborate a safe harbor amount set based on costs." *Id.*

The CFPB believed that "the cost factor deserves the most weight of th[e statutory] factors in setting the precise late fee safe harbor amount because it is most closely correlated to the consequences to the issuer of a consumer's late payment," *id.*, but that ignores Congress's express decisions in the statute. Congress authorized card issuers to continue charging "penalty fee[s]" for violations of a cardholder agreement, so long as they were reasonable and proportional to the omission or violation, and Congress instructed the CFPB to consider not just the cost incurred by issuers, but the deterrence of violations and the conduct of the cardholder in setting standards for assessing what is reasonable and proportional. *See* 15 U.S.C. § 1665d(a)-(c). That broader focus is meaningful, because Congress clearly thought the consequences to the issuer were not the only

13

relevant factor in assessing fees; instead, Congress thought that violating a cardholder agreement is conduct that should be deterred and could quite reasonably generate a penalty. The CFPB contends that Congress only expressly required consideration of these factors in rulemaking that is "required" by the CARD Act, not in rulemaking related to a safe harbor, *see* Final Rule at 123, but any bottom-line safe harbor that is "presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates" must be one that is consistent with those factors. Otherwise, the safe harbor would be meaningless and inconsistent with Congress's own understanding of what it means for a "penalty fee" to be "reasonable and proportional to the omission or violation." 15 U.S.C. 1665d(e); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). And that is only more evident here, where the only alternative the CFPB leaves issuers with is a cost-based analysis that does not account for the other "penalty" factors and has never been used by issuers. *Infra* at 16; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, . . . simply disregard rules that are still on the books.").

To be sure, the CFPB did discuss deterrence in setting the new safe harbor: it claimed that lowering the safe harbor would not wholly undermine any deterrent effect of late fees, although it may lower it by an indeterminate amount. *See* Final Rule at 125. But that continues to misconstrue the statute: It is not enough to assert that the promulgated safe harbor has a nonzero deterrent effect. A fee of one dollar, or even one cent, would arguably meet a nonzero deterrence test. The CARD Act expressly authorizes issuers to charge a "penalty fee" that is reasonable and proportional to the violation, which necessarily is one that has a *meaningful* deterrent effect, incentivizing on-time payment and responsible use of credit. The CFPB's contrary reading violates

"one of the most basic interpretive canons, that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009).

A fair reading of the Final Rule suggests that the CFPB simply disagrees with Congress's determination that penalty fees are appropriate for late payments. The CFPB repeatedly recognizes that consumers are already paying late a significant amount of the time, *see* Final Rule at 13, and that "consumers may engage in more late payments when they are less costly to consumers," *id.* at 128. But instead of using that information to craft reasonable and appropriate safe harbor amounts, the CFPB brushes it aside and touts its decision as providing "additional flexibility that a lower late fee will afford" to consumers to pay late. *Id.* at 240. That policy judgment contradicts the one that Congress made in enacting the CARD Act.

The CFPB's flawed statutory interpretation is similarly evident in its treatment of repeated late payments. The statute ties reasonableness and proportionality to the *violation*, not merely to costs. Thus, as the Board and the CFPB have recognized for more than a decade, repeated violations within a six-month period reflect higher-risk cardholder conduct, and a higher "penalty fee" for subsequent late payments is accordingly "reasonable and proportional." Yet the CFPB abandoned the settled approach that a higher penalty fee is appropriate for worse cardholder conduct based on the myopic view that the agency must consider the cost to the issuer above all else. *See* Final Rule at 110.

To the extent the CFPB considered consumer conduct, it did so only with respect to credit risk. *See, e.g.*, Final Rule at 145 ("[I]t is not clear that multiple violations during a relatively short period are associated with increased credit risk and thus reflect a more serious consumer violation."); *id.* at 146 ("[F]or risk management purposes, the industry itself does not appear to

15

consider the consumer's conduct in paying late to be a serious form of consumer conduct until the consumer is 30 or more days late."). But that position finds no footing in the CARD Act. Congress thought that penalty fees could appropriately be charged for violations of the cardholder agreement, regardless of whether those violations were associated with increased credit risk or justified a report to a credit bureau. *See* 15 U.S.C. § 1665d. And with respect to late payments, the reason is obvious: issuers must know when payments will be made in order to manage cash flow and other expectations, even if the cardholder later repays the money in full.

