**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS,<br><br>              Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>              Defendants. | Case No. 4:24-cv-213 |

**APPENDIX**
**TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

| Document | Page |
|---|---|
| Declaration of Bruce Bowman | App'x 1 |
| Declaration of Kelly Hall | App'x 6 |
| Declaration of Glenn Hamer | App'x 13 |
| Declaration of Steve Montgomery | App'x 20 |
| Declaration of David Pommerehn | App'x 27 |
| Declaration of Thomas Quaadman | App'x 34 |
| Declaration of Baron Schlachter | App'x 42 |
| Declaration of Jess Sharp | App'x 47 |
| Declaration of Matthew Susser | App'x 55 |
| Letter from Kimberly Ford to CFPB | App'x 60 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA; FORT WORTH
CHAMBER OF COMMERCE;
LONGVIEW CHAMBER OF
COMMERCE; AMERICAN
BANKERS ASSOCIATION;
CONSUMER BANKERS
ASSOCIATION; and TEXAS
ASSOCIATION OF BUSINESS

                Plaintiffs,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

                Defendants.

Case No. _____

**DECLARATION OF BRUCE
BOWMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**DECLARATION OF BRUCE BOWMAN**

    I, Bruce Bowman, do hereby declare and state as follows:

    1.    I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

    2.    I am the President of Comenity Capital Bank, which is headquartered at 12921 Vista Station Blvd., Draper, Utah 84020.

    3.    I have held this position since 2022.

1

**App'x 1**

4.      Comenity Capital Bank, as a subsidiary of Bread Financial Holdings, Inc., is a member of the Chamber of Commerce of the United States of America ("U.S. Chamber") and it is also a member of the American Bankers Association.

5.      Comenity Capital Bank issues credit card accounts to consumers across the United States, including consumers residing in the U.S. Northern District of Texas and the Fort Worth Division.  Comenity Capital Bank maintains over 21,000,000 credit card accounts in the United States and has a cumulative accounts receivable balance of over $ 9 billion.

6.      Comenity Capital Bank relies on the safe harbor currently in place under the CFPB's Regulation Z.  This safe harbor provides the bank with valuable compliance certainty and allows it to avoid the significant expense of performing the yearly cost-justification studies that would otherwise be required under Regulation Z.  Comenity Capital Bank currently charges the safe harbor late fee amount of $30 on its credit-card accounts for first delinquencies and the safe harbor late fee amount of $41 on subsequent late payments made within six (6) billing cycles.

7.      I am familiar with the Credit Card Penalty Fees Final Rule ("Final Rule") promulgated by the Consumer Financial Protection Bureau ("CFPB"), which amends Regulation Z.  Credit Card Penalty Fees, Final Rule, available at https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

8.      If not enjoined, the Final Rule will harm Comenity Capital Bank.  An eventual vacatur of the Final Rule would not redress the losses incurred while the Final Rule is in effect. These losses include losses on accounts that would not have been issued if the safe harbor late fee amount were $8 or Comenity Capital Bank knew that it would become $8 at some point after the

**App'x 2**

account was issued.  Losses also include compliance costs, organizational costs, and lost revenue, among other losses.

9.      First are the losses on accounts that never would have been issued.  Amongst other factors, every decision to issue a credit card account includes balancing (i) the likelihood of that particular consumer missing one or more payments against (ii) the fee that Comenity Capital Bank could charge that particular consumer for each delinquency.  All other considerations being equal, the higher the permissible late fee the more accounts that will be issued, and the inverse is also true.  Since the safe harbor was introduced over a decade ago, Comenity Capital Bank has relied on it heavily in deciding which applicants it could underwrite.  Accordingly, over the course of that time, Comenity Capital Bank has issued millions (if not tens of millions) of accounts that it would not have issued "but for" the fact that it relied on being able to charge the safe harbor amount.  Meaning, an amount which has ranged from $25-$30 for first delinquencies and $25-$41 for subsequent ones, substantially above the Final Rule's $8 amount.  If the CFPB's Final Rule is enacted for even a temporary period, every dollar (not just those involving reduced late fee charges) that Comenity Capital Bank loses on those "but for" accounts is lost, forever, and irreparably.  Comenity Capital Bank will not be able to recoup the money from the CFPB or the cardholders, even though Comenity would not have incurred the losses or issued the account in the first place if it had not relied on the CFPB's previously set safe harbor amounts.  On top of that, Comenity Capital Bank is left with the unprofitable accounts with limited ability to offset the corresponding losses given the provisions of the CARD Act.

10.     Secondly, Comenity Capital Bank will incur significant compliance costs from the Final Rule.  For instance, the bank will need to prepare, print, and distribute disclosures reflecting the revised late-fee terms.

**App'x 3**

11.     In addition, Comenity Capital Bank will need to train customer service agents, compliance officers, and other staff on the new regulations.  The bank will bear the cost of developing and presenting new training materials, as well as the expenditure of employee time of both trainers and trainees.

12.     To the extent that it is simply not possible to implement these new systems in the short window before the Final Rule goes into effect, Comenity Capital Bank could face irrecoverable penalties.

13.     The Final Rule is also likely to diminish the deterrent effect of late fees to a significant degree.  The result of this will be more delinquencies and related losses, which cannot be remediated retroactively after recission of the Final Rule, even with a late fee in excess of $8.

14.     If Comenity Capital Bank relies on the Final Rule's safe harbor, it will lose revenue because of the reduction in its late fee by $22 ($30-$8) or $33 ($41-$8), as applicable. Again, these losses are irrecoverable.

15.     If Comenity Capital Bank decides not to rely on the Final Rule's safe harbor, the costs of performing annual cost analyses, as required under Regulation Z, would be substantial. This cost does not include the increased risk of enforcement action and liability that might result if the CFPB or an adjudicatory body disagrees with our analysis and finds our late fee amounts to be too high.

16.     These and other losses will directly result from the Final Rule and will not be recoverable after the Final Rule's requirements go into effect.  In short, Comenity Capital Bank is already suffering, and will continue to suffer, irreparable harm if the Final Rule is not enjoined before its effective date.

**App'x 4**

I declare under penalty of perjury that the foregoing is true and accurate. Executed this

_6_ day of March, 2024, at _Draper_ , _Utah_ .

Bruce Bowman

5

**App'x 5**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS,<br><br>              Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>              Defendants. | Case No. _____<br><br>**DECLARATION OF KELLY HALL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**DECLARATION OF KELLY HALL**

I, Kelly Hall, declare as follows:

1.      I am the President and CEO of the Longview Chamber of Commerce.  In that capacity, I oversee all of the Longview Chamber's operations.  The Longview Chamber serves to enhance economic growth of the Longview trade area by focusing on education, promotion, and development of the business community, and those areas of the community affecting business.

2.      The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB pertaining to "Credit Card Penalty Fees."  Credit Card Penalty Fees, Final Rule,

1

**App'x 6**

available at https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

3.     Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Longview Chamber.  If called as a witness, I could and would testify competently thereto.

## I.      The Longview Chamber's Mission and Members

4.     The Longview Chamber of Commerce is a voluntary organization of business and professional men and women who have joined together for the betterment of business, development of tourism, development of downtown Longview potential, and the overall quality of life in Longview.  The Longview Chamber is pleased to represent and advocate for its members in front of various governmental bodies.

5.     The Longview Chamber has as members multiple institutions that issue credit cards and will be affected by this rule.  The Longview Chamber has a public membership directory available at https://members.longviewchamber.com/directory.

## II.     The Impact of the CFPB's Credit Card Late Fees Rule on Members' Businesses

6.     As President and CEO, I have worked closely with many Longview Chamber members to understand how the Final Rule will affect member businesses and the substantial and irreparable harm that will result from it.

### A.      The CFPB's Final Rule will force members to begin incurring compliance costs almost immediately.

7.     To comply with the Final Rule, members will have to within days begin updating all of the printed disclosure inserts that accompany new credit cards that they issue, as well as all of their periodic printed and electronic disclosures that notify customers of possible late fees. This requires working with their third-party processer, if they have one, to approve new

2

disclosure language, identify and dispose of any pre-printed materials that include inaccurate disclosures, and order new printed materials. These costs will be significant, particularly in light of the more than 500 million credit card accounts in this country.[1]

8.      In addition to those immediate compliance costs, members will also need to train customer service agents, compliance officers, and other staff on the new regulations before those regulations are effective, given the short compliance period under the proposed rule. Such training would be unnecessary and potentially cause confusion if the Final Rule is ultimately enjoined or vacated.

