**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA; FORT WORTH
CHAMBER OF COMMERCE;
LONGVIEW CHAMBER OF
COMMERCE; AMERICAN
BANKERS ASSOCIATION;
CONSUMER BANKERS
ASSOCIATION; and TEXAS
ASSOCIATION OF BUSINESS,

    Plaintiffs,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

    Defendants.

Case No.: 4:24-cv-213-O

**BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... ii

Introduction .......................................................................................................................... 1

Background ........................................................................................................................... 3

    A.   The CARD Act requires that any credit card penalty fees be "reasonable and proportional." ............................................................................................................. 3

    B.   The Federal Reserve Board issues regulations implementing the CARD Act and setting an initial safe harbor amount. .................................................................... 4

    C.   The Consumer Financial Protection Act transfers authority over the relevant CARD Act provisions to the Bureau. ................................................................................. 6

    D.   With the Board's safe harbor in place, late fees were not "reasonable and proportional" to the late payment, and were a major revenue source for credit card companies and a substantial burden on consumers. ................................... 7

    E.   The Bureau amends § 1026.52(b) to eliminate the unjustified safe harbor for late fees and put in place a reasonable and proportional one, as required by the statute...... 8

    F.   Plaintiffs bring suit and seek to preliminarily enjoin the Late Fee Rule. ....................... 9

Legal Standard ..................................................................................................................... 9

Argument & Authorities ..................................................................................................... 9

    I.   Plaintiffs are not likely to succeed on the merits of this case because the venue is improper. .............................................................................................................. 9

    II.   Plaintiffs are unlikely to succeed on the merits of their statutory claims. ................... 13

    A.   The Late Fee Rule is consistent with the CARD Act's mandate that late fees be "reasonable and proportional" to the late payment. .................................................. 13

        1.   The statute at most requires the Bureau to "consider" a non-exhaustive list of factors when implementing the CARD Act's penalty-fee provision.... 13

        2.   The Bureau considered cost, deterrence, consumer conduct, and other necessary and appropriate factors when crafting the Late Fee Rule............... 17

    B.   The Bureau properly set the effective date for the Late Fee Rule at 60 days after publication in the Federal Register. ........................................................................ 22

    III.   The balance of the equities weighs against a preliminary injunction. .......................... 23

Conclusion .......................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
  878 F.2d 806 (5th Cir. 1989) ........................................................................................ 9

*Anderson v. Jackson*,
  556 F.3d 351 (5th Cir. 2009) ........................................................................................ 9

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ...................................................................................... 12

*Barber v. Bryant*,
  860 F.3d 345 (5th Cir. 2017) ...................................................................................... 12

*Biden v. Texas*,
  597 U.S. 785 (2022)....................................................................................................... 24

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*,
  2023 WL 2975164 (N.D. Tex. Apr. 17, 2023) ......................................................... 10

*Cent. Valley Chrysler-Jeep v. Witherspoon*,
  456 F. Supp. 2d 1160 (E.D. Cal. 2006)...................................................................... 14

*Clark & Reid Co. v. United States*,
  804 F.2d 3 (1st Cir. 1986) ........................................................................................... 11

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ......................................................................................... 2

*Ctr. for Biological Diversity v. Spellmon*,
  2022 WL 3541879 (D. Mont. Aug. 18, 2022) ......................................................... 11

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985) ........................................................................................ 9

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
  867 F.3d 564 (5th Cir. 2017) ...................................................................................... 14

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)....................................................................................................... 19

*In re Space Expl. Techs., Corp.*,
  2024 WL 948321 (5th Cir. Mar. 5, 2024)................................................................. 10

*Inst. of Certified Pracs., Inc. v. Bentsen*,
  874 F. Supp. 1370 (N.D. Ga. 1994) ........................................................................... 11

ii

*Maryland v. King*,
   567 U.S. 1301 (2012) ........................................................................................ 24

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) .......................................................................................... 9

*Munro v. U.S. Copyright Off.*,
   2022 WL 3566456 (W.D. Tex. May 24, 2022) ................................................ 10

*PCI Transp., Inc. v. Fort Worth & W. R. Co.*,
   418 F.3d 535 (5th Cir. 2005) ............................................................................. 2

*Seila L. LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ....................................................................................... 6

*Simmons v. I.C.C.*,
   909 F.2d 186 (7th Cir. 1990) ........................................................................... 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ........................................................................................ 11

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................ 11

*Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
   587 F. Supp. 3d 528 (E.D. Tex. 2022) ............................................................ 12

*VanDerStok v. BlackHawk Mfg. Grp. Inc.*,
   639 F. Supp. 3d 722 (N.D. Tex. 2022) ............................................................ 23

*Wages & White Lion Invs., L.L.C. v. Food & Drug Admin.*,
   90 F.4th 357 (5th Cir. 2024) ........................................................................... 20

*Wages & White Lion Invs., L.L.C. v. USDA*,
   16 F.4th 1130 (5th Cir. 2021) ......................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................................. 9

**Statutes**

5 U.S.C. § 701 ......................................................................................................... 2

12 U.S.C. § 5481(12)(O) ........................................................................................ 6

12 U.S.C. § 5481(14) .............................................................................................. 6

12 U.S.C. § 5511(a) ................................................................................................ 6

12 U.S.C. § 5491(a) .................................................................................................. 6

12 U.S.C. § 5497(a)-(c) ............................................................................................ 6

12 U.S.C. § 5581 ...................................................................................................... 6

15 U.S.C. § 1604(d) ................................................................................................ 22

15 U.S.C. § 1665d(a) ...................................................................................... 4, 13, 17

15 U.S.C. § 1665d(b) ................................................................................ 4, 13, 16, 17

15 U.S.C. § 1665d(c) ................................................................................ 4, 13, 16, 17

15 U.S.C. § 1665d(c)(1) .......................................................................................... 18

15 U.S.C. § 1665d(c)(4) ..................................................................................... 14, 21

15 U.S.C. § 1665d(e) .................................................................................... 4, 13, 16

15 U.S.C. § 1693o-2 ......................................................................................... 14, 15

15 U.S.C. § 1693o-2(a)(2) ...................................................................................... 15

15 U.S.C. § 1693o-2(a)(4) ...................................................................................... 15

28 U.S.C. § 1391(e)(1) ............................................................................................ 10

28 U.S.C. § 1406(a) .................................................................................................. 9

Pub. L. No. 111-24, 132 Stat. 1734 (2009) ............................................................... 3

Pub. L. No. 111-203, § 1000A(2), 124 Stat. 1376 (2010) ........................................ 6

**Regulations**

12 C.F.R. § 226.52(b)(1)(i) ....................................................................................... 4

12 C.F.R. § 226.52(b)(1)(ii) ...................................................................................... 5

12 C.F.R. § 226.52(b)(1)(ii)(A)–(B) ........................................................................ 5

12 C.F.R. § 226.52(b)(1)(ii)(D) ................................................................................ 5

12 C.F.R. § 1026.6(b)(2)(viii) ................................................................................. 23

12 C.F.R. § 1026.7(b)(11)(i)(B) .............................................................................. 23

12 C.F.R. § 1026.52(b) ......................................................................................... 6, 8

12 C.F.R. § 1026.52(b)(1)(ii) ........................................................................................ 7

12 C.F.R. § 1026.52(b)(2) ............................................................................................ 9

12 C.F.R. Pt. 1026, Suppl. I, cmt. 52(b)(1)(i)-2 ................................................... 5, 18

12 C.F.R. Pt. 1026, Suppl. I, cmt. 52(b)(1)(i)-6(i) ............................................. 17, 19

Truth in Lending, Final Rule,
    75 Fed. Reg. 37526 (June 29, 2010) ................................................................ *passim*

