**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | Case No. 4:24-cv-213 |
| Plaintiffs, | |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**BRIEF AMICUS CURIAE
OF BANK POLICY INSTITUTE
IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION & INTEREST OF AMICUS CURIAE .............................................................. 1

ARGUMENT ............................................................................................................................. 4

 I. The Final Rule Is Arbitrary and Capricious Because the Bureau Relied on Secret Data and Methodologies ............................................................................... 4

 II. The Bureau's Use of the Y-14 Data Is Arbitrary and Capricious ......................... 10

  A. The Y-14 Data Are Ill-Suited to Assess the Financial Impact of Late Fees on Banks .................................................................................... 10

  B. The Bureau's Analysis of the Y-14 Data Regarding Costs is Fatally Flawed ........................................................................................................ 13

  C. The Bureau Wrongfully Minimizes the Deterrent Effect of Late Fees ............................................................................................................. 16

CONCLUSION ........................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Prod. & Chemicals, Inc. v. FERC,*
    650 F.2d 687 (5th Cir. 1981) ................................................................................6

*Air Transp. Ass'n of Am. v. FAA,*
    169 F.3d 1 (D.C. Cir. 1999) ..................................................................................5

*Am. Clinical Lab. Ass'n v. Azar,*
    931 F.3d 1195 (D.C. Cir. 2019) ............................................................................5

*Am. Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) ..............................................................................6

*Chamber of Commerce v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006) ..........................................................................7, 10

*Make the Road New York v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020) ..............................................................................4

*NRDC v. Thomas,*
    805 F.2d 410 (D.C. Cir. 1986) ..............................................................................8

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
    494 F.3d 188 (D.C. Cir. 2007) ........................................................................5, 6, 7

*Portland Cement Ass'n v. Ruckelshaus,*
    486 F.2d 375 (D.C. Cir. 1973) ..........................................................................6, 7

*Riverkeeper, Inc. v. EPA,*
    475 F.3d 83 (2d Cir. 2007) ................................................................................8, 9

*Small Refiner Lead Phase-Down Task Force v. EPA,*
    705 F.2d 506 (D.C. Cir. 1983) ..............................................................................7

*Solite Corp v. EPA,*
    952 F.2d 473 (D.C. Cir. 1991) ..............................................................................6

*Texas v. EPA,*
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ........................................................2, 6, 7, 9, 10

STATUTES

5 U.S.C. § 553(c) ....................................................................................................4, 7

15 U.S.C. § 1665d(c) ..................................................................................................12

**OTHER AUTHORITIES**

Consumer Financial Protection Bureau, The Consumer Credit Card Market (Sept. 2021), https://tinyurl.com/53wuex9w .................................................................13, 14

Federal Reserve Board of Governors, *Instructions for the Capital Assessments and Stress Testing Information Collection* (modified Sept. 2022), https://www.federalreserve.gov/apps/reportingforms/Report/Index/FR_Y-14M ...................12

Federal Reserve Board of Governors, *Truth in Lending*, 75 Fed. Reg. 37526, 37541 (June 29, 2010) ...........................................................13

NPRM, *Credit Card Penalty Fees (Regulation Z)*, 88 Fed. Reg. 18906 (Mar. 29, 2023)........................................................................16

Sumit Agarwal et al., *Learning in the Credit Card Market* (Apr. 24, 2013)................................18

## INTRODUCTION & INTEREST OF AMICUS CURIAE

The Bank Policy Institute ("BPI") is a nonpartisan public policy, research, and advocacy group, representing the nation's leading banks and their customers.  Its members include universal banks, regional banks, and the major foreign banks doing business in the United States.  Collectively, BPI's members employ almost 2 million Americans, make nearly half of the nation's small business loans, and are an engine for financial innovation and economic growth.

BPI supports thoughtful, well-founded efforts to promote transparency, consumer choice, and competition in financial products and services.  But the Consumer Financial Protection Bureau's sweeping Credit Card Penalty Fees Rule is not well-grounded in law or fact.  If not enjoined, the Rule would harm consumers, who obtain numerous benefits from credit cards provided by BPI's members.  And it would harm BPI's members, who would face all of the irreparable harms detailed in Plaintiffs' preliminary injunction motion.

As Plaintiffs explain, the Bureau's Final Rule cannot be squared with the plain text of the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act").  The Final Rule not only excludes certain costs that Congress authorized issuers to include, but also jettisons the deterrence and consumer-conduct factors Congress directed the Bureau to consider.  *See* Br. in Supp. of Prelim. Inj. at 10–19.

