### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | |
| Plaintiffs, | |
| v. | Case No.: 4:24-cv-213-P |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

### BRIEF IN SUPPORT OF DEFENDANTS'
### MOTION TO TRANSFER

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................ ii

Introduction ......................................................................................................... 1

Background .......................................................................................................... 2

Argument ............................................................................................................. 5

    Transfer to the District of Columbia Is Appropriate Under Section 1404 ................................ 5

        A.      The U.S. District Court for the District of Columbia is an appropriate venue. ...... 5

        B.      There is good cause for transfer to the U.S. District Court for the District of Columbia. .......................................................................................... 6

        1. The private interest factors favor transfer to D.C. .................................... 7

        a. The location of the record and the parties' attorneys support transfer to D.C. ... 7

        b. "Delay" does not weigh against transfer. ........................................... 8

        2. The public interest factors favor transfer to D.C. .................................... 11

        3. Transferring to D.C. would not mean that all APA cases must be brought there... 15

Conclusion .......................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Adab v. U.S. Citizenship & Immigr. Servs.*,
  2015 WL 6249563 (C.D. Cal. Feb. 9, 2015)..........................................................................14

*Alpha Servs., LLC v. Looman*,
  2023 WL 6795545 (E.D. La. Oct. 13, 2023) ........................................................................13

*Atl. Sounding Co. v. Townsend*,
  557 U.S. 404 (2009)..............................................................................................................15

*Batra v. U.S. Citizenship & Immigr. Servs.*,
  2021 WL 4353112 (C.D. Cal. Aug. 2, 2021)........................................................................14

*Chakrabarti v. U.S. Citizenship & Immigr. Servs.*,
  2021 WL 4458899 (D. Md. Sept. 29, 2021) ...........................................................................8

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ..................................................................................................4

*Cook Cnty., Illinois v. Wolf*,
  498 F. Supp. 3d 999 (N.D. Ill. 2020) ...................................................................................16

*Def. Distributed v. Bruck*,
  30 F.4th 414 (5th Cir. 2022) ................................................................................................14

*Do No Harm v. Pfizer Inc.*,
  2024 WL 949506 (2d Cir. Mar. 6, 2024)..............................................................................13

*Hidden Values, Inc. v. Sandoval*,
  2009 WL 10677477 (N.D. Tex. June 26, 2009) ...................................................................15

*Hoban v. U.S. Food & Drug Admin.*,
  2018 WL 3122341 (D. Minn. June 26, 2018)..........................................................................8

*In re Clarke*,
  94 F.4th 502 (5th Cir. 2024) ..........................................................................................12, 14

*In re TikTok, Inc.*,
  85 F.4th 352 (5th Cir. 2023) .............................................................................................7, 14

*In re Volkswagen of Am., Inc.*,
  545 F.3d 304 (5th Cir. 2008) ..........................................................................................*passim*

*Inst. for Free Speech v. Johnson*,
  2023 WL 7420281 (N.D. Tex. Nov. 8, 2023)..........................................................................8

*John Doe v. Pub. Co. Acct. Oversight Bd.*,
   2024 WL 1096546 (N.D. Tex. Mar. 13, 2024) ................................................................. 12

*Mashpee Wampanoag Tribe v. Zinke*,
   2019 WL 2569919 (D.D.C. June 21, 2019) ...................................................................... 14

*Norwood v. Kirkpatrick*,
   349 U.S. 29 (1955) ........................................................................................................... 6

*Nat. Res. Def. Council v. Thomas*,
   805 F.2d 410 (D.C. Cir. 1986) ......................................................................................... 14

*L. v. Session*s,
   2017 WL 2405331 (S.D. Tex. June 2, 2017) ..................................................................... 6

*State of Fla. v. Dep't of Health & Hum. Servs.*,
   19 F.4th 1271 (11th Cir. 2021) ....................................................................................... 16

*Stewart v. Azar*,
   308 F. Supp. 3d 239 (D.D.C. 2018) ................................................................................ 14

*Texas v. Becerra*,
   667 F. Supp. 3d 252 (N.D. Tex. 2023) ............................................................................ 16

*Wolfram Alpha LLC v. Cuccinelli*,
   490 F. Supp. 3d 324 (D.D.C. 2020) .................................................................................. 8

**Statutes**

5 U.S.C. § 701 ................................................................................................................... 13

15 U.S.C. § 1665d(a) ........................................................................................................... 3

15 U.S.C. § 1665d(b) ........................................................................................................... 3

15 U.S.C. § 1665d(e) ........................................................................................................... 3

28 U.S.C. § 1391(e) ............................................................................................................. 5

