# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA; FORT WORTH
CHAMBER OF COMMERCE;
LONGVIEW CHAMBER OF
COMMERCE; AMERICAN
BANKERS ASSOCIATION;
CONSUMER BANKERS
ASSOCIATION; and TEXAS
ASSOCIATION OF BUSINESS,

  Plaintiffs,

v.

Case No.: 4:24-cv-213-P

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

  Defendants.

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION AND LIFT THE STAY OF THE LATE FEE RULE

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ....................................................................................................... 1

Background ........................................................................................................ 2

    A.    The CARD Act requires that credit card penalty fees be "reasonable and proportional." ....................................................................................... 2

    B.    The Federal Reserve Board issues regulations implementing the CARD Act and setting an initial safe harbor amount. ................................................ 3

    C.    The Consumer Financial Protection Act transfers authority over the relevant CARD Act provisions to the Bureau. ..................................................... 4

    D.    The Board's safe harbor allowed larger card issuers to charge late fees that were not "reasonable and proportional" to the omission or violation. .................. 5

    E.    The Bureau amends § 1026.52(b) to eliminate the safe harbor that had proven unjustifiably high for larger card issuers and put in place one consistent with the CARD Act's mandate that fees must be "reasonable and proportional." ................................................................................ 6

    F.    Plaintiffs bring suit and secure a stay of the Rule under the Fifth Circuit's then-precedent in *CFSA*. ................................................................................ 8

Legal Standards ................................................................................................... 9

Argument .......................................................................................................... 11

    I.    The Supreme Court's decision in *CFSA* fatally undermines the justification for the May 10, 2024, preliminary injunction. ............................................... 11

    II.    Plaintiffs have not established a likelihood of success on the merits on any other claim raised in their preliminary injunction motion, so there is no justification for continuing to stay the Late Fee Rule. ................................................... 11

        A.    The Late Fee Rule's approach to the penalty fee safe harbor is consistent with the CARD Act. ...................................................................... 12

        B.    The Late Fee Rule's effective date does not violate TILA. ..................... 19

    III.    The Court should reconsider its determination that the balance of the equities and public interest support a preliminary injunction. ................................. 20

Conclusion ........................................................................................................ 23

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Austin v. Kroger Tex., L.P.*,
   864 F.3d 326 (5th Cir. 2017) .............................................................................. 10, 21

*Barnes v. Gorman*,
   536 U.S. 181 (2002) ................................................................................................. 17

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) ................................................................................... 22

*Canal Auth. of State of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) .................................................................................. 22

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ......................................................................................... 1, 9, 11

*Cent. Valley Chrysler-Jeep v. Witherspoon*,
   456 F. Supp. 2d 1160 (E.D. Cal. 2006) .................................................................. 13

*Cent. Vermont Ry., Inc. v. ICC*,
   711 F.2d 331 (D.C. Cir. 1983) ................................................................................ 13

*Collum v. Edwards*,
   578 F.2d 110 (5th Cir. 1978) .................................................................................... 9

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
   51 F.4th 616 (5th Cir. 2022) ................................................................................. 1, 8

*Davis Cnty. Solid Waste Mgmt. v. EPA*,
   108 F.3d 1454 (D.C. Cir. 1997) .............................................................................. 20

*eBay, Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ................................................................................................ 21

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
   867 F.3d 564 (5th Cir. 2017) .................................................................................. 13

*Grasshoppher, Inc v. Curtis*,
   2024 WL 2031772 (W.D. Tex. May 7, 2024) .................................................. 10, 11

*In re Chamber of Com.*,
   2024 WL 3042100 (5th Cir. June 18, 2024) ............................................................ 2

*In re Hovan, Inc.*,
   96 F.3d 1254 (9th Cir. 1996) .................................................................................. 15

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,
    944 F.2d 940 (D.C. Cir. 1991) ................................................................. 17

*Klevisha v. Provident Funding Assocs. L.P.*,
    128 F. Supp. 3d 399 (D. Mass. 2015) ...................................................... 12

*Matter of Fed. Bureau of Prisons' Execution Protocol Case*s,
    2020 WL 5604298 ...................................................................................... 12

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) ................................................................. 20

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................... 20

*Nuziard v. Minority Bus. Dev. Agency*,
    2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ............................................ 21

*Parks v. Dunlop*,
    517 F.2d 785 (5th Cir. 1975) ..................................................................... 22

*Providence Title Co. v. Truly Title, Inc.*,
    2021 WL 5003273 (E.D. Tex. Oct. 28, 2021) .......................................... 10

*Schiller v. Physicians Res. Grp. Inc.*,
    342 F.3d 563 (5th Cir. 2003) ..................................................................... 10

*Scionti v. Dornfried*,
    137 F.3d 1351 (5th Cir. 1998) ............................................................. 10, 11

*Second Baptist Church v. City of San Antonio*,
    2020 WL 6821334 (W.D. Tex. Feb. 24, 2020) ......................................... 22

*Seila L. LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ................................................................................. 5

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ................................................................................. 22

*Texas v. United States*,
    2015 WL 13424776 (N.D. Tex. June 26, 2015) .................................. 10, 12

*Total Safety v. Knox*,
    2019 WL 6894683 (S.D. Tex. Dec. 18, 2019) .......................................... 10

*Vaughn v. St. Helena Par. Police Jury*,
    261 F. Supp. 2d 553 (M.D. La. 2002) ...................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................... 20, 21, 22

**Statutes & Legislative Materials**

11 U.S.C. § 507(a)(8)(G) ................................................................................ 15

12 U.S.C. § 5481(12)(O) .................................................................................. 5

12 U.S.C. § 5481(14) ........................................................................................ 5

12 U.S.C. § 5511(a) ........................................................................................... 5

15 U.S.C. § 1604(d) .................................................................................... 19, 20

15 U.S.C. § 1665d ....................................................................................... 12, 13

15 U.S.C. § 1665d(a) .................................................................................... 2, 13

15 U.S.C. § 1665d(b) .................................................................................... 2, 13

15 U.S.C. § 1665d(c) ....................................................................... 3, 13, 14, 18

15 U.S.C. § 1665d(c)(1) ............................................................................. 18, 19

15 U.S.C. § 1665d(c)(4) .................................................................................. 14

15 U.S.C. § 1665d(e) .................................................................................... 3, 14

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 .............................................................. 5

Credit Card Accountability Responsibility and Disclosure Act of 2009
   Pub. L. No. 111-24, 132 Stat. 1734 ................................................................ 2

H.R. Rep. 111-88 (2009) ................................................................................... 2

