IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, <br><br> Plaintiffs, <br><br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, <br><br> Defendants. | Case No. 4:24-cv-00213-P |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION AND LIFT THE STAY OF THE FINAL RULE (OR IN ALTERNATIVE RENEWED MOTION FOR A PRELIMINARY INJUNCTION)**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 3

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR STATUTORY CLAIMS. ..................................................................................................... 4

      A.     THE FINAL RULE VIOLATES THE CARD ACT. ............................... 4

            1.     THE FINAL RULE MISCONSTRUES THE CARD ACT'S TEXT THAT ISSUERS MAY CHARGE A "PENALTY FEE" FOR THE "VIOLATION OF THE CARDHOLDER AGREEMENT." ................................ 5

                  A.     THE FINAL RULE ALLOWS ONLY FOR A "COST FEE." .................................................... 5

                  B.     THE CFPB'S ARGUMENTS NOW ARE NO BETTER THAN THEIR ARGUMENTS IN THE FINAL RULE. ................................ 8

            2.     THE FINAL RULE CONFLICTS WITH THE CARD ACT'S TEXT ON "COST." ........................................ 13

      B.     THE FINAL RULE VIOLATES THE TRUTH IN LENDING ACT'S EFFECTIVE-DATE REQUIREMENT. .................................... 15

II.     THE REMAINING FACTORS FAVOR MAINTAINING THE INJUNCTION. ............................................................................................... 16

III.    ALTERNATIVELY, PLAINTIFFS REQUEST THAT, IF THIS COURT DISSOLVES THE PRELIMINARY INJUNCTION, THE COURT ALLOW FOR A 90-DAY COMPLIANCE PERIOD. ........................................ 18

CONCLUSION ..................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CFPB v. Cmty. Fin. Servs. Ass'n,*
  601 U.S. 416 (2024)....................................................................................................1

*Cmty. Fin. Servs. Ass'n v. CFPB,*
  558 F. Supp. 3d 350 (W.D. Tex. 2021)......................................................................19

*Community Financial Services Ass'n v. CFPB,*
  51 F.4th 616 (5th Cir. 2022) .......................................................................................1

*Corley v. United States,*
  556 U.S. 303 (2009)...................................................................................................12

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.,*
  867 F.3d 564 (5th Cir. 2017) .....................................................................................12

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000).....................................................................................................7

*Matter of Garcia,*
  955 F.2d 16 (5th Cir. 1992) .......................................................................................10

*Matter of Hardee,*
  137 F.3d 337 (5th Cir. 1998) .....................................................................................10

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.,*
  944 F.2d 940 (D.C. Cir. 1991)......................................................................................5

*Michigan v. EPA,*
  No. 98-1497 (D.C. Cir. June 22, 2000)......................................................................20

*Nat. Res. Def. Council, Inc. v. EPA,*
  22 F.3d 1125 (D.C. Cir. 1994)....................................................................................16

*NFIB v. OSHA,*
  595 U.S. 109 (2022).....................................................................................................4

*NFIB v. Sebelius,*
  567 U.S. 519 (2012).....................................................................................................4

*Nken v. Holder,*
  556 U.S. 418 (2009).....................................................................................................4

*R.J. Reynolds Tobacco Co. v. FDA,*
    823 F. Supp. 2d 36 (D.D.C. 2011) ....................................................................19

*SEC v. Jarkesy,*
    144 S. Ct. 2117 (2024) ..............................................................................5, 6

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003) ........................................................................................5

*Total Safety v. Knox,*
    No. 4:19-CV-02718, 2019 WL 6894683 (S.D. Tex. Dec. 18, 2019) ..........................3

*Tull v. United States,*
    481 U.S. 412 (1987) ........................................................................................5

*United States v. Childs,*
    266 U.S. 304 (1924) ......................................................................................11

*United States v. Reorganized,*
    518 U.S. 213 (1996) ......................................................................................11

*Univ. of Chi. Med. Ctr. v. Sebelius,*
    56 F. Supp. 3d 916 (N.D. Ill. 2014) ................................................................16

*In re Vanguard Nat. Res., LLC,*
    No. 17-30560, 2020 WL 2027284 (Bankr. S.D. Tex. Jan. 14, 2020) ......................11

*Wages & White Lion Invs., L.L.C. v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ...............................................................17, 18

**Statutes**

11 U.S.C. § 507(a)(8)(G) ...............................................................................10

15 U.S.C. § 1604(d) ...............................................................................2, 15

15 U.S.C. § 1640(a)(1) .................................................................................10

15 U.S.C. § 1640(a)(2)(A) ............................................................................10

15 U.S.C. § 1665d ......................................................................................2, 5

15 U.S.C. § 1665d(a) .....................................................................................5

15 U.S.C. § 1665d(b) .....................................................................................2

15 U.S.C. § 1665d(c) .....................................................................................6

15 U.S.C. § 1665d(c)(1) ............................................................................13, 14

15 U.S.C. § 1693o-2(a)(2) ..................................................................................6

15 U.S.C. § 1693o-2(a)(3)(A) ..........................................................................14

15 U.S.C. § 1693o-2(a)(4)(B) ..........................................................................14

51 U.S.C. § 60125(a) ..........................................................................................6

Credit Card Accountability Responsibility and Disclosure Act of 2009, 111 Pub.
    L. 24, 123 Stat. 1734 (2009) .................................................................. *passim*

