IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS,<br><br>  Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>  Defendants. | Case No.: 4:24-cv-213-P |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION AND LIFT THE STAY OF THE LATE FEE RULE**

Plaintiffs' opposition provides no persuasive basis to maintain the preliminary injunction. While Plaintiffs continue to search for a reason that the Bureau's Late Fee Rule is inconsistent with the relevant statutory standards, their arguments all rest on mistaken readings of statutory text and distortions of statutory context. Plaintiffs likewise have not established that staying the Late Fee Rule would serve the public interest, and they certainly have not demonstrated why a 90-day stay of the Rule's effective date would be appropriate even if the Court agreed with the Bureau on every other point. The Court should dissolve the preliminary injunction and lift the stay.

**I.      The Late Fee Rule is consistent with the statute.**

**A.  Plaintiffs' atextual effort to narrow the term "penalty fee" fails.**

The Late Fee Rule's new safe harbor is entirely consistent with the CARD Act. Plaintiffs' argument to the contrary boils down to a claim that, when Congress provided that any "late payment fee" or "other penalty fee" must be "reasonable and proportional" to the relevant "violation of[] the cardholder agreement," 15 U.S.C. § 1665d(a), it meant that any such fee had to exceed the costs issuers incurred from the violation. Opp'n 5–6. That claim rests on a blinkered interpretation of the word "penalty" and disrespects Congress's decision to task the Bureau with establishing standards for meeting the statute's "reasonable and proportional" requirement.

**1.** Plaintiffs first overread the statute's designation of late fees as a type of "penalty fee"—a catchall term used to describe fees charged for a variety of different violations of the cardholder agreement, including fees for going over the credit limit and for returned payments. *See* 15 U.S.C. § 1665d(a) (including a non-exhaustive list of types of penalty fees); Truth in Lending, 75 Fed. Reg. 37526, 37531 (June 29, 2010) (in Board rulemaking, discussing common types of fees charged). None of Plaintiffs' evidence suggests that "penalty" inherently means something that exceeds costs, particularly as the term is used here.

To start, Plaintiffs offer no reason to doubt that "penalty fee" as used in the CARD Act is

best understood as an extra charge imposed on a party who violates a contractual provision, regardless of the amount levied. *See* Opening Br. 15. Plaintiffs offer competing dictionary definitions, *see* Opp'n 9–10, but that misses the point. Where words have multiple definitions, courts must decide based on context which one applies. *See Abbott v. Biden*, 70 F.4th 817, 832 (5th Cir. 2023) (discussing definitions listed first and fourth in various dictionaries and noting that "either" or "both" could apply, depending on context); *United States v. Williams*, 553 U.S. 285, 294–95 (2008) (Scalia, J.) (similar). Indeed, even many of Plaintiffs' sources separately define penalties as simply sums imposed for violations of contract terms. *See, e.g.*, *Penalties*, Am. Heritage Dictionary[1] ("A sum established by a contract to be forfeited in lieu of actual damages in the event of a breach of the contract."); *Penalty*, Oxford English Dictionary[2] ("[A] loss or disadvantage of some kind, prescribed by law for an offence, or *agreed upon by the parties concerned in the case of breach of contract; esp. the payment of a sum of money imposed in such a case, or the sum of money itself*." (emphasis added)). Here—in a provision referring to "penalty" fees for a "violation of[] the cardholder agreement"—that definition makes the most sense.

To promote their more prescriptive reading, Plaintiffs point to other contexts in which penalties bring with them punishment over and above what is needed to compensate the harmed party. *See* Opp'n 5–6, 9. But none of those other contexts is relevant because they involve specific types of penalties not at issue here. Plaintiffs cite, for example, *SEC v. Jarkesy*, but there the Supreme Court held only that "the *civil penalties in this case*" are "designed to punish and deter, not to compensate" because, among other things, they are paid to the government and the SEC was not required to use the funds to compensate injured shareholders. 144 S. Ct. 2117, 2130 (2024)

---

[1] *Available at* https://www.ahdictionary.com/word/search.html?q=penalty (last visited Aug. 22, 2024).

[2] *Available at* https://www.oed.com/dictionary/penalty_n (last visited Aug. 22, 2024).

