UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**CHAMBER OF COMMERCE OF THE**
**UNITED STATES OF AMERICA, ET AL.,**

   Plaintiffs,

v.                                                                      No. 4:24-cv-00213-P

**CONSUMER FINANCIAL PROTECTION**
**BUREAU, ET AL.,**

   Defendants.

## OPINION & ORDER

    Before the Court are two Motions advanced by Defendants Consumer Financial Protection Bureau and Rohit Chopra ("CFPB"): (1) a Motion to Dismiss the Fort Worth Chamber of Commerce ("Fort Worth Chamber") for Lack of Standing and Transfer this Case to the U.S. District Court for the District of Columbia (ECF No. 109); and (2) a Motion to Dissolve the Preliminary Injunction and Lift the Stay of the Late Fee Rule (ECF No. 105). For the reasons below, the Court **DENIES** both Motions.

### BACKGROUND & PROCEDURAL HISTORY

    When the CFPB was created in 2011, it took over enforcement of the Credit Card Accountability and Disclosure Act ("CARD Act") from the Federal Reserve and adopted the Federal Reserve's prior regulations. The CARD Act aims to "establish fair and transparent practices relating to the extension of credit," including by regulating "excessive fees" by credit card companies. *See* Pub. L. No. 111–24, 132 Stat. 1734 (2009); S. Rep. 111–16, at 6 (2009).

    To this end, the CARD Act allows credit card issuers to impose "penalty fee[s]" when a customer violates a credit card agreement by, for example, failing to make an on-time payment. *See* 15 U.S.C. § 1665d(a). Those penalty fees must be "reasonable and proportional to such

omission or violation." *Id.* To ensure penalty fees remain reasonable and proportional, the statute tasks the CFPB with "establish[ing] standards for assessing whether the amount of any penalty fee . . . is reasonable and proportional." *Id.* § 1665d(b). The CFPB is directed to consider four factors in establishing standards: "(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Bureau may deem necessary or appropriate." *Id.* § 1665d(c). Congress also authorized the CFPB to set a "safe harbor" amount for penalty fees that are "presumed" to be reasonable and proportional. *Id.* § 1665d(e).

From 2010 to 2023, the safe harbor amount was adjusted eight times for inflation. The current safe harbor caps penalty fees at $30 for a first violation and $41 for subsequent violations within six billing cycles. However, on March 5, 2024, under authority of the CARD Act, the CFPB amended 12 C.F.R. § 1026.52(b) ("Final Rule") reducing late-fee safe harbor charges to $8. The Final Rule also prohibited large credit card issuers from adjusting such fees for inflation and capped the late fees to twenty-five percent of a consumer's missed minimum payment. The Final Rule was slated to go into effect on May 14, 2024.[1]

Two days after the Final Rule was issued, Plaintiffs—a group of trade associations—brought this action under the Administrative Procedure Act and moved for a preliminary injunction the same day. Plaintiff Fort Worth Chamber is the only plaintiff located within the Northern District of Texas, where Plaintiffs brought suit. Perplexingly, none of the actual banks or credit card issuers affected by the Final Rule are parties to this suit, and none are headquartered in the Fort Worth Division.

---

[1]This Court has no opinion, nor should it, as to whether the Final Rule is good public policy or bad public policy. Rather, the only question before the Court is whether the Final Rule is proper under the power delegated to the CFPB by Congress because the "role of the judiciary is one of interpreting and applying the law, not making it." *Confirmation Hearings in the United States Senate on Justice O'Connor's Nomination to the Supreme Court*, 97th Cong. (Sept. 9, 1981).

2

On March 21, 2024, before the Court ruled on the preliminary injunction, Defendants filed a Motion to Transfer the Case to the United States District Court for the District of Columbia. The Court granted the motion on March 28, 2024. However, eleven days later, the Fifth Circuit granted mandamus relief to Plaintiffs and ordered this Court to reopen the case. The opinion from the Fifth Circuit was then released on April 30, 2024, directing this Court to rule on the merits of the preliminary injunction by May 10, 2024. The Fifth Circuit did not rule on the merits of the transfer—only that transferring the case prior to making findings and conclusions for the preliminary injunction was an "effective denial" of the Motion for Preliminary Injunction.