The CFPB's apparent disagreement with Congress is further evidenced in its consideration of the relationship between the safe harbor and the cost-based standard. The CFPB reasoned that, if the safe harbor amount is too low, issuers could rely on the cost-based standard to implement late fees outside of the safe harbor. Indeed, it stated expressly that if a court were to enjoin or vacate its $8 safe harbor, it would seek to treat its repeal of the existing safe harbor amount separately, thus leaving issuers with only the option to use a pared-down version of the cost-based standard to set late fees. *See* Final Rule at 108–09. The problem with that position is that it *still* does not account for the statutory mandate that issuers be allowed to recover "penalty fees" that are reasonable and proportional to the violation, taking into account deterrence, cardholder conduct, and costs. Indeed, the record is clear that the Board adopted the existing cost-based standard *only* because the safe harbor captured some of the statutory criteria that the cost-based analysis did not. *See* 75 Fed. Reg. at 37533. The CFPB cannot turn a blind eye to the interaction of these provisions, especially when the result of its actions is to prohibit issuers from collecting the very fees that the CARD Act protects.

Moreover, the CFPB's expedited timeline makes the alleged option to use the cost-based approach effectively a non-option. By giving issuers 60 days from the date of publication, the

CFPB is all but guaranteeing that issuers will have to at least temporarily transition to the drastically reduced safe harbor, because issuers have insufficient time to perform the necessary cost analyses to justify a higher fee and make any required changes to their disclosures.

That the CFPB exempted what it defined as "Smaller Card Issuers" from the Final Rule only confirms the problems with the rule. The CFPB justified this exemption on the ground that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees," particularly because of the burdens posed by the cost-based standard. Final Rule at 60. While Plaintiffs certainly agree that the CFPB's proposal would have imposed significant and unjustified burdens on smaller issuers, there is little reason to think that a "penalty fee" is reasonable and proportional to the violation of paying late when one obtains one's credit card from an issuer with less than one million open credit card accounts but not when one obtains a credit card from an issuer with more than one million open credit card accounts. Even recognizing that smaller issuers have some differences in their ability to recoup costs due to different economies of scale, the statutory language is keyed to the violation, not solely to costs. And nothing in the CARD Act suggests that the CFPB is authorized to maintain standards for penalty fees that account for all of the penalty factors for one subset of issuers but not for another.

In short, the CFPB has exceeded its statutory authority. In setting rules to ensure that "penalty fees" are reasonable and proportional to the violation of paying late, the CFPB has in fact prohibited issuers from collecting such reasonable and proportional fees. And it has implemented the very policy—allowing fees only to recover costs—that Congress considered and rejected.

### b.      The Final Rule misconstrues "costs."

Second, the CFPB restricted its already blinkered focus on costs to "pre-charge-off collection costs," both in the cost-based standard (that the CFPB purports to merely "clarify") and

in setting the new safe harbor. The CARD Act requires consideration of "the cost incurred by the creditor from such omission or violation" of the cardholder agreement. In 2010, the Board interpreted this phrase to exclude "losses" but to include the "total costs incurred by the card issuer as a result of that type of violation." 12 C.F.R. § 226.52(b)(1)(i). And the Board recognized that "collections generally continue after the account has been charged off" so that "an account that has been charged off is not necessarily a total loss." 75 Fed. Reg. at 37538 n.35. The Board thus permitted issuers to consider as part of their costs "the collection of late payments." *Id.* at 37586. Now, the CFPB says that card issuers may consider only "pre-charge-off collection costs."

There is no basis in the statutory text to distinguish among costs in this way, and the CFPB's rationale—that "post-charge-off collection costs" are "related to mitigating a loss" (Final Rule at 27-28)—makes no sense: these costs arise because of the late payment. Indeed, Congress knew how to direct an agency to distinguish among types of costs, and it did so in Dodd-Frank. *See* 15 U.S.C. § 1693o-2(a)(3)(A), (4)(B)(i)-(ii) (in prescribing regulations establishing standards for "whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction," the Board must "distinguish between (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered . . . ; and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered"). Congress did not similarly task the CFPB with distinguishing between fixed and incremental costs, or any other types of costs, in promulgating its late-fee standard.

The CFPB's claim that this change is a mere "clarification" of the Board's prior regulation digs an even deeper hole for the agency: an agency must acknowledge a departure from a prior

rule, *FCC v. Fox Television Stations, Inc*., 556 U.S. at 515, and interpret its own regulations reasonably, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). It cannot satisfy its APA obligations by sleight of hand. This error infects the entire Rule because it not only permeates the cost-based standard but also reduces the safe harbor.