9.      Members will also incur substantial costs if they make any changes to their annual fees or interest rates to compensate for the lost revenue from late fees, as contemplated by the CFPB in the Final Rule. Such changes would likewise require costly changes to their existing printed and electronic disclosures, new printed disclosures to many customers, and, at a minimum, a 45-days' notice period. *See* 12 C.F.R. 1026.9(c)(2).

10.     For sovereign immunity and other reasons, the Longview Chamber's members have no expectation that they could recover these compliance costs from the government if the Final Rule were to be enjoined or vacated. Nor do the Longview Chamber's members have any assurance that they could recover any loss of customer goodwill from changing and conflicting disclosures.

**B.      The CFPB's Final Rule will harm members if allowed to take effect.**

11.     The CFPB itself has acknowledged many of the harms to member issuers that would result if the Final Rule were to go into effect. Most obviously, the Final Rule will

---

[1] Becky Pokora, *Credit Card Statistics and Trends 2023*, Forbes, Mar. 9, 2023, *available at* https://www.forbes.com/advisor/credit-cards/credit-card-statistics/.

**App'x 8**

significantly reduce the revenue that members currently receive from late fees. *See* Final Rule at 140 ("The CFPB estimates that reducing the safe harbor for late fees to $8 for Larger Card Issuers will likely reduce late fee revenue by billions of dollars."); *id.* at 243 (noting that "over the 12 months between September 2021 and August 2022, limiting late fees to $8 could have reduced the late fee revenue of Y-14 issuers with cost data by 72.3 percent, or $4.11 billion"). Moreover, the rule would significantly impair the ability of issuers to recoup the true costs of late payments, including charged-off debt that begins with a cycle of late payments and the post-charge off collection costs associated with the account, from the individuals who are creating those costs. Instead, the rule would effectively require issuers to attempt to recover those costs from customers who pay their credit card bills on time.

12.     The rule will also "make some consumers somewhat more likely to make late payments." *Id.* at 250 (acknowledging that this "could" happen). Additional missed payments will increase overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments. And "an increased number of late payments could result in additional delinquencies and ultimately increase credit losses for Larger Card Issuers." *Id.* at 251.

13.     Although the CFPB thought that "issuers could increase investments in payment reminders or automatic payments," *id.*, such investments would themselves impose costs on the Longview Chamber's members. Moreover, if issuers are forced to "increase minimum payment amounts or adjust credit limits to reduce credit risk associated with consumers who make late payments," *id.*, they may experience a loss of goodwill from customers who carry a balance but do pay on time. Such customers would effectively be paying for the costs that issuers are unable to recoup from those customers who pay late, potentially at an increasing rate.

4

**App'x 9**

14.     If issuers choose to perform their own annual cost analyses rather than rely on the Final Rule's safe harbor, the costs of performing such analyses would be substantial.  That cost does not include the increased risk of enforcement action and liability that might result if the CFPB or an adjudicatory body disagreed with the member's analysis or found its late-fee amounts to be too high.

15.     In addition, members who qualify for the Smaller Card Issuer exemption will be harmed by the market pressure to lower their own late fees to compete with larger issuers, despite the CFPB's acknowledgement that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees."  *Id.* at 60.

**C.     The CFPB's Chosen Effective Date will expose members to enforcement actions.**

16.     The Longview Chamber's issuer members may not all be able to come into compliance with this rule by the effective date.  The timeline for approving, printing, and sending all of the required disclosures is extremely tight.  That is one reason why the Truth In Lending Act requires that new consumer-credit disclosures must have an October 1 effective date that is at least six months after the promulgation of the final rule.  *See* 15 U.S.C. § 1604(d).  It will take members time to review the final rule, identify all the disclosures that need to be updated, review and approve new language, and have those disclosures printed for appropriate distribution as of the effective date.  Even acting with the utmost urgency and good faith, the affected Longview Chamber members may not all be able to comply by the effective date.  Any penalties the Longview Chamber's members incur would be unrecoverable.

**III.    Enjoining CFPB's Final Rule Would Remedy Harms to Members**

17.     Preliminarily enjoining the CFPB's Final Rule before members are forced to begin incurring the substantial costs described above would temporarily remedy their harms.

**App'x 10**

18.     Vacating the CFPB's Final Rule would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to charge a penalty fee that is reasonable and proportional to the violation at issue, consistent with the expressed will of Congress.

**App'x 11**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  6 day of March 2024, at 10:30 am.

Kelly R Hall

President/CEO

**App'x 12**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | |
| | Case No. _____ |
|         Plaintiffs, | **DECLARATION OF GLENN HAMER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
|         Defendants. | |

**DECLARATION OF GLENN HAMER**

I, Glenn Hamer, declare as follows:

    1.    I am the President and CEO of the Texas Association of Business ("TAB"). TAB is a general business association and state chamber of commerce. TAB represents member companies, large and small, to advocate for a policy, legal, and regulatory environment that allows them to thrive in business.

    2.    The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB pertaining to "Credit Card Penalty Fees." Credit Card Penalty Fees, Final Rule,

1

**App'x 13**

available at https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

3.     Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of TAB.  If called as a witness, I could and would testify competently thereto.

**I.     TAB's Mission and Members**

4.     TAB, the state chamber, was established in 1922 by three San Antonio businessmen: G.M. Kneibel, G.G. Geyer, and I.M. McIlhenny.  Since then, TAB has worked alongside businesses and its chamber partners to represent companies of all sizes and sectors, advocating for pro-business policies.

5.     TAB works in a bipartisan manner to vigorously protect Texas' pro-business climate, delivering solutions to the challenges affecting Texas employers and fighting against excessive, burdensome, or unnecessary regulations.

6.     TAB's purpose is to champion the best business climate in the world, unleashing the power of free enterprise to enhance lives for generations.

7.     TAB has as members numerous institutions that issue credit cards, including some of the nation's largest depository institutions and smaller depository institutions.  TAB also has as members retail institutions that offer store-branded credit cards and other consumer financial products.

**II.     The Impact of the CFPB's Credit Card Late Fees Rule on Members' Businesses**

8.     As President and CEO, I have worked closely with many TAB members to understand how the Final Rule will affect member businesses and the substantial and irreparable harm that will result from it.

2

**App'x 14**

**A.    The CFPB's Final Rule will force members to begin incurring compliance costs almost immediately.**

9.    To comply with the Final Rule, members will have to within days begin updating all of the printed disclosure inserts that accompany new credit cards that they issue, as well as all of their periodic printed and electronic disclosures that notify customers of possible late fees. This requires working with their third-party processer, if they have one, to approve new disclosure language, identify and dispose of any pre-printed materials that include inaccurate disclosures, and order new printed materials.  These costs will be significant, particularly in light of the more than 500 million credit card accounts in this country.[1]

10.    In addition to those immediate compliance costs, members will also need to train customer service agents, compliance officers, and other staff on the new regulations before those regulations are effective, given the short compliance period under the proposed rule.  Such training would be unnecessary and potentially cause confusion if the Final Rule is ultimately enjoined or vacated.

11.    Members will also incur substantial costs if they make any changes to their annual fees or interest rates to compensate for the lost revenue from late fees, as contemplated by the CFPB in the Final Rule.  Such changes would likewise require costly changes to their existing printed and electronic disclosures, new printed disclosures to many customers, and, at a minimum, a 45-days' notice period.  *See* 12 C.F.R. 1026.9(c)(2).

12.    For sovereign immunity and other reasons, TAB's members have no expectation that they could recover these compliance costs from the government if the Final Rule were to be

---

[1] Becky Pokora, *Credit Card Statistics and Trends 2023*, Forbes, Mar. 9, 2023, *available at* https://www.forbes.com/advisor/credit-cards/credit-card-statistics/.

**App'x 15**

enjoined or vacated.  Nor do TAB's members have any assurance that they could recover any loss of customer goodwill from changing and conflicting disclosures.