Truth in Lending (Regulation Z), Interim Final Rule with request for public comment,
    76 Fed. Reg. 79768 (Dec. 22, 2011) ......................................................................... 6

Finalization of Interim Final Rules (Subject to Any Intervening Amendments)
    Under Consumer Financial Protection Laws, Final Rule,
    81 Fed. Reg. 25323 (Apr. 28, 2016) ......................................................................... 6

Truth in Lending (Regulation Z) Annual Threshold Adjustments
    (Credit Cards, HOEPA, and Qualified Mortgages), Final Rule,
    86 Fed. Reg. 60357-02 (Nov. 2, 2021) ..................................................................... 6

Credit Card Penalty Fees (Regulation Z), Proposed Rule with request for public comment,
    88 Fed. Reg. 18906 (Mar. 29, 2023) ....................................................................... 19

CFPB, Credit Card Penalty Fees (Regulation Z) (Mar. 5, 2024) .......................... *passim*

**Other Authorities**

CFPB, *Credit Card Late Fees* (Mar. 2022) ................................................................ 7

*Consider*, Merriam-Webster.com Dictionary, Merriam-Webster ................................. 14

Credit Card Accountability Responsibility and Disclosure Act of 2009,
    S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb.
    Affs., Apr. 29, 2009) ............................................................................................... 15

H.R. Rep. 111-88 (2009) ............................................................................................... 3

Maury Brown, *MLB Sets New Revenue Record, Exceeding $10.8 Billion for 2022*,
    Forbes (Jan. 10, 2023) ............................................................................................. 23

Pet'rs' Br., *CFPB v. CFSA*, No. 22-448,
    2023 WL 3385418 (S. Ct. filed May 8, 2023) .......................................................... 2

Polo Rocha, *Synchrony Isn't Sweating CFPB Scrutiny of Late Fees, CEO Says*, Am. Banker
    (Jan. 28, 2022) .......................................................................................................... 24

S. Rep. 111-16 (2009) ................................................................................................... 3

## INTRODUCTION

Plaintiffs ask this Court to preliminarily enjoin the Consumer Financial Protection Bureau (Bureau) from implementing a new credit card late fee rule, which will limit the immunity of large credit card issuers to charge late fees and could save consumers $10 billion each year. No injunction is warranted. The rule better carries out Congress's command—that credit card issuers not charge excessive late fees—by eliminating an outdated and unjustified regulatory safe harbor, which allowed large card issuers to charge late fees billions of dollars in excess of their cost with relative impunity. And although the statute doesn't require any safe harbor at all, the new rule—the considered product of a years long notice-and-comment rulemaking process—nonetheless adopts a new and more modest one for the benefit of large issuers.

The best way to start to understand this case, and by extension, this motion, is to understand what it is not. It is not a case that was brought by large card issuers, the entities actually subject to the new rule. Although Plaintiffs assert that the "status quo has served the interests of American consumers . . . for over a decade," Br. in Support of Pl. Mot. for Prelim. Inj. (PI Br.), ECF No. 4, it seems not one large card issuer wants its name on the marquee. Rather, it is a case brought by an assortment of industry associations, many of which are located more than a thousand miles away in Washington, D.C. It is also not a case with a real connection to this District. The rule applies to only the largest card issuers—approximately 30–35 total entities nationwide. Plaintiffs have not identified a single one that is based in this District. Instead, in what appears to be transparent forum shopping by primarily Washington lobbying groups seeking to halt a consumer protection rule for every American, the Plaintiffs include only one group that calls this District home, the Fort Worth Chamber of Commerce. But the Fort Worth Chamber sues on behalf of a *Utah* bank, which seems to have only recently joined the local chamber (and, indeed, may have not joined at all). Nor does this case seek to reduce government bureaucrats' involvement in the marketplace. Rather, the large card issuers want the Bureau to be more involved; they want the government to provide some of the largest financial

1

institutions in the world more legal cover to charge American consumers late fees, like the $14 billion in late fees assessed in 2022. Finally, this case does not involve a new overall cap on the fees that large card issuers can charge consumers, but a careful revision of the safe harbor. The large card issuers need not use the safe harbor, and outside of it, they can charge any late fee amount they can properly support. But the federal government will not shield them from citizens insisting they prove it.

With these basic propositions in mind, the Court should deny the industry groups' motion. To start, Plaintiffs are not likely to succeed on the merits because this case should be dismissed for improper venue. Far-flung entities cannot just pay membership fees to an association in their venue of choice to gain access to that venue. And here, the Fort Worth Chamber cannot secure venue because it lacks associational standing to sue on behalf of a forum-shopping Utah bank (and perhaps other unspecified members not based in Fort Worth). Associational standing requires the interests sought to be vindicated by the suit to be germane to the organization's purposes, and as this case shows, that's a tall order—too tall, in fact—where the marriage of convenience is between an out-of-state bank with an interest in charging excessive late fees and a chamber of commerce with an interest in furthering its local economy.

Beyond that, Plaintiffs are also not likely to succeed on the merits of their statutory claims under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*.[1] Plaintiffs contend that the Bureau violated the CARD Act by inadequately considering factors other than cost

---

[1] Plaintiffs also raise a constitutional claim based on the Fifth Circuit's holding in *Community Financial Services Ass'n of America v. CFPB* (*CFSA*), 51 F.4th 616 (5th Cir. 2022). But the Fifth Circuit's decision in *CFSA* is not final: The Supreme Court is currently reviewing the case and a decision is expected this term. *CFPB v. CFSA*, No. 22-448 (S. Ct.). While the Bureau recognizes that this Court is presently bound by the decision in *CFSA*, it respectfully maintains that that decision—like Plaintiffs' argument based on that decision—is mistaken. *See* Pet'rs' Br., *CFPB v. CFSA*, No. 22-448, 2023 WL 3385418 (S. Ct. filed May 8, 2023). At any rate, even the conclusion that, for purposes of this motion, Plaintiffs will be deemed likely to succeed on the merits of their constitutional claim would not be enough to justify preliminary relief given that the overwhelming balance of equities weighs in favor of denying the motion. *PCI Transp., Inc. v. Fort Worth & W. R. Co*., 418 F.3d 535, 545 (5th Cir. 2005) (holding that movants must "clearly carr[y] the burden of persuasion on all four requirements").

(namely, deterrence and consumer conduct) when setting the safe harbor amount, improperly defining what counts as a cost, and setting an effective date of 60 days after the rule is published in the Federal Register. PI Br. at 9–20. They are wrong. The Bureau considered deterrence and consumer conduct as reflected in the rule, even as it was not required to do so. Nothing in the statute requires that these factors be given a particular weight or treated equally; rather, the statute only requires the Bureau to consider (i.e., take into account) the necessary factors. The Bureau did. So too, the Bureau did not err in clarifying what "costs" count under the rule. Nor did it misstep in setting an effective date of 60 days after publication in the Federal Register; the statute does not require a longer lead time for the kind of limited change to the optional safe harbor at issue here.

The balance of equities likewise does not support an injunction. Equity does not demand that the Court enjoin a rule that the government estimates will save consumers up to $10 billion in late fees every year. The rule, and reducing unjustified fees, will help working Americans pay for their food, medicine, and rent, while the large card issuers will still likely collect well more than $100 billion in interest and fees per year. The fees often fall on the poorest consumers, and the injunction would frustrate the policy choices made by Congress and other public officials to protect consumers from excessive credit card fees. The Court should deny Plaintiffs' motion.