BPI does not repeat Plaintiffs' arguments here.  Instead, it files this brief to assist the Court in understanding the severe economic flaws that pervade the Bureau's Rule.  BPI raised these concerns in the rulemaking process.  *See* BPI, Comment Letter to CFPB (May 3, 2023) ("BPI Comment"), https://www.regulations.gov/comment/CFPB-2023-0010-0175.  But the Bureau failed to offer reasonable responses to these concerns—much less alleviate them.

As an initial matter, the Bureau made it impossible for this Court or the public to understand the economic analysis underlying the Bureau's decision to slash late payment penalty

1

fees to $8.  The Bureau relied primarily on data reported by the Nation's largest banks to the Federal Reserve Board of Governors ("Board") for stress-testing purposes, called the "Y-14 data."  But despite repeated requests from BPI and others to disclose the underlying data (in an appropriately redacted form) and the Bureau's methodologies for analyzing the data, *see*, *e.g.*, BPI Comment at 79–81, the Bureau refused to do so.  It thereby improperly "prevent[ed] interested parties from commenting on the studies that served as the technical basis for the rule." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019).  As a result, it violated the "fairly obvious" notice-and-comment requirements of the Administrative Procedure Act ("APA").  *Id.* And it gave itself every opportunity to slice and dice the data, use data that supported its pre-conceived conclusion, and discard any contrary data—while shielding its analysis from critical comment.

Even without the underlying data, the Bureau's Y-14-based analysis of costs and deterrence is flawed on its face.  The Bureau based its costs analysis on one particular line item in the Y-14 data.  But banks do not typically include the full range of costs incurred as a result of late payments in that line item.  Nor do they report the Y-14 data in a uniform manner across filers.  Those gaps and variations make absolutely no difference for the Board's stress-testing purposes—stress testing focuses on one individual institution, which can account for the relevant costs in a variety of places, so long as it accounts for them somewhere in its stress-testing submission.  But those gaps and variations render the Bureau's use of the Y-14 data an entirely unsuitable basis for reducing the penalty fees Congress authorized issuers to charge.  And even apart from those flaws with the underlying data, the Bureau's cost analysis suffers from additional problems.  The Bureau overestimated the post-charge off collection costs the Bureau improperly refused to allow issuers to collect as part of their penalty fees.  It failed to account for

2

important macroeconomic context, relying on data from a time period that is not representative of the long-term performance of the credit card market.  And it improperly weighted the Y-14 data based on number of accounts, which makes the Bureau's cost calculation more sensitive to measurement error—including those resulting from excluded cost categories, as well as from outliers among large institutions.

With respect to deterrence, the Bureau's analysis is deficient in numerous respects.  The Bureau apparently analyzed the difference in late payment rates for a subsample of consumers whose fees dropped from $41 to $30 because they had not missed a payment in the six months after missing an earlier payment.  The Bureau concluded that there was no increase in late payments in the seventh month, and therefore that there is no difference in deterrent effect between $41 and $30.  Regardless of the Bureau's methodology or statistical evidence, that difference says absolutely nothing about slashing penalty fees from $30 (or $41) to $8 for *all* consumers.  And, more fundamentally, the Bureau's deterrence analysis is disconnected from reality:  The Bureau focuses on hypothetical rational consumers who compare the costs of penalty fees to the benefits of paying late as of the due date; for those consumers, the Bureau asserts that an $8 late fee would still have some deterrent effect.  But, as the Bureau recognizes elsewhere, consumers can be prone to inattention, mistakes, and cognitive biases.  Penalty fees— and the *amount* of the penalty fees—play an important role in deterring late payments by those consumers, which the Bureau's deterrence analysis simply ignores.

Plaintiffs highlight the numerous irreparable injuries that the Bureau's Rule will impose on their members.  *See* Br. in Supp. of Prelim. Inj. 20–25.  The Bureau's flawed economic analysis based on secret data underscores those injuries.  As a practical matter, the vast majority of issuers will be required immediately to cap their late payment penalty fees at $8.  Given the

Bureau's flawed analysis, it is virtually certain that those issuers will not be able to recover their actual collection costs—let alone the total costs they incur in connection with late payments, a shortfall they can never make up—and that many consumers who would otherwise pay on time will miss payments, imposing even more unrecoverable costs on issuers.  To avoid those and other irreparable injuries, this Court should preliminarily enjoin the Bureau's Rule.

## ARGUMENT

As Plaintiffs explain, the Bureau's Final Rule violates the CARD Act in multiple respects, including because it impermissibly excludes costs that Congress allowed issuers to include and because it failed to meaningfully consider deterrence or consumer conduct.  *See* Br. in Supp. of Prelim. Inj. at 10–19.