28 U.S.C. § 1404(a) ..................................................................................................... *passim*

28 U.S.C. § 1406 ................................................................................................................. 2

**Regulations**

12 C.F.R. § 1026.6(b)(3) .................................................................................................... 10

12 C.F.R. § 1026.9(c)(2)(v)(A) .......................................................................................... 10

CFPB, Credit Card Penalty Fees (Regulation Z) (Mar. 5, 2024)............................................ 3, 10

**Other Authorities**

Bread Financial Holdings, Inc., *FQ 2023 Earnings Call Transcript* (Jan. 25, 2024).................. 11

CFPB, *The Consumer Credit Card Market* (Oct. 2023)................................................. 9

Equifax, *U.S. National Consumer Credit Trends Report: Originations* (Sept. 27, 2023)............. 9

Louisiana Ass'n of Bus. and Indus., *An Invisible Giant:*
   *Maritime Industry in Louisiana, Maritime Workforce Study* (2015)....................................... 15

Synchrony Financial, Form 8-K (Mar. 5, 2024) ........................................................ 10

U.S. District Courts, *Median Time From Filing to Disposition of Civil Cases,*
   *by Action Taken* ..................................................................................... 12

## INTRODUCTION

This case involves a challenge by several trade associations to a Consumer Financial Protection Bureau (Bureau) regulation governing the late fees charged by the nation's largest credit card issuers. Among the Plaintiffs are trade associations representing the interests of those large credit card issuers nationwide—the Chamber of Commerce of the United States, the American Bankers Association, and the Consumer Bankers Association. Rather than sue in Washington, D.C.—where the Bureau promulgated the regulation, and where all those large trade associations are headquartered—Plaintiffs have challenged the regulation in Fort Worth, Texas.

The Court should transfer this case because it has no adequate connection to either the Northern District of Texas or the Fort Worth Division. Plaintiffs hang their case for venue on two things: the presence of the Fort Worth Chamber of Commerce in the litigation, and the fact that the various Plaintiffs' members issue credit cards to consumers in this District (like every other district in the country). But the Fort Worth Chamber has not identified among its members a single large card issuer subject to the rule that resides in Fort Worth—and, indeed, it does not appear that *any* affected card issuer (member or not) is based here. To the contrary, the only card issuer the Fort Worth Chamber specifically identifies on its membership rolls is a Utah-based bank. That an out-of-state financial institution paid to join the local chamber of commerce is not nearly a strong enough tie to Fort Worth to hold up Plaintiffs' efforts to secure venue in this Division. Nor is there an adequate tie just because the 30 to 35 large card issuers affected by the Rule have customers in this District. The same could be said about literally any venue in the country. By Plaintiffs' logic, the D.C.-based associations or Utah-based bank wouldn't even need the Fort Worth Chamber to secure venue in this Court; they could sue here whenever a rule affected their dealings with any consumer in this district. That is not enough.

1

Even if venue were proper here, the Court should transfer this case to the U.S. District Court for the District of Columbia. Such a transfer is justified under 28 U.S.C. § 1404(a). It would be more convenient to resolve this case in the district where the Bureau promulgated the regulation, and where the majority of the litigants—three of the Plaintiffs and all Defendants—and nearly all the attorneys reside. On the other side of the ledger, there is no special interest in having a Fort Worth court resolve a challenge to a national regulation governing fees charged by the country's largest credit card issuers, none of which are based here. It would be contrary to the interests of justice to allow Plaintiffs to claim a sufficient connection to whatever division they choose by having a regulated entity join a local chamber of commerce in a city to which it otherwise has no particular connection.

In any event, a transfer of this case (or dismissal) is necessary under 28 U.S.C. § 1406 because—as laid out in Defendants' opposition to Plaintiffs' motion for a preliminary injunction—venue is improper in this District and Division. Defendants do not brief that here because the Court invited a motion to transfer only under § 1404. Defendants reserve the right to file a motion to dismiss or transfer under § 1406, as needed, and of course would be happy to provide the Court any additional briefing on whether venue properly lies in this District.