S. Rep. 111-16 (2009) ....................................................................................... 2

**Regulations**

12 C.F.R. § 226.52(b)(1)(i) ............................................................................... 3

12 C.F.R. § 226.52(b)(1)(ii) .............................................................................. 4

12 C.F.R. § 226.52(b)(1)(ii)(A) ........................................................................ 4

12 C.F.R. § 226.52(b)(1)(ii)(B) ........................................................................ 4

12 C.F.R. § 226.52(b)(1)(ii)(D) .................................................................... 4

12 C.F.R. § 1026.52(b) ........................................................................... 5, 6

12 C.F.R. § 1026.52(b)(1)(ii) ..................................................................... 5

12 C.F.R. § 1026.6(b)(2)(viii) ................................................................... 19

12 C.F.R. § 1026.7(b)(11)(i)(B) ................................................................ 19

12 C.F.R. Pt. 1026, Supp. I, cmt. 52(b)(1)(i)-2 ..................................... 3, 18

12 C.F.R. Pt. 1026, Supp. I, cmt. 52(b)(1)(i)-6(i) ...................................... 18

Truth in Lending, Final Rule,
    75 Fed. Reg. 37526 (June 29, 2010) ............................................... 3, 4, 18

Truth in Lending (Regulation Z), Interim Final Rule with Request for Public Comment,
    76 Fed. Reg. 79768 (Dec. 22, 2011) ...................................................... 5

Finalization of Interim Final Rules (Subject to any Intervening Amendments) Under Consumer
    Financial Protection Laws, Final Rule,
    81 Fed. Reg. 25323 (Apr. 28, 2016) ...................................................... 5

Truth in Lending (Regulation Z) Annual Threshold Adjustments (Credit Cards HOEPA, and
    Qualified Mortgages), Final Rule,
    86 Fed. Reg. 60357-02 (Nov. 2, 2021) ................................................... 5

Credit Card Penalty Fees (Regulation Z), Final Rule,
    89 Fed. Reg. 19128 (Mar. 15, 2024) ............................................... *passim*

**Other Authorities**

CFPB, *Credit Card Late Fees* (Mar. 2022). .............................................. 6

*Consider*, Merriam-Webster ................................................................... 13

*Penalty*, Black's Law Dictionary (12th ed. 2024) ...................................... 15

*Penalty*, Merriam-Webster ..................................................................... 15

Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?*,
    100 J. Crim. L. & Criminology 765 (2010) .............................................. 17

## INTRODUCTION

In this litigation, Plaintiff trade associations challenge a Consumer Financial Protection Bureau rule that reexamined and replaced an outdated regulatory safe harbor that allowed the largest credit card companies in the country to charge unjustifiably high late fees, contrary to Congress's intent. The Bureau has estimated that the rule could save consumers more than $10 billion annually.

In May, Plaintiffs obtained a preliminary injunction and stay of this rule. In granting the preliminary injunction, the Court based its determination that Plaintiffs were likely to succeed on the merits entirely on Plaintiffs' constitutional challenge, which at the time was governed by the Fifth Circuit's precedent in *Community Financial Services Ass'n of America, Ltd. v. CFPB* (*CFSA*), 51 F.4th 616, 638 (5th Cir. 2022), holding that the Bureau's statutory funding mechanism was unconstitutional. The Supreme Court has since reversed the Fifth Circuit's decision and determined that the Bureau's funding mechanism satisfies the Appropriations Clause. *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 435 (2024).

The Supreme Court's opinion in *CFSA* is a substantial change in the law that justifies dissolving the preliminary injunction, which now rests entirely on overruled precedent. While Plaintiffs offered several statutory challenges as alternative grounds for relief in their preliminary injunction motion, they have not established a likelihood of success on any of them. And the public interest does not support continuing to stay a Bureau rule that would ensure credit card companies comply with the limits Congress placed on late fees and return billions of dollars to customers annually. Accordingly, Defendants the Consumer Financial Protection Bureau and Rohit Chopra, in his official capacity as the Bureau's Director, (collectively, "the Bureau") respectfully request

that the Court dissolve the preliminary injunction and lift the stay of the Bureau's late fee rule.[1]

## BACKGROUND

### A. The CARD Act requires that credit card penalty fees be "reasonable and proportional."

Signed into law in May 2009, the Credit Card Accountability, Responsibility, and Disclosure Act (the CARD Act) amended the Truth in Lending Act (TILA) to "establish fair and transparent practices relating to the extension of credit." *See* Pub. L. No. 111-24, 132 Stat. 1734, 1734 (2009). One area of concern the CARD Act tackled was the imposition of "excessive fees" by credit card companies, S. Rep. 111-16 at 6 (2009)—including late fees, which had climbed on average to $35 per late payment in 2007, up from less than $13 in 1994, H.R. Rep. 111-88 (2009). The CARD Act therefore imposed new substantive limits on the fees that credit card companies could charge consumers in certain circumstances. Among those new limits was TILA Section 149, which requires that "[t]he amount of any penalty fee or charge that a card issuer may impose . . . in connection with any omission with respect to, or violation of, the cardholder agreement"— "including any late payment fee"—"shall be reasonable and proportional to such omission or violation." 15 U.S.C. § 1665d(a).

At the time, Congress tasked the Federal Reserve Board with "establish[ing] standards for assessing whether" any penalty fee, including a late payment fee, "is reasonable and proportional." *Id.* § 1665d(b) (2009). To guide the Board, the CARD Act laid out four factors for it to "consider"

---

[1] The Court also has before it the Bureau's motion to transfer or dismiss under 28 U.S.C. § 1406, ECF No. 94, which is not yet fully briefed. *See also In re Chamber of Com.*, No. 24-10463, 2024 WL 3042100, at *3 n.22 (5th Cir. June 18, 2024) (recognizing that this Court has not yet reached the § 1406 question presented by Bureau's motion and declining to reach the question itself). The Bureau respectfully suggests that the Court should first decide that motion and resolve where this case should be heard, before reaching the issues presented in this motion. However, the Bureau files this motion now to ensure that, wherever this case ultimately lands, the significant questions about the continued appropriateness of the preliminary injunction are ready for disposition.

in that "required rulemaking"—(1) the costs incurred by creditors; (2) the deterrent effect on cardholders; (3) cardholder conduct; and (4) any other factors "the Board may deem necessary or appropriate." *Id.* § 1665d(c) (2009). The statute also authorized—but did not require—the Board to establish an amount "that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates." *Id.* § 1665d(e) (2009). Issuers that imposed fees equal to or less than any such "safe harbor" amount would be immunized from liability. *Id.*

**B. The Federal Reserve Board issues regulations implementing the CARD Act and setting an initial safe harbor amount.**

In June 2010, the Board issued a rule implementing the CARD Act's penalty fee provision. *See* 75 Fed. Reg. 37526 (June 29, 2010) (2010 Rule). The 2010 Rule provided credit card companies with two routes for compliance with the new limitations on excessive fees.