Truth in Lending Act ........................................................................... *passim*

**Regulations**

12 C.F.R. § 226.52(b)(1)(ii) ..............................................................................13

Credit Card Penalty Fees (Regulation Z), 89 Fed. Reg. 19,128 (Mar. 15, 2024) ................. *passim*

Truth in Lending, 75 Fed. Reg. 37,526 (June 29, 2010) ....................................13

**Other Authorities**

American Heritage Dictionary (5th ed. 2022) ....................................................9

Black's Law Dictionary (12th ed. 2024) ............................................................9

*Code of Federal Regulations*, https://www.ecfr.gov/current/title-12/chapter-
    X/part-1026/subpart-G/section-1026.52 ........................................................4

Oxford English Dictionary (rev. 2005) ..............................................................9

Restatement (Second) of Contracts..................................................................10

## INTRODUCTION

The CFPB's final rule on credit card late fees originally suffered two fatal flaws meriting preliminary relief—one constitutional and one statutory. *See* Credit Card Penalty Fees (Regulation Z), 89 Fed. Reg. 19,128 (Mar. 15, 2024) ("Final Rule"). The first was that its promulgation was inconsistent with the Fifth Circuit's Appropriations Clause holding in *Community Financial Services Ass'n v. CFPB*, 51 F.4th 616, 635-42 (5th Cir. 2022). The second flaw was that the CFPB exceeded its authority under the Credit Card Accountability Responsibility and Disclosure Act of 2009 (CARD Act) and the Truth in Lending Act (TILA). This Court ultimately relied on the Fifth Circuit's Appropriations Clause precedent in preliminarily enjoining the Final Rule, along with its findings that Plaintiffs had established irreparable harm and satisfied the balance of the equities. *See* Order 5-7, ECF No. 82 ("PI Order"). But the Court also commented that Plaintiffs' statutory arguments were "compelling." *Id.* at 5.

Although the Supreme Court has since reversed the Fifth Circuit's Appropriations Clause holding,[1] those statutory bases for a preliminary injunction of the Final Rule remain. The CFPB's latest attempts to harmonize its Final Rule with the text of the CARD Act and TILA are unavailing. And this Court's findings on irreparable harm and the balance of the equities also remain correct (indeed, the CFPB does not even contest the former and rehashes old arguments

---

[1] The Supreme Court's decision did not, however, completely foreclose Plaintiffs' claim asserting a violation of the constitutional separation of powers. *See CFPB v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 437-38 (2024) (noting that the Appropriations Clause is a narrower constraint than the separation of powers and limiting its ruling to the Appropriations Clause question). While Plaintiffs do not press their separation-of-powers claim as a basis for preliminary relief, they reserve their right to assert this claim at a later stage.

in asking for reconsideration of the latter). The Court should accordingly deny the CFPB's motion to dissolve the preliminary injunction.

The CARD Act expressly recognizes that issuers may impose "penalty fee[s]" when customers violate their credit card agreements, so long as such fees are "reasonable and proportional to the omission or violation." 15 U.S.C. § 1665d(b). Congress tasked federal agencies—first the Federal Reserve Board of Governors (the "Board"), and now the CFPB—with establishing standards for ensuring that such "penalty fees" are reasonable and proportional, taking into account the costs incurred by the issuer from such violation, the deterrent effects of a late fee, and the conduct of the cardholder. *Id.* § 1665d. A decade ago, the Board promulgated, and the CFPB subsequently adopted, a regulatory framework that attempted to incorporate those three statutory criteria into its late-fee safe harbor. Now, the CFPB has effectively jettisoned two of those criteria and issued a rule that will prevent issuers from collecting the reasonable and proportional penalty fees that the CARD Act expressly authorizes. To add insult to injury, the Final Rule would allow issuers to collect only a subset of the costs they incur as a result of late payments, instead of the full amount set forth by Congress.

This rule not only exceeds the CFPB's authority, it will also ultimately harm consumers. As the CFPB admits, it will likely lead to more late payments, higher interest rates, constricted access to credit, and other less favorable credit card terms for consumers nationwide, including those who make their payments on time. *See* 89 Fed. Reg. at 19,191-92.

This CARD Act violation is sufficiently damning in itself. But it is exacerbated by the CFPB's violation of TILA, which provides that CFPB rules requiring different disclosures to consumers "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). In the Final Rule, the CFPB set an effective date

2

of 60 days instead of the 6-month-plus compliance period that is required by statute. The Final Rule's short compliance period creates the very risks of turmoil in the credit card markets that Congress intended to avoid.