(emphasis added). The "penalties" here are not civil penalties collected by the government for violations of law that the government uncovers—they are automatically collected by the injured card issuer for each late payment. *See* Opening Br. 17 n.7. Plaintiffs' resort to punitive damages case law is no more relevant, including because punitive damages are generally unavailable for contractual breaches, which is what a late credit card payment is. *Id.* at 17.

Plaintiffs' search for support in other parts of the CARD Act is similarly doomed because those provisions again focus on kinds of penalties not at issue here. For instance, Plaintiffs point out that one statutory damages provision in the CARD Act authorizes "Enhanced Penalties" over and above actual damages. Opp'n 10 (citing CARD Act, Pub. L. No. 111-24, § 107, 123 Stat. 1734, 1743 (2009)). But if *enhanced* penalties are more than actual damages, doesn't that suggest that plain old penalties need not be? Another provision Plaintiffs rely on distinguishes statutory penalties available to state attorneys general from "damages, restitution or other compensation." Opp'n 10 (citing CARD Act § 107, 123 Stat. at 1743). Again, civil penalties paid to the government are distinct from the contractual penalties credit card issuers assess and collect themselves.

Finally, Plaintiffs have not effectively rebutted the Bureau's demonstration, Opening Br. 15–16, that Congress has used the word "penalty" to describe amounts imposed that do no more than compensate for costs incurred. Plaintiffs quibble with the Bureau's discussion of pecuniary-loss penalties under the Bankruptcy Code, Opp'n 10–11, but their authorities demonstrate only that some kinds of penalties are indeed purely compensatory, even as others are not. *See Matter of Garcia*, 955 F.2d 16, 18–19 (5th Cir. 1992) (categorizing interest meant "to repay the government and the public[] for the loss of the use of the money" as a "pecuniary loss penalty"); *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) ("[A] penalty, *as the word is here used*, is an exaction imposed by statute as punishment for an unlawful act" (emphasis

added)); 4 Collier on Bankruptcy ¶ 507.11 (16th ed. 2024) (describing case law on determining whether something qualifies as a "compensatory penalty").

**2.** Plaintiffs' claim that the penalty fees here must do more than compensate card issuers also finds no support in the statute's instruction that the Bureau "consider" costs as well as deterrence, cardholder conduct, and any other factors the Bureau deems necessary or appropriate when engaging in required rulemaking to establish standards for assessing whether penalty fee amounts are "reasonable and proportional." *See* Opp'n 6–7 (discussing 15 U.S.C. § 1665d(b)). As the Bureau explained in its opening brief, that statutory language does not purport to define a "reasonable and proportional penalty fee," and it is not even applicable to the portions of the Bureau's rule implementing the optional safe harbor. *See* Opening Br. 13–14 & n.6.

Plaintiffs nevertheless insist that the fees here must be set at a level that exceeds costs because Congress could have set fees based on card issuers' costs alone—as it did in the Durbin Amendment governing interchange transaction fees and in an unenacted earlier version of the CARD Act[3]—but it chose not to do so. True enough, but Congress didn't do what Plaintiffs say, either. Congress did not mandate that a penalty fee be set at a level that exceeds costs. Instead, Congress said that fees must be reasonable and proportional to the relevant violation of the cardholder agreement and left it to the Bureau to decide how to ensure that fees did not exceed this "reasonable and proportional" requirement, guided by the statutory factors. All that Plaintiffs' cited examples demonstrate is that Congress knows how to craft a statutory standard, on the one

---

[3] *See* 15 U.S.C. § 1693o-2(a)(2) (mandating that "the amount of any" interchange fee "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction"); Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb. Affs., Apr. 29, 2009) (draft legislation mandating that "[t]he amount of any" penalty fee, including a late payment fee, "shall be reasonably related to the cost to the card issuer").

4

hand, and provide agencies with factors to consider when writing their own, on the other.

For this reason, Plaintiffs are wrong to criticize the Bureau's focus on "the meaning of the word 'consider'" as "a red herring." Opp'n 9. It's not misdirection to draw the Court's attention to the statutory text and structure, which make clear that Congress consciously chose to give the Bureau authority to consider how cost, deterrence, consumer conduct, and other necessary or appropriate factors can contribute to a reasonable and proportional penalty fee.