On May 10, 2024, this Court granted Plaintiffs' Motion for Preliminary Injunction, thereby staying the Final Rule. The Court's decision relied on Fifth Circuit precedent holding that the CFPB was unconstitutionally funded under the Appropriations Clause. Under that precedent, the Final Rule was improperly promulgated. But six days after this Court granted the preliminary injunction, the United States Supreme Court issued its opinion in *Consumer Financial Protection Bureau v. Community Financial Services Association of America, Ltd.* (hereinafter "*CFSA*"), reversing the Fifth Circuit decision that this Court relied on in granting the preliminary injunction. 601 U.S. 416 (2024).

Despite granting the preliminary injunction, the Court revisited the still-unsettled matter of venue on May 28, 2024. And having already completed the analysis in its prior order, the Court again granted Defendants' Motion to Transfer to the District of Columbia. Plaintiffs again sought mandamus relief, and on July 15, 2024, the Fifth Circuit vacated the transfer order, this time ruling on the merits of the transfer analysis.

Three days later, on July 18, 2024, based on the Supreme Court's decision in *CFSA*, Defendants filed a Motion to Dissolve the Preliminary Injunction. Then, on July 29, 2024, the Defendants filed a Motion to Dismiss the Fort Worth Chamber of Commerce for Lack of Standing and Transfer This Case to the U.S. District Court for the District of Columbia. The Court now addresses those two Motions.

## LEGAL STANDARD

Standing is a constitutional requirement that every plaintiff must meet. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).[2] Generally, to prove standing, a plaintiff must show injury, causation, and redressability. *See id.* at 560–61. However, the United States Supreme Court has recognized that "an association may have standing to assert the claims of its members[,]" even if the association itself has not suffered harm. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). An association has standing if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343.

To dissolve a preliminary injunction, a party must "present a[] change in the operative facts or relevant decisional or statutory law [to] warrant[] such relief." *Scionti v. Dornfried*, 137 F.3d 1351 (5th Cir. 1988) (per curiam). If such a change is established, Fifth Circuit courts "apply the same standards in reviewing a preliminary injunction under a motion to dissolve as they do in deciding whether to grant one in the

---

[2]Under recent Supreme Court precedent, determining whether a party has standing to bring a lawsuit can be a very treacherous undertaking for lowly district court judges, comparable to exploring uncharted territory with no compass. *See, e.g., Haaland v. Brackeen*, 599 U.S. 255 (2023) (holding that a state lacks standing to challenge federal law preempting state laws on foster child placement, even though "Congress's Article I powers rarely touch state family law"); *contra Massachusetts v. EPA*, 549 U.S. 497 (2007) (holding that a state had standing to challenge the EPA's decision not to regulate emissions of greenhouse gases because that power was preempted and greenhouse gases affected "the earth and air within [their] domain"); *contra United States v. Texas*, 599 U.S. 670 624 (2023) (holding that states near an international border lacked standing to challenge the federal government's immigration enforcement policies because the state's financial injury was not "legally cognizable"); *but see Biden v. Nebraska*, 600 U.S. ——, 143 S. Ct. 2355 (2023) (holding that Missouri established standing by showing that it "suffered . . . a concrete injury to a legally protected interest, like property or money"); *contra Dept. of Ed. v. Brown*, 600 U.S. 551 (2023) (holding that individual loan borrowers lacked standing to allege the federal government unlawfully excluded them from a one-time direct benefit program purportedly designed to address harm caused by an indiscriminate global pandemic).

first instance." *Texas v. United States*, No. 7:15-cv-00056-O, 2015 WL 13424776 at *1 (N.D. Tex. June 26, 2015) (O'Connor, J.) (citing *Vaughn v. St. Helena Parish Police Jury*, 261 F. Supp. 2d 553, 556 (M.D. La. 2002)).