**2.      The Final Rule violates the statutory requirements on timing.**

Finally, CFPB rules that require new disclosures to consumers "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). The Final Rule contravenes that requirement by setting its effective date 60 days after publication in the Federal Register. The CFPB acknowledges that many issuers will need to change their late fees in response to the Final Rule, and even that they will likewise need to change their disclosures (in applications, card agreements, statements, and customer education materials). *See* Final Rule at 218-19 ("Larger Card Issuers would have 60 days to delete the existing late fee figure in their disclosures and replace it with $8 or another number computed using the cost analysis provisions, and this change would only have to appear on disclosures mailed or delivered to consumers 60 days after publication of this final rule in the *Federal Register*."). Further, by changing the safe harbor late fee amount and not allowing sufficient time for issuers to complete a cost analysis, at least some card issuers will be forced to go to $8 initially and then send an updated change-in-terms with any new late fee amount once a cost calculation can be performed. Those issuers too must update their disclosures, requiring an October 1, 2024, effective date. The Final Rule's effective date is thus unlawful.

None of the CFPB's arguments for excusing itself from its obligations under TILA is persuasive. The CFPB first asserts that changing the amount of the late fee does not alter the general requirements for late fees, so TILA's effective date provision is inapplicable. *See* Final

19

Rule at 220–21. But that simply ignores the plain meaning of this provision of TILA, which requires the Board to give an effective date of the October 1 at least six months after promulgation of *any* regulation of the Bureau "requiring any disclosure which differs from the disclosures previously required." 15 U.S.C. § 1604(d). The statutory context clearly suggests that regulations requiring alteration of the amount of particularly disclosed fees would qualify. *See, e.g.*, 15 U.S.C. § 1602(v) (defining the more specific term "material disclosures" to include specific aspects of disclosures like "the annual percentage rate" and "the amount of the finance charge" and "the number and amount of payments"); *id.* § 1602(aa) ("The disclosure of an amount or percentage which is greater than the amount or percentage required to be disclosed under this subchapter does not in itself constitute a violation of this subchapter."). The CFPB's second argument that card issuers occasionally change disclosure of late fee amounts such as for inflation without waiting until October 1 is even less persuasive, as the October 1 date is not set as a date that *issuers* are required to follow, but rather that the *CFPB* must follow in order to give issuers adequate time to adjust their disclosures. And the CFPB's third argument that the safe harbor is optional ignores its own concession that issuers representing the vast majority of open credit card accounts in this country will be required to adjust their disclosures for such accounts going forward in light of this new rule, whether that is because they adopt the reduced safe harbor amount or choose to conduct a separate cost analysis and impose a different rate. *See* Final Rule at 218-19. Outside of a few narrow circumstances not present here, Congress required agencies to afford issuers at least six months to be able to make such adjustments, and the CFPB lacks the authority to afford less.

## II.    Irreparable Harms to Card Issuers

Card issuers, including many of Plaintiffs' members, will suffer at least six types of irreparable harm if the final rule is allowed to take effect: (1) compliance costs; (2) risk of

enforcement actions; (3) lost late-fee revenue; (4) increased late-payment costs; (5) changed economics of accounts which would never have been issued, or would not have been issued on their particular terms, had issuers been limited to (or had anticipated) an $8 late fee; and (6) loss of customer goodwill. Economic losses are irreparable injuries when they cannot be redressed "in the course of the litigation." *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). Whether a plaintiff could theoretically offset these losses through price increases (which the CARD Act limits for existing balances) is irrelevant. *See id.* at 434 n.41. Here, the federal government's sovereign immunity, among other issues, will prevent Plaintiffs' members from recovering on the economic injuries that they are already suffering and will continue to suffer if the Final Rule is not enjoined. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

### A.    Compliance Costs

"[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)). The CFPB's Final Rule is no exception. Plaintiffs' members will have to (1) update disclosures to cardholders; (2) train staff on the new requirements; and (3) for those who opt to maintain fees above the $8 safe harbor, conduct initial and then annual cost-justification studies. The costs of these requirements will be substantial, and issuers must begin incurring these costs *now*. *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (cleaned up) ("Federal courts have long recognized that, when the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.").