**B.    The CFPB's Final Rule will harm members if allowed to take effect.**

13.    The CFPB itself has acknowledged many of the harms to member issuers that would result if the Final Rule were to go into effect.  Most obviously, the Final Rule will significantly reduce the revenue that members currently receive from late fees.  *See* Final Rule at 140 ("The CFPB estimates that reducing the safe harbor for late fees to $8 for Larger Card Issuers will likely reduce late fee revenue by billions of dollars."); *id.* at 243 (noting that "over the 12 months between September 2021 and August 2022, limiting late fees to $8 could have reduced the late fee revenue of Y-14 issuers with cost data by 72.3 percent, or $4.11 billion").  Moreover, the rule would significantly impair the ability of issuers to recoup the true costs of late payments, including charged-off debt that begins with a cycle of late payments and the post-charge off collection costs associated with the account, from the individuals who are creating those costs.  Instead, the rule would effectively require issuers to attempt to recover those costs from customers who pay their credit card bills on time.

14.    The rule will also "make some consumers somewhat more likely to make late payments."  *Id.* at 250 (acknowledging that this "could" happen).  Additional missed payments will increase overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments.  And "an increased number of late payments could result in additional delinquencies and ultimately increase credit losses for Larger Card Issuers."  *Id.* at 251.

15.    Although the CFPB thought that issuers "could increase investments in payment reminders or automatic payments," *id.*, such investments would themselves impose costs on

4

**App'x 16**

TAB's members.  Moreover, if issuers are forced to "increase minimum payment amounts or adjust credit limits to reduce credit risk associated with consumers who make late payments," *id.*, they may experience a loss of goodwill from customers who carry a balance but do pay on time.  Such customers would effectively be paying for the costs that issuers are unable to recoup from those customers who pay late, potentially at an increasing rate.

16.     If issuers choose to perform their own annual cost analyses rather than rely on the Final Rule's safe harbor, the costs of performing such analyses would be substantial.  That cost does not include the increased risk of enforcement action and liability that might result if the CFPB or an adjudicatory body disagreed with the member's analysis or found its late-fee amounts to be too high.

17.     In addition, members who qualify for the Smaller Card Issuer exemption will be harmed by the market pressure to lower their own late fees to compete with larger issuers, despite the CFPB's acknowledgement that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees."  *Id.* at 60.

18.     Other members, including those in the retail industry, will have to scale back and possibly cease offering some of the credit products on which American customers rely.  For example, retailers may not be able to offer a credit product like deferred interest financing to allow a customer to purchase a new refrigerator when theirs unexpectedly ceases to function.  Such products become less economically viable when the late fees that nudge on-time payments are so watered down.  The loss of such consumer financial products harms both the consumer, who may not be able to make an emergency purchase, and the retailer, who cannot sell the customer that product.  Similarly, members who have co-branded cards may not be able to offer the same rewards and incentives that encourage store loyalty.

5

**App'x 17**

**C.    The CFPB's Chosen Effective Date will expose members to enforcement actions.**

19.    TAB's issuer members may not all be able to come into compliance with this rule by the effective date.  The timeline for approving, printing, and being prepared to send all of the required disclosures is extremely tight. That is one reason why the Truth In Lending Act requires that new consumer-credit disclosures must have an October 1 effective date that is at least six months after the promulgation of the final rule.  *See* 15 U.S.C. § 1604(d).  It will take members time to review the final rule, identify all the disclosures that need to be updated, review and approve new language, and have those disclosures printed for appropriate distribution as of the effective date.  Even acting with the utmost urgency and good faith, the affected TAB members may not all be able to comply by the effective date.  Any penalties TAB's members incur would be unrecoverable.

**III.    Enjoining CFPB's Final Rule Would Remedy Harms to Members**

20.    Preliminarily enjoining the CFPB's Final Rule before members are forced to begin incurring the substantial costs described above would temporarily remedy their harms.

21.    Vacating the CFPB's Final Rule would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to charge a penalty fee that is reasonable and proportional to the violation at issue, consistent with the expressed will of Congress.

**App'x 18**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **6** day of March 2024, at **Austin** , **Texas** .

Glenn Hamer

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | |
| Plaintiffs, | Case No. _____ <br><br> **DECLARATION OF STEVE MONTGOMERY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**DECLARATION OF STEVE MONTGOMERY**

I, Steve Montgomery, declare as follows:

1.      I am the President and CEO of the Fort Worth Chamber of Commerce ("FWC"). In that capacity, I oversee all of FWC's operations.  FWC brings the region together to identify issues, solve problems, and help align resources resulting in a stronger business climate and greater economic prosperity.

2.      The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB pertaining to "Credit Card Penalty Fees."  Credit Card Penalty Fees, Final Rule,

1

**App'x 20**

available at https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

3.      Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of FWC.  If called as a witness, I could and would testify competently thereto.

**I.      FWC's Mission and Members**

4.      FWC's core mission is to cultivate a thriving business climate in the Fort Worth region.  FWC drives efforts to increase opportunity, talent, connectivity, and resources to help businesses compete in the local and global marketplace.

5.      Fort Worth is home to a growing financial services industry, which supports over 20,000 jobs and has increased the presence of corporate credit and consumer finance.  FWC has as members multiple institutions that issue credit cards and will be affected by this rule.  Our public membership directory is located on our website at https://business.fortworthchamber.com/list.

**II.      The Impact of the CFPB's Credit Card Late Fees Rule on Members' Businesses**

6.      As President and CEO, I have worked closely with many FWC members to understand how the Final Rule will affect member businesses and the substantial and irreparable harm that will result from it.

**A.      The CFPB's Final Rule will force members to begin incurring compliance costs almost immediately.**

7.      To comply with the Final Rule, members will have to within days begin updating all of the printed disclosure inserts that accompany new credit cards that they issue, as well as all of their periodic printed and electronic disclosures that notify customers of possible late fees. This requires working with their third-party processer, if they have one, to approve new

2

**App'x 21**

disclosure language, identify and dispose of any pre-printed materials that include inaccurate disclosures, and order new printed materials.  These costs will be significant, particularly in light of the more than 500 million credit card accounts in this country.[1]

8.    In addition to those immediate compliance costs, members will also need to train customer service agents, compliance officers, and other staff on the new regulations before those regulations are effective, given the short compliance period under the proposed rule.  Such training would be unnecessary and potentially cause confusion if the Final Rule is ultimately enjoined or vacated.

9.    Members will also incur substantial costs if they make any changes to their annual fees or interest rates to compensate for the lost revenue from late fees, as contemplated by the CFPB in the Final Rule.  Such changes would likewise require costly changes to their existing printed and electronic disclosures, new printed disclosures to many customers, and, at a minimum, a 45-days' notice period.  *See* 12 C.F.R. 1026.9(c)(2).

10.    For sovereign immunity and other reasons, FWC's members have no expectation that they could recover these compliance costs from the government if the Final Rule were to be enjoined or vacated.  Nor do FWC's members have any assurance that they could recover any loss of customer goodwill from changing and conflicting disclosures.

**B.    The CFPB's Final Rule will harm members if allowed to take effect.**

11.    The CFPB itself has acknowledged many of the harms to member issuers that would result if the Final Rule were to go into effect.  Most obviously, the Final Rule will significantly reduce the revenue that members currently receive from late fees.  *See* Final Rule at

---

[1] Becky Pokora, *Credit Card Statistics and Trends 2023*, Forbes, Mar. 9, 2023, *available at* https://www.forbes.com/advisor/credit-cards/credit-card-statistics/.

**App'x 22**

140 ("The CFPB estimates that reducing the safe harbor for late fees to $8 for Larger Card Issuers will likely reduce late fee revenue by billions of dollars."); *id.* at 243 (noting that "over the 12 months between September 2021 and August 2022, limiting late fees to $8 could have reduced the late fee revenue of Y-14 issuers with cost data by 72.3 percent, or $4.11 billion"). Moreover, the rule would significantly impair the ability of issuers to recoup the true costs of late payments, including charged-off debt that begins with a cycle of late payments and the post-charge off collection costs associated with the account, from the individuals who are creating those costs. Instead, the rule would effectively require issuers to attempt to recover those costs from customers who pay their credit card bills on time.

12.     The rule will also "make some consumers somewhat more likely to make late payments." *Id.* at 250 (acknowledging that this "could" happen). Additional missed payments will increase overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments. And "an increased number of late payments could result in additional delinquencies and ultimately increase credit losses for Larger Card Issuers." *Id.* at 251.

13.     Although the CFPB thought that issuers "could increase investments in payment reminders or automatic payments," *id.*, such investments would themselves impose costs on FWC's members. Moreover, if issuers are forced to "increase minimum payment amounts or adjust credit limits to reduce credit risk associated with consumers who make late payments," *id.*, they may experience a loss of goodwill from customers who carry a balance but do pay on time. Such customers would effectively be paying for the costs that issuers are unable to recoup from those customers who pay late, potentially at an increasing rate.