## BACKGROUND

### A. The CARD Act requires that any credit card penalty fees be "reasonable and proportional."

Signed into law in May 2009, the Credit Card Accountability and Disclosure Act (the CARD Act) amended the Truth in Lending Act (TILA) to "establish fair and transparent practices relating to the extension of credit." *See* Pub. L. No. 111-24, 132 Stat. 1734, 1734 (2009). One area of concern the CARD Act tackled was the imposition of "excessive fees" by credit card companies, S. Rep. 111-16 at 6 (2009)—including late fees, which had climbed on average to $35 per late payment in 2007, up from less than $13 in 1994, H.R. Rep. 111-88 (2009). The CARD Act therefore imposed new substantive limits on the fees that credit card

companies could charge consumers in certain circumstances. Among those new limits was TILA Section 149, which requires that "[t]he amount of any penalty fee or charge that a card issuer may impose . . . in connection with any omission with respect to, or violation of, the cardholder agreement"—"including any late payment fee"—"shall be reasonable and proportional to such omission or violation." 15 U.S.C. § 1665d(a).

At the time, Congress tasked the Federal Reserve Board with "establish[ing] standards for assessing whether" any penalty fee, including a late payment fee, "is reasonable and proportional." *Id.* § 1665d(b) (2009). To guide the Board, the CARD Act laid out four factors for it to "consider" in that "required rulemaking"—(1) the costs incurred by creditors; (2) the deterrent effect on cardholders; (3) cardholder conduct; and (4) any other factors "the Board may deem necessary or appropriate." *Id.* § 1665d(c) (2009). The statute also authorized—but did not require—the Board to establish an amount "that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates." *Id.* § 1665d(e) (2009). If an issuer imposed fees equal to or less than that "safe harbor," they were immunized from liability. *Id.*

### B. The Federal Reserve Board issues regulations implementing the CARD Act and setting an initial safe harbor amount.

In June 2010, the Board issued a rule implementing the CARD Act's penalty-fee provision. *See* 75 Fed. Reg. 37526 (June 29, 2010) (2010 Rule). The 2010 Rule provided credit card companies with two routes for compliance with the new limitations on excessive penalty fees. First, the Board instructed that "[a] card issuer may impose a fee for violating the terms or other requirements of an account if the card issuer has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of that type of violation." *Id.* at 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)). In the Board's view, this "cost analysis" provision was "consistent with Congress['s] intent" because it "permits card issuers to use penalty fees to pass on the costs incurred as a result of violations." *Id.* at 37532, 37534. In commentary adopted in the same rulemaking, the Board clarified that, for the purposes of this cost analysis, issuers may not recover "[l]osses and associated costs" through

penalty fees. *Id.* at 37585 (codified at 12 C.F.R. Pt. 1026, Suppl. I, cmt. 52(b)(1)(i)-2. While the Board recognized that "losses impose substantial costs on card issuers," it determined that requiring issuers to instead factor any risk of loss into their upfront annual rates—as they had historically done—was consistent with the CARD Act's purposes of "promot[ing] transparency and protect[ing] consumers from unanticipated increases in the cost of credit." *Id.* at 37538.

Second, and in the alternative, the 2010 Rule allowed credit card companies to charge penalty fees consistent with a newly established safe harbor. *Id.* at 37572 (codified at 12 C.F.R. § 226.52(b)(1)(ii)). Although the Board recognized that it was only authorized—not required—to create a safe harbor, it concluded that doing so would "facilitate compliance by issuers and increase consistency and predictability for consumers." *Id.* at 37540. In determining the appropriate safe harbor amount, the Board lacked data on credit card issuer collection costs or deterrence, and therefore did not engage in any of its own detailed statistical analysis. *See id*. at 37540–43. And the Board expressed "significant concerns" about the few empirical sources commenters had provided; it concluded that the sole study on costs "significantly overstate[d] the fee amounts necessary to cover" costs and "question[ed] the assumptions used" in the two studies on deterrence. *Id.* at 37541. Because the Board lacked significant, relevant data to rely on, it instead reviewed the penalty fees financial institutions charged for credit card and other accounts; state and local laws regulating fees; the £12 safe harbor the United Kingdom's Office of Fair Trading had established in 2006; some limited data related to deterrence; and data submitted by one card issuer about the risk profile of consumers who paid late multiple times. *Id.* at 37540–43. Ultimately, the Board decided to set the safe harbor at $25 per violation, but it allowed card issuers to charge $35 for subsequent violations of the same type during the next six billing cycles. 12 C.F.R. § 226.52(b)(1)(ii)(A)–(B). The Board determined that those new safe harbors would be "generally sufficient to cover issuers' costs and to deter future violations." 75 Fed. Reg. at 37542. The 2010 Rule provided that those safe harbors would be adjusted annually for inflation. 12 C.F.R. § 226.52(b)(1)(ii)(D).

### C.  The Consumer Financial Protection Act transfers authority over the relevant CARD Act provisions to the Bureau.

A month after the Board issued its CARD Act regulations, the Consumer Financial Protection Act (CFPA) became law. Enacted to address the causes and effects of the 2008 financial crisis, the CFPA established the CFPB as an independent bureau within the Federal Reserve System. *Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2191, 2193 (2020). As it has long done for numerous other agencies and programs, Congress chose to fund the agency in its organic statute, rather than through annual spending bills. The CFPA thus authorizes the Bureau to draw money each year from the combined earnings of the Federal Reserve System in an amount capped by statute and adjusted only for inflation. *See* 12 U.S.C. §§ 5491(a), 5497(a)–(c).

In the CFPA, Congress tasked the Bureau "with 'implement[ing]' and 'enforc[ing]' a large body of financial consumer protection laws to 'ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.'" *Seila L.*, 140 S. Ct. at 2193 (quoting 12 U.S.C. § 5511(a)). To carry out that mission, the CFPA transferred to the Bureau authority over several laws, including TILA. 12 U.S.C. § 5481(12)(O), (14); *id.* § 5581; *see also* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1000A(2), 124 Stat. 1376, 2107 (2010) (amending TILA Section 149 to include references to the Bureau, but otherwise leaving the penalty-fee provision substantively intact).

In 2011, the Bureau issued an interim final rule repromulgating TILA's implementing regulation, Regulation Z. The Bureau included the Board's restriction on penalty fees in identical form. *See* 76 Fed. Reg. 79768, 79821 (Dec. 22, 2011); *see also* 81 Fed. Reg. 25323, 25325 (Apr. 28, 2016) (adopting interim final rule as final). That provision is now codified at 12 C.F.R. § 1026.52(b). Over the next decade, the Bureau updated the safe harbor amounts for inflation but otherwise left the Board's rule unchanged. *See, e.g.*, 86 Fed. Reg. 60357-02, 60359 (Nov. 2, 2021). Until the most recent rulemaking, the regulation insulated card issuers from liability for

imposing penalty fees of up to $30 for a first violation and $41 for subsequent violations within the next six billing cycles. *See* 12 C.F.R. § 1026.52(b)(1)(ii).

> **D.   With the Board's safe harbor in place, late fees were not "reasonable and proportional" to the late payment, and were a major revenue source for credit card companies and a substantial burden on consumers.**

A decade on from the initial implementation of the penalty-fee provision, late fees have continued to burden consumers and drive revenue for card issuers—exactly the situation Congress intended to avert with the CARD Act. Although the safe harbor was intended only to facilitate compliance, 75 Fed. Reg. at 37536, it has become the de facto industry standard. In surveys of credit card agreements submitted to its publicly available database, the Bureau found that nearly all the largest card issuers set a maximum late fee at or near the highest safe harbor amount, although the same was not true of smaller banks and credit unions. *See* CFPB, Credit Card Penalty Fees (Regulation Z) at 9–11 (Mar. 5, 2024) (Late Fee Rule or Rule).[2] There was no evidence of any issuers disclosing a maximum late fee above the highest safe harbor, *id.*, suggesting the safe harbor amount was more than enough to allow issuers to recoup their costs.