The Rule is also arbitrary and capricious because the Bureau's economic analysis of costs and deterrence is procedurally unlawful and substantively unreasonable.  The Bureau violated the APA's notice-and-comment requirements, 5 U.S.C. § 553(c), by premising the Rule on secret data, thereby depriving interested parties of the opportunity to submit meaningful comments.  And from what little information is publicly available, it appears that the data are unreliable, inapplicable, and unsupportive of the conclusions that the Bureau seeks to draw from them.

This Court should enjoin the Rule pending the resolution of this litigation.

**I.  The Final Rule Is Arbitrary and Capricious Because the Bureau Relied on Secret Data and Methodologies.**

The APA's notice-and-comment requirements are designed to "subject agency decisonmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced."  *Make the Road New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020).  This critical exchange of ideas between agencies and the public helps "ensure

the parties develop a record for judicial review." *Am. Clinical Lab. Ass'n v. Azar*, 931 F.3d 1195, 1206 (D.C. Cir. 2019).

Here, the Bureau undermined the notice-and-comment process—and blatantly violated the APA—by premising the Rule on unpublished data and methodologies that the Bureau refused to disclose to the public. By relying on secret data, the Bureau failed to provide the public with a reasonable opportunity to understand and comment on the key basis for its proposed Rule. Because of that "serious procedural error," the Rule should be set aside. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007).

The Bureau's Rule relies extensively—and almost exclusively—on a data set called the "Y-14" data, which is provided confidentially by the Nation's largest banks to the Board for stress-testing purposes. The Bureau does not—and certainly could not—even attempt to justify its draconian restriction on the penalty fees Congress permitted issuers to charge without reference to the Y-14 data.

The Bureau's reliance on the Y-14 data renders the Rule fundamentally flawed because the Bureau refused to provide the data—or its methodologies for analyzing the data—to the public. A sound notice-and-comment process requires giving the public the opportunity to scrutinize agency reasoning and provide constructive feedback. An agency therefore has a "duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules." *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 199 (quotation marks omitted). Specifically, "the most critical factual material that is used to support the agency's position on review *must have been made public in the proceeding and exposed to refutation*." *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) (emphasis added).

5

Because the duty to publicly disclose the material facts underlying an agency's reasoning is "[i]ntegral to the notice requirement," *Solite Corp v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991), it is a "fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment," *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).  An agency accordingly violates the "fairly obvious" requirements of the APA when it fails to disclose the data on which it relies, thereby "preventing interested parties from commenting on the studies that served as the technical basis for the rule." *Texas v. EPA*, 389 F. Supp. 3d at 505; *see also Owner-Operator Indep. Drivers Ass'n,* 494 F.3d at 199 ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.").  After all, "[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of data that, (in) critical degree, is known only to the agency."  *Air Prod. & Chemicals, Inc. v. FERC*, 650 F.2d 687, 699 n.17 (5th Cir. 1981).

Courts have repeatedly set aside or remanded regulations when agencies violate their duty to disclose the data underlying their analyses.  In *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C. Cir. 1973), for example, EPA announced new emissions standards based on testing that it conducted.  Although EPA released a *summary* of the test results, it did not release "the details" of its testing in time for public comment.  *Id.* at 393.  The D.C. Circuit explained that commenters' "inability . . . to obtain—in timely fashion—the test results" was a "critical defect in the decision-making process."  *Id.* at 392.  Because "it is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on

6

data that, to a critical degree, is known only to the agency," the court remanded to EPA for additional factual development. *Id.* at 393.

Likewise, in *Chamber of Commerce v. SEC*, 443 F.3d 890, 901 (D.C. Cir. 2006), the SEC made "extensive reliance upon extra-record materials in arriving at . . . cost estimates" crucial to its rule. These "essential" materials did more than "clarify, expand, or amend" the record. *Id.* at 903. Rather, they were among "the most critical factual material that is used to support the agency's position." *Id.* at 900. The SEC's failure to publicize these materials prejudicially deprived the public of the opportunity to comment, in violation of the notice-and-comment requirements of section 553(c), and resulted in vacatur. *Id.* at 908–09.

Similarly, in *Texas v. EPA*, EPA did not publish in a timely manner a report that served as "the technical basis for the Final Rule and was instrumental in determining what [regulatory] changes were to be made." 389 F. Supp. 3d at 505. Because EPA "failed to give commenters an opportunity to refute the most critical factual material used to support the Final Rule . . . and possibly deconstruct the [report]," the court found a section 553(c) violation. *Id.* at 505–06.