## BACKGROUND

Plaintiffs in this case—a group of trade associations—have sued the Consumer Financial Protection Bureau and its Director over regulations the Bureau promulgated under the Credit Card Accountability and Disclosure Act (the CARD Act).[1] As relevant here, the CARD Act (1) mandates that the fees credit card issuers impose on consumers who fail to pay on time must

---

[1] The Bureau provided additional background on the statute and regulation in its opposition to Plaintiffs' motion for a preliminary injunction, *see* ECF No. 23.

be "reasonable and proportional" to the violation; (2) instructs the Bureau to "establish standards for assessing whether" any late fee satisfies that directive; and (3) authorizes—but does not require—the Bureau to establish a "safe harbor" fee amount presumed to be reasonable and proportional. *See* 15 U.S.C. § 1665d(a), (b), (e). Exercising that authority, the Bureau—a federal agency based in Washington, D.C.—issued a final rule on credit card late fees on March 5, 2024. *See* CFPB, Credit Card Penalty Fees (Regulation Z) (Mar. 5, 2024) (Late Fee Rule or Rule).[2] Among other things, the Late Fee Rule repeals the previously applicable safe harbor amount for late fees charged by the nation's largest credit card issuers, which the Bureau found was unjustifiably high. *See id.* at 102–04. The Rule then institutes a new, lower safe harbor that the Bureau has determined is reasonable and proportional, consistent with the CARD Act's mandates. *See id.* at 102–04, 123. These changes are applicable to approximately 30 to 35 large credit card issuers nationwide—issuers that, together with their affiliates, each have one million or more open credit card accounts. *See id.* at 61, 259.

Two days after the Bureau published the Late Fee Rule on its website, Plaintiffs sued to vacate and enjoin the regulation in the Fort Worth Division of the Northern District of Texas. *See* Compl. ¶ 8, ECF No. 1. Plaintiffs are six business associations of varying sizes and scopes. Three are national trade associations headquartered in Washington, D.C., that have a nationwide focus and count the nation's largest financial institutions among their members: the Chamber of Commerce of the United States, the American Bankers Association, and the Consumer Bankers Association. *See* Compl. ¶¶ 9, 12–13. Two more are based elsewhere in Texas and focus on either state or local economic issues: the Texas Association of Business and the Longview Chamber of

---

[2] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf (last visited Mar. 21, 2024).

Commerce. *See* Compl. ¶¶ 11, 14. Only one—the Fort Worth Chamber of Commerce—is located in this judicial District. *See* Compl. ¶ 10. According to the Fort Worth Chamber, its "core mission is to cultivate a thriving business climate in the Fort Worth region." App'x to PI Mot. at 22 (Montgomery Decl. ¶ 3), ECF No. 5.

In their first claim for relief, Plaintiffs raise a constitutional challenge to the Bureau's statutory funding mechanism under the Appropriations Clause and separation-of-powers principles. *See* Compl. ¶¶ 86–87. This claim mirrors a challenge to Bureau rulemaking that the Fifth Circuit endorsed, but the Supreme Court is now reviewing, in *Community Financial Services Ass'n of America, Ltd. v. CFPB*, 51 F.4th 616, 638 (5th Cir. 2022), *cert granted*, 143 S. Ct. 978 (2023). *See* Compl. ¶¶ 86–87. Plaintiffs also raise four claims under the Administrative Procedure Act (APA). *See* Compl. ¶¶ 88–107.

The same day they filed the complaint, Plaintiffs moved to preliminarily enjoin the Rule based on their constitutional challenge and a subset of their APA claims. *See* Pls.' Mot. for Preliminary Inj., ECF No. 3. The Bureau opposed. *See* Bureau Br. in Supp. of PI Opp'n (PI Opp'n), ECF No. 23. Among other arguments raised in opposition, the Bureau contended that Plaintiffs are not likely to succeed on the merits of their claims because venue in this District is improper. *See id.* at 9–13.

Shortly after the completion of preliminary injunction briefing, on March 18, 2024, the Court asked the parties to address its "concerns regarding whether the Fort Worth Division of the Northern District of Texas is the correct venue to hear this lawsuit." Order, ECF No. 45. In particular, the Court noted it is "weary that there appears to be an attenuated nexus to the Fort Worth Division, given only one plaintiff of the six has even a remote tie to the Fort Worth Division." *Id.* The Court thus set a schedule for additional briefing, and in the alternative invited

4

the Bureau to file a motion to transfer the case. *Id.* On March 19, 2024, the Bureau gave notice to the Court that it intended to move to transfer.

## ARGUMENT

### TRANSFER TO THE DISTRICT OF COLUMBIA IS APPROPRIATE UNDER SECTION 1404.

The Court correctly noted "that that there appears to be an attenuated nexus to the Fort Worth Division, given only one plaintiff of the six in this matter has even a remote tie to the Fort Worth Division." Order, ECF No. 45. Thus, even if this District were a proper forum—it's not, as the Bureau explained in its opposition to Plaintiffs' preliminary injunction motion, PI Opp'n at 9–13—a transfer to the United States District Court for the District of Columbia would be appropriate under 28 U.S.C. § 1404.