First, the Board provided that "[a] card issuer may impose a fee for violating the terms or other requirements of an account if the card issuer has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of that type of violation." *Id.* at 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)). In the Board's view, this "cost analysis" provision was "consistent with Congress['s] intent" because it "permits card issuers to use penalty fees to pass on the costs incurred as a result of violations." *Id.* at 37532, 37534. In commentary adopted in the same rulemaking, the Board clarified that, for the purposes of this cost analysis, issuers may not use penalty fees to recover "[l]osses"—*i.e.*, credit card balances (including fees and interest imposed) that issuers have had to charge off on their books, often because consumers have failed to pay for a substantial amount of time—and any "associated costs" of recovering those losses. *Id.* at 37585 (codified at 12 C.F.R. Pt. 1026, Supp. I, cmt. 52(b)(1)(i)-2). While the Board recognized that "losses impose substantial costs on card issuers," it determined that requiring issuers to instead factor any risk of loss into their upfront annual rates—as they had

historically done—was consistent with the CARD Act's purposes of "promot[ing] transparency and protect[ing] consumers from unanticipated increases in the cost of credit." *Id.* at 37538.

Second, and in the alternative, the 2010 Rule allowed credit card companies to charge penalty fees consistent with a newly established safe harbor. *Id.* at 37572 (codified at 12 C.F.R. § 226.52(b)(1)(ii)). Although the Board recognized that it was only authorized—not required—to create a safe harbor, it concluded that doing so would "facilitate compliance by issuers and increase consistency and predictability for consumers." *Id.* at 37540. In determining the appropriate safe harbor amount, the Board lacked data on credit card issuer collection costs or deterrence, and therefore did not engage in any of its own detailed analysis. *See id.* at 37540–43. And the Board expressed "significant concerns" about the few empirical sources commenters had provided; it concluded that the sole study on costs "significantly overstate[d] the fee amounts necessary to cover" costs and "question[ed] the assumptions used" in the two studies on deterrence. *Id.* at 37541. Without significant relevant data to rely on, the Board reviewed the limited available sources, *see id.* at 37540–43, and decided to set the safe harbor at $25 per violation, but it allowed card issuers to charge $35 for subsequent violations of the same type during the next six billing cycles, 12 C.F.R. § 226.52(b)(1)(ii)(A)–(B). The Board predicted that those new safe harbors would be "generally sufficient to cover issuers' costs and to deter future violations." 75 Fed. Reg. at 37542. The 2010 Rule provided that those safe harbors would be adjusted annually for inflation. 12 C.F.R. § 226.52(b)(1)(ii)(D).

### C. The Consumer Financial Protection Act transfers authority over the relevant CARD Act provisions to the Bureau.

A month after the Board issued its CARD Act regulations, the Consumer Financial Protection Act (CFPA) became law. Enacted to address the causes and effects of the 2008 financial crisis, the CFPA tasks the Bureau "with 'implement[ing]' and 'enforc[ing]' a large body of

financial consumer protection laws to 'ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.'" *Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2191, 2193 (2020) (quoting 12 U.S.C. § 5511(a)). To carry out that mission, the CFPA transferred to the Bureau authority over several laws, including TILA. 12 U.S.C. § 5481(12)(O), (14); *id.* § 5581; *see also* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1000A(2), 124 Stat. 1376, 2107 (2010) (amending TILA Section 149 to include references to the Bureau, but otherwise leaving the penalty fee provision substantively intact).

In 2011, the Bureau issued an interim final rule repromulgating TILA's implementing regulation, Regulation Z. That rule included the Board's restriction on penalty fees in identical form. *See* 76 Fed. Reg. 79768, 79821 (Dec. 22, 2011); *see also* 81 Fed. Reg. 25323, 25325 (Apr. 28, 2016) (adopting interim rule as final). That provision is now codified at 12 C.F.R. § 1026.52(b). Over the next decade, the Bureau updated the safe harbor amounts for inflation but otherwise did not alter the Board's rule. *See, e.g.*, 86 Fed. Reg. 60357-02, 60359 (Nov. 2, 2021). Until the most recent rulemaking, the regulation insulated all card issuers from liability for imposing penalty fees of up to $30 for a first violation and $41 for subsequent violations within the next six billing cycles. *See* 12 C.F.R. § 1026.52(b)(1)(ii).

### D.  The Board's safe harbor allowed larger card issuers to charge late fees that were not "reasonable and proportional" to the omission or violation.

A decade on from the Board's implementation of the penalty fee provision based on limited data, the more robust data now available indicate that the late fee amounts charged by larger card issuers have again ballooned out of proportion to the causes and consequences of consumers' late payments for those issuers—exactly the situation Congress intended to avert with the CARD Act. The safe harbor has become the de facto industry standard for larger card issuers. In surveys of

credit card agreements submitted to its publicly available database, the Bureau found that nearly all the larger card issuers set a maximum late fee at or near the highest safe harbor amount, although the same was not true of small banks and credit unions. *See* Credit Card Penalty Fees (Regulation Z), 89 Fed. Reg. 19128, 19130 (Mar. 15, 2024) ("Late Fee Rule or Rule"); *see also* CFPB, *Credit Card Late Fees* at 14 (Mar. 2022) ("2022 Late Fee Report").[2] There was no evidence of any larger card issuers using the cost-analysis provision to charge a late fee above the safe harbor amounts, 89 Fed. Reg. at 19130, suggesting the safe harbor amount was more than enough to allow them to recoup their costs. And with that safe harbor provision in place, major card issuers now take in about five times more than is needed to cover relevant costs. *Id.* at 19155. In other words, the existing penalty fee safe harbor, as originally set by the Board in 2010 and since adjusted for inflation, has allowed larger issuers to charge amounts that are disproportionately high, and therefore inconsistent with the statute.

### E.  The Bureau amends § 1026.52(b) to eliminate the safe harbor that had proven unjustifiably high for larger card issuers and put in place one consistent with the CARD Act's mandate that fees must be "reasonable and proportional."