Against these statutory arguments, the CFPB doubles down on expanding its own authority at the expense of Congress's text. The CFPB's brief describes how Congress meant "nothing" by the term "penalty fee," Br. 15, that the CFPB need not incorporate Congress's express statutory factors "in any particular way," Br. 13-14, that the CFPB can add distinctions not in the statutory text (and not posited for over a decade), Br. 18-19, that the CFPB can interpret Congress's "any" to mean "some," Br. 19, and that its rule should be put in effect for now, *even if it is likely unlawful*, because it is good policy, Br. 20-22. To the extent there was any doubt before, these arguments confirm that the CFPB simply disagrees with Congress's policy judgments and seeks to impose its own through this Final Rule.

## ARGUMENT

Defendants are half correct in their recitation of the relevant standard for dissolution of a preliminary injunction. They correctly state that once they have made the relevant showing of a change in facts or law, district courts apply "the same standards in reviewing a preliminary injunction under a motion to dissolve as they do in deciding whether to grant one in the first instance."  Br. 10. But they incorrectly omit what their own cited authority establishes, that they must establish a "significant change." *Total Safety v. Knox*, No. 4:19-CV-02718, 2019 WL 6894683, at *2 (S.D. Tex. Dec. 18, 2019) (quoting *Horne v Flores*, 557 US 433, 447 (2009) (cited at Br. 10 n.3). This omission is important because there are four factors for preliminary injunctive relief and there has been no change at all, let alone a "significant" one, for three of them.

3

To justify preliminary relief, Plaintiffs were required to demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest; with the latter two factors "merg[ing] when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418. 434-35 (2009). This Court previously found that all four factors weighed in favor of Plaintiffs, and no new facts or legal developments warrant a change with respect to this Court's analysis of the final three. Indeed, the CFPB does not even contest Plaintiffs' showing of irreparable injury, and its arguments on the last two factors are policy-based and inconsistent with the law in this Circuit. With respect to the first factor, although this Court must revisit its analysis in light of the Supreme Court's decision in *CFPB v. CFSA*, Plaintiffs are likely to succeed on their alternative arguments that the CFPB exceeded its authority under the CARD Act and TILA. Accordingly, the preliminary injunction should be maintained and the Final Rule stayed until the case is fully litigated.[2]

## I.    Plaintiffs are likely to succeed on their statutory claims.

### A.    The Final Rule violates the CARD Act.

"[A]gencies are creatures of statute" and "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). The "best evidence" of Congress's intent is the statutory text. *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). In the CARD Act, Congress

---

[2] Plaintiffs note that although it may seem ministerial, the federal government has taken the liberty of posting the new regulation in the online version of the CFR as if it is in force, notwithstanding this Court's preliminary injunction. *See* National Archives, *Code of Federal Regulations*, https://www.ecfr.gov/current/title-12/chapter-X/part-1026/subpart-G/section-1026.52 (last visited Aug. 7, 2024).

authorized issuers to collect a "penalty fee" that is "reasonable and proportional to [an] omission or [a] violation" of the cardholder agreement, and it allowed the CFPB to create a safe harbor for such a "penalty fee." 15 U.S.C. § 1665d. The Final Rule is inconsistent with that statutory text in several ways.

>    1.    **The Final Rule misconstrues the CARD Act's text that issuers may charge a "penalty fee" for the "violation of the cardholder agreement."**

>    a.    **The Final Rule allows only for a "cost fee."**

The first problem with the Final Rule is that it does not allow issuers to collect a reasonable and proportional "penalty fee" for the violation of paying late. The CARD Act expressly permits card issuers to charge a "penalty fee" for a "violation" when a cardholder fails to make a required payment by the due date. 15 U.S.C. § 1665d(a). A "penalty fee" is not solely compensatory, but more akin to special damages that aim to deter violations and address cardholder conduct. *See Tull v. United States*, 481 U.S. 412, 422-23 (1987) (civil penalties reflect conduct and deterrence, not just compensation); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 947 (D.C. Cir. 1991) (a penalty is "a pecuniary form of punishment" that "seeks to deter" rather than provide "dollar-for-dollar recompense"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (punitive damages seek deterrence by supplementing compensatory damages).

Indeed, the Supreme Court in *SEC v. Jarkesy*, recently discussed at length that "civil penalties" are "designed to punish and deter, not to compensate." 144 S. Ct. 2117, 2130 (2024). "Civil penalties," in the Supreme Court's view, concern "culpability, deterrence, and recidivism," and are to be contrasted with monetary relief that merely seeks to "restore the status quo." *Id.* at

2129-30. By its plain meaning, the term "penalty," which Congress used to describe a credit card late fee, must encompass more than issuer costs. Otherwise, Congress would have used that term.

Congress's enumeration of statutory criteria for the CFPB confirms that a "penalty fee" is not a "cost fee." In identifying the factors relevant to assessing the reasonableness and proportionality of such a fee, Congress specifically listed not only the "cost incurred by the creditor from [an] omission or [a] violation" of the cardholder agreement, but also "deterrence of such omission or violation by the cardholder" and "the conduct of the cardholder." 15 U.S.C. § 1665d(c). Such criteria go beyond simply restoring the status quo by recouping issuer costs. *Jarkesy*, at 2129-30.