**3.** Unable to find any real conflict with the statute, Plaintiffs are left to object to *how* the Bureau considered the various factors.[4] Those arguments are more appropriately left to arbitrary and capricious review, *see* Opening Br. 14, and in any event are no more persuasive.

Plaintiffs' objections to the deterrence and consumer conduct analysis, Opp'n 12, ignore both the statutory text and the analysis that's actually in the Final Rule. As to deterrence, the Bureau concluded that an $8 late fee would serve as a "powerful deterrent to those consumers who pay attention to financial penalties"—and who are thus most easily deterred. 89 Fed. Reg. at 19163. And reviewing available empirical evidence, the Bureau further concluded that setting a late fee substantially higher would not be "sufficiently more of a deterrent" to justify imposing a fee that was so disproportionate to the costs card issuers incurred. *See id.* at 19165. While Plaintiffs complain that this does not ensure that there would be "meaningful" deterrence, they do not clarify what amount of deterrent effect would be "meaningful" in their eyes. The statute certainly doesn't say. And as the Bureau has noted, "consideration of deterrence" does not "necessitate[], as a matter

---

[4] Amicus Bank Policy Institute also suggests the court should maintain an injunction based on arguments about the data the Bureau used to assess the statutory factors. *See* Notice, ECF No. 120. Plaintiffs have never raised those arguments as grounds for a preliminary injunction, so the Court should not reach them. *Cf. FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 (2013) (refusing to consider argument raised only by amicus). The Bureau will respond to this claim at the appropriate time, after Plaintiffs have placed it before the Court.

of law or policy, setting a safe harbor amount that will have the maximum theoretical deterrence effect." *Id.* at 19162. Plaintiffs' protests about consumer conduct are even less connected to the statutory text. Even if Plaintiffs were right that the Bureau only discussed consumer conduct with respect to credit risk—and they're not, *see* Opening Br. 16–17—it's not clear why that would matter. The statute does not define consumer conduct, so it cannot somehow mandate that the Bureau consider other aspects of consumer conduct that Plaintiffs don't even bother to identify.

Plaintiffs further err when they attack how the Bureau weighed all the factors. Plaintiffs fault the Bureau for giving cost "the most weight" in setting the late fee safe harbor. Opp'n 7 (quoting 89 Fed. Reg. at 19162). But the CARD Act says only that in promulgating certain rules, the Bureau must "consider" the statutory factors. The Bureau considered them here when it determined $8 would be enough to cover issuers' costs and then thoroughly discussed why a fee set at that level would adequately account for deterrence and consumer conduct, too. *See* 89 Fed. Reg. at 19163, 19167. In suggesting that consideration was somehow inadequate, Plaintiffs seem to imply that the statute requires some sort of addition problem, with a late fee set at cost *plus* an amount for deterrence *plus* an amount for consumer conduct. It's unclear why that would be a reasonable reading of the word "consider," as a stylized example makes clear: If the Bureau first determined that $7 would adequately deter late payments and account for consumer conduct, then found that issuer costs were $8 per late payment, what would an appropriate fee be? In Plaintiffs' view, would it be $15—even though $8 would be enough to accomplish compensation and deterrence? That solution makes little sense, and certainly isn't mandated by the statute.

**B. The Bureau's new commentary on costs is consistent with the CARD Act.**

The Rule also appropriately clarifies that the relevant costs for setting late fees do not include collection costs incurred after delinquent accounts are charged off. Plaintiffs object that

6

Congress did not "distinguish between different types of costs." Opp'n 14.[5] But Congress *did* set limits on what costs were relevant: The statute provides that fees must be reasonable and proportional to "the omission or violation to which the fee . . . relates" and instructs the Bureau to consider "the cost incurred by the creditor *from such omission or violation*" in regulating those fees. 15 U.S.C. § 1665d(b), (c) (emphasis added). Costs incurred after a cardholder has missed so many payments that the issuer must charge the account off as a loss are no longer reasonably considered costs incurred "from" "the violation" to which a late fee relates—*i.e.*, from the failure to make payment by the initial statement due date. Those costs instead come from the persistent nonpayment on the account. And, under the statute, they are not appropriately considered in setting the late fee.