## ANALYSIS

The Court will first address the CFPB's Motion to Dismiss the Fort Worth Chamber for Lack and Standing. ECF No. 109. Because the Court concludes that the Fort Worth Chamber has standing and that venue is proper, it will subsequently address the CFPB's Motion to Dissolve the Preliminary Injunction. ECF No. 105.

**A. Motion to Dismiss and Transfer**

1. <u>The Fort Worth Chamber has associational standing.</u>

The CFPB limits its associational standing challenge to the second *Hunt* prong—whether "the interests [the Fort Worth Chamber] seeks to protect are germane to the organization's purpose." *Hunt*, 432 U.S. at 343. The Fifth Circuit has characterized "the germaneness requirement" as "'undemanding' and requir[ing] 'mere pertinence' between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n.2 (quoting *Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138 (2d Cir. 2006)).

Although there are few germaneness requirement challenges in the Fifth Circuit, the bar is set unmistakably low. For example, in *Association of American Physicians & Surgeons, Inc.*, the court noted that the germaneness requirement was "easily surpassed" because the national medical association had an interest in "government abuse" presented by the state medical board procedures. 627 F.3d. at 550 n.2. Likewise, in *Southwestern Electric Power Company v. United States Environmental Protection Agency*, "no party contest[ed] the issue" of associational standing, but the court addressed the germaneness requirement in a footnote. 920 F.3d 999, 1014 n.18 (5th Cir. 2019). There, the water trade associations' challenge to EPA regulations was germane because the associations sought "to protect environmental interests . . . ." *Id.* The handful of other Fifth Circuit cases give little

5

scrutiny to the germaneness requirement.[3] Additionally, in the two non-Fifth Circuit cases cited by the CFPB in its Motion (ECF No. 109 at 7–10), the courts ultimately found the germaneness requirement's low bar was satisfied.[4]

The Fort Worth Chamber meets the undemanding germaneness requirement. Neither side disputes that the Fort Worth Chamber's purpose involves "cultivat[ing] a thriving business climate in the Fort Worth region." The effects of the Final Rule include lowering late-fee safe harbor charges from $30 to $8, prohibiting adjustments for inflation, and capping late fees to twenty-five percent of a consumer's missed minimum payment. The Court need not opine on any potential downstream economic consequences of the Final Rule to conclude that the Fort Worth Chamber's mission to promote a "thriving business climate" in Fort Worth will be affected if card issuers belonging to its organization are subjected to the Final Rule's changes.

---

[3] *See Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F. 4th 495, 504–05 (5th Cir. 2021) (noting that a challenge to an adult entertainment regulation was germane to a trade association's broad purpose of "representing the interests" of its members); *Jornaleros de Las Palmas v. City of League City*, 945 F. Supp. 2d 779, 794 (S.D. Tex. 2013) (concluding a challenge to a pedestrian solicitation law was "clearly" germane because the organization was formed to help members "learn about their rights" in response to police activity); *Sierra Club v. U.S. Army Corps of Eng'rs*, No. CV H-11-3063, 2012 WL 13040281, at *11 (S.D. Tex. Aug. 22, 2012) (finding germaneness satisfied because a beltway project might cause a flood and the organization's purpose included "protect[ing] the wild places of the earth").

[4] *See Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 57–58 (D.C. Cir. 1988); *Bldg. & Constr. Trades Council of Buff., N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006). In *Hodel*, the D.C. Circuit recognized, as noted by the CFPB in its Motion, that the germaneness requirement "serves as a backstop" and "prevent[s] associations from being merely law firms with standing." *Id.* at 58. Yet, given the "undemanding" standard, the court had "little difficulty" determining that "hunting on wildlife refuges is germane" to the organization's mission of "protecting animals and assuring their humane treatment." *Id.* at 59. In *Building & Construction*, the court focused on a trade group's general purpose of "improv[ing] 'working conditions' and 'the occupational safety and health of its members.'" 448 F.3d at 149. And even though the trade group "was not established for the purpose of enforcing environmental laws," the issue of waste and water disposal was germane to its purpose. *See id.*

6

The CFPB sounds the alarm that a finding of associational standing will "create an improper end-run around the venue limitations." ECF No. 109 at 12. It is true that this Court has not been untroubled by questions of venue in this case. But the associational standing precedent in the Fifth Circuit leaves little room for dismissing parties based on geographical ties. Unlike 28 U.S.C. § 1404(a), which the CFPB relied on to argue for transferring this case to Washington D.C., the doctrine of associational standing does not involve any balancing test or equitable measure.