21

First, many card issuers who lower their fees will need to update the fee disclosures provided to cardholders and prospective cardholders. *See* 12 CFR §§ 1026.6(b)(2)(viii), 1026.9(c)(iii)(2); App'x 57, Decl. of Matthew Susser ¶¶ 10, 12. There are hundreds of millions of credit card accounts that will need to have their periodic disclosures updated, and issuers will need to destroy many existing applications and other disclosure documents and reprint them with the updated amounts. *See* App'x 3, Decl. of Bruce Bowman ¶ 10; App'x 7-8, Decl. of Kelly Hall ¶¶ 7, 9; App'x 15, Decl. of Glenn Hamer ¶¶ 9, 11; App'x 21-22, Decl. of Steve Montgomery ¶¶ 7, 9; App'x 29, Decl. of David Pommerehn ¶¶ 8, 10; App'x 36-37, Decl. of Thomas Quaadman ¶¶ 8, 10; App'x 44, Decl. of Baron Schlachter ¶ 10; App'x 49-50, Decl. of Jess Sharp ¶¶ 8, 10; App'x 57, Susser Decl. ¶¶ 10, 12. One large credit card processor informed the CFPB that the new disclosures contemplated by the proposed rule would take approximately 10 months to print and distribute. App'x 61, Letter from Kimberly Ford to CFPB (Aug. 10, 2023) ("Fiserv Letter"). In addition, if a card issuer increases rates or minimum payments to mitigate the effects of its rule, as the CFPB advises, the issuer would be required to send updated disclosures to its current cardholders at least 45 days before implementing the new terms. *See* 12 C.F.R. § 1026.9(c)(iii)(2). For those issuers whose programs are linked to retail partners, changes in terms may be the subject of contractual negotiations, which adds costs to the process. App'x 37, Quaadman Decl. ¶ 10.

Second, card issuers will need to train compliance, customer-service, and other staff on the Final Rule's new requirements. *See* App'x 4, Bowman Decl. ¶ 11; App'x 44-45, Schlachter Decl. ¶ 11; App'x 57, Susser Decl. ¶ 11.

Third, any card issuer who opts to charge a late fee above the new safe harbor will incur the cost of performing an initial and then annual cost-justification study under 12 C.F.R. § 1026.52(b)(1)(i). *See* App'x 4, Bowman Decl. ¶ 15; App'x 38, Quaadman Decl. ¶ 15; App'x 45,

Schlachter Decl. ¶ 15; App'x 52, Sharp Decl. ¶ 16; App'x 56-57, Susser Decl. ¶ 9. These studies are expensive and complex. Indeed, even the CFPB acknowledges that it "did not find evidence of issuers using the cost analysis provision to charge an amount higher than the safe harbor." Final Rule at 11; *see also* 88 Fed. Reg. at 18919 (acknowledging the "administrative burden and complexity of using the cost analysis provisions"). And because the CFPB has not yet provided updated guidance on this process, issuers will likely be forced to adopt the safe harbor in the interim even if they intend to switch to the cost-analysis provision, creating a yo-yo effect that will only confuse consumers and cause issuers to incur unnecessary costs, as well.

### B. Enforcement Actions

The CFPB's rushed effective date will expose members to the risk of enforcement actions. There is a significant risk that it will be impossible to approve and print all of the required physical disclosures in the 60-day timeline set by the CFPB. *See* App'x 10, Hall Decl. ¶ 16; App'x 31, Pommerehn Decl. ¶ 16; App'x 39, Quaadman Decl. ¶ 18; App'x 53, Sharp Decl. ¶ 18.

Indeed, Fiserv, Inc., which processes credit card accounts and provides print capabilities for issuing statements and notices to many issuers, told the CFPB that it would take approximately 10 months for it to source, print, mail merge, and mail printed disclosures. App'x 60-61. Fiserv explained that when a credit card issuer wants to modify its accountholder disclosure information, it typically requests "at least 4 months of advance notice," and if "all issuers will request updated materials to be produced and mailed by their service providers at the same time, the industry that supports this work will be physically unable to meet the demand due to capacity limitations of the printers, paper stock, and the sorting and packaging machines." *Id.* at 62.