4

**App'x 23**

14.     If issuers choose to perform their own annual cost analyses rather than rely on the Final Rule's safe harbor, the costs of performing such analyses would be substantial.  That cost does not include the increased risk of enforcement action and liability that might result if the CFPB or an adjudicatory body disagreed with the member's analysis or found its late-fee amounts to be too high.

15.     In addition, members who qualify for the Smaller Card Issuer exemption will be harmed by the market pressure to lower their own late fees to compete with larger issuers, despite the CFPB's acknowledgement that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees." *Id.* at 60.

**C.     The CFPB's Chosen Effective Date will expose members to enforcement actions.**

16.     FWC's issuer members may not all be able to come into compliance with this rule by the effective date.  The timeline for approving, printing, and being prepared to send all of the required disclosures is extremely tight.  That is one reason why the Truth In Lending Act requires that new consumer-credit disclosures must have an October 1 effective date that is at least six months after the promulgation of the final rule. *See* 15 U.S.C. § 1604(d).  It will take members time to review the final rule, identify all the disclosures that need to be updated, review and approve new language, and have those disclosures printed for appropriate distribution as of the effective date.  Even acting with the utmost urgency and good faith, the affected FWC members may not all be able to comply by the effective date.  Any penalties FWC's members incur would be unrecoverable.

**III.    Enjoining CFPB's Final Rule Would Remedy Harms to Members**

17.     Preliminarily enjoining the CFPB's Final Rule before members are forced to begin incurring the substantial costs described above would temporarily remedy their harms.

**App'x 24**

18.     Vacating the CFPB's Final Rule would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to charge a penalty fee that is reasonable and proportional to the violation at issue, consistent with the expressed will of Congress.

**App'x 25**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of March 2024, at _Fort Worth_ , _Texas_ .

_____

Steve Montgomery

**App'x 26**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | Case No. _____ |
| Plaintiffs, | **DECLARATION OF DAVID POMMEREHN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**DECLARATION OF DAVID POMMEREHN**

I, David Pommerehn, declare as follows:

1.      I am the General Counsel of the Consumer Bankers Association ("CBA"), the only national trade association that focuses exclusively on retail banking.  In that role, I lead regulatory policy and act as lead legal officer for CBA and our membership.

2.      CBA is a leading voice in the banking industry and Washington.  It represents over 70 banks, which hold a combined $15.1 trillion in assets, as well as premier suppliers and providers of bank goods and services.  On behalf of its members and their customers, CBA

1

regularly advocates before Congress and regulatory agencies for policies that will create a stronger industry and economy.

3.      The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB pertaining to "Credit Card Penalty Fees."  Credit Card Penalty Fees, Final Rule, available at https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

4.      Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of CBA.  If called as a witness, I could and would testify competently thereto.

**I.      CBA's Mission and Members**

5.      Founded in 1919, CBA is the trade association for today's leaders in retail banking—banking services geared toward consumers and small businesses.  The nation's largest financial institutions, as well as many regional and online banks, are CBA corporate members, collectively holding well over half of the industry's total assets.  Most of CBA's corporate members issue credit cards.

6.      An important part of CBA's mission is to promote sound policy in the consumer and small business banking sector.  CBA supports modern regulations that allow retail banks to offer products and services to more consumers in ways that meet their unique needs.  To achieve these ends, CBA regularly advocates before Congress and regulatory agencies, including the CFPB.  CBA also participates in litigation involving issues that are important to its members.

**II.      The Impact of the CFPB's Credit Card Late Fees Rule on CBA Members**

2

**App'x 28**

7.     As General Counsel, I have worked closely with many CBA members to understand how the Final Rule will affect members and the substantial and irreparable harm that will result from it.

### A.     The CFPB's Final Rule will force members to begin incurring compliance costs almost immediately.

8.     To comply with the Final Rule, members will have to within days begin updating all of the printed disclosure inserts that accompany new credit cards that they issue, as well as all of their periodic printed and electronic disclosures that notify customers of possible late fees. This requires working with their third-party processer, if they have one, to approve new disclosure language, identify and dispose of any pre-printed materials that include inaccurate disclosures, and order new printed materials.  These costs will be significant, particularly in light of the more than 500 million credit card accounts in this country.[1]

9.     In addition to those immediate compliance costs, members will also need to train customer service agents, compliance officers, and other staff on the new regulations before those regulations are effective, given the short compliance period under the proposed rule.  Such training would be unnecessary and potentially cause confusion if the Final Rule is ultimately enjoined or vacated.

10.     Members will also incur substantial costs if they make any changes to their annual fees or interest rates to compensate for the lost revenue from late fees, as contemplated by the CFPB in the Final Rule.  Such changes would likewise require costly changes to their existing printed and electronic disclosures, new printed disclosures to many customers, and, at a minimum, a 45-days' notice period.  *See* 12 C.F.R. 1026.9(c)(2).

---

[1] Becky Pokora, *Credit Card Statistics and Trends 2023*, Forbes, Mar. 9, 2023, *available at* https://www.forbes.com/advisor/credit-cards/credit-card-statistics/.

App'x 29

11.     For sovereign immunity and other reasons, CBA's members have no expectation that they could recover these compliance costs from the government if the Final Rule were to be enjoined or vacated.  Nor do CBA's members have any assurance that they could recover any loss of customer goodwill from changing and conflicting disclosures.

**B.     The CFPB's Final Rule will harm members if allowed to take effect.**

12.     The CFPB itself has acknowledged many of the harms to member issuers that would result if the Final Rule were to go into effect.  Most obviously, the Final Rule will significantly reduce the revenue that members currently receive from late fees.  *See* Final Rule at 140 ("The CFPB estimates that reducing the safe harbor for late fees to $8 for Larger Card Issuers will likely reduce late fee revenue by billions of dollars."); *id.* at 243 (noting that "over the 12 months between September 2021 and August 2022, limiting late fees to $8 could have reduced the late fee revenue of Y-14 issuers with cost data by 72.3 percent, or $4.11 billion").  Moreover, the rule would significantly impair the ability of issuers to recoup the true costs of late payments, including charged-off debt that begins with a cycle of late payments and the post-charge off collection costs associated with the account, from the individuals who are creating those costs.  Instead, the rule would effectively require issuers to attempt to recover those costs from customers who pay their credit card bills on time.

13.     The rule will also "make some consumers somewhat more likely to make late payments."  *Id.* at 250 (acknowledging that this "could" happen).  Additional missed payments will increase overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments.  And "an increased number of late payments could result in additional delinquencies and ultimately increase credit losses for Larger Card Issuers."  *Id.* at 251.

4

**App'x 30**

14.     Although the CFPB thought that issuers "could increase investments in payment reminders or automatic payments," *id.*, such investments would themselves impose costs on CBA's members.  Moreover, if issuers are forced to "increase minimum payment amounts or adjust credit limits to reduce credit risk associated with consumers who make late payments," *id.*, they may experience a loss of goodwill from customers who carry a balance but do pay on time.  Such customers would effectively be paying for the costs that issuers are unable to recoup from those customers who pay late, potentially at an increasing rate.

15.     If issuers choose to perform their own annual cost analyses rather than rely on the Final Rule's safe harbor, the costs of performing such analyses would be substantial.  That cost does not include the increased risk of enforcement action and liability that might result if the CFPB or an adjudicatory body disagreed with the member's analysis or found its late-fee amounts to be too high.

**C.     The CFPB's Chosen Effective Date will expose members to enforcement actions.**

16.     CBA's issuer members may not all be able to come into compliance with this rule by the effective date.  The timeline for approving, printing, and being prepared to send all of the required disclosures is extremely tight.  That is one reason why the Truth In Lending Act requires that new consumer-credit disclosures must have an October 1 effective date that is at least six months after the promulgation of the final rule.  *See* 15 U.S.C. § 1604(d).  It will take members time to review the final rule, identify all the disclosures that need to be updated, review and approve new language, and have those disclosures printed for appropriate distribution as of the effective date.  Even acting with the utmost urgency and good faith, the affected CBA members may not all be able to comply by the effective date.  Any penalties CBA's members incur would be unrecoverable.

5

**App'x 31**

### III.   Enjoining CFPB's Final Rule Would Remedy Harms to Members

17.   Preliminarily enjoining the CFPB's Final Rule before members are forced to begin incurring the substantial costs described above would temporarily remedy their harms.