This generous safe harbor provision has resulted in late fees that are disproportionately high; in other words, it has allowed larger issuers to charge amounts inconsistent with the statute. This has been a boon for card issuers and a drain on the most vulnerable consumers' finances. Late fees represent about one-tenth of the total that card issuers generate from consumers in the form of interest and fees. *Id.* at 13. In 2022, the largest issuers reported $14.5 billion in revenue generated from late fees alone—which the Bureau estimates is five times higher than needed to cover relevant costs. *Id.* at 104, 238. Those billions are paid by those least able to afford it. In 2019, nearly half of all accounts held by consumers with the lowest credit scores were charged three or more late fees. CFPB, *Credit Card Late Fees* at 7 (Mar. 2022).[3] Overall, accounts held by those consumers were charged, on average, $138 in late fees that year. *Id.* at 7–8.

---

[2] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf (accessed Mar. 12, 2024).
[3] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees_report_2022-03.pdf (accessed Mar. 12, 2024).

### E.   The Bureau amends § 1026.52(b) to eliminate the unjustified safe harbor for late fees and put in place a reasonable and proportional one, as required by the statute.

On March 5, 2024—after a nearly two-year regulatory review process, including an advance notice of proposed rulemaking seeking initial input and data on late fees—the Bureau issued a final rule amending the late-fee provisions in § 1026.52(b). Through that rulemaking process, the Bureau determined that, for larger card issuers—those with one million or more open credit card accounts—the existing discretionary safe harbor amounts for late fees were inconsistent with the CARD Act's instruction that fees must "be reasonable and proportional" to the late payment. Late Fee Rule at 104. In fact, the Bureau's analysis of an extensive data set cataloging certain larger card issuers' collection costs revealed that the overly generous safe harbor had allowed late fee revenue to climb at least five times higher than relevant costs. *Id.* at 104. The Bureau thus decided to repeal the existing safe harbor, as originally set by the Board and since adjusted for inflation. *Id.* at 102.

But because the Bureau, like the Board, believed in the "compliance certainty and administrative simplicity" that a safe harbor offered, the Rule adopted a new safe harbor of $8, for both first and subsequent violations. *Id.* at 123. Given evidence that issuers' costs are not "rising lockstep with inflation," the Bureau also removed the annual adjustments and instead determined that changes will be made based on regular market monitoring. *Id.* at 106, 174. As before, the safe harbor provision—which Congress authorized but did not require the Bureau to provide—sets no cap on late fees. The minority of larger credit card issuers who, in the Bureau's estimate, may not be able to cover relevant costs with an $8 penalty can continue to impose higher fees, so long as the amount charged represents a reasonable proportion of the costs incurred. *See id.* at 120. The Late Fee Rule is set to go into effect 60 days after publication in the Federal Register. *Id.* at 217.

This final Rule was the product of a considered process in which the Bureau received approximately 58,000 public comments—98 percent in support. *Id.* at 18. The CFPB made two significant adjustments in response to comments from industry, including Plaintiff trade

8

associations. First, the Bureau left the existing safe harbor in place for smaller institutions with fewer than one million credit card accounts. *Id.* at 58. Second, it declined to finalize a proposal to lower a separate cap on fees appearing in the rule at § 1026.52(b)(2). *Id.* at 200.

### F.  Plaintiffs bring suit and seek to preliminarily enjoin the Late Fee Rule.

Two days after the Bureau published the Rule on its website, a group of trade associations filed this suit on behalf of their members against the Bureau and its Director (collectively, the Bureau). Plaintiffs ask this Court to enjoin the Bureau from enforcing, applying, or implementing the Rule against any of their members during the pendency of this case. *See* Pls.' Mot. for Preliminary Inj. at 2, ECF No. 3.

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should only be granted when the movant has clearly carried the burden of persuasion," *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (cleaned up). Failure to satisfy any of these requirements precludes injunctive relief, *see Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and Plaintiffs bear a heavy burden as to each, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

### ARGUMENT & AUTHORITIES

### I.    Plaintiffs are not likely to succeed on the merits of this case because the venue is improper.

Plaintiffs are not likely to succeed on the merits because the Court should dismiss or transfer Plaintiffs' complaint for improper venue under 28 U.S.C. § 1406(a).[4] Only one Plaintiff resides in this District, the Fort Worth Chamber of Commerce. But the Fort Worth Chamber—

---

[4] The Bureau reserves the right to file a Rule 12 motion based on its venue objection.

suing on behalf of its members, only one of whom is named, Synchrony Bank *of Draper, Utah* (apparently, a recent addition to its roster)—lacks standing and, therefore, cannot provide the foundation for venue in this Court. The other Plaintiffs are associations headquartered in Washington, D.C., or other parts of Texas. And those other Texas groups identify zero members with standing. Put simply, this case—about a consumer protection rule issued in Washington and applicable to a small number of large card issuers, not one of which appears to be based in this District—does not have an adequate connection to this District for venue to be proper.[5]

In suits against the Federal government, venue is proper where "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1).

Plaintiffs appear to claim that venue is proper in this Court because the Fort Worth Chamber resides here. They allege venue is proper under subsections (B) (events and omissions) and (C) (plaintiff's residence). Compl. ¶ 23. Both allegations are meritless.

First up is the allegation that the events or omissions giving rise to the claim occurred in this district. But that prong of the venue statute properly looks just to "the defendant's conduct, and where that conduct took place, rather than focusing on the activities of the plaintiff." *Munro v. U.S. Copyright Off.,* No. 6:21-cv-00666, 2022 WL 3566456, at *2 (W.D. Tex. May 24, 2022), report and recommendation adopted, 2022 WL 17400772 (W.D. Tex. Sept. 15, 2022). That would be where the Bureau issued the rule, in Washington, D.C. Nor would venue be proper in this District even if this prong more broadly authorized venue where "(1) the plaintiff has a significant presence in the forum; and (2) the plaintiff was subject to actual or imminent burden within the forum should the contested agency action take effect." *In re Space Expl. Techs., Corp.*, No. 24-40103, 2024 WL 948321, at *4 (5th Cir. Mar. 5, 2024) (Elrod, J., dissenting from denial of mandamus) (citing *Career Colls.*, 2023 WL 2975164, at *2). Only one plaintiff claims

---

[5] Plaintiffs bear the burden of proving that venue is proper. *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 2023 WL 2975164, at *1 (N.D. Tex. Apr. 17, 2023).

a significant (or any) presence in the forum—the Fort Worth Chamber. The other plaintiff associations are based in Washington, D.C. (the U.S. Chamber of Commerce, the American Bankers Association, and the Consumer Bankers Association), or in parts of Texas outside of this District (the Longview Chamber of Commerce and the Texas Association of Business). And the Fort Worth Chamber will not be subjected to any burden here (or anywhere), because it is not a large card issuer. Indeed, it does not even point to a member who will suffer burden within this District.

But even if the Fort Worth Chamber could satisfy the requirements for venue under the acts-and-omissions clause, it cannot secure venue under this theory because the party that creates venue "must have standing," *Clark & Reid Co. v. United States*, 804 F.2d 3, 5 (1st Cir. 1986), and the Fort Worth Chamber doesn't. *See also Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) (noting that Plaintiffs cannot "manufacture venue by adding . . . a party" that "lacks standing to bring th[e] action"); *Ctr. for Biological Diversity v. Spellmon*, No. 21-cv-47, 2022 WL 3541879, at *3 (D. Mont. Aug. 18, 2022) (concluding that a party without standing cannot create venue).