The Y-14 data—and the Bureau's analysis of that data—unquestionably provided the technical basis and were among the most critical factual material in support of the Bureau's Rule. *See*, *e.g.*, Final Rule at 24–30. The Bureau was therefore required to "expose[ ]" the Y-14 data and its methodologies for analyzing that data "to refutation" in the rulemaking proceeding. *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 202. And it was required to "explain the assumptions and methodology" it used "and, if the methodology is challenged, [to] provide a complete analytic defense." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C. Cir. 1983).

But the Bureau manifestly failed to comply with its obligations.  Nearly two months before the comment period closed, BPI wrote the Bureau to request release of the underlying data and methodologies, explaining that without that information, it would be "virtually impossible to understand or replicate the [Bureau's] analysis in any meaningful way, significantly hindering the public's ability to provide thoughtful input."  BPI Comment at 80. Yet the Bureau simply ignored BPI's letter.  And in its filed comments, BPI—like several other commenters—again explained that its "ability to evaluate the [Bureau's] proposal in a thorough and meaningful way has been significantly hampered by the lack of insight into the data, methodology, and analyses that form the basis of the [Bureau's]" proposal.  BPI Comment at 10. But the Bureau never disclosed the underlying data and methodologies, much less provided a meaningful opportunity for comment after doing so.  Instead, it simply finalized the Rule.

The Bureau's defense of its reliance on secret data is paper thin.  *See* Final Rule at 33–37. *First*, the cases on which it relies *confirm* its failure to provide a meaningful opportunity for public comment.  *See id.* at 34 n.93.  In *NRDC v. Thomas*, 805 F.2d 410, 418 n.13 (D.C. Cir. 1986), the D.C. Circuit held that EPA "provided a reasoned explanation" of its decision—a different question from whether the agency had provided a sufficient opportunity for public comment—only because EPA had "combine[d] the data from the confidential reports of . . . various manufacturers and plot[ted] them on a graph that was made part of the public record."  In other words, EPA *disclosed* anonymized and aggregated data—precisely what the Bureau refused to do here.  And, even then, the D.C. Circuit expressed "misgivings about the confidential status of the data."  *Id.*

*Riverkeeper, Inc. v. EPA*, 475 F.3d 83 (2d Cir. 2007), is even *worse* for the Bureau. There, the court approved the use of *anonymized* data—which, again, the Bureau refused to

provide here—as sufficient to permit meaningful public comment on EPA's "methodology and general cost data." *Id.* at 112. But it vacated EPA's rule because even that was not enough to provide "an opportunity to challenge the cost estimates for specific facilities." *Id.* at 113. Neither of those cases remotely supports the Bureau's position that it may upend congressionally approved practices in the credit card industry based on undisclosed data.

*Second*, the Bureau provided no reasonable explanation for its refusal to disclose the underlying Y-14 data in an appropriately anonymized form. Nor did it fill in the methodological gaps BPI and commenters flagged in the Bureau's proposal. Instead, the Bureau notes that it "explained the source of the Y-14 data (from the Board)," "described the four types of Y-14 data that it used for the analysis," "detailed the relevant years of data examined," and provided general information about its methodologies. Final Rule at 34–35. That information comes nowhere close to satisfying the Bureau's obligation to "give commenters an opportunity to refute" and "possibly deconstruct" the Bureau's analysis. *Texas v. EPA*, 389 F. Supp. 3d at 505.

To the contrary, the Bureau's approach gave it carte blanche to slice and dice the data, generate conclusions based on the data it liked, and ignore any data undermining its proposal— all outside the view of the public. To take just one example, the Bureau's deficient "deterrence" analysis was based "on a random subsample from account-level data available in 2019 from the Y-14 data." Final Rule at 35. But the Bureau could easily have analyzed numerous random subsamples from many different years and then published only the results that best supported its pre-conceived conclusion, while discarding the rest. That possibility is hardly far-fetched. As BPI explained, if the Bureau's subsample came in part from the end of 2019, the results could have been skewed by the onset of the pandemic and, with it, forbearance policies that frequently included waiving late fees. BPI Comment at 54. And if the subsample covered the first five

months of 2019, it might have reflected seasonal factors.  *Id.*  Either way, the subsample could have been biased in favor of the Bureau.

To be clear, it makes no difference whether the Bureau *in fact* chopped the data and announced only the most favorable snippets.  The Bureau's use of secret data and methodologies did not permit commenters to assess whether the Bureau had done so—or to point out any number of additional hidden flaws, intentional or otherwise.  That approach violated the notice-and-comment requirements of the APA.