Under § 1404, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

**A. The U.S. District Court for the District of Columbia is an appropriate venue.**

The "preliminary question under § 1404(a) is whether a civil action might have been brought in the destination venue." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 312 (5th Cir. 2008). Plaintiffs undoubtedly could have filed this suit in D.C. The venue statute applicable to suits against the federal government provides that venue is proper where: "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e). Underscoring the connection between D.C. and this case, venue would be proper under *each prong* of the statutory test. The Bureau resides in D.C. A substantial part of the events giving rise to the claim—indeed, the central event giving rise to this suit, the issuance of the challenged regulation—occurred in

D.C. Finally, three of the plaintiff associations (the U.S. Chamber of Commerce, the American Bankers Association, and the Consumer Bankers Association) call D.C. home—and unlike the Fort Worth Chamber of Commerce, they have properly pleaded standing to bring this suit. *See* PI Opp'n at 9–13.

### B. There is good cause for transfer to the U.S. District Court for the District of Columbia.

Having easily cleared this preliminary hurdle, the Bureau must show that there is "good cause" for the transfer. *Volkswagen*, 545 F.3d at 315. Good cause exists when the moving party "satisfies the statutory requirements and clearly demonstrate that a transfer is for the convenience of parties and witnesses, in the interest of justice." *Id.* (cleaned up). Importantly, "while a plaintiff has the privilege of filing his claims in any judicial division appropriate under the general venue statute, § 1404(a) tempers the effects of the exercise of this privilege." *Id.* at 313. Indeed, "[t]he underlying premise of § 1404(a) is that courts should prevent plaintiffs from abusing their privilege under [28 U.S.C.] § 1391 by subjecting defendants" to venues that lack any substantial connection to the litigation.[3] *Id.* Thus, "when the plaintiff's chosen forum has little or no factual connection to the case, the plaintiff's choice carries less weight." *L. v. Session*s, No. 4:16-cv-2799, 2017 WL 2405331, at *2 (S.D. Tex. June 2, 2017).

The Fifth Circuit has identified eight factors that the Court may consider in assessing whether a transfer is appropriate. *Volkswagen*, 545 F.3d at 315. Four of these factors are referred to as the "private interest factors"; they are: "(1) the relative ease of access to sources of proof; (2)

---

[3] Notably, transfers under § 1404(a) are to be more freely granted than dismissals ordered on forum non conveniens grounds. *See Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955) ("Congress, by the term 'for the convenience of parties and witnesses, in the interest of justice,' intended to permit courts to grant transfers upon a lesser showing of inconvenience" than had been required to dismiss on forum non conveniens grounds).

the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* And four of the factors are referred to as the "public interest factors"; they are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* (citation omitted). "No factor is of dispositive weight," and the Fifth Circuit has "cautioned against a raw counting of the factors that weighs each the same." *In re TikTok, Inc.*, 85 F.4th 352, 358 (5th Cir. 2023) (cleaned up). "A district court abuses its discretion by denying transfer when not a single relevant factor favors the plaintiff's chosen venue." *Id.* (cleaned up).

The private and public interest factors here favor transfer. Transfer is therefore warranted "[f]or the convenience of parties and witnesses," and because transfer is "in the interest of justice[.]" 28 U.S.C. § 1404(a).

### 1. The private interest factors favor transfer to D.C.

#### a. The location of the record and the parties' attorneys support transfer to D.C.

The private factors, which focus on the convenience of the parties and witnesses in litigating in the chosen District or Division, point in favor of transferring this case to the District of Columbia. Plaintiffs' complaint raises constitutional and APA claims about decisions a federal government agency made from its headquarters in Washington, D.C. Although review of final agency action is generally based on the administrative record—rather than through the presentation of witnesses or discovery materials—courts have found that the location of that record nevertheless "carries some weight" in favor of transfer to the place where the agency made the decision and

7

holds the relevant material. *See Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 333–34 (D.D.C. 2020); *Chakrabarti v. U.S. Citizenship & Immigr. Servs.*, No. 21-cv-1945-PJM, 2021 WL 4458899, at *4 (D. Md. Sept. 29, 2021).

Beyond that, other practical problems with litigating this case would be obviated by transfer to the District of Columbia. Perhaps unsurprisingly, given the presence of so many Washington-based plaintiffs, nearly all the attorneys in this case are based in D.C. Indeed, the only ones based in Texas are two of Plaintiffs' counsel (out of eight total). As this court has recognized, transfer of venue to the location where most counsel "maintain their law practices . . . would reduce attorneys' fees and travel costs for counsel on both sides." *Inst. for Free Speech v. Johnson*, No. 4:23-cv-0808-P, 2023 WL 7420281, at *3 (N.D. Tex. Nov. 8, 2023) (Pittman, J.); *see also Hoban v. U.S. Food & Drug Admin.*, No. 18-cv-269-JNE/LIB, 2018 WL 3122341, at *2 (D. Minn. June 26, 2018) (reasoning that "convenience to counsel" is relevant to "the comparative costs to the parties of litigating in each forum").