On March 5, 2024—after a nearly two-year rulemaking process, including an advance notice of proposed rulemaking seeking initial input and data on late fees—the Bureau issued a final rule amending the late fee provisions in § 1026.52(b). Through that rulemaking process, the Bureau determined that, for larger card issuers—those with one million or more open credit card accounts—the existing discretionary safe harbor amounts for late fees that the Board had adopted based on limited data were inconsistent with the CARD Act's instruction that fees must "be reasonable and proportional." 89 Fed. Reg. at 19156. In fact, the Bureau's analysis of an extensive

---

[2] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees_report_2022-03.pdf (last visited July 8, 2024).

data set cataloging certain larger card issuers' collection costs revealed that the unjustifiably high safe harbor had allowed late fee revenue to climb at least five times higher than relevant costs. *Id.* The Bureau thus decided to repeal the existing safe harbor for larger card issuers, as originally set by the Board and since adjusted for inflation. *Id.*

But because the Bureau, like the Board, recognized the benefits of offering a discretionary safe harbor, including the "compliance certainty and administrative simplicity" that it offered, the Bureau adopted a new safe harbor for larger card issuers of $8, for both first and subsequent violations. *Id.* at 19162. The Bureau's data showed that an $8 fee would generally be sufficient for most larger card issuers to recoup their costs, and that a fee set at that amount would still be a substantial deterrent to paying late. *Id.* at 19158, 19162. Given evidence that larger card issuers' costs are not "rising lockstep with inflation," the Bureau also eliminated the provision for annual adjustments for those larger card issuers to ensure that the safe harbor would not again come to defy Congress's instruction that fees be "reasonable and proportional." *Id.* at 19175–76. The Bureau instead determined that it will make any adjustments as needed going forward, based on regular market monitoring. *Id.* As before, the safe harbor provision—which Congress authorized but did not require the Bureau to provide—sets no cap on late fees. The minority of larger credit card issuers that, in the Bureau's estimate, may not be able to cover relevant costs with an $8 penalty can continue to impose higher fees, so long as the amount charged represents a reasonable proportion of the costs incurred, on average, as a result of late payments. *See id.* at 19169. The Late Fee Rule was originally set to go into effect 60 days after publication in the Federal Register— on May 14, 2024. *Id.* at 19188.

**F. Plaintiffs bring suit and secure a stay of the Rule under the Fifth Circuit's then-precedent in *CFSA*.**

Two days after the Bureau published the Rule on its website, a group of trade associations filed suit on behalf of their members against the Bureau. In their complaint, Plaintiffs raised a constitutional challenge to the Rule based on the Fifth Circuit's then-in-force precedent in *Community Financial Services Ass'n of America, Ltd. v. CFPB* (*CFSA*), 51 F.4th 616, 638 (5th Cir. 2022), which held that the Bureau's statutory funding mechanism was unconstitutional and accordingly invalidated a different rule promulgated using that funding. *See* Compl. ¶¶ 86–87 (Mar. 7, 2024), ECF No. 1. Plaintiffs also raised four Administrative Procedure Act (APA) claims. *See id.* ¶¶ 88–107. Plaintiffs immediately moved for a preliminary injunction based on their constitutional challenge and a subset of their APA claims focusing on the Rule's purported inconsistency with the CARD Act and TILA. *See* PI Mot. (Mar. 7, 2022), ECF No. 3; Br. in Supp. of PI Mot. at 10–20 (Mar. 7, 2022), ECF No. 4 ("PI Br.").

Over the next several months, the case moved between the U.S. District Court for the Northern District of Texas, the U.S. District Court for the District of Columbia, and the Fifth Circuit as the parties litigated the appropriate venue for the case and Plaintiffs' request for preliminary relief. Two developments are of particular relevance for this motion.

First, on May 10, the Court granted Plaintiffs' motion for a preliminary injunction and stayed the Late Fee Rule. *See* Op. & Order (May 10, 2024), ECF No. 82 ("PI Op."). In its evaluation of their likelihood of success on the merits, the Court ruled only that Plaintiffs were likely to succeed on their challenge to the Bureau's funding mechanism based on the Fifth Circuit's then-binding precedent in *CFSA*. *Id.* at 5–6. It did not reach any of Plaintiffs' statutory arguments. *Id.*

8

Second, six days after this Court's preliminary injunction order, the Supreme Court reversed the Fifth Circuit's decision in *CFSA*. *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024). In that opinion, the Supreme Court rejected the same challenge to the Bureau's statutory funding mechanism that Plaintiffs relied on here and held that the way Congress chose to fund the Bureau in the CFPA "complies with the Appropriations Clause." *Id.* at 421. As the Bureau has previously explained, the Supreme Court decision in *CFSA* undermines the existing stay of the Bureau's Late Fee Rule. *See* Notice (May 17, 2024), ECF No. 90. The Bureau did not immediately move to dissolve the preliminary injunction because it was uncertain at that point whether this Court had jurisdiction to take any action given Plaintiffs' then-pending preliminary injunction appeal, *see* Defs.' Scheduling Resp. at 2–3 (May 15, 2024), ECF No. 87, and because renewing its request for transfer was consistent with this Court's "longtime . . . practice" of first addressing whether "venue is proper" before reaching any merits questions, PI Op. at 3. The Bureau respectfully suggests that the Court follow that longtime practice here and resolve its pending motion to transfer or dismiss under § 1406 before otherwise proceeding with this case. *See* Br. in Supp. of Renewed Transfer Mot. at 6 (May 28, 2024), ECF No. 95 (moving to transfer under § 1404 and in the alternative to transfer or dismiss under § 1406). But, to ensure that the issue is ripe for decision at whatever time this Court (or a transferee court) deems appropriate, the Bureau now moves to dissolve the preliminary injunction and lift the stay of the Late Fee Rule, which was based entirely on a Fifth Circuit holding the Supreme Court has since reversed.