The nature of the "penalty fee" is further confirmed by the fact that the very same Congress that enacted the CARD Act expressly directed a different agency to focus exclusively on cost to determine whether a different fee is reasonable and proportional. The Durbin Amendment provides that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional *to the cost incurred by the issuer with respect to the transaction*." 15 U.S.C. § 1693o-2(a)(2) (emphasis added); *see also* 51 U.S.C. § 60125(a) (same Congress enacting statute providing for a "reasonable and proportionate share of fixed, platform, data transmission, and launch costs"). That the same Congress used different language in the provision here confirms that, to Congress, a "penalty fee" is not a "cost fee." Congress knew how to limit issuers to charging fees based solely on costs and did not do so here.

Indeed, Congress actually declined to enact an earlier version of the CARD Act that would have authorized late fees "reasonably related *to the cost* to the card issuer of such omission or violation." Credit Card Accountability Responsibility and Disclosure Act of 2009, S.

414, 111th Cong. § 103 (as reported by S. Comm. On Banking, Hous., & Urb. Affs., Apr. 29, 2009) (emphasis added). It would be surprising if an agency could take the position that the statutory text Congress enacted has the same meaning as the statutory text that Congress rejected. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147-48 (2000).

The statutory text and context are thus clear: Congress intended to authorize issuers to collect a "penalty fee" that is reasonable and proportional to the violation. A penalty fee must, by its nature, deter the violation, account for the conduct of the violation, and compensate the issuer for costs incurred as a result of the violation. That conclusion is not only dictated by the statutory text, but it is also logical, for penalty fees encourage timely payment and responsible credit card use, which are critical for banks to engage responsibly in credit card lending.

Yet, despite the CARD Act's mandate, the Final Rule does not allow issuers to collect such penalty fees. Instead, the Final Rule allows only much lower fees to recoup (a subset of) the costs issuers incur as a result of late payments. Specifically, the CFPB lowered the safe harbor to $8 because it believed that amount would "cover pre-charge-off collection costs for Large Card Issuers on average."  89 Fed. Reg. at 19,162. This implicit substitution of "cost fee" for "penalty fee" was intentional: the CFPB explicitly states that its new rule includes a "safe harbor amount set based on costs," that "costs are the best guide to what constitutes a 'reasonable and proportional' fee" and, indeed, that the other factors of "deterrence and consumer conduct" can only "help corroborate a safe harbor amount set based on costs." *Id.*; *see also* Br. 16 (admitting the Final Rule is based only on costs).

The CFPB has simply substituted its judgment for that of Congress. The CFPB asserts in the Final Rule that "the cost factor deserves the most weight of th[e statutory] factors in setting the precise late fee safe harbor amount because it is most closely correlated to the consequences

7

to the issuer of a consumer's late payment." 89 Fed. Reg. at 19,162. But Congress authorized

reasonable and proportional "penalty fee[s]" for violations and directed the CFPB to consider not

just the "consequences to the issuer" but also deterrence of violations and the conduct of the

cardholder. Congress thought the consequences to the issuer were not the only relevant factor in

assessing fees but rather that violating a cardholder agreement is conduct that should be deterred

and reasonably could generate a penalty.

> **b.** **The CFPB's arguments now are no better than their arguments in the Final Rule.**

Against this straightforward textual analysis, the CFPB diverts and deflects. First, the

CFPB cites a definition of the word "consider" and argues that because the CARD Act directs the

CFPB only to "consider" deterrence, cardholder conduct, and costs, "the statute does not require

Bureau regulations to incorporate those factors in any particular way." Br. 13-14. That position

sounds extreme because it is—and, if accepted, it would imply that the CFPB could issue a Final

Rule that ignores these factors *entirely*. But putting aside that problem, this argument

fundamentally is a distraction: the Final Rule is inconsistent with the statutory text not because

of a dispute over the word "consider," but because the Final Rule does not allow issuers to

charge a "penalty fee" that is "reasonable and proportional" to the violation. Congress's

enumeration of factors for the agency to consider evidences Congress's own understanding of

what it means for a "penalty fee" to be "reasonable and proportional."[3] This is not a quibble with

---

[3] The CFPB's now-footnoted argument that the enumerated factors are not even relevant to the safe harbor, Br. 14 n.5, is flawed for the same reason: any safe harbor that is "presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates" must comport with the enumerated factors or it would be inconsistent with Congress's own understanding of what it means for a "penalty fee" to be "reasonable and proportional." It would

"how the Bureau weighed those factors," Br. 14, as the CFPB tries to characterize it. Rather, this is an objection to the CFPB's refusal to allow issuers to charge the very "penalty fee[s]" that Congress authorized them to charge for late payments.