### C.  TILA's effective-date provision does not entitle Plaintiffs to the relief they seek.

In addition, Plaintiffs are not entitled to a preliminary injunction based on a provision of TILA requiring "at least six months" lead time and an October 1 effective date for "[a]ny regulation of the Bureau . . . requiring any disclosure which differs from the disclosures previously required by this part," 15 U.S.C. § 1604(d). That provision does not apply here because the Late Fee Rule does not "requir[e] any [different] disclosure" within its meaning. The Rule may change the amount issuers can charge, and therefore the amount they must disclose under preexisting disclosure requirements, but it leaves the disclosure requirement itself—to accurately disclose late

---

[5] Plaintiffs also claim that the Board's 2010 rule recognized that post-charge-off costs should be included. Opp'n 13. They are mistaken. The Board's rule clarified that issuers could not use late fees to help cover "losses and associated costs," and it provided a non-exhaustive list of what costs should be considered "associated" with losses. *See* 75 Fed. Reg. at 37538. The rule was silent about how to characterize post-charge-off collection costs. And indeed, the Board's rule elsewhere recognized that charge off is a relevant point in time for this consideration:  When discussing the fact that "most" late payments do "not actually result in losses," the Board cited data on charge-off rates for that point. *See id.* n.35.

7

fees in a specified manner—unchanged.[6] Plaintiffs object that the provision applies to "any" new disclosure, not just "some." Opp'n 15. But the provision makes clear it is concerned only with new "disclosure requirements"[7]—ones creditors would have to "adjust their forms to accommodate," 15 U.S.C. § 1604(d). And that makes sense. Changes to what credit card companies can charge consumers may come from many different places, not just Bureau regulations. It would make little sense for Congress to give companies six months to change the amounts they disclose in response to substantive changes that happen to be required by rules under TILA, but not for substantive changes required under other laws. The Late Fee Rule and other such substantive adjustments to what credit card issuers can charge cannot reasonably be considered a "disclosure requirement" under this statute.

In any event, even if TILA's effective-date provision somehow applied and required the Bureau to set the effective date as October 1, 2024, that would at most entitle Plaintiffs to an October 1, 2024, effective date—not the indefinite postponement Plaintiffs apparently seek. *See* Opening Br. 20. Plaintiffs cannot credibly claim that they should get longer because they "reasonably relied on" the existing stay of the Rule. *See* Opp'n 16. Among other problems with this argument, it is unclear how it was reasonable for Plaintiffs' members to rely on a stay whose sole basis on the merits the Supreme Court undercut six days after it was entered. Nor should the Court accept Plaintiffs' invitation to wait until final judgment to figure out the proper remedy for any violation of TILA's effective date provision. *See* Opp'n 16. It can't be that Plaintiffs can get *more* relief in a preliminary injunction than they would be entitled to at final judgment.

---

[6] Plaintiffs complain in passing that the Final Rule did not make this point. Opp'n 15. That's not true. In the Final Rule, the Bureau explained that the Rule "does not change" what disclosures "card issuers are currently required" to make. 89 Fed. Reg. at 19189.

[7] 15 U.S.C. § 1604(d) (providing effective date for rules with "new disclosure requirements" and permitting creditors to comply with "newly promulgated disclosures requirements" earlier).

## II. Plaintiffs' assessment of the public interest is flawed.

As explained in the Bureau's opening brief, the Court should also reconsider its determination that a preliminary injunction would best balance the equities and further the public interest. *See* Opening Br. 20–22. Plaintiffs' responses fall flat. They suggest that the Bureau's and the public's interest in the rule must give way once Plaintiffs have shown a likelihood of success on the merits. *See* Opp'n 17. That approach would improperly read the balance of the equities out of the preliminary injunction test. Despite Plaintiffs' protests, the public has been and will be harmed by the continued injunction of the Late Fee Rule. Plaintiffs claim the Bureau has ignored the potential downsides of the Late Fee Rule for consumers, Opp'n 17–18, but the Bureau addressed those possible harms to certain segments of consumers in the Final Rule and concluded that the Rule would nonetheless generate billions of dollars in net benefits for consumers. 89 Fed. Reg. at 19166, 19191, 19193–94, 19197. Plaintiffs have provided no evidence that undermines that detailed analysis. The public interest therefore supports lifting the stay of the Rule.