Given the lack of Fifth Circuit precedent denying standing based on germaneness challenges, the CFPB points to one out-of-circuit district court case, decided after the CFPB filed its Motion, that denied associational standing on a similar germaneness challenge and with a similar plaintiff. *See Dayton Area of Com. v. Becerra*, No. 3:23-cv-156, 2024 WL 3741510 (S.D. Ohio Aug. 8, 2024) (hereinafter "*Dayton*"). In *Dayton*, two state chambers and a local chamber ("Dayton Chamber") sued in Dayton, Ohio, challenging the constitutionality of the federal Drug Price Negotiation Program promulgated by the Department of Health and Human Services ("HHS"). *See id.* The Dayton Chamber purported to have two named members: AbbVie and Pharmacyclics. *Id.* at *5. As in this case, the Dayton Chamber had a distinctly localized mission: "striv[ing] to improve the . . . business climate and overall standard of living" in the Dayton area. *Id.* Ultimately, the *Dayton* court dismissed the Dayton Chamber based on a germaneness challenge to its associational standing because there was nothing "connecting the interests" of Pharmacyclics—a California-based company—or AbbVie—an Illinois-based company—"to the business climate in the Dayton Area." *Id.* at *6. The CFPB insists that "[this] Court should reach the same conclusion . . . ." ECF No. 109 at 5.

The CFPB is correct that *Dayton* is remarkably similar to this case. But while the *Dayton* court felt free to "adopt a narrow interpretation of the interests at stake in [that] lawsuit," this Court does not recognize a

7

similar freedom to do so.[5] *Dayton Area of Com.*, 2024 WL 3741510 at *5. Although the Fifth Circuit has not yet discussed the germaneness requirement in depth, the sparse treatment it has given to the subject is undoubtedly consistent.

Given the clear Fifth Circuit precedent on the undemanding germaneness requirement, this Court concludes that the Fort Worth Chamber has associational standing. The CFPB's Motion to Dismiss is therefore **DENIED**.

 2. <u>Venue is proper in this District.</u>

The CFPB also argues that the Northern District of Texas is not a proper venue. Venue is proper in actions against federal agencies where "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(C). Neither side disputes that the Fort Worth Chamber resides in the Northern District of Texas or that there is no real property in dispute. Moreover, this Court must also consider that it has previously been mandamused twice and found by the Fifth Circuit as having failed to act diligently and "clearly abusing its discretion" by transferring this case to the District of Columbia.[6]

Thus, venue is proper, and the CFPB's Motion to Transfer is **DENIED**.

---

[5]In Justice Thomas's recent concurrence in *FDA v. Alliance for Hippocratic Med.*, he questioned whether associational standing "can be squared with Article III's requirement that courts respect the bounds of their judicial power." 602 U.S. 367 (2024) (Thomas, J., concurring). The Court likewise worries that organizations are often created as litigation vehicles, thereby distorting the doctrine of standing and the boundaries of the judiciary's power. A more rigorous germaneness requirement may be one way to demand stronger ties between the association and the litigation. The Court awaits the Fifth Circuit's learned analysis on this point.

[6]Plaintiffs' ties to the Fort Worth Division are weak at best. Indeed, Plaintiffs' only connection to the Fort Worth Division is that the Fort Worth Chamber of Commerce is located here—all of the banks and credit card issuers affected by the Final Rule are located elsewhere. Of course, the City of Fort Worth and the Fort Worth Chamber of Commerce would no doubt welcome them to our thriving city and business-friendly environment. *S*ee City of Fort Worth, Business Services (last visited December 6, 2024) https://www.fortworthtexas.gov/business.