C.      **Lost Revenue**

As the CFPB acknowledges, "late fees are by far the most prevalent penalty fees charged by card issuers," and the Final Rule will reduce card issuers' revenues by between $5 and $9 billion, including on accounts that issuers never would have issued had they been limited to an $8 safe harbor. *See* Final Rule at 158, 236-37. Plaintiffs estimate that their members subject to the Final Rule, most of whom are likely to lower their late fees to $8, would lose significant amounts of late-fee revenue. *See* App'x 4, Bowman Decl. ¶ 14; App'x 45, Schlachter Decl. ¶ 14. These losses would only increase over the first year, since the safe-harbor amount would no longer be adjusted for inflation. Even Plaintiffs' members that are not subject to the Final Rule will lose revenue as a result of the downward competitive pressure the Rule will put on their late fees. App'x 24, Montgomery Decl. ¶ 15; App'x 39, Quaadman Decl. ¶ 16; App'x 53, Sharp Decl. ¶ 17.

D.      **Collection Costs**

The Rule also will make consumers more likely to make late payments, as the CFPB acknowledges. An increase in late payments will increase "overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments." App'x 38, Quaadman Decl. ¶ 13.

E.      **Changed Economics for Certain Accounts**

In deciding whether to open new credit card accounts, many issuers factored in the current late fee safe harbor as a means of mitigating the risk of late payments. Some issuers relied heavily upon the safe harbor in making decisions to issue particular accounts. *See* App'x 44, Schlachter Decl. ¶ 9.  Thus, in addition to the lost revenues discussed above, such issuers will be left with accounts with diminished economic value. *See id.*

24

### F.      Loss of Customer Good Will

Finally, issuers face the prospect of losing customer goodwill. *See* App'x 38, Quaadman Decl. ¶ 14. This may happen if issuers are forced to drop their late fees to $8 only to raise them later, either through the cost-analysis provisions or this litigation. Moreover, given the competitive nature of the credit card market, efforts to change other rates or eliminate rewards to recoup lost late-fee revenue will similarly cause unrecoverable losses to goodwill. *See* 88 Fed. Reg. at 18908 ("Survey data suggest that other factors, such as rewards, annual fees, and annual percentage rate(s) (APR), drive credit card usage.").

## III.      Balance of Harms and the Public Interest

The equities favor a stay pending resolution of this case. "[T]he maintenance of the *status quo* is an important consideration in granting a stay." *Wages & White Lion*, 16 F.4th at 1143. The harms to Plaintiffs' members will be substantial, while the harms to the CFPB in delaying the effective date of its rulemaking are negligible. The existing framework has been in place for more than a decade, supported by CFPB directors across administrations, and is well-understood by the American people. It has allowed issuers to give higher-risk customers the opportunity to build their credit by mitigating the risks of doing so. And because the Final Rule would likely lead to more late payments, higher interest rates, constricted access to credit, and other less favorable terms, *see* 88 Fed. Reg. at 18934, the public interest would be served by delaying these effects while the case is decided. In all events, "[t]he public interest is in having governmental agencies abide by the federal laws that govern their existence and operations. And there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion*, 16 F.4th at 1143 (cleaned up).

### CONCLUSION

This Court should preliminarily enjoin the Final Rule during the pendency of this case.

Dated:  March 7, 2024                     Respectfully submitted,


  /s/ Michael Murray
Michael Murray
D.C. Bar No. 1001680
*Application for pro hac vice forthcoming*
michaelmurray@paulhastings.com
Tor Tarantola
D.C. Bar No. 1738602
*Application for pro hac vice forthcoming*
tortarantola@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1730


  /s/ Derek Carson
Philip Vickers
Texas Bar No. 24051699
pvickers@canteyhanger.com
Derek Carson
Texas Bar No. 24085240
dcarson@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800


***Attorneys for Plaintiffs***


Thomas Pinder
D.C. Bar No. 451114
*Application for pro hac vice forthcoming*
tpinder@aba.com
Andrew Doersam
D.C. Bar No. 1779883
*Application for pro hac vice forthcoming*
adoersam@aba.com
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave. NW
Washington, DC 20036


***Attorneys for Plaintiff American Bankers Association***

Jennifer B. Dickey
D.C. Bar No. 1017247
*Application for pro hac vice forthcoming*
Jdickey@uschamber.com
Maria C. Monaghan
D.C. Bar No. 90002227
*Application for pro hac vice forthcoming*
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

***Attorneys for Plaintiff Chamber of
Commerce of the United States of America***

### CERTIFICATE OF SERVICE

I certify that on March 7, 2024, counsel for Plaintiffs notified counsel for Defendants of

the foregoing motion and will provide a courtesy copy upon filing, including an email copy to

Mr. Padis.

  /s/ Derek Carson
Derek Carson

27