18.   Vacating the CFPB's Final Rule would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to charge a penalty fee that is reasonable and proportional to the violation at issue, consistent with the expressed will of Congress.

**App'x 32**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of March, 2024, at Washington, D.C.

David Pommerehn
SVP, General Counsel
Consumer Bankers Association

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | |
| Plaintiffs, | Case No. _____ |
| | **DECLARATION OF THOMAS QUAADMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**DECLARATION OF THOMAS QUAADMAN**

I, Thomas Quaadman, declare as follows:

1.  I am the Executive Vice President of the Center for Capital Markets

Competitiveness ("CCMC") for the Chamber of Commerce of the United States of America.  In

that capacity, I oversee all of CCMC's operations.  CCMC works to advance America's global

leadership in capital formation by supporting diverse capital markets that are the most fair,

transparent, efficient, and innovative in the world.  CCMC advocates on behalf of American

businesses to ensure that legislation and regulation strengthen our capital markets, thus allowing

businesses—from the local flower shop to a multinational manufacturer—to mitigate risks,

1

**App'x 34**

manage liquidity, access credit, and raise capital.  I headed the Chamber's efforts on the Dodd-Frank Wall Street Reform and Consumer Protection Act, and I direct the Chamber's work on corporate governance.  I supervise the development of the Chamber's CFPB and consumer finance policy views.  I have also testified on several occasions before congressional committees on issues covering capital formation, financial reporting, and corporate governance.

2.      The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB pertaining to "Credit Card Penalty Fees."  Credit Card Penalty Fees, Final Rule, available at https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

3.      Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Chamber.  If called as a witness, I could and would testify competently thereto.

**I.      The Chamber's Mission and Members**

4.      The Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than 3 million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the country.

5.      The Chamber has as members numerous institutions that issue credit cards, including some of the nation's largest depository institutions and smaller depository institutions.  The Chamber also has as members numerous retail institutions that offer store-branded credit cards and other consumer financial products.

6.      The Chamber's mission is to advocate for policies that help businesses grow and create jobs in their communities.  As part of advancing that mission, the Chamber seeks to

2

advance America's global leadership in capital formation by supporting diverse capital markets that are the most fair, transparent, efficient, and innovative in the world.  Among other things, the Chamber seeks to ensure that businesses have access to diverse financial service providers and products helping to meet their credit, investment, risk management, and liquidity needs; works to enhance Americans' access to investment options and advice while ensuring strong protections are in place; and advocates for consumer protection and expanded access to responsible consumer financial products.  An important function of the Chamber is to represent the interests of its members before Congress, the Executive Branch, and the courts.

## II.     The Impact of the CFPB's Credit Card Late Fees Rule on Members' Businesses

7.      As Executive Vice President of CCMC, I have worked closely with many Chamber members to understand how the Final Rule will affect member businesses and the substantial and irreparable harm that will result from it.

### A.     The CFPB's Final Rule will force members to begin incurring compliance costs almost immediately.

8.      To comply with the Final Rule, members will have to within days begin updating all of the printed disclosure inserts that accompany new credit cards that they issue, as well as all of their periodic printed and electronic disclosures that notify customers of possible late fees. This requires working with their third-party processer, if they have one, to approve new disclosure language, identify and dispose of any pre-printed materials that include inaccurate disclosures, and order new printed materials.  These costs will be significant, particularly in light of the more than 500 million credit card accounts in this country.[1]

---

[1] Becky Pokora, *Credit Card Statistics and Trends 2023*, Forbes, Mar. 9, 2023, *available at* https://www.forbes.com/advisor/credit-cards/credit-card-statistics/.

**App'x 36**

9.      In addition to those immediate compliance costs, members will also need to train customer service agents, compliance officers, and other staff on the new regulations before those regulations are effective, given the short compliance period under the proposed rule.  Such training would be unnecessary and potentially cause confusion if the Final Rule is ultimately enjoined or vacated.

10.      Members will also incur substantial costs if they make any changes to their annual fees or interest rates to compensate for the lost revenue from late fees, as contemplated by the CFPB in the Final Rule.  Such changes would likewise require costly changes to their existing printed and electronic disclosures, new printed disclosures to many customers, and, at a minimum, a 45-days' notice period.  *See* 12 C.F.R. 1026.9(c)(2).  And for members who offer co-branded cards, changes in terms may be subject to contractual negotiations with retail partners, which will add complexity and time to the process.

11.      For sovereign immunity and other reasons, the Chamber's members have no expectation that they could recover these compliance costs from the government if the Final Rule were to be enjoined or vacated.  Nor do the Chamber's members have any assurance that they could recover any loss of customer goodwill from changing and conflicting disclosures.

**B.      The CFPB's Final Rule will harm members if allowed to take effect.**

12.      The CFPB itself has acknowledged many of the harms to member issuers that would result if the Final Rule were to go into effect.  Most obviously, the Final Rule will significantly reduce the revenue that members currently receive from late fees.  *See* Final Rule at 140 ("The CFPB estimates that reducing the safe harbor for late fees to $8 for Larger Card Issuers will likely reduce late fee revenue by billions of dollars."); *id.* at 243 (noting that "over the 12 months between September 2021 and August 2022, limiting late fees to $8 could have

**App'x 37**

reduced the late fee revenue of Y-14 issuers with cost data by 72.3 percent, or $4.11 billion"). Moreover, the rule would significantly impair the ability of issuers to recoup the true costs of late payments, including charged-off debt that begins with a cycle of late payments and the post-charge off collection costs associated with the account, from the individuals who are creating those costs.  Instead, the rule would effectively require issuers to attempt to recover those costs from customers who pay their credit card bills on time.

13.     The rule will also "make some consumers somewhat more likely to make late payments."  *Id.* at 250 (acknowledging that this "could" happen).  Additional missed payments will increase overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments.  And "an increased number of late payments could result in additional delinquencies and ultimately increase credit losses for Larger Card Issuers."  *Id.* at 251.

14.     Although the CFPB thought that issuers "could increase investments in payment reminders or automatic payments," *id.*, such investments would themselves impose costs on the Chamber's members.  Moreover, if issuers are forced to "increase minimum payment amounts or adjust credit limits to reduce credit risk associated with consumers who make late payments," *id.*, they may experience a loss of goodwill from customers who carry a balance but do pay on time. Such customers would effectively be paying for the costs that issuers are unable to recoup from those customers who pay late, potentially at an increasing rate.

15.     If issuers choose to perform their own annual cost analyses rather than rely on the Final Rule's safe harbor, the costs of performing such analyses would be substantial.  That cost does not include the increased risk of enforcement action and liability that might result if the

**App'x 38**

CFPB or an adjudicatory body disagreed with the member's analysis or found its late-fee amounts to be too high.

16.     In addition, members who qualify for the Smaller Card Issuer exemption will be harmed by the market pressure to lower their own late fees to compete with larger issuers, despite the CFPB's acknowledgement that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees." *Id.* at 60.

17.     Other members, including those in the retail industry, will have to scale back and possibly cease offering some of the credit products on which American customers rely.  For example, retailers may not be able to offer a credit product like deferred interest financing to allow a customer to purchase a new refrigerator when theirs unexpectedly ceases to function.  Such products become less economically viable when the late fees that nudge on-time payments are so watered down.  The loss of such consumer financial products harms both the consumer, who may not be able to make an emergency purchase, and the retailer, who cannot sell the customer that product.  Similarly, members who have co-branded cards may not be able to offer the same rewards and incentives that encourage store loyalty.

**C.      The CFPB's Chosen Effective Date will expose members to enforcement actions.**

18.     The Chamber's issuer members may not all be able to come into compliance with this rule by the effective date.  The timeline for approving, printing, and being prepared to send all of the required disclosures is extremely tight.  As one company providing output printing services to many credit issuers informed the CFPB during the comment period, "when a credit issuing client wants to modify its account holder disclosure information, [the company] requests our card issuer clients to provide at least 4 months of advance notice to ensure there is an appropriate amount of time to source the materials for the printing of the notice, print the notice,

mail merge the notice, and finally send it to the consumer."  Comment submitted by Kimberly Ford, CFPB-2023-0010-116791.  The company estimated that "the industry needs 10 months to comply with this portion of the final rule."  *Id.* at 2.  That is one reason why the Truth In Lending Act requires that new consumer-credit disclosures must have an October 1 effective date that is at least six months after the promulgation of the final rule.  *See* 15 U.S.C. § 1604(d).  It will take members time to review the final rule, identify all the disclosures that need to be updated, review and approve new language, and have those disclosures printed for appropriate distribution as of the effective date.  Even acting with the utmost urgency and good faith, the affected Chamber members may not all be able to comply by the effective date.  Any penalties the Chamber's members incur would be unrecoverable.