That is because the Fort Worth Chamber cannot satisfy the well-established test for associational standing. To sue on behalf of its members, an association must demonstrate three things: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

The second element sinks Plaintiffs.[6] The interests that the Fort Worth Chamber seeks to protect are not germane to the organization's purpose. Admittedly, the germaneness test does not

---

[6] Indeed, the first element—that the "members would otherwise have standing to sue in their own right"—is a stumbling block as well. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009), holds that, to demonstrate associational standing, the association must name a member with standing. Plaintiffs have provided contradictory evidence on this point, however. Synchrony Bank claims harm from the rule and identifies itself as member of the Fort Worth Chamber.

set a high bar; it requires that the litigation be "pertinent" to the organization's interests. *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd*., 627 F.3d 547, 551 (5th Cir. 2010). But in trying to use local associations as venue vehicles for far-flung members, Plaintiffs fail even this test. Based on the only member of the Fort Worth Chamber that Plaintiffs' papers identify as allegedly harmed by the rule—Synchrony Bank, of Draper, Utah, App'x at 56—the interest that the Forth Worth Chamber seeks to protect is the interest of a large, out-of-state card issuer to charge high late fees with impunity. This interest, however, is not "germane" to the Fort Worth Chamber of Commerce's interest in "cultivat[ing] a thriving business climate in [] Fort Worth." Montgomery Decl. ¶ 4, App'x at 21. Plaintiffs have not identified a single card issuer subject to the Rule that is based in Fort Worth (and the Bureau is aware of none). And while the Fort Worth Chamber's declaration describes costs and burdens that (unnamed) members will bear, it at no point explains how those burdens on out-of-state issuers relate to its mission of promoting "the business climate in Fort Worth." Indeed, the Rule could return billions of dollars to the pocketbooks of consumers, *see, e.g.*, Late Fee Rule at 140, some of which could be spent in the grocery stores, medical offices, shops, and other businesses of Fort Worth.

Acts-and-omissions venue, then, is not the answer—but what about the allegation that venue is proper here based on where the plaintiffs reside? That allegation fares no better. As discussed above, only one Plaintiff, the Fort Worth Chamber, resides in the District. But, to

---

App'x at 55-56. But the Fort Worth Chamber's own membership directory, which is referenced in its declaration, App'x at 21, does not list the bank as a member. It lists Synchrony Financial, not Synchrony Bank, as a member. Synchrony Bank is not the same as Synchrony Financial; it's a wholly owned subsidiary. App'x at 55–56. Under the shareholder standing doctrine—which limits the ability of shareholders to sue on behalf of a company in which they own stock— Synchrony Financial would likely lack prudential standing to represent Synchrony Bank. *See Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs*., 587 F. Supp. 3d 528, 539 (E.D. Tex. 2022). This contradictory evidence does not satisfy Plaintiffs' obligation, at the preliminary injunction stage, to make a clear showing that they have standing. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017); *Simmons v. I.C.C.*, 909 F.2d 186, 189 (7th Cir. 1990) (concluding that a union lacked standing to sue on behalf of its members because the members were not within the zone of interests of the relevant statute). And lest Plaintiffs claim that providing a link to their directory satisfies *Summers*, it doesn't: Plaintiff must name a member with standing, not promise that the name of an injured party is buried somewhere among a list of their members.

sound a familiar refrain, the Fort Worth Chamber lacks standing, so it cannot be the foundation for venue in this District. In short, Plaintiffs are not likely to succeed on the merits because their apparent attempt at forum shopping fails and this case should be dismissed for improper venue.

## II.   Plaintiffs are unlikely to succeed on the merits of their statutory claims.

### A.   The Late Fee Rule is consistent with the CARD Act's mandate that late fees be "reasonable and proportional" to the late payment.

The CARD Act instructs that the amount of any penalty fee, including late payment fees, "shall be reasonable and proportional" to the relevant "omission or violation" of "the cardholder agreement." 15 U.S.C. § 1665d(a). Rather than define "reasonable and proportional" itself, Congress tasked federal regulators—first the Board, now the Bureau—with implementing the provision and laid out a series of factors for the agency to consider. *See id.* § 1665d(b)–(e). Plaintiffs assert that the Bureau's Late Fee Rule is inconsistent with that statute, but their arguments require the Court to read dictates into the law where none exist. The regulation the Bureau promulgated is entirely consistent with the law Congress actually enacted, which left it up to the agency whether to institute a safe harbor at all. Because it rests on a fundamental misreading of both the statute and the Rule, the Court should deny Plaintiffs' motion.

#### 1.   The statute at most requires the Bureau to "consider" a non-exhaustive list of factors when implementing the CARD Act's penalty-fee provision.

Plaintiffs first claim that the Rule violates Congress's judgment that card issuers can charge "a reasonable and proportional penalty fee" because, in their view, the Rule focuses too much on issuer costs, to the exclusion of other statutory factors. *See* PI Br. at 10–17. Plaintiffs' argument ignores the text and structure of the penalty-fee provision, so they are unlikely to succeed on the merits of this challenge.

We start first with the text. Plaintiffs hang their statutory argument on the enumeration of factors in 15 U.S.C. § 1665d(c). That provision provides that, "[i]n issuing rules required by this section, the Bureau shall consider—(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Bureau may deem necessary or appropriate." *Id.*

13

In Plaintiffs' view, the Bureau would only satisfy this provision if its final rule somehow directly ties the amount of any penalty-fee safe harbor to cost, deterrence, and consumer conduct.

But that is not what the statute says. The only mandatory instruction to the Bureau is to "*consider*" those factors when engaging in required rulemaking under § 1665d. As explained below, establishing a safe harbor is not a *required* rulemaking to which this mandate applies. But even if it were, "consider" means only "to think about carefully," or "to take into account." Merriam-Webster, *Consider*.[7] As the Fifth Circuit has observed, "the term 'consider' does not compel a certain outcome, but rather it serves to inform the . . . careful decision-making process." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 573 (5th Cir. 2017). As a result, "Congress's use of the term 'consider' in a statute requires an actor to merely 'investigate and analyze' the specified factor, but not necessarily act upon it." *Id.* (quoting *Cent. Valley Chrysler-Jeep v. Witherspoon*, 456 F. Supp. 2d 1160, 1173 (E.D. Cal. 2006)). These principles govern the penalty-fee provision. Because Congress instructed the Bureau only to "consider" the enumerated factors when "issuing rules required by this section"—rather than defining a "reasonable and proportional" fee to be one that accounts for them—the statute does not require Bureau regulations to reflect those factors in any particular way. Indeed, by telling the Bureau to also consider "such other factors" it "deem[s] necessary or appropriate," 15 U.S.C. § 1665d(c)(4), Congress explicitly recognized that the Bureau is best positioned to determine how the rules for a reasonable and appropriate fee should account for the various factors.