## II.    The Bureau's Use of the Y-14 Data Is Arbitrary and Capricious.

The Bureau's decision to rely on secret data "prejudiced the ability of interested parties," including BPI, "to (1) provide meaningful comments regarding the Final Rule's" assessment of each statutory factor and (2) "mount a credible challenge to the Final Rule."  *Texas v. EPA*, 389 F. Supp. 3d at 506.  To show prejudice, a party "might point to inaccuracies in the . . . data . . . or indicate with reasonable specificity what portions of the data it objects to and how it might have responded if given the opportunity."  *Chamber of Com.*, 443 F.3d at 904 (cleaned up).  This is a low bar, *see id.*, and it is clearly satisfied here:  Based even on the minimal information the Bureau provided about the Y-14 data and its analysis, the Bureau's reasoning is analytically and substantively flawed.

### A.    The Y-14 Data Are Ill-Suited to Assess the Financial Impact of Late Fees on Banks.

The Y-14 data are obviously ill-suited for the task of analyzing the factors Congress instructed the Bureau to consider in setting rules for credit card penalty fees.  As the Bureau *itself* notes, the Y-14 data are collected by the Board and "are used to support the Board's supervisory stress test models"—that is, models meant to evaluate an individual bank's stability and resilience.  Final Rule at 25.  In other words, the Y-14 data are collected by an entirely different

agency for an entirely different purpose.  They are not designed to estimate issuer costs and net late fees assessed for purposes of determining whether the current safe harbor should be reduced—and have never before been used for that purpose.

For good reasons:  *First*, the Y-14 line item the Bureau considered likely significantly understates costs for many or most banks.  Although banks incur a variety of costs from late payments, that Y-14 line item typically incorporates only the *variable* costs borne by banks' collection departments.  BPI Comment at 30.  Banks generally do not report *fixed* costs and supporting services that should be allocated to collection.  *Id.*  These significant costs can include office space, technological equipment, information technology and security, regulatory compliance, accounting, loan servicing, risk management, human resources, and internal audits. *Id.* at 30–31.  Additionally, some costs associated with late payments, such as the cost of fielding and responding to customer inquiries, are borne outside of collection departments and are likely not included in that line item because they are not "collection" costs or generally associated with delinquent accounts.  *Id.* at 31.  And because the Bureau refused to release the Y-14 data, it is impossible to know the extent to which the Y-14 data it considered overlook these costs.

The Bureau failed to respond *at all* to this problem.  To the contrary, the Bureau *acknowledged* concerns that "the Y-14 data are underinclusive of the actual costs that card issuers incur as a result of late payments."  Final Rule at 92.  And it *conceded* that issuers may appropriately include "the costs associated with notifying consumers of delinquencies and resolving delinquencies," *id.* at 40–41, as well as "overhead costs . . . incurred as a result of collecting late payments," *id.* at 42.  But it did not even attempt to explain why the Y-14 data it considered, which typically do not include any of those costs, were an appropriate "source of data" for analyzing issuers' total collection costs.  *Id.* at 41.

11

*Second*, the Y-14 data are an unreliable basis for evaluating "the cost[s] incurred by" issuers, 15 U.S.C. § 1665d(c), and the late fees they assess because they are *not* reported in a uniform manner by different banks.  BPI Comment at 26.  The Bureau purportedly considered a subsample of data reported on line 32 of Schedule D of the Y-14M survey, which instructs banks to report the "costs incurred to collect problem credits" including "the total collection cost for delinquent, recovery, and bankrupt accounts," as well as the data reported for "net fee income."[1] But the Y-14 reporting instructions do not define *any* of these terms or provide more specific direction to banks.

As a result, banks vary in how they report their data and allocate different costs to different items in their reports.  For example, some banks include overhead and fixed costs such as real estate and IT support services—but, as explained, other banks do not, even though a portion of those costs would appropriately be considered as costs incurred as a result of late payments.  BPI Comment at 26.  Similarly, in reporting "net fees," some banks may include fees on accounts that enter repayment plans, while others may not.  *Id.*

Of course, lack of uniform reporting is not important for stress-testing purposes—what principally matters there is that an individual bank's costs are reported *somewhere* in its Y-14 submission.  But that lack of uniformity undermines any assessments of late fees' impact on financial institutions when it is aggregated in a way that assumes it is reported consistently.  That is precisely why the Board in 2010 *rejected* the "results of a study of the costs associated with late payments on credit card accounts issued by ten of the largest credit card issuers"; the Board could not tell whether the information was "consistent from issuer to issuer" because banks

---

[1] *See* Board, *Instructions for the Capital Assessments and Stress Testing Information Collection* 186 (modified Sept. 2022), https://www.federalreserve.gov/apps/reportingforms/Report/Index/FR_Y-14M; Final Rule at 25.