### b. "Delay" does not weigh against transfer.

Plaintiffs claimed in their motion to expedite consideration of their request for a preliminary injunction that the "delay" a transfer would cause "weighs heavily against transfer." Br. in Supp. of Pls.' Mot. Expedite at 10 (Expedite Br.), ECF No. 48. Not so. For starters, any delay here is one of Plaintiffs' own making. They are the ones that chose to file suit in a District with no real ties to this dispute.

Plaintiffs also greatly overstate the gravity and immediacy of any harm that any "delay" will cause them. Plaintiffs claim that they imminently face two irreparable harms if they do not get a preliminary injunction immediately, but those claims of imminent harm just aren't true.

First, Plaintiffs contend that delay is harming them because the Rule means they will have to print and distribute updated applications and disclosure materials for new card accounts, and that they need four months to prepare those disclosures. Expedite Br. at 2. But there are still 54 days before they have to do that—leaving adequate time for the transferee court to consider their motion. Besides, the vast majority of new credit card accounts are now opened online, and thus are not submitted on paper applications.[4]

And there is reason to doubt Plaintiffs' assertion that card issuers need four months to change account-opening disclosures to list a lower late fee. When credit card issuers have wanted to change any account-opening disclosures to increase fees, they have updated both digital and printed materials quickly and without complaint. Take Comenity Bank, a member of the U.S. Chamber of Commerce whose President submitted a declaration asserting that the Bank will "incur significant compliance costs" in support of Plaintiffs' preliminary injunction motion. *See* App'x to PI Mot. at 44 (Schlacter Decl. ¶ 12). When the Bureau last increased the safe harbor amount for inflation on November 2, 2021, Comenity updated its account agreements to list a new, higher maximum late fee of $41 by the end of January of 2022—the same month the new safe harbor became effective. *See* App'x to Mot. to Transfer at 5–6, 21 (Comenity credit card agreement with a timestamp of January 27, 2022, submitted to the Bureau as part of its quarterly collection of

---

[4] In 2022, for example, 86 percent of general purpose credit card and 44 percent of retail card applications were submitted via digital channels. *See* CFPB, *The Consumer Credit Card Market* at 79 (Oct. 2023), *available at* https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf (last visited Mar. 21, 2024) (2023 Late Fee Report). Given the total number of accounts opened each month—about 7 million general purpose and 2 million retail credit cards, *see* Equifax, *U.S. National Consumer Credit Trends Report: Originations* at 32, 41 (Sept. 27, 2023), *available at* https://assets.equifax.com/marketing/US/assets/EFX_OriginationCreditTrends_202308.pdf (last visited Mar. 21, 2024)—the Bureau estimates that more than three-quarters of new accounts (or, roughly 7 of the 9 million) are opened without any physical application containing disclosures.

credit card agreements). In the preamble to the Final Rule, the Bureau noted that such quick updates to account agreements are common, considering and rejecting card issuers' concerns about the purported difficulty of updating physical disclosures. *See* Late Fee Rule at 220 ("[T]he CFPB notes that such changes to the numerical amount of late fees are something that card issuers frequently do.").

Plaintiffs' second claimed imminent harm is even more contrived. They complain that affected card issuers will need to send notice to millions of existing customers "*by March 29, 2024*" (emphasis Plaintiffs') in order to give consumers the required 45 days' notice of a change in terms. Expedite Br. at 2. But nothing in the Late Fee Rule requires them to do that. TILA and Regulation Z do not require card issuers to send any advance notice to consumers about the upcoming *reduction* in late fees that the Rule will likely cause. *See* 12 C.F.R. § 1026.9(c)(2)(v)(A) (requiring no advance notice for reduction in any "finance or other charge"); *see also id.* § 1026.6(b)(3) & Comment 6(b)(3)(ii) (making clear that the relevant charges include late payment fees).

To the extent large card issuers need to send a notice by March 29, that would only be if *they* choose to try to offset losses caused by the Late Fee Rule by raising *other* fees and rates for which a 45-day change-in-terms notice is required. But the Rule does not require them to do that— and certainly not by the Rule's May 14 effective date. The credit card industry's profitability doesn't depend on some sort of daily balancing of revenue sources and costs. Large card issuers— including ones (indirectly) involved in this litigation—have repeatedly indicated that they have a longer-term view of the impacts of the Late Fee Rule. Those few issuers that have indicated plans to try to offset the effects of the Late Fee Rule—and not all have—have made clear that any revenue recovery will happen over time. *See* Synchrony Financial, Ex. 99.1 to Form 8-K at 3 (Mar.