## LEGAL STANDARDS

This Court has "broad and flexible equitable powers" to dissolve the preliminary injunctive relief it has granted.[3] *Collum v. Edwards*, 578 F.2d 110, 112 (5th Cir. 1978). Generally, a party

---

[3] Courts in this Circuit have evaluated motions to dissolve preliminary injunctions using their inherent equitable powers, as well as under a variety of Federal Rules of Civil Procedure: Rule

seeking to dissolve a preliminary injunction must "present a[] change in the operative facts or relevant decisional or statutory law [to] warrant[] such relief." *Scionti v. Dornfried*, 137 F.3d 1351 (5th Cir. 1998) (per curiam). When movants have shown such a change in facts or law, "[d]istrict courts in the Fifth Circuit 'apply the same standards in reviewing a preliminary injunction under a motion to dissolve as they do in deciding whether to grant one in the first instance.'" *Grasshopper, Inc v. Curtis*, No. 1:24-cv-382-DII, 2024 WL 2031772, at *4 (W.D. Tex. May 7, 2024) (quoting *Vaughn v. St. Helena Par. Police Jury*, 261 F. Supp. 2d 553, 556 (M.D. La. 2002)). In other words, the Court must evaluate whether, given the change in circumstances, the party that originally sought the preliminary injunction can continue to show that "(1) there is a substantial likelihood that [it] will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm

---

54(b), which allows for reconsideration of interlocutory orders as justice requires; Rule 59(e), which covers motions "to alter or amend a judgment"; and Rule 60(b), which allows courts to "relieve a party . . . from a final judgment, order, or proceeding" when, among other things, "applying it prospectively is no longer equitable." *See Vaughn v. St. Helena Par. Police Jury*, 261 F. Supp. 2d 553, 556 (M.D. La. 2002) (reviewing motion to dissolve without reference to any federal rule); *Providence Title Co. v. Truly Title, Inc.*, No. 4:21-cv-147-SDJ, 2021 WL 5003273, at *2–3 (E.D. Tex. Oct. 28, 2021) (applying Rule 54(b) because order granting preliminary injunction is not final); *Texas v. United States*, No. 7:15-cv-00056-O, 2015 WL 13424776, at *1 (N.D. Tex. June 26, 2015) (citing case law using Rule 59(e) to determine whether to dissolve preliminary injunction after change in law); *Total Safety v. Knox*, No. 4:19-cv-02718, 2019 WL 6894683, at *2 (S.D. Tex. Dec. 18, 2019) (applying Rule 60(b)).

The exact standard the Court chooses to use here makes no difference because the Supreme Court's intervening decision in *CFSA* would entitle the Bureau to relief under any possible mechanism: Under the Court's inherent equitable powers or under Rule 54(b) because the Supreme Court's vacatur of governing precedent is sufficient reason to reconsider the preliminary injunction, *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017); under Rule 59(e) because there has been "an intervening change in the controlling law," *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003); and under Rule 60(b) because there has been "a significant change . . . in law" that "renders continued enforcement [of the preliminary injunction] detrimental to the public interest," *Total Safety*, 2019 WL 6894683, at *2 (internal quotation marks omitted).

to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Id.*

## ARGUMENT

### I.    The Supreme Court's decision in *CFSA* fatally undermines the justification for the May 10, 2024, preliminary injunction.

In its preliminary injunction decision, the Court held that Plaintiffs had shown a substantial likelihood of success on the merits—necessary to their bid for a preliminary injunction—based on the Fifth Circuit's constitutional holding in *CFSA*. *See* PI Op. at 5–6; *see also* PI Br. at 9 (arguing likelihood of success on claim that "[t]he CFPB promulgated the Final Rule with funds drawn in violation of the Appropriations Clause"). Just six days after this Court entered that order, the Supreme Court reversed the Fifth Circuit's decision in *CFSA* and held that "the Bureau's funding mechanism does not violate the Appropriations Clause." *CFPB v. CFSA*, 601 U.S. at 424. With Justice Thomas writing for a seven-justice majority, the Court held that the "Bureau's funding statute contains the requisite features of a congressional appropriation" and "fits comfortably within the First Congress' appropriations practice," so it satisfies "the requirements of the Appropriations Clause." *Id.* at 435. The Supreme Court's decision in *CFSA* means that Plaintiffs are no longer able to show a likelihood of success on the merits on their constitutional claim. It is therefore a significant change in the law that warrants granting the Bureau's request to dissolve the preliminary injunction. *See Scionti*, 137 F.3d at 1351.

### II.   Plaintiffs have not established a likelihood of success on the merits on any other claim raised in their preliminary injunction motion, so there is no justification for continuing to stay the Late Fee Rule.

The Bureau anticipates that Plaintiffs will ask the Court to continue the stay of the Late Fee Rule, and refuse to dissolve the preliminary injunction, based on alternative merits arguments raised in their March 7 preliminary injunction motion. In that motion, Plaintiffs argued that they

are likely to succeed on their claims that (1) "the Final Rule rests on an unlawful interpretation of the CARD Act" and (2) the Rule's "effective date . . . violates TILA." PI Br. at 10. Plaintiffs continue to bear the burden of establishing their likelihood of success on these claims, to the extent they seek to maintain preliminary relief on alternative grounds. *Cf. Texas v. United States*, No. 7:15-cv-00056-O, 2015 WL 13424776, at *1 (N.D. Tex. June 26, 2015) (dissolving preliminary injunction because, "[i]n light of" intervening Supreme Court opinion, "the Court finds that the Plaintiffs have not demonstrated a likelihood of success on the merits, as required by the four-factor preliminary injunction test"); *Matter of Fed. Bureau of Prisons' Execution Protocol Case*s, No. 05-cv-2337, 2020 WL 5604298, at *2 (explaining that, at dissolution stage, court is guided by familiar factors, including plaintiffs' "likelihood of success"); *Klevisha v. Provident Funding Assocs. L.P.*, 128 F. Supp. 3d 399, 400 (D. Mass. 2015) (dissolving preliminary injunction because, following clarification in governing law, "Plaintiff cannot demonstrate that she has a likelihood or a substantial possibility of success on the merits"). Plaintiffs cannot carry that burden on either point, so the Court has no grounds to continue the preliminary injunction. The Court should therefore grant the Bureau's request to dissolve the injunction and lift the stay of the Late Fee Rule.

### A. The Late Fee Rule's approach to the penalty fee safe harbor is consistent with the CARD Act.

In their preliminary injunction motion, Plaintiffs claimed that the Late Fee Rule exceeds the Bureau's statutory authority because it is inconsistent with the text of the relevant CARD Act provision in two key ways. First, they argued that the Late Fee Rule does not allow them to charge a "penalty fee" that is "reasonable and proportional" to customers' late payments, even though the CARD Act expressly allows them to charge such a fee. *See* PI Br. at 10–17 (citing 15 U.S.C. § 1665d). Second, they contended that the Bureau's Rule improperly narrows the definition of "costs," as used in that statutory section. *See id.* at 17–19. Both of Plaintiffs' arguments rest on a

12

fundamental misreading of the statute, so they cannot establish any likelihood of success on this claim.