Perhaps recognizing that its argument about the meaning of the word "consider" is a red herring, the CFPB offers its own interpretation of "penalty fee," claiming that "nothing about the word 'penalty' implies that a 'penalty' fee must be set at an amount higher than what's necessary to compensate the other party." Br. 15. But its purported authority falls short. It first appeals to Black's Law Dictionary. As an initial matter, dictionary or treatise arguments cannot overcome Congress's own indication of what it meant by "penalty fee," *see supra* page 6-7 (discussing enactment history and contemporaneous statutes), as informed by the case law that Plaintiffs cite and that the CFPB does not address. But even the definition the CFPB cites—the second definition for penalty in that dictionary—makes clear that a "penalty" is more than compensation; it is "extra." *See Penalty*, Black's Law Dictionary (12th ed. 2024) (defining "penalty" first as "a sum of money . . . distinguish[able] from compensation for the injured party's loss"); *see also* Br. 15 (citing Merriam-Webster Dictionary, which circularly defines a "penalty" as a "sum to be forfeited" and "Forfeit" as a "penalty"). And the balance of such dictionary or treatise authority is the same: a penalty is more than compensatory. *See Penalty*, American Heritage Dictionary (5th ed. 2022) ("A sum established by a contract to be forfeited in lieu of actual damages"); *Penalty*, Oxford English Dictionary (rev. 2005) (similar); *Penalty Clause*, Black's Law Dictionary (12th ed. 2024) (a clause that "assesses against a defaulting

---

be nonsensical for the CFPB to consider these factors when setting a standard only to disregard them when deciding which fees presumptively meet it.

party an excessive monetary charge unrelated to actual harm"); Restatement (Second) of Contracts § 356 cmt. b (1981) (clause does not qualify as a "penalty" if it merely compensates for the losses incurred by the other party).

The CFPB next relies on 11 U.S.C. § 507(a)(8)(G), which gives priority in bankruptcy to "a penalty . . . in compensation for actual pecuniary loss." Br. 15 (also citing a case interpreting that provision). Although other uses of the same statutory term may inform courts on the meaning of a particular statute, this is a section of *the Bankruptcy Code* enacted in 1978—*three decades* before the CARD Act, which itself repeatedly used "penalty" in the ordinary sense discussed above. For example, the CARD Act amended a statute that allowed states to seek "penalties" by also allowing them to seek "damages, restitution, or other compensation." CARD Act, 111 Pub. L. 24, § 511, 123 Stat. 1734, 1764 (2009); *see also id.* § 107, 123 Stat. 1743 (labeling as "Enhanced Penalties" an amendment to 15 U.S.C. § 1640(a)(2)(A), which provides for statutory damages in addition to (and distinct from) the "actual damage[s]" provided for in § 1640(a)(1)).

Moreover, it is noteworthy that the cited bankruptcy statute specifies that the supposed "penalty" is "in compensation for actual pecuniary loss," a specification that is not present in this case and that is an outlier even in bankruptcy law. The leading bankruptcy treatise notes that this provision is an oxymoron: "The nature of a penalty—as a method of punishing unlawful conduct—would seem to preclude the penalty from being in compensation for actual pecuniary loss." 4 Collier on Bankruptcy ¶ 507.11 (16th ed. 2024). To make sense of it, the Fifth Circuit has treated a "pecuniary [loss] penalty" under this provision as distinct from a simple "penalty." *See Matter of Hardee*, 137 F.3d 337, 342 (5th Cir. 1998); *cf. Matter of Garcia*, 955 F.2d 16, 18 (5th Cir. 1992) (quoting Statement of Rep. Don Edwards, 124 Cong. Rec. H11089, 112-13

(1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 6436, 6567-68) ("In bankruptcy terminology, [certain] tax liabilities are referred to as pecuniary loss penalties," which are distinct from "tax penalt[ies] which [are] punitive in nature").

Even in bankruptcy law, it has been long settled that a true "penalty" must do more than compensate an injured party. *See United States v. Childs*, 266 U.S. 304, 307 (1924) ("A penalty is a means of punishment; interest a means of compensation."); *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) ("[I]f the concept of penalty means anything, it means punishment for an unlawful act or omission . . . ."); *In re Vanguard Nat. Res., LLC*, No. 17-30560, 2020 WL 2027284, at *8 (Bankr. S.D. Tex. Jan. 14, 2020) ("Thus, 'taxes' are those that compensate for actual pecuniary loss, while a 'penalty' is that which has punitive characteristics."); *id.* at *9 ("[A] penalty is that which is punitive in nature, intended solely or primarily to punish the debtor; . . . if the rate assessed is to be considered something other than a 'penalty' under the [Bankruptcy] Code, it must bear some relationship to the direct financial loss of the government—it must be in compensation for actual pecuniary loss.").

The CFPB's final argument involves some creative re-writing of the Final Rule. The CFPB posits that a fee "set at a level that does no more than compensate the other party" can also "provide for deterrence" and "account for consumer conduct" and that the Final Rule's late fee does just that. Br. 16. As an initial matter, a Congress that specifically enumerated three different factors would be surprised to find that two of them were superfluous. And it is certainly convenient that the CFPB in its telling decided both that it need only consider costs and that, alternatively, deterrence and consumer conduct are adequately incorporated into a fee based solely on costs.