## III. The Court should not impose a 90-day compliance period.

As a last-ditch effort to stave off implementation of the Bureau's lawfully promulgated Late Fee Rule, Plaintiffs ask the Court to give them 90 days to comply even if it otherwise concludes that the stay should be lifted. *See* Opp'n 18–19. Neither the law nor the facts justify this request. While Plaintiffs cite several cases where they say similar stays were granted, those cases are unpersuasive and in any event do not support Plaintiffs' ambitious request for 30 days *more* than the Rule originally gave for compliance. One case would have extended a stay for a period that replicated the rule's original implementation schedule, but the court offered no explanation for that extension. *R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 53 (D.D.C. 2011). The other cited cases offered challengers only the amount remaining on the clock at the time the stay was entered, reasoning that that remedy would return the parties to the status quo. *See Cmty. Fin.*

9

*Servs. Ass'n of Am., Ltd. v. CFPB*, 558 F. Supp. 3d 350, 368 (W.D. Tex. 2021); Order, *Michigan v. EPA*, No. 98-1497 (D.C. Cir. June 22, 2000), Doc. 524995. Here, that would give Plaintiffs four days. Plaintiffs provide exactly zero legal basis for their extraordinary request that this Court maintain the stay for 90 days even if it concludes the stay is no longer justified.

Beyond that, Plaintiffs offer no competent or persuasive evidence that their members even need that much time. The declarations they submitted come from the presidents of the Plaintiff trade associations—not any of the regulated card issuers themselves. And each declarant only stated that, "[b]ased on conversations with" or "reports" from members they do not even identify, they understood that those card issuers will need at least 90 days to comply. *See* Opp'n App'x 2 (Hall Decl. ¶ 5), 6 (Hamer Decl. ¶ 4), 10 (Montgomery Decl. ¶ 5), 14 (Pommerehn Decl. ¶ 6), 18 (Quaadman Decl. ¶ 5), 23 (Sharp Decl. ¶ 9). At previous stages of the litigation, two larger card issuers have come forward to aver to their purported compliance burdens. *See* PI App'x 1–5, 42–46, ECF No. 5 (declaration from Comenity executives); PI App'x 55–58 (declaration from Synchrony executive). Tellingly, none spoke up now. Even if it could somehow be appropriate to maintain an unjustified stay based on some showing of need, the Court should not rely on Plaintiffs' unpersuasive hearsay to do so. *See TEXO ABC/AGC, Inc. v. Perez*, No. 3:16-cv-1998-L, 2016 WL 6947911, at *6 (N.D. Tex. Nov. 28, 2016) (noting that, while hearsay is admissible at preliminary injunction stage, declaration detailing only "unsupported belief that irreparable harm will result" cannot support requested relief); 11A Fed. Prac. & Proc. Civ. § 2949 (3d ed.) (explaining that "the quality of the affidavit" matters, and that courts "give hearsay statements less credence than direct allegations").

## CONCLUSION

For the foregoing reasons, the Court should dissolve the preliminary injunction and lift the stay of the Bureau's Late Fee Rule.

| | |
|---|---|
| DATED: August 22, 2024 | Respectfully Submitted, |

SETH FROTMAN
*General Counsel*

STEVEN Y. BRESSLER
*Deputy General Counsel*

KRISTIN BATEMAN
*Assistant General Counsel*

*/s/ Stephanie B. Garlock*
STEPHANIE B. GARLOCK*
*Counsel*
D.C. Bar No. 1779629
JUSTIN M. SANDBERG*
*Senior Counsel*
Ill. Bar No. 6278377
JOSEPH FRISONE*
*Senior Counsel*
Va. Bar No. 90728
Consumer Financial Protection Bureau
1700 G St. NW
Washington, D.C. 20552
Stephanie.Garlock@cfpb.gov
Justin.Sandberg@cfpb.gov
Joseph.Frisone@cfpb.gov
(202) 435-7201 (Garlock)
(202) 450-8786 (Sandberg)
(202) 435-9287 (Frisone)
(202) 435-7024 (fax)

*Admitted *pro hac vice*

*Counsel for Defendants the Consumer Financial Protection Bureau and Rohit Chopra*

11

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 22, 2024, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

                                                    */s/ Stephanie B. Garlock*
                                                   STEPHANIE B. GARLOCK