**B. Motion to Dissolve Preliminary Injunction**

Given the *CFSA* decision finding that the CFPB does not violate the Appropriations Clause, the Court must next determine whether Plaintiffs can continue to show that a preliminary injunction is warranted. *See Scionti*, 137 F.3d at 1351. The factors are the same on a motion to dissolve as they are for the preliminary injunction: (1) likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the plaintiff's threatened injury must outweigh the threatened injury to the defendant; and (4) the injunction will not be against the public interest. *See, e.g.*, *Trans. World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990) (abrogated on other grounds by *Johnson v. Baylor University*, (5th Cir. 2000)). The Court will evaluate the likelihood of success on the merits and then reconsider the remaining elements.

1. <u>Plaintiffs are likely to succeed on the merits.</u>

Plaintiffs reassert a separate basis for the preliminary injunction first advanced in their initial motion for a preliminary injunction—that the Final Rule violates both the CARD Act and Truth in Lending Act. Finding a clear violation of the former, the Court forgoes analysis of the latter.

"An administrative agency is itself a creature of statute" and therefore derives its power from statutory text. *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.C.*, 463 U.S. 582, 614 (1983) (O'Connor, J., concurring). The Court therefore begins where it always does: with the text of the statute. *See, e.g.*, *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023). The Court gives words their normal contextual meanings using normal rules of interpretation. *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). In interpreting the CARD Act, the Court endeavors to read the whole statute contextually, giving effect to every word, clause, and sentence. *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024).

The CFPB relies on the authority granted in the CARD Act to justify its issuance of the Final Rule. *See* 15 U.S.C. § 1665d. The Act allows card issuers to charge "penalty fee[s]" for violations of the cardholder agreement so long as they are "reasonable and proportional" to the

violation of the agreement. *Id.* § 1665d(a). The CFPB is tasked with "establish[ing] standards for assessing whether the amount of any penalty fee . . . is reasonable and proportional." *Id.* § 1665d(b). Four factors should be considered in establishing such standards: "(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Bureau may deem necessary or appropriate." *Id.* § 1665d(c).

A plain language reading reveals that the Final Rule violates the CFPB's statutory authority under the CARD Act. To begin, the CARD Act explicitly allows card issuers to impose "penalty fee[s]." The Final Rule, however, lowered the safe harbor to $8 for card issuers because it would "cover pre-charge-off collection costs for Large Card Issuers on average." Credit Card Penalty Fees (Regulation Z), 89 Fed. Reg. 19,128, 19,162 (Mar. 15, 2024). And the CFPB's Motion and other filings admit as much.[7] But fees to cover "costs" and fees that constitute "penalties" are not the same thing.

Unlike a compensatory charge, a "penalty fee" implies a purpose of deterrence. *See Tull v. United States*, 481 U.S. 412, 422–23 (1987) (analyzing the Clean Water Act's imposition of civil penalties and the court's duty to "consider the need for retribution and deterrence"). In fact, a recent Supreme Court case, *SEC v. Jarkesy*, contrasted civil penalties, which the Court explained are "designed to punish and deter," with other monetary relief meant to merely "restore the status quo." 144 S. Ct. 2117, 2129 (2024). And while the CFPB is correct that *Jarkesy*'s analysis differs from this case because the "penalties" are not being collected by a governmental body, there is no reason Congress cannot authorize corporations such as large card issuers to exact penalties (so long as they are reasonable and proportional under the statute) just as the SEC was authorized to do in *Jarkesy*.

---

[7]*See* ECF No. 105 at 16 ("The [Final Rule] does all of those things, even while generally being no more than enough to cover larger issuers' costs."); ECF No. 22 at 8 ("[S]o long as the amount charged represents a reasonable proportion of the costs incurred.").

10

In fact, subsection (c) expressly refers to the deterrent effect of the penalty fees as one of the four factors that the CFPB "shall consider" in establishing standards to ensure the penalty fees are reasonable and proportional. 15 U.S.C. § 1665d(c)(2) ("the deterrence of such omission or violation by the cardholder."). This further confirms that "penalty fees" includes the potential for card issuers to charge more than just enough to cover costs.