**III.    Enjoining CFPB's Final Rule Would Remedy Harms to Members**

19.    Preliminarily enjoining the CFPB's Final Rule before members are forced to begin incurring the substantial costs described above would temporarily remedy their harms.

20.    Vacating the CFPB's Final Rule would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to charge a penalty fee that is reasonable and proportional to the violation at issue, consistent with the expressed will of Congress.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this _01_ day of March, 2024, at Washington, D.C.

Thomas Quaadman

8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA; FORT WORTH
CHAMBER OF COMMERCE;
LONGVIEW CHAMBER OF
COMMERCE; AMERICAN
BANKERS ASSOCIATION;
CONSUMER BANKERS
ASSOCIATION; and TEXAS
ASSOCIATION OF BUSINESS,

          Plaintiffs,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

          Defendants.

Case No. _____

**DECLARATION OF BARON
SCHLACHTER IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**DECLARATION OF BARON SCHLACHTER**

I, Baron Schlachter, do hereby declare and state as follows:

1.     I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.     I am the President of Comenity Bank, which is headquartered at 1 Righter Parkway Suite 100, Wilmington, Delaware 19803

3.     I have held this position since 2021.

1

<strong>App'x 42</strong>

4.      Comenity Bank, as a subsidiary of Bread Financial Holdings Inc., is a member of the Chamber of Commerce of the United States of America ("U.S. Chamber") and is also a member of the American Bankers Association.

5.      Comenity Bank issues credit card accounts to consumers across the United States, including consumers residing in the U.S. Northern District of Texas and the Fort Worth Division. Comenity Bank maintains over 24,000,000 credit card accounts in the United States and has a cumulative accounts receivable balance of over $ 7 billion.

6.      Comenity Bank relies on the safe harbor currently in place under the CFPB's Regulation Z. This safe harbor provides the bank with valuable compliance certainty and allows it to avoid the significant expense of performing the yearly cost-justification studies that would otherwise be required under Regulation Z. Comenity Bank currently charges the safe harbor late fee amount of $30 on its credit-card accounts for first delinquencies and the safe harbor late fee amount of $41 on subsequent late payments made within six (6) billing cycles.

7.      I am familiar with the Credit Card Penalty Fees Final Rule ("Final Rule") promulgated by the Consumer Financial Protection Bureau ("CFPB"), which amends Regulation Z.   Credit   Card   Penalty   Fees,   Final   Rule,   available   at https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

8.      If not enjoined, the Final Rule will harm Comenity Bank. An eventual vacatur of the Final Rule would not redress the losses incurred while the Final Rule is in effect. These losses include losses on accounts that would not have been issued if the safe harbor late fee amount were $8 or Comenity Bank knew that it would become $8 at some point after the account was issued. Losses also include compliance costs, organizational costs, and lost revenue, among other losses.

**App'x 43**

9.      First are the losses on accounts that never would have been issued.  Amongst other factors, every decision to issue a credit card account includes balancing (i) the likelihood of that particular consumer missing one or more payments against (ii) the fee that Comenity could charge that particular consumer for each delinquency.  All other considerations being equal, the higher the permissible late fee the more accounts that will be issued, and the inverse is also true.  Since the safe harbor was introduced over a decade ago, Comenity Bank has relied on it heavily in deciding which applicants it could underwrite.  Accordingly, over the course of that time, Comenity Bank has issued millions (if not tens of millions) of accounts that it would not have issued "but for" the fact that it relied on being able to charge the safe harbor amount.  Meaning, an amount which has ranged from $25-$30 for first delinquencies and $25-$41 for subsequent ones, substantially above the Final Rule's $8 amount.  If the CFPB's Final Rule is enacted for even a temporary period, every dollar (not just those involving reduced late fee charges) that Comenity loses on those "but for" accounts is lost, forever, and irreparably.  Comenity will not be able to recoup the money from the CFPB or the cardholders, even though Comenity would not have incurred the losses or issued the account in the first place if it had not relied on the CFPB's previously set safe harbor amounts.  On top of that, Comenity is left with the unprofitable accounts with limited ability to offset the corresponding losses given the provisions of the CARD Act.

10.     Secondly, Comenity Bank will incur significant compliance costs from the Final Rule.  For instance, the bank will need to prepare, print, and distribute disclosures reflecting the revised late-fee terms.

11.     In addition, Comenity Bank will need to train customer service agents, compliance officers, and other staff on the new regulations.  The bank will bear the cost of developing and

presenting new training materials, as well as the expenditure of employee time of both trainers and trainees.

12.     To the extent that it is simply not possible to implement these new systems in the short window before the Final Rule goes into effect, Comenity Bank could face irrecoverable penalties.

13.     The Final Rule is also likely to diminish the deterrent effect of late fees to a significant degree.  The result of this will be more delinquencies and related losses, which cannot be remediated retroactively after recision of the Final Rule, even with a late fee in excess of $8.

14.     If Comenity Bank relies on the Final Rule's safe harbor, it will lose revenue because of the reduction in its late fee by $22 ($30-$8) or $33 ($41-$8), as applicable. Again, these losses are irrecoverable.

15.     If Comenity Bank decides not to rely on the Final Rule's safe harbor, the costs of performing annual cost analyses, as required under Regulation Z, would be substantial.  This cost does not include the increased risk of enforcement action and liability that might result if the CFPB or an adjudicatory body disagrees with our analysis and finds our late fee amounts to be too high.

16.     These and other losses will directly result from the Final Rule and will not be recoverable after the Final Rule's requirements go into effect.  In short, Comenity Bank is already suffering, and will continue to suffer, irreparable harm if the Final Rule is not enjoined before its effective date.

I declare under penalty of perjury that the foregoing is true and accurate. Executed this 5ᵗʰ day of March, 2024, at _Wilmington, Delaware_.

Baron Schlachter

**App'x 46**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | Case No. _____ <br><br> **DECLARATION OF JESS SHARP IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**DECLARATION OF JESS SHARP**

I, Jess Sharp, declare as follows:

1.    I am an Executive Vice President (EVP) of the American Bankers Association (ABA). In that capacity, I lead our Advocacy & Innovation group, which works closely with banks of all sizes on a range of domestic policy and economic issues, including payments.

2.    ABA is a national trade association for the American banking industry. ABA represents banks of all sizes and charters and is the voice for the nation's $23.7 trillion banking industry. ABA's members collectively employ more than 2 million people and protect nearly $20 trillion in deposits. ABA advocates for banks before Congress, regulatory agencies, and the

1

**App'x 47**

courts to drive pro-growth policies that help customers, clients, and communities thrive. ABA regularly advocates before the Consumer Financial Protection Bureau (CFPB) to promote regulatory policies that protect consumers while ensuring that markets for consumer financial products and services are fair and transparent and encourage innovation and competition to support economic growth. *See, e.g.*, American Bankers Association et al., Comment Letter to CFPB (May 3, 2023), *available at* https://www.regulations.gov/comment/CFPB-2023-0010-0192.

3.      The purpose of this declaration is to discuss the effects of a new rule announced by the CFPB pertaining to "Credit Card Penalty Fees." Credit Card Penalty Fees, Final Rule, *available at* https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf.

4.      Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of ABA. If called as a witness, I could and would testify competently thereto.

I.      **ABA's Mission and Members**

5.      ABA represents Federal Deposit Insurance Corporation (FDIC) insured banks and trust companies of all sizes and types, including banks that operate internationally. Many of ABA's members issue credit cards.

6.      A core part of ABA's mission is to support common sense policies that allow banks of all sizes to better serve their customers and communities. ABA supports private initiatives and government policies that expand banks' collective ability to meet unmet needs, invest in untapped potential, and support the financial well-being of every American household. To carry out this mission, ABA regularly advocates before Congress and regulatory agencies.

2

App'x 48

ABA also participates in litigation against the government to defend the legal and economic rights of its members.

**II.    The Impact of the CFPB's Credit Card Late Fees Rule on ABA Members**

7.      As the EVP responsible for the Advocacy and Innovation group, I have worked closely with many ABA members to understand how the Final Rule will affect members and the substantial and irreparable harm that will result from it.

**A.    The CFPB's Final Rule will force members to begin incurring compliance costs almost immediately.**

8.      To comply with the Final Rule, members will have to, within days, begin updating all of the printed disclosure inserts that accompany new credit cards that they issue, as well as all of their periodic printed and electronic disclosures that notify customers of changes to the terms governing their credit card account late fees.  This requires working with their third-party processer, if they have one, to approve new disclosure language, identify and dispose of any pre-printed materials that include inaccurate disclosures, and order new printed materials.  This is a substantial burden: the drafting, printing, and mailing of disclosures is an extensive, costly, and deliberative process that requires the coordination of parties across multiple departments.  These harms are particularly significant in light of the more than 500 million credit card accounts in this country.[1]

9.      In addition to these immediate compliance costs, members will also need to incur operational costs to, among other things, manage strategy teams and outside agency expenses and train customer service agents, compliance officers, and other staff on the new regulations before those regulations are effective, given the short compliance period under the Final Rule.

---

[1] Becky Pokora, *Credit Card Statistics and Trends 2023*, Forbes, Mar. 9, 2023, *available at* https://www.forbes.com/advisor/credit-cards/credit-card-statistics/.

3

Any such training would be unnecessary and potentially cause confusion if the Final Rule is ultimately enjoined or vacated.

10.     Members will also incur substantial costs if they make any changes to their annual fees or interest rates to compensate for the lost revenue from late fees, as contemplated by the CFPB in the Final Rule.  These changes will likely be necessary for issuers to cover operational costs, as each delinquent account costs issuers approximately $38.30 more than the safe-harbor cap—$46.30 total—in costs that must be recovered through other means or ultimately absorbed by the issuer.  Such changes would likewise require costly changes to their existing printed and electronic disclosures, new printed disclosures to many customers, and, at a minimum, a 45-days' notice period. *See* 12 C.F.R. § 1026.9(c)(2).  These costs are substantial and unrecoverable.

11.     For sovereign immunity and other reasons, ABA's members have no expectation that they could recover these compliance costs from the government if the Final Rule were to be enjoined or vacated.  Nor do ABA's members have any assurance that they could recover any loss of customer goodwill from changing and conflicting disclosures.

12.     Based on their particular businesses and product lines, the impact of the Final Rule on ABA members will result in increased operational costs.  These are unrecoverable business expenses that ABA's members would not have incurred but for the Final Rule.

**B.      The CFPB's Final Rule will harm members if allowed to take effect.**

13.     The CFPB itself has acknowledged many of the harms to member issuers that would result if the Final Rule were to go into effect.  Most obviously, the Final Rule will significantly reduce the revenue that members currently receive from late fees. *See* Final Rule at 140 ("The CFPB estimates that reducing the safe harbor for late fees to $8 for Larger Card Issuers will likely reduce late fee revenue by billions of dollars."); *id.* at 243 (noting that "over

4

the 12 months between September 2021 and August 2022, limiting late fees to $8 could have reduced the late fee revenue of Y-14 issuers with cost data by 72.3 percent, or $4.11 billion"). The Final Rule reduces by 75 percent the safe harbor amount for credit card fees determined pursuant to the methodology set by the Federal Reserve more than a decade ago. *See id.* at 2-3. Moreover, the rule would significantly impair the ability of issuers to recoup the true costs of late payments, including charged-off debt that begins with a cycle of late payments and the post-charge off collection costs associated with the account, from the individuals who are creating those costs. Instead, the rule would effectively require issuers to attempt to recover those costs from customers who pay their credit card bills on time. The reduction in revenue likely would impact issuers of all sizes. Although the Final Rule exempts card issuers with fewer than one million open credit cards accounts, smaller issuers are nevertheless affected by the Final Rule. ABA has observed that, even when regulating agencies create exemptions for small issuers, market forces often demand that small issuers respond in parallel to actions taken by large issuers. Because the Final Rule requires large issuers, which represent the vast majority of credit card accounts, to comply with the new safe-harbor amount, small issuers may reduce their own late fees accordingly. The Final Rule therefore impacts small issuers despite the exemption.

14. Because the Final Rule reduces the safe-harbor amount to $8, which undermines the deterrent value of late fees, the rule will also "make some consumers somewhat more likely to make late payments." *Id.* at 250 (acknowledging that this "could" happen). Indeed, ABA data show that 83 percent of consumers believe that a $10 fee (let alone an $8 fee) would not be high enough to deter them from paying a credit card bill late. Additional missed payments will increase overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments. An increase in late

5

payments will have a cascading adverse impact on the integrity of issuer portfolios, as

delinquencies influence the amount of reserves that banks must maintain for their credit card

loans, and unpredictable rates of delinquency may require issuers to increase their reserves and

decrease available funding for credit. And, "an increased number of late payments could result

in additional delinquencies and ultimately increase credit losses for Larger Card Issuers." *Id.* at

251. This is further compounded by the fact that the Final Rule removes the safe harbor that

allows issuers to charge an increased fee for additional violations during the six billing cycles

following the initial violation. Issuers incur additional costs for repeated delinquent payments

and need to be able to apportion those costs to delinquent customers who create the costs.

15.     Although the CFPB suggested that issuers "could increase investments in

payment reminders or automatic payments," *id.*, such notification tools are already common in

the market, but where they are not already available, investments would themselves impose costs

on ABA's members in terms of software development and testing of such notification tools, and

additional communication and customer service resources to support them. Moreover, if issuers

are forced to "increase minimum payment amounts or adjust credit limits to reduce credit risk

associated with consumers who make late payments," *id.*, these issuers may experience a loss of

goodwill from customers who carry a balance but do pay on time. Such customers would

effectively be paying for the costs that issuers are unable to recoup from those customers who

pay late, potentially at an increasing rate.

16.     If issuers choose to perform their own annual cost analyses rather than rely on the

Final Rule's safe harbor, the costs of performing such analyses would be substantial and would

trigger the aforementioned redisclosure costs. These costs do not include the increased risk of

6

enforcement action and liability that might result if the CFPB or an adjudicatory body disagreed with the member's analysis or found its late-fee amounts to be too high.

17.    In addition, members who qualify for the Smaller Card Issuer exemption will be harmed by the market pressure to lower their own late fees to compete with larger issuers, despite the CFPB's acknowledgement that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees." *Id.* at 60.

### C.    The CFPB's Chosen Effective Date will expose members to enforcement actions.

18.    ABA's members may not all be able to come into compliance with this rule by the effective date. The timeline for approving, printing, and being prepared to send all of the required disclosures is extremely tight. That is one reason why the Truth In Lending Act requires that a regulatory amendment that requires a disclosure that differs from the disclosures previously required must have an October 1 effective date that is at least six months after the promulgation of the final rule. *See* 15 U.S.C. § 1604(d). It will take members time to review the Final Rule, identify all the disclosures that need to be updated, review and approve new language, and have those disclosures printed for appropriate distribution as of the effective date, at the same time that all other credit card issuers are demanding that their third-party vendors prioritize their required updates.

19.    Even acting with the utmost urgency and good faith, the affected ABA members may not all be able to comply by the effective date, particularly if the member is forced to perform its own annual cost analyses rather than rely on the safe harbor. Any penalties ABA's members incur would be unrecoverable.

7

**III.     Enjoining CFPB's Final Rule Would Remedy Harms to Members.**

20.     Preliminarily enjoining the CFPB's Final Rule before members are forced to begin incurring the substantial costs described above would temporarily remedy their harms. ABA members could safely forgo the additional compliance costs that the Final Rule imposes and would save the resources ABA members would otherwise expend on compliance.

21.     Vacating the CFPB's Final Rule would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to charge a penalty fee that is reasonable and proportional to the violation at issue, consistent with the expressed will of Congress.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of March, 2024, at Washington, DC.

Jess Sharp

8

DocuSign Envelope ID: A4CA2CF3-ADE8-4EA5-AEAE-464434CF0E1A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; TEXAS ASSOCIATION OF BUSINESS, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

### DECLARATION OF MATTHEW SUSSER

I, Matthew Susser, do hereby declare and state as follows:

1.      I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.      I am the Senior Vice President & Chief Financial Officer of the Diversified & Value and Lifestyle platforms of Synchrony Bank ("Synchrony"), which has its home office located at 170 Election Road, Suite 125, Draper, Utah. Synchrony Bank is a wholly-owned subsidiary of

1

**App'x 55**

Synchrony Financial. I have held this position since June 2021 and have been employed by Synchrony since July 2018.

3.     Synchrony is a member of the Chamber of Commerce of the United States of America ("U.S. Chamber"), the Fort Worth Chamber of Commerce, the American Bankers Association and the Consumer Bankers Association.

4.     Synchrony issues credit cards to consumers across the United States, including consumers residing in the Northern District of Texas and the Fort Worth Division.  As of December 31, 2023, Synchrony maintained approximately 73 million active accounts in the United States with a cumulative balance of approximately $103 billion, of which approximately $97 billion was from consumer credit cards.

5.     Synchrony relies on the late fee safe harbor currently in place under the CFPB's Regulation Z. Currently, Synchrony typically charges a $30 late fee on its credit-card products, with a $41 late fee imposed on subsequent late payments as authorized by Regulation Z.

6.     I am familiar with the Credit Card Penalty Fees Final Rule ("Final Rule") published by the Consumer Financial Protection Bureau ("CFPB"), which amends Regulation Z.

7.     If not enjoined, the Final Rule will injure Synchrony.  An eventual vacatur of the Final Rule would not redress the losses incurred while the Final Rule is in effect.

8.     The Final Rule gives Synchrony two choices, both of which result in an injury to Synchrony.  First, the Final Rule gives Synchrony the option to use the $8 safe harbor.  Because the new $8 safe harbor is substantially lower than the current $30 and $41 safe harbors, relying on the new safe harbor will cost Synchrony revenue.

9.     Second, the Final Rule gives Synchrony the option of performing annual cost analyses.  That option would require Synchrony to bear the cost of conducting those analyses.  In

2

**App'x 56**

DocuSign Envelope ID: A4CA2CF3-ADE8-4EA5-AEAE-464434CF0E1A

addition, if Synchrony relies on that option, it would face increased risk of enforcement action and liability that might result if the CFPB or an adjudicatory body disagrees with our analysis and finds our late-fee amounts to be too high.

10.     In addition, Synchrony would incur significant compliance costs imminently if the Final Rule is not enjoined.  For instance, we will need to prepare, print, and distribute new disclosures reflecting the revised late fee terms. We will also need to reconfigure system rules to ensure compliance with the Final Rule.

11.     As well, Synchrony will need to train customer-facing representatives, compliance officers, and other staff on the new regulations.  Synchrony will be forced to bear the cost of developing and presenting new training materials, as well as the expenditure of employee time of both trainers and trainees.

12.     As noted above, to implement the Final Rule, Synchrony will need to prepare, print, and distribute new disclosures reflecting the revised late fee terms.  Because Synchrony issues private label and co-branded credit cards, this process requires it to update disclosures for hundreds of unique credit card programs.  In addition, for Synchrony's partners who offer credit at the point of sale, it will need to distribute the new disclosures at hundreds of thousands of merchant locations throughout the United States. To my knowledge, Synchrony has never updated disclosures on this scale in less than six months.

13.     The expenses that Synchrony will incur to comply with the Final Rule will not be recoverable from the government after the Final Rule's requirements go into effect. In short, Synchrony will be irreparably harmed if the Final Rule is not enjoined before it becomes effective.

**App'x 57**

DocuSign Envelope ID: A4CA2CF3-ADE8-4EA5-AEAE-464434CF0E1A

14.    Moreover, if the Final Rule is not enjoined and becomes effective, but is later found to be unenforceable, Synchrony would incur additional costs to undo the changes it made to comply with the Final Rule.

**App'x 58**

DocuSign Envelope ID: A4CA2CF3-ADE8-4EA5-AEAE-464434CF0E1A

I declare under penalty of perjury that the foregoing is true and accurate. Executed this

6th day of March, 2024, at Stamford, Connecticut.

DocuSigned by:

*Matt Susser*

—8140981595D8479..._____

Matthew Susser

**App'x 59**



August 11, 2023

Comment Intake – 2023 NPRM Credit Card Late Fee
c/o Legal Division Docket Manager
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552

**Re: Fiserv Comments on Docket No. CFPB-2023-0010, Credit Card Penalty Fees (Regulation Z) Proposed Rulemaking**

To Whom It May Concern:

Fiserv, Inc. (NYSE: FI) respectfully submits this comment for the record on the Notice of Proposed Rulemaking modifying Regulation Z related to credit card penalty fees for late or no payment. In reviewing the comments submitted to-date, we believe technical challenges related to the 60-day implementation timeframe were largely unaddressed and would like to provide Fiserv's perspective as to why such a timeframe would be problematic for the industry.

As background, Fiserv is a global leader in payments and financial technology. Among the solutions that we provide to financial institutions that issue credit cards, we process credit card accounts, emboss, code, mail new and replacement credit cards for credit issuers, and provide print capabilities for the issuance of statements and required notices.

With these operational services in mind, we want to highlight the concerns that a 60-day implementation timeframe would create for the market with potential negative impacts to consumer cardholders. Specifically, the industry needs more time to make technical changes to the processing platforms used by card issuers to meet the specific requirements outlined in the proposed rule, the industry needs more lead time to support the capacity planning that is needed for a wave of change in terms and notifications via mailed letters, and the industry needs more time to minimize the potential for errors that could cause negative impacts to consumers.

1. Software Modifications to Minimum Pay Due Calculation

Fiserv platforms that credit issuer clients use to manage consumer credit accounts are highly technical and support a level of customization and programmability for each credit issuer. To implement a variable late fee based on the minimum payment due amount, Fiserv will need to modify the underlying software underpinning the credit issuing system that supports the processing of credit card accounts. This type of major change can't be accomplished with a simple add-on, as it affects downstream account calculations and status.

A change of this magnitude requires developing and adding new code and then thoroughly testing that code – testing must be done by both Fiserv and our credit card issuers – before it is made operational for client use and consumer engagement. To require this work to be completed within 60 days of the issuance of a final rule puts this coding and testing process at significant risk, which we believe is neither in the best interest of the CFPB nor of consumer credit card holders.

**App'x 60**

Moreover, it is difficult to begin work on system modifications until final rules are issued. The potential for variability between a proposed rule and a final rule is too great to confidently spend the time and resources necessary to update these systems before knowing what the ultimate requirements will be. We believe that once the final requirements are known, we can make the system updates in 10 months. A 10-month implementation period will give the service providers of this technology enough time to develop, test, and deploy the updates, as well as provide credit issuers with the time to independently test and validate the system, and thus avoid potential consumer harm before making the new late fee construct operational for customers.

2.   Issuer Notification of Updated Terms

We believe the proposed late fee changes will require all card issuers to update the terms and conditions of their credit products, which will likely necessitate all cardholders receiving updated notices via a separate mailing.

Typically, when a credit issuing client wants to modify its account holder disclosure information, Fiserv requests our card issuer clients to provide at least 4 months of advance notice to ensure there is an appropriate amount of time to source the materials for the printing of the notice, print the notice, mail merge the notice, and finally send it to the consumer. With the assumption that all issuers will request updated materials to be produced and mailed by their service providers at the same time, the industry that supports this work will be physically unable to meet the demand due to capacity limitations of the printers, paper stock, and the sorting and packaging machines.

This is not work that can confidently be done prior to the issuance of a final rule, either. Should a credit issuer request updated materials to be printed with information that is ultimately changed between the NPR and final rule, the issuer would be required to pay for these materials to be securely destroyed and would need to schedule new printing. For most service providers, printing is completed on a per page basis, regardless of the accuracy of the information. As such, most issuers will not want to risk the cost associated with printing and potentially destroying inaccurate materials.

Given Fiserv's experience providing output printing services to credit issuers, we believe the industry needs 10 months to comply with this portion of the final rule as well.

**Conclusion**

Again, after further review and examination of the requirements proposed in the NPR, Fiserv believes it is in the best interest of the consumer credit market, including mitigating potential negative impacts to consumer cardholders, for the final rule to be released with a 10-month implementation window. This timing would ensure issuers can deploy appropriately coded, tested, and audited software updates, and it would provide the time necessary to notify credit account holders of their new rights under Regulation Z.

Fiserv appreciates the CFPB's willingness to consider the views within this comment. Further, we stand ready to assist the CFPB should there be any questions or follow-up related to the content provided above.

Sincerely,

Kimberly Ford
Senior Vice President, Government Relations
Kim.ford@fiserv.com

**App'x 61**