The two other CARD Act provisions that Plaintiffs rely on by analogy (at 11–12)—one final, one draft—only underscore the error of their reading of the statute. They first point to another portion of the CARD Act governing interchange transaction fees, known as the Durbin Amendment. *See* 15 U.S.C. § 1693o-2. The Durbin Amendment mandates that "the amount of any" interchange fee "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* § 1693o-2(a)(2). In Plaintiffs' view, this provision demonstrates

---

[7] *Available at* https://www.merriam-webster.com/dictionary/consider (accessed Mar. 12, 2024).

that, when Congress wants to tie a fee to costs alone, it does so expressly. But Plaintiffs miss the relevant distinction between the two provisions. What matters is not the list of inputs—whether costs alone, or costs, deterrence, consumer conduct, and other necessary or appropriate considerations together—but how Congress places them in the statutory scheme. In the Durbin Amendment, Congress crafted a direct substantive standard, mandating that fees "*shall be reasonable and proportional to the cost incurred*." *Id.* (emphasis added). Here, by contrast, Congress did not decree by statute what constitutes a "reasonable and proportional" fee—not linking it to costs alone, but also not, as Plaintiffs would have it, linking it to costs, deterrence, and consumer conduct together. Congress did not cabin the definition of "reasonable and proportional" and instead listed all those factors as ones the Bureau must *consider* when engaging in required rulemaking. All the Durbin Amendment demonstrates is that Congress knows how to craft a statutory standard, on the one hand, and provide agencies with factors to consider when writing their own, on the other.[8]

Similar problems undermine Plaintiffs' reliance on an earlier version of the penalty-fee provision in a Senate version of the CARD Act bill. As Plaintiffs note, that draft legislation would have mandated that "[t]he amount of any" penalty fee, including a late payment fee, "shall be reasonably related to the cost to the card issuer." Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb. Affs., Apr. 29, 2009). That draft version of the bill gave no role to the agency to define the scope of the appropriate fee. *See id.* When Congress ultimately chose to give the Board (and now the Bureau) the authority to define what constitutes a reasonable and proportional fee, it removed that reference to costs from the substantive standard. The enacted version lists costs (alongside deterrence, consumer conduct, and such other factors as the Bureau

---

[8] Plaintiffs also ignore that the Durbin Amendment likewise contains a provision with factors for an agency to "consider" when engaging in relevant rulemaking. *See* 15 U.S.C. § 1693o-2(a)(4). But nobody would claim that a regulation promulgated under the Durbin Amendment is invalid if the Board's consideration of any of those factors—such as the functional similarity between transaction types—was not reflected in the final rule in a certain way.

deems necessary or appropriate) only as factors for the agency to "consider" in its rulemaking. Had Congress in fact wished to incorporate the three enumerated factors directly into a substantive definition of "reasonable and proportional," it could have maintained and expanded—rather than deleted—the baseline statutory standard.

If that weren't enough, the four statutory factors Congress gave the Bureau to "consider" do not even apply to the aspect of the Late Fee Rule that Plaintiffs object to most strenuously— the decision to repeal the Board-set safe harbor and exercise its discretion to instate a new, lower safe harbor. In the penalty-fee provision, Congress mandated only that "the Bureau shall consider" the enumerated factors "[i]n issuing rules *required* by this section." 15 U.S.C. § 1665d(c) (emphasis added). That clearly applies to any rulemaking to establish "standards for assessing whether the amount of any penalty fee . . . is reasonable and proportional," since Congress required those rules by statute. *See id.* § 1665d(b) (titling section "rulemaking required" and instructing that agency "shall issue final rules"). But the safe harbor is not a "required rulemaking." The statute only *authorizes* the Bureau to institute a safe harbor, providing that it "may issue rules" establishing an amount that is "presumed to be reasonable and proportional." *Id.* § 1665d(e). In this rulemaking, the Bureau decided to replace the Board-set safe harbor it had repealed because of the "compliance certainty and administrative simplicity" advantages such a provision would offer. *See* Late Fee Rule at 102, 123. Because the safe harbor is not a "rule required by" the penalty-fee section, the Bureau was not even obligated to consider every statutory factor in crafting those portions of the Rule.

Ignoring all this statutory text and context, Plaintiffs charge the Bureau with transforming the "penalty fee" allowed by the CARD Act into a "cost fee" with its new safe harbor. *See* PI Br. at 10–11. They are mistaken. To begin, Plaintiffs are simply wrong to suggest that consumers somehow feel less penalized by a late fee just because the amount charged is tied primarily to the costs of their misconduct to the card issuer. There is no evidence to support that argument in

their preliminary injunction briefing.[9] More fundamentally, the CARD Act does not mandate that deterrence, consumer conduct, or any other consideration must be assigned some special dollar amount in either the safe harbor calculation or the general rules governing reasonable and proportional penalty fees. Indeed, the statute doesn't require even consideration of the statutory factors when setting the safe harbor.[10] In any case, and as discussed below, the Bureau certainly did consider all the relevant factors throughout its rulemaking process here.

### 2. The Bureau considered cost, deterrence, consumer conduct, and other necessary and appropriate factors when crafting the Late Fee Rule.

Plaintiffs' challenge rests not only on a misreading of the statute but also on a blinkered view of the fulsome analysis of the relevant factors in the Rule. Plaintiffs contend that the regulation does not adequately account for providers' true costs, and they argue that the Bureau failed to appropriately reflect deterrence and consumer conduct in the Late Fee Rule. They are wrong, on both the process and the outcome. The Bureau considered each factor at length. *See* Late Fee Rule at 110–25 (costs); *id.* at 125–45 (deterrence); *id.* at 145–49 (consumer conduct); *id.* at 123, 149–52 (other factors). Plaintiffs may dislike the new discretionary safe harbor, but that is not enough to establish inconsistency with the CARD Act. For this independent reason, Plaintiffs cannot succeed on their statutory challenge to the Rule.

**a. Costs.** First, the Late Fee Rule appropriately considered and evaluated the costs card issuers incurred "as a result of" late payments, as the statute instructs, 15 U.S.C. § 1665d(a)–(c). Plaintiffs object to the approach that the Bureau—following the lead of the Board—has taken to evaluating issuer costs. *See* PI Br. at 17–19. The Board's 2010 Rule stated that costs incurred as a result of a late payment include collection costs. 75 Fed. Reg. at 37527; *see also* 12 C.F.R. Pt. 1026, Suppl. I, cmt. 52(b)(1)(i)-6(i). The rule also explained that, for the purposes of the cost analysis provision, issuers may not include "losses and associated costs (such as the cost of

---

[9] Plaintiffs suggest that a fee tied largely to costs is no longer a "penalty" because penalties are "akin to special damages" and "not solely compensatory." PI Br. at 11. But they cite only tort and public law, which have little applicability to contractual credit card late fees.

[10] The Board believed that its safe harbor, too, would "generally reflect issuers' costs," 75 Fed Reg. at 37536, but Plaintiffs apparently don't take issue with that regulation.

holding reserves against losses)." 75 Fed. Reg. at 37538; *see also* 12 C.F.R. Pt. 1026, Suppl. I, cmt. 52(b)(1)(i)-2. In other words, when a card issuer must write off the entire account after a customer stops paying, those losses and any associated costs are not considered to have been "incurred *from*" the late payment. 75 Fed. Reg. at 37538 (quoting 15 U.S.C. § 1665d(c)(1)). After all, although a consumer must generally miss several payments before his account becomes so delinquent that it needs to be "charged off" as a loss, the eventual loss results from the consumer's failure to pay *entirely*, not his failure to pay *on time*. In addition, and as the Board observed, card issuers can recover losses and their associated costs by setting upfront rates, which serves to make the cost of credit more transparent for consumers. *See id.*

The Bureau's Late Fee Rule clarifies that "losses and associated costs" include any collection costs a card issuer incurs after an account has been charged off as a loss, which typically happens after 180 days of delinquency. Late Fee Rule at 15, 71–72, 78. Consistent with the Board's approach in its 2010 rulemaking, the Bureau explained that those post-charge-off costs—which are made up in large part of commissions paid to third-party debt collectors—"are substantially related to mitigating a loss as opposed to the cost of a violation of the account terms." *Id.* at 28, 79. The Bureau therefore amended the relevant comment to clarify this point. *Id.* at 78. And, applying a consistent definition of relevant costs, the Bureau used an estimate of larger card issuers' pre-charge-off costs to determine the appropriate safe harbor. *Id.* at 110–11.

Plaintiffs contend that this clarification of the definition of "costs" is inconsistent with the CARD Act because "[t]here is no basis in the statutory text to distinguish among costs." PI Br. at 18. But, again, the statute instructs that the relevant costs are those "incurred by the creditor *from such omission or violation*." 15 U.S.C. § 1665d(c)(1). The Bureau reasoned that commissions paid to debt collectors and other such post-charge-off costs are more appropriately attributed to the fact that a consumer has failed to pay entirely—not that a consumer may have initially missed the payment deadline. Late Fee Rule at 79. And because most consumers charged late fees ultimately make payments, any contrary approach would require those consumers to compensate issuers for the far greater damage caused by the small number whose accounts are

18

written off. *Id.* Plaintiffs may disagree with that determination, but this analysis of what constitutes an appropriate "cost" is necessary to ensure that consumers are only charged a late fee that is reasonable and proportional to their actual violations.

As a last-ditch effort to undermine the Bureau's discussion of costs, Plaintiffs contend the Bureau's express exclusion of post-charge-off costs violates the APA's change-in-position doctrine. *See* PI Br. at 18–19. But the Bureau did not change positions; it clarified what the rule had always provided. In Plaintiffs' reading, the Board expressly held that post-charge-off collection costs are recoverable via late fees. They point to a footnote to the 2010 Rule, which recognized that some collections activity will "generally continue after the account has been charged off," such that charged-off accounts may not ultimately be "total loss[es]." *See* 75 Fed. Reg. at 37538 n.35. Plaintiffs read too much into this footnote, which suggests only that post-charge-off collections efforts might be successful in recouping some losses resulting from charge off. Plaintiffs fare no better when they rely on commentary adopted by the Board defining "costs incurred as a result of late payments" to include "costs associated with the collection of late payments." *See* 12 C.F.R. Pt. 1026, Suppl. I, cmt. 52(b)(1)(i)–6(i). That comment is silent on whether the costs of collecting a late payment include collection efforts *after* charge-off. And indeed, elsewhere in the commentary, the Board made clear that it considered fees imposed on accounts that had been "charged off" to be "uncollectable"—suggesting that, in the Board's view, the accounts at that point should be considered a loss for the purposes of cost analysis. *See* 75 Fed. Reg. at 37537 & n.33 (discussing comment 52(b)(1)(i)-5). Nothing Plaintiffs point to in the 2010 Rule, then, establishes that the Board thought post-charge-off costs should be included in the late fee calculation.

In any event, even if the Bureau's clarification of "costs" were somehow a change in position, the Bureau did not "depart from" that apparent "prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Although the Board was silent on the issue, the Bureau learned from comments received in response to the advance notice of proposed rulemaking here that some industry members had assumed that late fees could be used to "help

offset the charge-off on accounts not paid by consumers." 88 Fed. Reg. 18906, 18913 (Mar. 29, 2023). In clarifying what "costs" are actually covered, the Bureau proposed the new position through notice-and-comment rulemaking, explained why excluding post-charge-off costs was more consistent with the text and purposes of the CARD Act, and determined that any harm to card issuers from this adjustment could be adequately addressed through the other mechanisms issuers have to recover losses. Late Fee Rule at 80. That is all the "reasoned analysis" the Bureau needed to provide to justify a change in positions under the APA. *See Wages & White Lion Invs., L.L.C. v. Food & Drug Admin*., 90 F.4th 357, 381 (5th Cir. 2024).

**b. Deterrence.** The Bureau also adequately considered deterrence when crafting the Late Fee Rule. The Rule includes a lengthy discussion of available empirical evidence on the deterrent effect of late fees. *See* Late Fee Rule at 125–44. The Bureau detailed an analysis it had conducted using late fee data from larger card issuers, and it addressed each of the studies commenters—including those opposed to lower late fees—had submitted on deterrence. After reviewing this evidence, the Bureau determined that an $8 safe harbor, although calculated based on costs, would nevertheless be a deterrent to paying late—and "a powerful deterrent to those consumers who pay attention to financial penalties." *Id.* at 125–27. The Bureau found no compelling evidence that a higher late fee of $30 or $40 would be "sufficiently more of a deterrent . . . to justify late fees far above cost, especially given the other negative consequences of a late payment" consumers already face. Late Fee Rule at 137.

Plaintiffs say this consideration of deterrence is inadequate because, in their view, the statute requires "a *meaningful* deterrent effect," rather than just some "nonzero deterrent effect." PI Br. at 14. But that is not what the statute says. The statute only requires the Bureau to "consider" deterrence, which the Bureau did. Plaintiffs do not even say what it would take for a safe harbor to be a "meaningful" deterrent, perhaps because "meaningful" is an amorphous standard found nowhere in the text Congress wrote. As the Bureau explained in the final Rule, while it may be true that higher late fees will have a greater deterrent effect, that observation

"provides scant evidence to help the CFPB ensure that late fees are reasonable and proportional, as guided by the factors of deterrence, cost, and consumer conduct." Late Fee Rule at 138.

c. **Consumer Conduct.** The Bureau's Late Fee Rule also contains a sufficient analysis of the final listed statutory factor, consumer conduct. In the 2010 Rule, the Board's discussion of consumer conduct largely focused on its decision to allow card issuers to impose a higher fee for additional violations committed within the next six billing cycles, on the ground that multiple violations "reflect a more serious form of consumer conduct." 75 Fed. Reg. at 37533–34, 37540; *see also id.* at 37533 (also considering consumer conduct in cost analysis discussion). Plaintiffs complain that the Late Fee Rule "abandon[s]" that "settled approach," PI Br. at 14, but they ignore the substantial analysis the Bureau engaged in before concluding that the Board was wrong. Based on a brand-new analysis of account-level data from large card issuers that the Board did not consider, along with other evidence, the Bureau found "it not clear that multiple violations during a relatively short period are associated with increased credit risk and thus reflect a more serious consumer violation." Late Fee Rule at 145. The Bureau went on to evaluate other aspects of consumer conduct that the Board had not considered, including the reasons consumers may miss a payment deadline and the possibility that lowering late fees may positively impact consumers' ability to ultimately repay their credit obligations. *Id.* at 148–49. The final Late Fee Rule, therefore, reflects an adequate analysis of consumer conduct.

d. **The Final Rule.** The CARD Act's penalty-fee provision ultimately leaves it up to the Bureau how to balance these statutory factors in crafting its regulations. Indeed, Congress provided a fourth factor granting particularly wide discretion, allowing the Bureau to consider "such other factors as the Bureau may deem necessary or appropriate."[11] 15 U.S.C. § 1665d(c)(4). In other words, the statute left the Bureau free to decide that an appropriate safe harbor can be reached by taking into account costs—the most quantifiable element, and the one most directly tied to the consequences of late payment—and then looking to deterrence,

---

[11] The Bureau here considered the benefits card issuers gain from a safe harbor, such as compliance certainty, administrative simplicity, and reduced litigation risk. Late Fee Rule at 123.

consumer conduct, and other necessary or appropriate considerations to confirm the suitability of the amount chosen. *See* Late Fee Rule at 124.

Finally, Plaintiffs are wrong to say that various aspects of the Late Fee Rule evince some Bureau "disagreement" with the CARD Act's provisions. *See* PI Br. at 16. They particularly attack the Bureau's decision to treat the repeal of the old safe harbor amounts and promulgation of the new amount as separate and severable rulemaking exercises because, in their view, leaving card issuers with the cost analysis provision alone would not allow them to charge a penalty fee consistent with the CARD Act. But the Board, like the Bureau, made clear in its rulemaking that a fee calculated under the cost analysis provision is "reasonable and proportional" to the violation, which is all the statute requires.[12] 75 Fed. Reg. at 37532 ("The Board believes that, for purposes of new TILA Section 149(a), the dollar amount of a penalty fee is generally reasonable and proportional to a violation if it represents a reasonable proportion of the total costs incurred by the issuer as a result of all violations of the same type.").

### B. The Bureau properly set the effective date for the Late Fee Rule at 60 days after publication in the Federal Register.

Plaintiffs separately contend that the Late Fee Rule violates a provision of the Truth in Lending Act governing the effective date for disclosure regulations. *See* PI Br. at 19–20. That provision dictates that Bureau regulations "requiring any disclosure which differs from the disclosures previously required" under certain TILA sections or implementing regulations "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). Plaintiffs assert that TILA's timing provision governs the Late Fee Rule because card issuers will need to change their late fees, and thus the maximum late fees listed in their disclosures.

---

[12] Plaintiffs also never explain how fees calculated using the cost analysis provision are less reflective of deterrence and consumer conduct than fees charged consistent with a safe harbor. Because the Board offered both cost analysis and a safe harbor in its 2010 rules, issuers would only proceed under the cost analysis provision if their costs required charging *more* than the safe harbor. Those higher fees would then by definition incorporate whatever deterrence and conduct principles were reflected in the lower safe harbor amount.

The Late Fee Rule, however, does not "requir[e] any" different disclosures than the CARD Act or other parts of TILA previously required. As before, card issuers must disclose possible late payment fees at account opening, 12 C.F.R. § 1026.6(b)(2)(viii), in periodic statements, *id.* § 1026.7(b)(11)(i)(B), and elsewhere. The Late Fee Rule at most changes the amount of a fee, but not the existing requirement to disclose that fee. And large parts of the Rule don't even do that; they focus only on a safe harbor amount that regulations have never required card issuers to use. Of course, some issuers may need to change the *amount* they disclose if their current fees are no longer legally justifiable, without the shield of a too-generous safe harbor. But credit card companies have easily changed the numerical amount of late fees on an annual basis, undermining their complaints that the effective date here imposes an unreasonable burden that TILA disallows. In any case, any alteration to the maximum late fee is not a change in disclosure "requir[ed]" by the Rule, so TILA's effective date provision does not govern.[13]

### III.   The balance of the equities weighs against a preliminary injunction.

"The final two elements necessary to support a grant of injunctive relief—the balance of equities (the difference in harm to the respective parties) and the public interest—merge when the government is a party." *VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 639 F. Supp. 3d 722, 730 (N.D. Tex. 2022) (cleaned up). Taken together, these elements weigh against an injunction.

Large card issuers are awash in revenue from interest and fees. In 2022 alone, they charged their customers more than *$130 billion* in interest and fees. Late Fee Rule at 250. Late fees made up more than $14 billion of that amount. *Id.* This is a drop in the $130 billion bucket to the large issuers, but, to others, it's not a small number. Indeed, it's more than the total revenue of Major League Baseball in 2022. *See* Maury Brown, *MLB Sets New Revenue Record, Exceeding $10.8 Billion for 2022*, Forbes (Jan. 10, 2023).[14] And this $14 billion tidal wave of

---

[13] Besides, even if Plaintiffs are correct—and they are not—this claim would entitle them at most to a temporary delay of the effective date until October 1, not an injunction against the Rule as a whole or the Bureau's implementation work.

[14] *Available at* https://www.forbes.com/sites/maurybrown/2023/01/10/mlb-sets-new-revenue-record-exceeding-108-billion-for-2022/ (accessed Mar. 12, 2024).

fees hits the poorest Americans hardest: Data show that cardholders living in this country's poorest neighborhoods paid twice as much, on average, in total late fees as those in the richest areas. Late Fee Rule at 25. The new rule changes this harsh calculus: It could return around $10 billion to consumers' wallets, *id.* at 239, money that can be spent on things like food and healthcare, instead of credit card penalty fees. As for the large card issuers, they will be fine. And you don't have to take the Bureau's word for it: Synchrony has said the same thing. *See, e.g.*, Polo Rocha, *Synchrony Isn't Sweating CFPB Scrutiny of Late Fees, CEO Says*, Am. Banker (Jan. 28, 2022).[15]

An injunction would also irreparably harm the government because it would block a consumer protection regulation that implements the policy choices of the public's elected officials (including the President through the executive branch). *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (Roberts, C.J., in chambers) (cleaned up); *cf. Biden v. Texas*, 597 U.S. 785, 812 (2022) (recognizing that there is nothing improper about policy preferences influencing agency decisions within APA's bounds).

Plaintiffs make much of the argument that the injunction will preserve the status quo. But, logically, this factor is more important when the change is irreversible or nearly so (such as razing a historical structure), and the rules for late fees are not irreproducible artifacts. Similarly, the large card issuers claim that the new rule will hurt consumers because it will result in more "late payments, higher interest rates, constricted access to credit, and other less favorable terms." PI Br. at 25. Not so. For one, even if the reduction in the late fee amount were to result in more late payments, consumers would likely pay less overall because each late fee will be a fraction of what it otherwise would have been. As for the claim that the Rule will result in higher rates, reduced access to credit, and less favorable terms, that depends—on *what Plaintiffs do*, for they (or their large card issuing members) largely control these things. And in any case, the evidence

---

[15] *Available at* https://www.americanbanker.com/news/synchrony-isnt-sweating-cfpb-scrutiny-of-late-fees-ceo-says (accessed Mar. 12, 2024).

suggests that the benefits of the Rule to consumers will outweigh the additional costs that card issuers could impose on consumers.[16] *See, e.g.*, Late Fee Rule at 242–45. Moreover, the Rule provides an incentive for large card issuers to make it easier for their customers to pay on time— a win for everyone. Put simply, the balance of equities weighs in favor of denying Plaintiffs' motion.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED:  March 12, 2024                    Respectfully Submitted,

SETH FROTMAN
*General Counsel*

STEVEN Y. BRESSLER
*Deputy General Counsel*

KRISTIN BATEMAN
*Assistant General Counsel*

*/s/ Stephanie B. Garlock*
STEPHANIE B. GARLOCK*
*Counsel*
D.C. Bar No. 1779629
JUSTIN M. SANDBERG**
*Senior Counsel*
Ill. Bar No. 6278377
Consumer Financial Protection Bureau
1700 G St. NW
Washington, D.C. 20552

---

[16] Plaintiffs also contend "there is generally no public interest in the perpetuation of unlawful agency action." PI Br. at 25 (citing *Wages & White Lion Invs., L.L.C. v. USDA*, 16 F.4th 1130, 1143 (5th Cir. 2021)) (cleaned up). This is undoubtedly a reference to *CFSA*. But "generally" does not mean always, and this general maxim is not persuasive here. First, the rule neither causes nor is caused by the funding question at issue in *CFSA*: the rule does not set the Bureau's funding, nor is it, in any real sense, a product of the identified funding issue—the Bureau did not enact the Rule because of how it is funded. Second, the *CFSA* litigation is not final—the Supreme Court is reviewing the case and a decision is expected this term.

Stephanie.Garlock@cfpb.gov
Justin.Sandberg@cfpb.gov
(202) 435-7201 (Garlock)
(202) 450-8786 (Sandberg)
(202) 435-7024 (fax)

*_Pro hac vice_ application pending
**_Pro hac vice_ application forthcoming

_Counsel for Defendants the Consumer
Financial Protection Bureau and Rohit
Chopra_

_/s/ George M. Padis_
GEORGE M. PADIS
_Assistant United States Attorney_
Texas Bar No. 24088173
1100 Commerce Street, Third Floor
Dallas, Texas 75242
george.padis@usdoj.gov
(214) 659-8645 (phone)
(214) 695-8807 (fax)

_Of Counsel_

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2024, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Stephanie B. Garlock*
STEPHANIE B. GARLOCK