"presumably do not track their costs in a uniform fashion."  Board, *Truth in Lending*, 75 Fed. Reg. 37526, 37541 (June 29, 2010).

Although the Bureau acknowledged "that there may be some variation in the particular costs that issuers report in the Y-14 total collection costs line item," it provided no reasonable explanation for its conclusion that such variations are unimportant.  Final Rule at 41.  The Bureau's explanation amounts to asserting that complying with the cost-analysis approach that its regulations permit as an alternative to the safe harbor would also "involve a certain amount of variability."  *Id.* at 42.  That "explanation" makes no sense.  The fact that issuers using the cost-analysis approach would need to individually allocate a certain amount of overhead or fixed expenses to the costs incurred as a result of late payments, *id.* at 42–43, hardly justifies setting a uniform safe harbor based on a data set where some issuers included those costs, and some did not.

Even the Bureau could not overlook another reason why the Y-14 data are categorically unsuited to its analysis; specifically, in the Bureau's own words, they are "not representative" of "the credit card market" as a whole because they include data from only the largest banks—those with more than $100 billion in assets ($50 billion, prior to 2019).  Bureau, The Consumer Credit Card Market at 17 n.29 (Sept. 2021), https://tinyurl.com/53wuex9w.  Rather than collect representative data, however, the Bureau arbitrarily excluded what it refers to as "Smaller Card Issuers" from the Rule.  *See* Final Rule at 4.

### B.    The Bureau's Analysis of the Y-14 Data Regarding Costs is Fatally Flawed.

As BPI explained in its comment letter, the Bureau's substantive analysis of the Y-14 data is fatally flawed on its face.  Even if the Y-14 data the Bureau considered included all appropriate collection costs, reported in a uniform manner—and thus conceivably permitted an apples-to-apples comparison for purposes of analyzing the statutory cost factor—the Bureau's

methodology for analyzing the data suffers from multiple errors.  For example, it likely overstates the amount of post-charge off collection costs (which the Bureau impermissibly excludes), ignores essential macroeconomic context, and uses an account-weighted average that gives undue weight to potential outliers.  As a result of these methodological flaws alone, the Bureau's bottom-line conclusion and justification for reducing the safe harbor—that current late fees vastly exceed actual collection costs—are likely inaccurate.  But, of course, without access to the underlying data and the Bureau's precise methodology, it is impossible to determine just how biased and inaccurate the Bureau's conclusion might be.

*First*, the Y-14 data the Bureau considered do not accurately present the costs to banks from late payments.  As discussed above, *supra* at II.A, the data are marred by multiple limitations and do not include numerous significant costs to banks.  To take one essential example, not all banks report commissions paid to third-party collection agencies after a loan has been charged off.  *See* BPI Comment at 31, 35.  But the Bureau's calculations baselessly assume that the Y-14 line item consistently incorporates these commissions and applies a uniform adjustment to eliminate these costs.  *See* Final Rule at 47–48.  Indeed, the Bureau purportedly "recognizes that some issuers may not report post-charge-off costs" in the Y-14 data, but asserts, without explanation or evidence, that "these issuers are outliers."  *Id.* at 41.  As Plaintiffs explain, there is no basis in the text of the CARD Act for preventing issuers from recouping their post-charge off collection costs.  *See* Br. in Supp. of Prelim. Inj. at 17–19.  By doing so, the Bureau impermissibly amended the CARD Act without congressional action.  But even if the Bureau could permissibly exclude post-charge off collection costs, it is manifestly unreasonable to apply an across-the-board deduction to reported Y-14 costs to account for them, when banks do not uniformly include such costs in the first place.  For both reasons, the Bureau's

methodology results in an exaggerated payment-to-cost ratio—the principal basis for the Bureau's reducing the safe harbor to $8.

*Second*, the Bureau underestimates costs by failing to adequately consider the macroeconomic context. *See* BPI Comment at 36. The Bureau's proposal relied on Y-14 data from 2016 through 2022, but this period is not remotely representative of the long-term performance of the credit card market. *See id.* at 37. Charge-off rates since 2016 have been well below the long-term average and fell to historically low levels after 2020. *See id.* Consequently, the Y-14 data on which the Bureau relied very likely understates issuers' collection costs in a more typical macroeconomic climate. The Bureau failed to address this problem in the Rule.

*Third*, the Bureau did not consider the disadvantages of weighing the Y-14 data by the number of accounts at a specific bank. *See* BPI Comment at 32–33. The Bureau calculated an industry average payment-to-cost ratio by weighting each Y-14 reporting institution according to the number of accounts it has. *Id.* at 32. This weighting is sensitive to measurement error and outlier effects—for example, if just a few of the biggest institutions have an usually large missing cost component, it would result in a significant upward bias for the ratio the Bureau calculated for the entire Y-14 data set. *Id.* at 32–33. The Bureau did not discuss the potential limitations of using the account-weighted average, nor did it explain why it chose to do so.

As the economic analysis in BPI's comment letter explains, correcting these methodological problems alone would have resulted in a significant difference in the Bureau's bottom-line conclusion regarding the costs issuers actually incur as a result of late fees. *See* BPI Comment at 39. And when these methodological problems are combined with the underlying flaws in the Y-14 data—*i.e.*, that they do not generally, much less uniformly, include relevant and important costs—there is simply no support for the Bureau's enormous reduction in the safe

15

harbor.  *See id.*  Of course, that conclusion follows solely from the data and methodology the Bureau was *willing* to release.  There is no telling how many other flaws commenters might have uncovered if the Bureau had complied with its obligations and publicized the Y–14 data and related analyses.

### C.    The Bureau Wrongfully Minimizes the Deterrent Effect of Late Fees.

The Bureau's use of the Y-14 data to analyze the deterrent effect of an $8 late fee is likewise deeply flawed.  Regulations superseded by the Rule had "set[ ] a higher late fee safe harbor amount for instances where another late payment occurred over the course of the preceding six [monthly] billing cycles."  NPRM, *Credit Card Penalty Fees (Regulation Z)*, 88 Fed. Reg. 18906, 18920 (Mar. 29, 2023).  Relying on Y-14 data, the Bureau concluded that higher late fees in the seventh month did not deter late payments by consumers.  *Id.*  The Bureau's failure to disclose the data and methodology is particularly egregious with respect to this analysis.  Commenters have absolutely no way to check the Bureau's work, and the Bureau provides no information about parameter estimates, standard errors, and statistical significance levels, other than an unexplained reference to "conventional confidence levels."  *Id.*; *see also* Final Rule at 129–30.

Although reconstruction of the Bureau's analysis without access to the Y-14 data is not possible, the limited information the Bureau provided itself demonstrates a deeply flawed empirical analysis.  The Bureau conducted a so-called "Y-14 seventh month" analysis using a random sample of monthly account-level Y-14 data from 2019 only.  Final Rule at 129–30.  Under the old regulations, the safe harbor for a first-time late fee was $30, and the safe harbor for a second late fee (one within six months of the first late fee) was $41.  If no additional payment was late within six months, the safe harbor reset to $30 in the seventh month.  The Bureau's analysis thus purportedly tested whether the lower late fee in the seventh month led to a distinct

rise in late payments among borrowers whose most recent late payment was seven months prior. And it concluded that because the likelihood of late payments did not increase in month seven, when the late fee returned to $30, higher late fees had no greater deterrent effect. *Id.* at 130.

This conclusion makes no sense on its own—and certainly does not suggest that an unprecedented reduction of late fees to $8 across the board would have no effect on deterrence. As an initial matter, the Bureau's deterrence "analysis" relies on an overly narrow and nonrepresentative subset of data. The Bureau only considered data from 2019. *See* Final Rule at 129. These data do not even encapsulate an entire year, let alone a full economic cycle, and 2019 macroeconomic conditions differ considerably from present ones—including the onset of the pandemic at the end of that year. *See* BPI Comment at 54.

But even if the underlying data were comprehensive and predictive of future economic conditions, the Bureau's conclusions are unsubstantiated. The Bureau interprets the lack of increased late payments in the seventh month as indicating an absence of a deterrent effect tied to the difference in late fees between month seven ($30) and the preceding six months ($41). *See* Final Rule at 130. But this improperly ignores the distinct possibility that the consequences of reduced deterrence unfold *gradually*. *See* BPI Comment at 53. For example, consumers with a bias toward overspending might begin to increase their spending and card balances in month seven leading to a gradual rise in probability of paying late. *See id.* Additionally, even if a decrease in late fees from $41 to $30 exerts no impact on deterrence, the Bureau now proposes a vastly greater reduction in the late-fee safe harbor—from either $30 or $41 to $8—an order of magnitude difference which the Y-14 analysis does not capture.

Setting aside the problems in the Bureau's use of the Y-14 data—which its Final Rule does not even acknowledge, much less explain—its deterrence analysis is overly simplistic and

assumes, wrongly, that all consumers always behave rationally, ignoring the effects of late fees on consumers who are prone to inattention, mistakes, and cognitive biases. The Bureau makes little effort to assess how late fees deter or even benefit these consumers, instead assuming that consumers are rational and pay attention to financial penalties at the time a card payment is due. Indeed, the Bureau's Final Rule simply repeats—nearly verbatim—its analytically flawed focus on "a rational consumer faced with the decision of whether to make a minimum balance payment on time or to put off the payment until later." Final Rule at 127.

But reality belies the assumption that consumers prone to pay late behave rationally and consider the cost of paying late only when a payment is due. For example, some consumers ignore or downplay late fees because they do not expect to be late. As the Bureau recognizes elsewhere—but omits from its deterrence analysis without explanation—these consumers "mistakenly expect high fees to be unimportant to them, as they are overly optimistic about not missing a payment." Final Rule at 247. The Bureau claims that these consumers would "benefit from the changes to late fee amounts, which lower the cost of this mistake." *Id.* The Bureau appears to be saying that someone who does not see any likelihood of missing a payment, as mistaken as that notion might be, would have no reason to behave any differently in the presence of a late fee, large or small, and thus, these consumers would benefit if the inevitable late fees they end up paying were lower. But it is overly simplistic to conclude that late fees have no role in relation to this type of consumer. There is solid empirical evidence of a learning effect associated with incurring late fees; consumers who pay late fees are likely to learn the importance of timely future payments, which means that the *amount* of the fee matters. *See*, *e.g.*, Sumit Agarwal et al., *Learning in the Credit Card Market* (Apr. 24, 2013). The Bureau does not consider this evidence.

Other consumers pay more attention to late fees than to other potentially more significant consequences of paying late, such as interest charges and credit reporting. The Bureau concedes that these consumers would "be harmed in the short run if a reduction in late fees makes it more likely that they mistakenly miss payments." Final Rule at 248. Despite acknowledging that late fees play an important role for consumers who pay more attention to such fees than to other consequences of paying late, the Bureau concedes that it "has not quantified this effect" and assumes without evidence that a lower safe-harbor maximum will "increase issuer incentives to find other approaches to make the consequences of late payment salient to consumers, including reminders or warnings." *Id.* But the Bureau offers no evidence or reasonable analysis to suggest that issuers can make up the deterrent effect of late fees for those consumers.

The Bureau also admits that late fees play an important role in deterring late payments from present-biased consumers for whom penalties "serve as a valuable commitment device" without which they would find it "harder to responsibly managing their credit card debt," once again suggesting that the Rule would incentivize "reminders" or "other mechanisms" to replace late fees. Final Rule at 248. But the Bureau offers no support for the idea that $8 would be enough to deter these consumers from late payments. And it is standard practice for many banks to send reminders and warnings to credit card customers who have missed a payment. Typically, banks also send out reminders of upcoming due dates to credit card customers who have been regularly paying on schedule. Thus, it is not clear why the Bureau believes that banks will increase their use of reminders if the safe-harbor maximum is lowered—many already use these tools—or that increased use would have an additional deterrent effect. *See* BPI Comment at 45.

At bottom, the Bureau fundamentally misunderstands deterrence. It fixates on payment due dates and seems to believe that the sole incentive effect of late fees is to encourage

19

consumers to make payments on time. *See* BPI Comment at 41–42. But payers consider late fees continuously in making financial and budgeting decisions—not just at the end of a month when supposedly deciding whether to make a timely payment at the moment it is due. *See id.* at 42. Late fees therefore motivate greater, long-run attention by consumers to their spending and finances, and they incentivize consumers to meet their debt obligations. *See id.* Instead of considering the ongoing role of late fees, the Bureau fixates on payment due dates, thereby ignoring an important aspect of the problem of late payments and consumer debts.

## CONCLUSION

For these reasons, and the reasons provided by Plaintiffs, the Court should preliminarily enjoin the Rule.

Dated:  March 12, 2024

Respectfully submitted,

 */s/ Eugene Scalia*

Eugene Scalia (*pro hac vice* forthcoming)
Jacob T. Spencer (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Fax:  202.467.0539
*EScalia@gibsondunn.com*
*JSpencer@gibsondunn.com*

Brad G. Hubbard, Bar No. 24090174
Zack Faircloth, Bar No. 24123076
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone:  214.698.3100
Fax:  214.571.2900
*BHubbard@gibsondunn.com*
*ZFaircloth@gibsondunn.com*

*Attorneys for Bank Policy Institute*