10

5, 2024)[5] (indicating in a recent SEC filing that its ability to offset any lost revenue from the Rule "will build through the year"); Bread Financial Holdings, Inc., *FQ 2023 Earnings Call Transcript* (Jan. 25, 2024)[6] (parent company of Comenity noting that it expects "substantial progress" in mitigating the financial impact of the Rule "within the first four quarters post-implementation"). Besides, history belies again Plaintiffs' claim that large card issuers cannot quickly provide consumers with change-in-terms notices. When the Bureau last adjusted the late fee safe harbor upward on November 2, 2021, on December 6—less than five weeks later—Comenity sent the required notice to at least some cardholders that it was increasing the maximum late fee to $41. *See* App'x to Mot. to Transfer at 32. Plaintiffs cannot manufacture an emergency in order to avoid transfer out of a venue where their case does not belong.

In sum, the private interest factors favor transferring this case to the district where the Bureau issued the regulation and the majority of the litigants and attorneys are based.

### 2. The public interest factors favor transfer to D.C.

The public interest factors also weigh in favor of a transfer. The first factor is "the administrative difficulties flowing from court congestion." *Volkswagen*, 545 F.3d at 315. It militates in favor of transfer. This District is more congested than D.C., as demonstrated by two basic facts. First, as this Court recently pointed out in denying Plaintiffs' motion to expedite, in 2023, there were 584 filings per judgeship here, as opposed to 298 in D.C. *See* Order Denying Mot. Expedite at 2, ECF No. 51. Indeed, the Court remarked that this statistic undersells the caseload burdens of this Division, given that Fort Worth has nearly one million residents, but this

---

[5] *Available at* https://investors.synchrony.com/filings-regulatory/sec-filings/all-sec-filings/content/0001601712-24-000098/0001601712-24-000098.pdf (last visited Mar. 21, 2024).

[6] *Available at* https://seekingalpha.com/article/4665034-bread-financial-holdings-inc-bfh-q4-2023-earnings-call-transcript (last visited Mar. 21, 2024).

Division has only two active judges. *Id. See also John Doe v. Pub. Co. Acct. Oversight Bd.*, No. 3:23-cv-0149-S, 2024 WL 1096546, at *7 (N.D. Tex. Mar. 13, 2024) (noting higher case burden in this District as opposed to D.C. while granting a motion to transfer a case to D.C.). Second, the median time from filing to disposition of civil cases is more than 25 percent shorter in D.C. than it is in this District: the median time to disposition in D.C. is 5.1 months, as opposed to the 6.5 months it takes in this busier District. U.S. DIST. CTS., *Median Time From Filing to Disposition of Civil Cases, by Action Taken*.[7] There is no need to add to this congestion a case with (at best) an "attenuated nexus to the Fort Worth Division."[8] Order, ECF No. 45.[9]

The next factor is "the local interest in having localized interests decided at home." *Volkswagen*, 545 F.3d at 315. This "inquiry is concerned with the interest of non-party citizens in adjudicating the case." *In re Clarke*, 94 F.4th 502, 511 (5th Cir. 2024). "Considerations such as the location of the injury, witnesses, and the plaintiff's residence are useful proxies for determining what local interests exist in each venue." *Id.* (cleaned up). This factor is neutral, but crucially does not weigh in favor of this District. Take first the place of the injury. Plaintiffs are suing on behalf of their allegedly injured members—not one of whom they have identified as being in this District. Indeed, the Fort Worth Chamber of Commerce is the only Plaintiff that calls this District home—

---

[7] *Available at* https://www.uscourts.gov/statistics/table/c-5/federal-judicial-caseload-statistics/2023/03/31 (last visited Mar. 21, 2024).

[8] Indeed, as noted in Defendants' brief in opposition to Plaintiffs' motion for a preliminary injunction, the nexus to this District is actually nonexistent because the Forth Worth Chamber of Commerce lacks standing, and therefore cannot serve as a hook for venue. PI Opp'n at 9–13.

[9] The Fifth Circuit in *In re Clarke*, 94 F.4th 502, 510 (5th Cir. 2024), concluded that statistics such as these should take a back seat to a district court's own evaluation of its "docket efficiency." But it did not indicate an alternative to the reliance on these statistics (which is common, *see, e.g.*, *Pub. Co. Acct. Oversight Bd.*, 2024 WL 1096546, at *7), and these statistics give the parties, as outsiders to the court's operation, the best indication of the relevant "docket efficiency" and congestion of the two courts.

and no local member who has been injured has been identified. The only member that it has identified, Synchrony Bank, is a Utah bank. App'x to PI Mot. at 55. In the reply in support of their preliminary injunction, Plaintiffs raise a flurry of arguments in an effort to draw a connection between this case and this District, *see* Reply at 4–5, ECF No. 41, but none of those arguments identifies an injured member in this District. They make anonymized allegations indicating that there are injured members in this District—but "hey, trust us" is not a recognized principle in our adversary system. *Cf. Do No Harm v. Pfizer Inc.*, No. 23-15, 2024 WL 949506, at *2 (2d Cir. Mar. 6, 2024) (requiring Plaintiff to identify injured member at preliminary injunction stage). Given that the policy is a national one, any alleged injury is not centrally located in this District (or D.C.). The location of witnesses favors D.C., as indicated above. *See* § B.1.a. The last proxy is the Plaintiffs' residence. Only one Plaintiff is located in this District, but it lacks standing. *See* PI Opp'n at 11–12. And a plurality of the Plaintiffs are located in D.C. But given that they are allegedly advocating for members spread throughout the country (and that the policy applies nationally), this element too does not favor this District or D.C.

Third on the list of public interest factors is "the familiarity of the forum with the law that will govern the case." *Volkswagen*, 545 F.3d at 315. This factor too weighs in favor of a transfer to D.C. Plaintiffs raise claims under two distinct bodies of law, federal constitutional law and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. Compl. ¶¶ 86–107. The constitutional claims do not move the needle: Courts in this District and D.C. are undoubtedly equally familiar with the requirements of the Constitution. *E.g., Alpha Servs., LLC v. Looman*, No. 23-cv-2988, 2023 WL 6795545, at *7 (E.D. La. Oct. 13, 2023) (holding that courts are equally familiar with constitutional law). And the constitutional claim will soon be resolved by the Supreme Court anyway. But the story is different when it comes to the APA. Judges in this forum are undoubtedly capable of

13

adjudicating any case before them. But whether to transfer is not a question of absolutes. Rather, the "transfer factors are relative." *In re Clarke*, 94 F.4th at 510. And, as a forum, D.C. is more "familiar[ ]" with the APA, given that, as the home of many federal agencies, it has traditionally been a hub of APA litigation. *See, e.g.*, *Stewart v. Azar*, 308 F. Supp. 3d 239, 248 (D.D.C. 2018) ("If anything, this Court [D.D.C.] has more experiences with APA cases, which would weigh against transfer."); *Mashpee Wampanoag Tribe v. Zinke*, No. 18-cv-2242-RMC, 2019 WL 2569919, at *8 (D.D.C. June 21, 2019) (similar); *Adab v. U.S. Citizenship & Immigr. Servs.*, No. 2:14-cv-04597-CAS-AGRx, 2015 WL 6249563, at *6 (C.D. Cal. Feb. 9, 2015) (explaining that "if anything, the United States District Court for the District of Columbia is more familiar with Administrative Procedure Act . . . challenges" than other courts); *Batra v. U.S. Citizenship & Immigr. Servs.*, No. 2:21-cv-02489-SB-AFM, 2021 WL 4353112, at *5 (C.D. Cal. Aug. 2, 2021) (same). A review of the number of decisions in Westlaw referencing the APA provides a window into the differing familiarity of the fora with that law: Over 5,700 D.C. district court decisions reference the "Administrative Procedure Act," whereas fewer than 540 decisions in this District reference it. Importantly, this case involves not just meat-and-potatoes APA issues, *see In re TikTok, Inc.*, 85 F.4th at 366, but also an uncommon issue about the use of confidential information in notice-and-comment rulemaking that the D.C. district court has some experience with. *See NRDC v. Thomas*, 805 F.2d 410, 418 n.13 (D.C. Cir. 1986). Moreover, the D.C. forum's familiarity with the APA, combined with the significantly lower caseloads carried by judges there, may allow for a "meaningful efficiency" in the resolution of this matter, "rendering [D.C.] a more convenient forum." *Def. Distributed v. Bruck*, 30 F.4th 414, 436 (5th Cir. 2022).

This should come as no surprise. Familiarity is a matter of experience, and the experience of district courts is shaped in significant part by geography (e.g., the presence of so many federal

agencies in D.C.'s borders). Indeed, this pattern plays out similarly in other areas of the law. For example, the courts of the Eastern District of Louisiana, given the area's strong maritime economy, Louisiana Ass'n of Bus. and Indus., *An Invisible Giant: Maritime Industry in Louisiana, Maritime Workforce Study*, at 14 (2015),[10] would be expected to be more familiar than D.C. courts with the Jones Act, which "created a statutory cause of action for negligence" for seamen, *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 415 (2009). And a Westlaw search reflects just that fact: the phrase "Jones Act" has found its way into over 2,800 opinions from the Eastern District of Louisiana, whereas fewer than 50 district court opinions from D.C. mention it. Some courts assume that all federal courts are equally familiar with all federal laws, *see, e.g.*, *Hidden Values, Inc. v. Sandoval*, No. 3:09-cv-0034-B, 2009 WL 10677477, at *6 (N.D. Tex. June 26, 2009), but this approach ignores the differences that naturally arise within our geographically based court system.

There is no issue with the conflict of laws or the application of foreign laws, so those factors are neutral.

### 3. Transferring to D.C. would not mean that all APA cases must be brought there.

Now is as good a point as any to address Plaintiffs' argument, raised in the brief in support of their motion to expedite, Expedite Br. at 11, that "if this Court were to order transfer to the District for the District of Columbia, for example, on this record, one would wonder how any facial challenge under the Administrative Procedure Act could be brought in district courts outside of the District of Columbia."

Plaintiffs should wonder no more. The answer is simple: Bring a case that has more than "an attenuated nexus" to the court in which suit is brought. If a plaintiff large bank had sued at the

---

[10] *Available at* https://labi.org/wp-content/uploads/2021/06/
Maritime_Workforce_Study_LABI_LCTCS.pdf) (last visited Mar. 21, 2024).

location of its headquarters, for example, that would be a different matter. Indeed, as Plaintiffs well know, APA challenges regularly proceed in districts outside of D.C. *See, e.g.*, *Cook Cnty., Illinois v. Wolf*, 498 F. Supp. 3d 999 (N.D. Ill. 2020) (APA and constitutional challenge to DHS's "public charge" rule); *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271 (11th Cir. 2021) (APA and constitutional challenge to interim rule regarding vaccination requirements for healthcare employees); *Texas v. Becerra*, 667 F. Supp. 3d 252 (N.D. Tex. 2023) (APA challenge to rule regarding the vaccination of school district employees). Transferring this case, then, would not be inconsistent with the handling of venue in these (and many other) non-D.C. APA cases, or Congress's recognition in § 1391(e) that plaintiffs can bring lawsuits against the federal government in places other than in D.C. (i.e., the place that most federal agencies reside). Rather, it would demonstrate that plaintiffs cannot "abus[e] their privilege under [28 U.S.C.] § 1391 by subjecting defendants to venues that" lack any substantial connection to the litigation. *Volkswagen*, 545 F.3d at 313 (cleaned up).

And, let there be no doubt: Plaintiffs did abuse their privilege under § 1391. No plaintiff is a large card issuer based in this District. Indeed, only one plaintiff is based in this District—the Fort Worth Chamber of Commerce, suing for alleged injuries inflicted on its members. But the only injured member that it identifies is an out-of-state bank whose interests have no connection to the Fort Worth Chamber's proclaimed mission of "cultivat[ing] a thriving business climate in the Fort Worth region." App'x to PI Mot. at 21 (Montgomery Decl. ¶ 3). The other Texas plaintiffs are not based in this District and do not identify any injured members. As for the other plaintiff associations, they do identify injured members, but those associations are based in Washington, D.C.—and the identified members are *not based* in this District. A transfer to D.C.—where three

16

Plaintiffs reside, where Defendants reside, and where the central act at issue in this suit (the issuance of the Rule) took place—would rectify Plaintiffs' errant venue selection.

## CONCLUSION

For the foregoing reasons, the Court should grant the Bureau's motion and transfer this case to the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1404.

DATED: March 21, 2024                                    Respectfully Submitted,

SETH FROTMAN
*General Counsel*

STEVEN Y. BRESSLER
*Deputy General Counsel*

KRISTIN BATEMAN
*Assistant General Counsel*

*/s/ Stephanie B. Garlock*
STEPHANIE B. GARLOCK*
*Counsel*
JUSTIN M. SANDBERG*
*Senior Counsel*
Consumer Financial Protection Bureau
1700 G St. NW
Washington, D.C. 20552
Stephanie.Garlock@cfpb.gov
Justin.Sandberg@cfpb.gov
(202) 435-7201 (Garlock)
(202) 450-8786 (Sandberg)

*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2024, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

/s/ Stephanie B. Garlock
STEPHANIE B. GARLOCK