**1.** The CARD Act instructs that the amount of any penalty fee, including late payment fees, "shall be reasonable and proportional" to the relevant "omission or violation" of "the cardholder agreement." 15 U.S.C. § 1665d(a). Rather than define "reasonable and proportional" itself, the Act tasks the Bureau with implementing the provision and lays out a series of factors for it to "consider" when doing so. *See id.* § 1665d(b), (c). "Consider" means "to think about carefully," or "to take into account." *Consider*, Merriam-Webster.[4] As the Fifth Circuit has observed, "the term 'consider' does not compel a certain outcome, but rather it serves to inform the . . . careful decision-making process." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 573 (5th Cir. 2017). As a result, "Congress's use of the term 'consider' in a statute requires an actor to merely 'investigate and analyze' the specified factor, but not necessarily act upon it." *Id.* (quoting *Cent. Valley Chrysler-Jeep v. Witherspoon*, 456 F. Supp. 2d 1160, 1173 (E.D. Cal. 2006)); *see also Cent. Vermont Ry., Inc. v. ICC*, 711 F.2d 331, 336 (D.C. Cir. 1983) ("As a general rule, when a statute requires an agency to 'consider' a factor, the agency must reach an express and considered conclusion about the bearing of the factor, but need not give any specific weight to the factor." (cleaned up)).

These principles govern § 1665d and the Late Fee Rule implementing it. Because Congress instructed the Bureau to "consider" the enumerated factors when "issuing rules required by this section"—rather than defining a "reasonable and proportional" fee to be one that accounts for them directly—the statute does not require Bureau regulations to incorporate those

---

[4] *Available at* https://www.merriam-webster.com/dictionary/consider (last visited July 8, 2024).

factors in any particular way.[5] Indeed, by telling the Bureau to also consider "such other factors" it "deem[s] necessary or appropriate," 15 U.S.C. § 1665d(c)(4), Congress explicitly recognized that the Bureau is best positioned to determine how the rules ensure that penalty fees will be reasonable and proportional based on the various considerations the statute lays out. In the Late Fee Rule Plaintiffs challenge here, the Bureau adequately evaluated and discussed each enumerated factor—costs, deterrence, consumer conduct, and other necessary or appropriate factors—and explained how the final rule incorporates them. 89 Fed. Reg. at 19156–19169; *see also id.* at 19162 (explaining that, while the $8 fee was *calculated* based on costs, the Bureau had determined that it would adequately deter late payments and accounted for consumer conduct). The Rule therefore does not exceed the Bureau's statutory authority nor is it otherwise inconsistent with the CARD Act; indeed, the new safe harbor amount is intended to ensure that the statutory requirements and protections are fulfilled. To the extent Plaintiffs' real complaint is with how the Bureau weighed those factors, that amounts to an arbitrary and capricious challenge, which Plaintiffs did not raise as grounds for a preliminary injunction. Such a challenge would fail in any event because, as the Bureau will explain when relevant, it did appropriately consider and weigh the various statutory factors when crafting the Late Fee Rule. Those criticisms thus cannot support extending the stay of the Rule.

---

[5] To the contrary, Section 1665d did not even require the Bureau to directly consider the four listed statutory factors when crafting the part of the Late Fee Rule that Plaintiffs object to most strenuously—the decision to repeal the Board-set safe harbor and exercise its discretion to instate a new, lower safe harbor. The portion of § 1665d listing statutory factors applies only to rulemakings "required by this subsection," 15 U.S.C. § 1665d(c), but the safe harbor is only an authorized—not a required—rulemaking, *see* 15 U.S.C. § 1665d(e) (authorizing but not requiring Bureau to set safe harbor). Regardless, even though not required, the Bureau did consider all of the relevant statutory factors in deciding to repeal and reset the safe harbor for late fees charged by larger card issuers. *See* 89 Fed. Reg. at 19156–69.

In an effort to undermine the Bureau's well-grounded, common sense reading of the CARD Act's mandates, Plaintiffs focus single-mindedly on the moniker that the CARD Act uses for all fees authorized under § 1665d—"*penalty* fees." In Plaintiffs' telling, a "penalty fee" cannot be "solely compensatory," but must also "deter[] the violation," "account[] for the conduct of the violation," and act "as a pecuniary form of punishment" to the violator. PI Br. at 11. There are (at least) two problems with this line of argument, as applied to the Late Fee Rule.

First, nothing about the word "penalty" implies that a "penalty" fee must be set at an amount higher than what's necessary to compensate the other party. Traditional notions of what counts as a penalty do not require that penalties be set at any specific level: Black's Law Dictionary, for instance, explains that a penalty can be merely some "extra charge against a party who violates a contractual provision," with a prepayment penalty cited as the paradigmatic example. *Penalty*, Black's Law Dictionary (12th ed. 2024); *see also Penalty*, Merriam-Webster[6] (offering as one definition "the suffering or the sum to be forfeited to which a person agrees to be subjected in case of nonfulfillment of stipulations"). That definition—which neatly encompasses the penalty fees at issue in § 1665d—implies nothing about the relationship between the amount of the penalty and the consequences of the violation. Plaintiffs' argument also ignores that Congress has used "penalty" to describe charges that are purely compensatory. For example, the Bankruptcy Code gives priority to certain unsecured claims for "penalt[ies]" owed to government units, but *only* when such penalty is "in compensation for actual pecuniary loss." 11 U.S.C. § 507(a)(8)(G); *see also In re Hovan, Inc.*, 96 F.3d 1254, 1258 (9th Cir. 1996) (distinguishing between penalties that are compensatory and those that are punitive). Plaintiffs, then, are wrong to presume that Congress's use of the blanket term "penalty fee" to describe the types of charges

---

[6] *Available at* https://www.merriam-webster.com/dictionary/penalty (last visited July 8, 2024).

covered by § 1665d was meant to create some substantive standard requiring late fees to be higher than issuers' associated costs.

Second, Plaintiffs are also wrong to assume that a fee cannot provide for deterrence, account for consumer conduct, or operate as a punishment if it is set at a level that does no more than compensate the other party. The Late Fee Rule does all of those things, even while generally being no more than enough to cover larger issuers' costs. *Contra* PI Br. at 11. As for deterrence, when it set the new $8 late fee safe harbor, the Bureau included a lengthy discussion of the available empirical evidence on the deterrent effect of late fees. 89 Fed. Reg. at 19162–67. After reviewing this evidence, the Bureau determined that an $8 safe harbor, although calculated based on costs, would nevertheless operate as a deterrent to paying late. *Id.* at 19163. The Bureau explained that late fees are but one of many adverse consequences consumers face if they pay late; consumers may also lose grace periods, be subject to penalty interest rates, or see effects to their credit scores when late payments are reported to credit bureaus. *Id.* at 19164–65. Especially given those "other negative consequences of late payment," the Bureau found no compelling evidence that a higher late fee of $30 or $40 would be "sufficiently more of a deterrent . . . to justify late fees far above cost. *Id.*

The new $8 safe harbor also adequately incorporated an understanding of consumer conduct (a phrase the statute does not define). *Id.* at 19167–69. For instance, the Bureau considered how quickly consumers who incur a late fee tend to ultimately make the required payment—noting that the majority of accounts come current within 30 days, before even issuers consider the violation a serious enough form of consumer conduct to merit reporting to a credit reporting agency. *See id.* at 19168. The Bureau also discussed the various reasons consumers may pay late

and explained that lowering late fees may positively impact consumers' ability to ultimately repay their credit obligations. *Id.* at 19168–69.

And the Rule likewise allows larger card issuers to charge fees that operate as a "punishment" for consumers who pay late, despite Plaintiffs' complaints to the contrary. Most plainly, a late fee imposed under the Bureau's Rule is still a negative consequence that cardholders suffer as a result of late payment. Plaintiffs say that is not enough, analogizing to case law dealing with fines and punitive damages that punish "act[s] society finds repugnant and seeks to deter." *See* PI Br. at 11 (quoting *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 947 (D.C. Cir. 1991)). But failing to pay the minimum amount due on a credit card bill by the due date is hardly the kind of repugnant act that warrants heightened punishment; indeed, a breach of contract like that traditionally would *not* suffice. *See Barnes v. Gorman*, 536 U.S. 181, 187 (2002) (noting that punitive damages are traditionally not available for contract breach).[7] In sum, the new safe harbor does not somehow fail to operate as a "penalty" just because it does not incorporate considerations of deterrence and consumer conduct, or operate as "punishment," in the particular way Plaintiffs wish.

**2.** In their preliminary injunction motion, Plaintiffs separately took issue with the way the Late Fee Rule addresses larger card issuers' costs, contending that this, too, is inconsistent with

---

[7] Plaintiffs also ignore that consumers who pay their credit card bills late are not similarly situated, with respect to the potential penalty, as those who may face fines or punitive damages in other circumstances. To adequately deter wrongdoing in many civil and criminal contexts, penalties must be set high enough to account for the reality that not every violator will be caught. *See* Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 784 (2010) (explaining that certainty, severity, and celerity are all "important deterrence variables"). But those who pay their credit cards late are guaranteed certain and swift consequences—the immediate imposition of a late fee on their next bill.

the CARD Act. *See* PI Br. at 17–19. This argument similarly misses the mark because the Bureau's consideration of costs is fully consistent with the statute.

The CARD Act requires that, in determining what late fee is "reasonable and proportional," the Bureau evaluate the costs card issuers "incur[red] . . . from such" late payment. *See* 15 U.S.C. § 1665d(c). In commentary promulgated in the 2010 Rule, the Board explained that those costs generally included the cost of collecting late payments, but clarified that "losses and associated costs" must be excluded. 75 Fed. Reg. at 37527, 37538; *see also* 12 C.F.R. Pt. 1026, Supp. I, cmts. 52-b(1)(i)–2, 52(b)(1)(i)-6(i). As the Board explained, "although an account generally cannot become a loss without" the cardholder first missing a payment, the eventual loss of the account, as well as any costs of dealing with that loss, are not "incurred by the creditor *from*" the initial late payment. 75 Fed. Reg. at 37538 (quoting 15 U.S.C. § 1665d(c)(1)).

In its new Late Fee Rule, the Bureau offered a further clarification, in revised commentary to Regulation Z, about how to handle collection costs issuers incur after an account must be "charged off . . . as a loss" under loan-loss rules. *See* 89 Fed. Reg. at 19146–49. Such charge offs typically happen after 180 days of delinquency, and collection costs after that point consist in large part of commissions paid to third-party debt collectors. *Id.* at 19131, 19140. As the Bureau noted, the vast majority of consumers who pay late ultimately cure their delinquency, and thus the late payment never leads issuers to charge off their accounts or to incur post-charge-off collection costs. *Id.* at 19148. So, consistent with the Board's approach in its 2010 rulemaking, the Bureau determined that any costs issuers incur *after* charge-off, for the small minority of accounts that reach that point, are properly categorized as "losses and associated costs"—and should not be recovered via late fees. *Id.* at 19148. In support, the Bureau reasoned that these post-charge-off

18

costs "are not directly linked to the violation of the late payment," but are instead "substantially related to mitigating [the] loss." *Id.* at 19148.

Plaintiffs say that this clarification of the definition of "costs" is inconsistent with the CARD Act because "[t]here is no basis in the statutory text to distinguish among costs." PI Br. at 18. But, again, the statute instructs that the relevant costs are those "incurred by the creditor *from such omission or violation*." 15 U.S.C. § 1665d(c)(1) (emphasis added). The Bureau reasoned that commissions paid to debt collectors and similar post-charge-off costs are more appropriately attributed to the fact that a consumer has stopped paying entirely—not that a consumer may have initially missed the payment deadline. 89 Fed. Reg. at 19148. Indeed, because only a small fraction of accounts that incur late fees are ultimately written off, incorporating post-charge-off costs into the late fee calculation would improperly require the majority of consumers who pay late to compensate issuers for losses that have nothing to do with the conduct they engaged in. *See id.* Plaintiffs may disagree with that determination, but this analysis of what constitutes an appropriate "cost" is required by the statutory text and necessary to ensure that consumers are only charged a late fee that is reasonable and proportional to their actual violations.

### B. The Late Fee Rule's effective date does not violate TILA.

In their preliminary injunction motion, Plaintiffs also claimed that the Late Fee Rule's effective date violates a section of TILA providing that any rule "requiring any disclosure which differs from the disclosures previously required . . . shall have an effective date of that October 1 which follows by at least six months the date of promulgation," 15 U.S.C. § 1604(d). *See* PI Br. at 19–20. The Late Fee Rule, however, is not a rule requiring any different disclosure within the meaning of this provision. The statute's disclosure requirements remain unchanged: Issuers must disclose late payment fees at account opening, 12 C.F.R. § 1026.6(b)(2)(viii), in periodic statements, *id.* § 1026.7(b)(11)(i)(B), and elsewhere. The Late Fee Rule may require larger issuers

to change the *amount* they charge if their current fees are no longer justifiable, and they'll have to disclose that new amount. But that is not a new required disclosure. And credit card companies have quickly changed the numerical amount of late fees on an annual basis, undermining any complaint that the effective date here imposes an unreasonable burden that TILA disallows.

Besides, even if Plaintiffs were correct—and they are not—this claim would entitle them at most to a temporary delay of the effective date until October 1. *See Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) ("[A]n injunction must be narrowly tailored to remedy the specific harm shown."). That's because the Court could sever the effective date provision from the remainder of the Late Fee Rule. *See Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (court will sever agency action and affirm in part if "agency's intent" to make regulations severable is clear, and if relevant portions "operate entirely independently"); 89 Fed. Reg. at 19202 (explaining that any provision of Late Fee Rule held invalid is severable). And, if § 1604(d) required such severance, that statutory section would itself fill in the operative effective date, as it provides that covered regulations "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." *See* 15 U.S.C. § 1604(d). As a result, any defect in the effective date would not establish that, at the end of this case, Plaintiffs are likely to secure an injunction against the Rule as a whole.

### III. The Court should reconsider its determination that the balance of the equities and public interest support a preliminary injunction.

The two final considerations of the preliminary injunction analysis—the balance of the equities and the public interest—merge where, as here, the government is the defendant. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). In this analysis, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Although the Court previously concluded that Plaintiffs had established that the equities supported staying the Bureau's Late Fee Rule, *see* PI Op. at 6–7, it should reconsider that determination.[8]

As the Bureau explained in its opposition to Plaintiffs' preliminary injunction motion, an injunction would burden the Bureau and the working Americans it seeks to protect—who currently pay billions of dollars in unjustifiably high late fees annually, making it more difficult for them to pay for necessities like food and medicine and, indeed, pay their credit card bills. *See* PI Opp'n at 23–24 (Mar. 12, 2024), ECF No. 23. Those burdens far outweigh the harm to Plaintiffs' larger card issuer members, who would lose only a relatively small proportion of their revenue. *See id.* The Court did not directly address or weigh these harms in its initial preliminary injunction decision, deciding instead to take the "'do-no-harm' approach"—which it took to mean granting the preliminary injunction and staying the Bureau's Late Fee Rule. *See* PI Op. at 7 (citing *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-cv-00278-P, 2024 WL 965299, at \*45 (N.D. Tex. Mar. 5, 2024)).[9] The Bureau respectfully urges the Court to reconsider that approach.

---

[8] The Court has plenary authority to reconsider aspects of its previous preliminary injunction opinion. Because that preliminary injunction order is interlocutory rather than final, the Court can reconsider it, and any conclusions contained in it, under Rule 54(b), under which "the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin*, 864 F.3d at 336.

[9] In *Nuziard*, this Court determined that it is "unclear whether an injunction must further public interest or preserve the status quo" after comparing case law with two different formulations of the public interest factor—some holding that the injunction must be "in the public interest," and others requiring only that "the public interest would not be disserved by a[n] . . . injunction." *Nuziard*, 2024 WL 965299, at \*45 n.86 (first quoting *Winter*, 555 U.S. at 20, and then quoting *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). But neither formulation says anything about the status quo, nor do they suggest that the public interest (whether it is served or not disserved) is irrelevant and should be ignored in favor of maintaining the status quo.

Both the Supreme Court and Fifth Circuit have made clear that courts *must* balance the equities and consider how an injunction would affect the public interest, regardless of whether an injunction works to preserve some status quo. *See Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) ("The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing . . . 'that the balance of equities tips in his favor, and that an injunction is in the public interest.'" (quoting *Winter*, 555 U.S. at 22)); *Book People, Inc. v. Wong*, 91 F.4th 318, 336 (5th Cir. 2024) ("A plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tip in his favor[] and that an injunction is in the public interest"). Indeed, the Fifth Circuit has specifically cautioned that, although "[t]here is always a status quo" that could be preserved, "[t]here should not be a preliminary injunction to protect it . . . unless the court's ability to render a meaningful decision on the merits would otherwise be in jeopardy." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *see also Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975) ("Maintenance of the status quo is only a sometimes concomitant of preventing irreparable harm never the touchstone for such injunctive relief."); *Second Baptist Church v. City of San Antonio*, No. 5:20-cv-29-DAE, 2020 WL 6821334, at *3 (W.D. Tex. Feb. 24, 2020) ("[T]he focus of the court's inquiry must be prevention of injury by a proper order, not merely preservation of the status quo.").

That limited approach to considering the status quo makes sense: It avoids putting a thumb on the scale in favor of granting preliminary relief in every challenge to a new law or regulation— which would run afoul of the Supreme Court's mandate that movants *must* carry their burden on every element of the preliminary injunction test. And it recognizes that there are many instances where maintaining the status quo is *not* in the public interest; after all, new laws and regulations are put in place because the people's elected representatives—or the agencies tasked with carrying

out the mandates of those representatives—have determined that they are appropriate and in the public interest.

In this case, an injunction is not needed to preserve the Court's ability to render a meaningful decision on the merits. *See* PI Opp'n at 24 ("[T]he rules for late fees are not irreproducible artifacts."). And maintaining that status quo would disserve the public interest by allowing larger card issuers to burden sometimes-struggling consumers with unjustifiably high late fees under an outdated and unsupported regulatory safe harbor. Because the equities do not in fact support a preliminary injunction, the Court should not continue the stay of the Bureau's Late Fee Rule.

## CONCLUSION

For the foregoing reasons, the Court should dissolve the preliminary injunction and lift the stay of the Bureau's Late Fee Rule.

DATED: July 8, 2024

Respectfully Submitted,

SETH FROTMAN
*General Counsel*

STEVEN Y. BRESSLER
*Deputy General Counsel*

KRISTIN BATEMAN
*Assistant General Counsel*

*/s/ Stephanie B. Garlock*
STEPHANIE B. GARLOCK*
*Counsel*
D.C. Bar No. 1779629
JUSTIN M. SANDBERG*
*Senior Counsel*
Ill. Bar No. 6278377
JOSEPH FRISONE*
*Senior Counsel*
Va. Bar No. 90728

23

Consumer Financial Protection Bureau
1700 G St. NW
Washington, D.C. 20552
Stephanie.Garlock@cfpb.gov
Justin.Sandberg@cfpb.gov
Joseph.Frisone@cfpb.gov
(202) 435-7201 (Garlock)
(202) 450-8786 (Sandberg)
(202) 435-9287 (Frisone)
(202) 435-7024 (fax)

*Admitted *pro hac vice*

*Counsel for Defendants the Consumer Financial Protection Bureau and Rohit Chopra*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2024, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Stephanie B. Garlock*
STEPHANIE B. GARLOCK