11

More fundamentally, however, although the CFPB did discuss deterrence in setting the Final Rule's safe harbor, it did not conclude what the CFPB now portrays. With respect to deterrence, the Final Rule states that lowering the safe harbor would not *wholly* undermine any deterrent effect of late fees, although it may diminish its effect by an indeterminate amount. *See* 89 Fed. Reg. 19,162. But asserting that the promulgated safe harbor has a nonzero deterrent effect—or, as the CFPB now puts it in the negative, that a higher safe harbor might not have "sufficiently more of a deterrent [effect] to justify late fees far above cost," Br. 16—does not satisfy the mandate of the CARD Act. A fee of even one cent would arguably meet a nonzero deterrence test, but the CARD Act expressly authorizes issuers to charge a "penalty fee" that is reasonable and proportional to the violation, which necessarily is one that has a *meaningful* deterrent effect. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (it is "one of the most basic interpretive canons, that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal quotation marks omitted); *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 573 (5th Cir. 2017) ("The regulation's requirement to consider certain factors unambiguously requires pipeline operators to carefully undergo an informed decision-making process in good faith, reasonably taking into account all relevant risk factors in reaching a decision."). The Final Rule nowhere determines that its new safe harbor has any such meaningful effect.

Nor does the CFPB's Final Rule suggest anywhere that a cost fee in this circumstance incorporates consumer conduct. The CFPB considered consumer conduct only with respect to credit risk, but the CARD Act nowhere limits consideration of consumer conduct in this manner. *Compare, e.g.*, 89 Fed. Reg. 19,168 ("[I]t not [sic] clear that multiple violations during a relatively short period are associated with increased credit risk and thus reflect a more serious

12

consumer violation."), *with* Truth in Lending, 75 Fed. Reg. 37,526, 37,533-34 (June 29, 2010) (considering credit risk along with other implications of consumer conduct, such as the amount of the missed payment and whether a different penalty fee is also being charged for the same violation). The CFPB is now re-writing the Final Rule in the face of its weaknesses.

It is important to take a step back regarding what the CFPB has done. The Federal Reserve adopted the 2010 cost-based standard for late fees in part *because* the safe harbor captured the other two statutory criteria of deterrence and cardholder conduct that make up a "penalty fee." 75 Fed. Reg. at 37,533; *see* 12 C.F.R. § 226.52(b)(1)(ii). Now, the CFPB has made the safe harbor turn only on cost as well. That is not what the statute authorized the CFPB to do. A fair reading of the Final Rule suggests that the CFPB simply disagrees with Congress's determination that "penalty fees" for late payments based on deterrence and cardholder conduct are appropriate. That judgment is beyond the CFPB's authority.

### 2.    The Final Rule conflicts with the CARD Act's text on "cost."

The CARD Act requires that the CFPB's penalty-fee standard take account of "the cost incurred by the creditor from [the] omission or violation" for which the fee is charged. 15 U.S.C. § 1665d(c)(1). The Final Rule, though, draws an arbitrary line, disallowing consideration of any costs incurred by issuers after an account is charged off. *See* 89 Fed. Reg. at 19,148.

This line-drawing finds no support in the statute. Indeed, the Federal Reserve recognized that "collections generally continue after the account has been charged off" so that "an amount that has been charged off is not necessarily a total loss." 75 Fed. Reg. at 37,538 n.35. Thus, the Federal Reserve allowed issuers to consider "the collection of late payments" as part of their costs. *Id.* at 37,586. Now, the CFPB seeks to arbitrarily limit issuers to only "pre-charge-off collection costs."

13

If Congress had wanted the agency to distinguish between different types of costs, it knew how to say as much. In Dodd-Frank, for example, Congress tasked the Federal Reserve with promulgating standards for "whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A). In doing so, it required the Board to "distinguish between (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered . . . ; and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered." *Id.* § 1693o-2(a)(4)(B). Despite the striking similarity in statutory structure, Congress made no such distinction in the penalty-fee section of the CARD Act. The CFPB may disagree with Congress's judgment, but it is not empowered to second-guess it.

The CFPB argues that "post-charge-off costs are more appropriately attributed to the fact that a consumer has stopped paying entirely—not that a consumer may have initially missed the payment deadline." Br. 19. But regardless of whether an issuer collects a missed payment before an account is charged off or after, the violation precipitating its collection costs is the same: failing to make the required payment by the deadline. Both pre- and post-charge-off collection costs are "cost[s] incurred by the creditor *from* [that] omission or violation." 15 U.S.C. § 1665d(c)(1) (emphasis added). The CFPB also argues that the Final Rule is a mere "clarification," but the change speaks for itself: under the Federal Reserve's rule, costs from "the collection of late payments" counted; under the Final Rule, only collection costs incurred "pre-charge-off" count. The CFPB again misinterprets the statute.

14

**B.      The Final Rule violates the Truth in Lending Act's effective-date requirement.**

TILA provides that rules "requiring any disclosure which differs from the disclosures previously required by this part . . . shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). Here, the CFPB admits that, under the Final Rule, issuers will "have to disclose [the] new amount" they charge as a penalty for a late payment. Br. 20. Yet the Final Rule sets its effective date 60 days after publication in the Federal Register. That is a clear violation of TILA.

Against this straightforward argument, the CFPB in its brief (but not in the Final Rule) asserts that disclosure of these new amounts "is not a new required disclosure." Br. 20. If the CFPB means to argue that the Final Rule escapes this TILA provision because it does not require the disclosure of new *categories* of information, it points to no support for that reading. Rather, the plain text of the statute resolves the issue. A rulemaking that requires issuers to change their disclosures is a rulemaking that "requir[es] any disclosure which differs from the disclosures previously required." 15 U.S.C. § 1604(d). The Final Rule's effective date violates this provision: "any" does not mean "some." The CFPB also offers notes that issuers sometimes change their disclosures "quickly" for inflation adjustments. But these adjustments are often predictable, *see* Suppl. Schlachter Declaration at ¶ 10, No. 24-10248 (5th Cir. Apr. 26, 2024), and, in any event TILA binds the CFPB, not issuers.

Finally, the CFPB asserts that this claim requires a delay in the effective date only until October 1 of this year. That is not correct for several reasons. First, TILA contemplates a compliance period of "at least six months." 15 U.S.C. § 1604(d). Once the rule was preliminary enjoined to "preserve the status quo" under Section 705 of the APA, that suspended TILA's

15

mandated six-month-plus compliance deadline, because it would be "unfair to penalize [parties] that reasonably relied on" a Section 705 stay. *Nat. Res. Def. Council, Inc. v. EPA*, 22 F.3d 1125, 1137 (D.C. Cir. 1994); *see Univ. of Chi. Med. Ctr. v. Sebelius*, 56 F. Supp. 3d 916, 922 (N.D. Ill. 2014) ("no reasonable litigant could have understood that the [TILA deadline] remained in effect or would be enforced against it"). And there is no support for the CFPB's proposition that a regulated party must effectively concede its case and prepare for an alteration of the status quo while a rule is preliminarily enjoined. That is why courts routinely suspend compliance deadlines in cases like this one. *See infra* Part III. Second, at a minimum, the question of the proper permanent remedy for the CFPB's violation of TILA is a question for summary judgment, not preliminary injunction proceedings. A preliminary injunction is designed to preserve the "status quo" and plaintiff need establish only a showing of likelihood of success on the merits and the other factors. Whether a rule should be vacated or effectively amended by court order is a question of remedy to be adjudicated upon briefing at the summary judgment phase.

## II.    The remaining factors favor maintaining the injunction.

Plaintiffs have already established that their members would face irreparable injury from the Final Rule's statutory violations. *See* ECF Nos. 4, 5, 41. The CFPB does not contest this.

The CFPB does ask the Court to revisit its determination on the equities. But it offers nothing new. The Court was correct to conclude that, without an injunction, "Plaintiffs face an enormous undertaking," while an injunction would leave the CFPB "relatively unaffected." PI Order 6. Now nearly three months in, the CFPB points to no harm suffered as a result of the injunction. Nor does it dispute that dissolving the injunction would irreparably harm Plaintiffs' members.

Rather, the CFPB hangs its hat on a questionable proposition—that allowing the Final Rule to go into effect immediately would serve the public interest by putting more money in Americans' pockets. But the public-interest factor is not affected by the purported benefits of an unlawful regulation. "The public interest is in having governmental agencies abide by the federal laws that govern their existence and operations. And there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (cleaned up). In short, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Id.* (quoting *Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021)).

Regardless, the CFPB's policy-laden argument falls short. Its brief fails to engage with the likely *harms* to the public that the Final Rule itself acknowledges: higher interest rates, constricted access to credit, and other less favorable terms for cardholders. *See, e.g.*, 89 Fed. Reg. at 19,191 (acknowledging the potential costs to consumers, including "increases in the interest rate, increases in the amount of other fees, or changes in rewards"); *id.* at 19,192 ("[I]t is also possible that some consumers' access to credit could fall if issuers could adequately offset lost fee revenue expected from them only by increasing APRs to a point at which a particular card is not viable."). Nor does the CFPB's brief acknowledge the significant costs resulting from the inevitable increase in late payments that the Final Rule will cause—costs that will ultimately be borne by consumers.

Even the consumers whom the Final Rule seeks to help are unlikely to benefit in the long run. While each late fee will be lower, the other consequences—such as increased penalty rates and restricted credit access—could make it even harder to pay for life's necessities. But even assuming that late-paying cardholders would see a net benefit, redistributing the costs of their

17

late payments to a broader group of cardholders—while simultaneously increasing those costs by increasing the frequency of late payments—does not ultimately benefit the public at large. It merely redistributes money from one group to another while increasing inefficiency and volatility in the credit card market. In short, even taking the Final Rule's benefits at face value, more of the public will be harmed than helped.

The CFPB also argues that the Court was wrong to give any weight to preserving the status quo. Br. 21-22. But its cited cases (most of which do not involve administrative law) say merely that a preliminary injunction must be supported by a showing of irreparable harm, and simply preserving the status quo for status quo's sake is not enough. The CFPB does not contest Plaintiffs' showing of irreparable harm. And the Fifth Circuit has been clear that "the maintenance of the *status quo* is an important consideration in granting a stay." *Wages & White Lion*, 16 F.4th at 1143.

Ultimately, the CFPB's argument for the Court's reversing itself boils down to this: even if the Final Rule is likely unlawful and will irreparably harm Plaintiffs' members, it should still be allowed to go into effect because it's good policy. That argument is untenable, and the Court was right to reject it the first time around.

## III.    Alternatively, Plaintiffs request that, if this Court dissolves the preliminary injunction, the Court allow for a 90-day compliance period.

Plaintiffs respectfully ask that, if this Court were to dissolve the preliminary injunction for any reason, it enter an order that allows for at least a 90-day compliance period. Although issuers undertook significant preparatory efforts in advance of the original effective date that may now help reduce the time to come into compliance with the Final Rule, a change in late fees cannot simply be turned on and off. Issuers will need "to update marketing materials, cardholder

agreements, billing statements, servicing materials, printed disclosures, digital displays, and other legal disclosures." App'x 23, Decl. of Jess Sharp ¶ 9; App'x 18, Decl. of Thomas Quaadman ¶ 5; App'x 10, Decl. of Steve Montgomery ¶ 5; App'x 2, Decl. of Kelly Hall ¶ 5; App'x 14, Decl. of David Pommerehn ¶ 6; App'x 6, Decl. of Glenn Hamer ¶ 5. Many of the materials that were prepared for the May 14 effective date have been discarded and will need to be created again and, in the case of paper disclosures, finalized, printed, and mailed. App'x 23-24, Sharp Decl. ¶ 9; App'x 18-19, Quaadman Decl. ¶ 5; App'x 10, Montgomery Decl. ¶ 5; App'x 2, Hall Decl. ¶ 5; App'x 14, Pommerehn Decl. ¶ 6; App'x 6, Hamer Decl. ¶ 5. Members will also need to conduct end-to-end testing of their systems to ensure that the change is properly implemented, and lack of adequate time for such testing could expose issuers to enforcement actions or litigation if their best efforts to ensure compliance are not successful. App'x 24, Sharp Decl. ¶ 10; App'x 19, Quaadman Decl. ¶ 6; App'x 10-11, Montgomery Decl. ¶ 6; App'x 2, Hall Decl. ¶ 6; App'x 15, Pommerehn Decl. ¶ 7; App'x 6-7, Hamer Decl. ¶ 6. These changes take time, and it would be appropriate to afford affected issuers at least 90 days to undertake them.

Other courts have granted relief of this nature in similar circumstances. In *R.J. Reynolds Tobacco Co. v. FDA*, for example, the District of Columbia stayed an FDA rule well into the fifteen-month compliance period and ordered that, if it were to eventually reverse course and rule for the FDA, regulated parties would be given the full initial fifteen-month compliance period to comply. 823 F. Supp. 2d 36, 53 (D.D.C. 2011). Other courts have provided similarly long compliance periods when contemplating lifting a stay of a rule. *See Cmty. Fin. Servs. Ass'n v. CFPB*, 558 F. Supp. 3d 350, 369 (W.D. Tex. 2021) (staying reinstated rule's effective date by 286 days to allow regulated parties to comply), *aff'd on remand*, 104 F.4th 930 (5th Cir. 2024);

Order, *Michigan v. EPA*, No. 98-1497 (D.C. Cir. June 22, 2000), Doc. 524995 (setting forth 128 day compliance period upon reversal of stay of rule).

## CONCLUSION

Defendants' motion should be denied. In the event that this Court is inclined to grant Defendants' motion, Plaintiffs respectfully request that, consistent with TILA's six-month compliance window, this Court allow for at least a 90-day compliance period.

Dated: August 8, 2024

Respectfully submitted,

 /s/ *Michael Murray*
Michael Murray (*Pro Hac Vice*)
D.C. Bar No. 1001680
michaelmurray@paulhastings.com
Tor Tarantola (*Pro Hac Vice*)
D.C. Bar No. 1738602
tortarantola@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1730

 /s/ *Derek Carson*
Philip Vickers
Texas Bar No. 24051699
pvickers@canteyhanger.com
Derek Carson
Texas Bar No. 24085240
dcarson@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800

***Attorneys for Plaintiffs***

20

Thomas Pinder (*Pro Hac Vice*)
D.C. Bar No. 451114
tpinder@aba.com
Andrew Doersam (*Pro Hac Vice*)
D.C. Bar No. 1779883
adoersam@aba.com
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave. NW
Washington, DC 20036

***Attorneys for Plaintiff American Bankers Association***

Jennifer B. Dickey (*Pro Hac Vice*)
D.C. Bar No. 1017247
jdickey@uschamber.com
Maria C. Monaghan (*Pro Hac Vice*)
D.C. Bar No. 90002227
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

***Attorneys for Plaintiff Chamber of Commerce of the United States of America***

21

**CERTIFICATE OF SERVICE**

I certify that on August 8, 2024, counsel for Plaintiffs caused the foregoing to be served

on counsel for Defendants via the Court's ECF System.

/s/ *Michael Murray*
Michael Murray
*Counsel for Plaintiffs*