The distinction between a penalty fee and a cost-based fee is further highlighted by comparing the CARD Act to another piece of legislation, the Durbin Amendment. *See* 15 U.S.C. § 16930-2(a)(2). The Durbin Amendment was enacted by the same Congress and, like the CARD Act, was aimed at consumer credit protection. The Durbin Amendment tasks the Federal Reserve with promulgating regulations regarding "interchange transaction fees" by card issuers. *Id.* But unlike the CARD Act, the Durbin Amendment tasks the Federal Reserve with establishing standards to ensure the interchange transaction fees are "reasonable and proportional *to the cost incurred* by the issuer . . . ." *Id.* § 1693o-2(a)(3)(A) (emphasis added).

This contrast undercuts the CFPB's characterization of Plaintiffs' arguments. The CFPB casts Plaintiffs' argument as a claim that "penalty fee[s]" that are "'reasonable and proportional' to the relevant 'violation of[] the cardholder agreement" means that "any such fee *had to exceed the costs* issuers incurred from the violation." ECF No. 106 at 1 (emphasis added). The CFPB is close, but the error is crucial. The point is that, under the CARD Act, card issuers have the *opportunity* to charge penalty fees reasonable and proportional to violations, and narrowing the safe harbor to cost-based fees eliminates that opportunity.

Indeed, the CARD Act does two things: (1) enables card issuers to impose penalty fees; and (2) tasks the CFPB with establishing standards for those fees. Congress assigned the CFPB as an umpire to call balls and strikes on the reasonableness and proportionality of penalty fees. However, by issuing the Final Rule—which prevents card issuers from actually imposing penalty fees—the CFPB has impermissibly assumed the role of commissioner and established a strike-zone only large enough for pitches right down the middle.

11

The CFPB also asserts that, even though the Final Rule "does no more than compensate" the card issuers, it is "wrong to assume that [the Final Rule] cannot provide for deterrence . . . ." ECF No. 106 at 16. But a regulation's self-characterization does not change its nature. It cannot both be a cost-based fee and a penalty fee used for deterrence—the two are incompatible. *See Jarkesy*, 144 S. Ct. 2117, 2130 (2024) ("Such a penalty by definition does not 'restore the status quo' and can make no pretense of being equitable.").

Given the Court's finding that the Final Rule violates the statutory authority granted to the CFPB under the CARD Act, the Plaintiffs maintain a strong likelihood of success on the merits, and this factor weighs against dissolution of the Court's preliminary injunction.

2. The balance of equities and public interests favor Plaintiffs.

The CFPB does not contest the second factor—that Plaintiffs and their members would face irreparable injuries from the Final Rule. But the CFPB does ask this Court to reconsider its findings on the third and fourth factors—that the balance of the equities and public interest support a preliminary injunction.

Those final two considerations merge when the defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And under Rule 54(b), the Court has power to modify or reconsider any previous, non-final decisions. *See* FED. R. CIV. P. 54(b).

The CFPB argues that the Court should revisit its decision to follow the Fifth Circuit's "do-no-harm" approach. ECF No. 82 at 6. In support, the CFPB cites to caselaw showing that "courts *must* balance the equities" and consider the implications on public interest. ECF No. 106 at 22. However, even if it were necessary for the Court to revisit these factors—which it is not, given nothing has changed since its previous order—such analysis clearly reveals that the balance of equities and public interest do not favor the CFPB because "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (cleaned up).

12

Because the Court finds that the Final Rule clearly violates the CARD Act, it declines to reconsider its previous finding on the balance of equities and public interest. Accordingly, the CFPB's Motion to Dissolve the Preliminary Injunction is **DENIED.**

## CONCLUSION

For the above reasons, the Court **DENIES** both the CFPB's Motion to Dismiss the Fort Worth Chamber of Commerce for Lack of Standing and Transfer This Case to the U.S. District Court for the District of Columbia (ECF No. 109) and its Motion to Dissolve the Preliminary Injunction (ECF No. 105).

**SO ORDERED** on this **6th day of December 2024.**

*[signature: Mark T. Pittman]*

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE