IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | |
| Plaintiffs, | Case No. 4:24-cv-00213-P |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... III

INTRODUCTION .................................................................................... 1

    I.     REGULATORY FRAMEWORK ...................................................... 3

          A.     THE TRUTH IN LENDING ACT AND THE CARD ACT OF 2009 .................................................................................... 3

          B.     THE FEDERAL RESERVE BOARD'S RULEMAKING ....................... 5

          C.     THE CFPB'S CURRENT RULEMAKING ............................................ 9

              1.     THE BIDEN ADMINISTRATION'S FOCUS ON "JUNK FEES" .................................................................................. 9

              2.     THE FINAL RULE ................................................................. 13

    II.     PROCEDURAL HISTORY ............................................................. 16

          A.     THE COMPLAINT AND ORIGINAL PRELIMINARY INJUNCTION OPINION ........................................................ 16

          B.     THE SUBSEQUENT PRELIMINARY INJUNCTION OPINION ........ 17

ARGUMENT…………………………………………………………………20

    I.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS. ......................................................................................... 19

          A.     THE FINAL RULE VIOLATES THE CARD ACT. ............................. 21

              1.     THE FINAL RULE MISCONSTRUES THE CARD ACT'S TEXT THAT ISSUERS MAY CHARGE A "PENALTY FEE" FOR THE "VIOLATION OF THE CARDHOLDER AGREEMENT," AND INSTEAD ALLOWS ONLY FOR A "COST FEE." ..................................... 21

              2.     THE FINAL RULE CONFLICTS WITH THE CARD ACT'S TEXT ON "COST." ........................................................ 24

          B.     THE FINAL RULE VIOLATES THE TRUTH IN LENDING ACT'S EFFECTIVE DATE REQUIREMENT ....................................... 26

          C.     THE FINAL RULE VIOLATES THE APA. .......................................... 27

               1.     THE FINAL RULE'S RELIANCE ON NON-PUBLIC DATA WAS PROCEDURALLY IMPROPER AND ARBITRARY AND CAPRICIOUS. ........................................... 27

               2.     THE CFPB ANALYSIS OF DETERRENCE WAS ARBITRARY AND CAPRICIOUS. ........................................... 30

3.      THE FINAL RULE FAILS TO CONSIDER THAT IT
WILL CREATE HIGHER INTEREST RATES AND
REDUCED ACCESS TO CREDIT, TO THE
DETRIMENT OF CONSUMERS. .............................................. 33

D.      THE FINAL RULE VIOLATES THE UNITED STATES
CONSTITUTION. .................................................................... 34

II.      PLAINTIFFS ARE ENTITLED TO VACATUR, DECLARATORY
RELIEF, AND A PERMANENT INJUNCTION. ............................................ 36

A.      THIS COURT SHOULD SET ASIDE THE FINAL RULE. ................. 36

B.      THIS COURT SHOULD DECLARE THE FINAL RULE
UNLAWFUL AND ENTER A PERMANENT INJUNCTION. ........... 37

CONCLUSION ........................................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................20

*Basinkeeper v. U.S. Army Corps of Eng'rs*,
  715 F. App'x 399 (5th Cir. 2018) ...........................................................................37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................20

*CFPB v. Cmty. Fin. Servs. Ass'n*,
  601 U.S. 416 (2024) .............................................................................................2, 17

*Chamber of Commerce v. CFPB*,
  691 F. Supp. 3d 730 (E.D. Tex. 2023) ........................................................19, 38, 39

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022), *rev'd by CFPB v. Cmty. Fin. Servs. Ass'n of Am.
  Ltd.*, 601 U.S. 416 (2024) ...........................................................16, 17, 34, 36

*Cruz v. Braum's, Inc.*,
  No. 6:20-cv-00217, 2021 WL 979610 (E.D. Tex. Mar. 16) ....................................19

*Cunningham v. Circle 8 Crane Servs., LLC*,
  64 F.4th 597 (5th Cir. 2023) ...................................................................................20

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) ...................................................................................27

*Edwards v. Oliver*,
  31 F.4th 925 (5th Cir. 2022) ...................................................................................20

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ......................................................................................28, 30, 33

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................................23

*Fed. Ins. Co. v. Northfield Ins. Co.*,
  837 F.3d 548 (5th Cir. 2016) ...................................................................................19

*Franciscan Alliance, Inc. v. Becerra,*
    553 F. Supp. 3d 361 (N.D. Tex. 2021) ..............................................37, 38

*Gundy v. United States,*
    588 U.S. 128 (2019) ................................................................................35

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.,*
    944 F.2d 940 (D.C. Cir. 1991) ................................................................21

*Mayfield v. U.S. Dep't of Labor,*
    117 F.4th 611 (5th Cir. 2024) .................................................................35

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................30, 33

*NAM v. SEC,*
    631 F. Supp. 3d 423 (W.D. Tex. 2022) ...................................................38

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ..............................................................37

*NFIB v. OSHA,*
    595 U.S. 109 (2022) ................................................................................21

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................21

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................38

*Ohio v. EPA,*
    603 U.S. 279 (2024) .............................................................28, 30, 32, 33, 34

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
    494 F.3d 188 (D.C. Cir. 2007) ...........................................................2, 27

*Paul v. United States,*
    140 S. Ct. 342 (2019) .............................................................................35

*Rest. L. Ctr. v. United States Dep't of Lab.,*
    120 F.4th 163 (5th Cir. 2024) ...........................................................27, 33

*SEC v. Jarkesy,*
    603 U.S. 109 (2024) ................................................................................22

*Seila Law v. CFPB,*
    591 U.S. 197 (2020) ........................................................................3, 34, 35

*Shell Offshore v. Babbitt*,
  61 F. Supp. 2d 520 (W.D. La. 1999), *aff'd in relevant part*, 238 F.3d 622 (5th
  Cir. 2011) ........................................................................................................38

*Sherwin-Williams Co. v. Holmes Cty.*,
  343 F.3d 383 (5th Cir. 2003) ..........................................................................37

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ........................................................................................21

*Texas v. United States*,
  50 F.4th 498 ....................................................................................................38

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ..........................................................................19

*Tull v. United States*,
  481 U.S. 412 (1987) ........................................................................................21

*Valentine v. Collier*,
  993 F.3d 270 (5th Cir. 2021) ..........................................................................37

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000) ........................................................................................19

**Statutes**

5 U.S.C. § 706(2) .................................................................................................27, 36

12 U.S.C. § 5497(a) .............................................................................................35, 36

12 U.S.C. § 5497(a)(1) ..............................................................................................3

15 U.S.C. § 1601(a) ..................................................................................................3

15 U.S.C. § 1602(v) ................................................................................................26

15 U.S.C. § 1604(d) .......................................................................................1, 16, 26

15 U.S.C. § 1665(c) ..................................................................................................6

15 U.S.C. § 1665d .....................................................................................................4

15 U.S.C. § 1665d(a) ..............................................................................................21

15 U.S.C. § 1665d(b) ............................................................................................1, 5

15 U.S.C. § 1665d(c) ...........................................................................................5, 22

15 U.S.C. § 1665d(c)(1) ..................................................................................16, 24, 26

15 U.S.C. § 1665d(e) ...........................................................................................5, 21

15 U.S.C. § 1693o-2(a)(2) .........................................................................................22

15 U.S.C. § 1693o-2(a)(3)(A) .................................................................................4, 25

28 U.S.C. § 2201(a) .....................................................................................................37

51 U.S.C. § 60125(a)(1) ..............................................................................................22

Credit Card Accountability Responsibility and Disclosure Act of 2009 ............................ *passim*

Declaratory Judgment Act .............................................................................................37

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
    203, 124 Stat. 1376 (2010) ..................................................................................7, 33

Federal Civil Penalties Inflation Adjustment Act of 1990 ................................................7

Truth in Lending Act .................................................................................... *passim*

**Regulations**

12 C.F.R. Part 1026 ........................................................................................................8

12 C.F.R. § 226.52(b)(1)(ii) ...................................................................................5, 6, 24

75 Fed. Reg. 37526 (June 29, 2010) .............................................................5, 6, 7, 14, 15, 24, 25

76 Fed. Reg. 79768 (Dec. 22, 2011) ..............................................................................7

87 Fed. Reg. 42662 (July 18, 2022) .............................................................................10

88 Fed. Reg. 18906 (Mar. 29, 2023) .................................................8, 10, 11, 12, 13, 14

89 Fed. Reg. 19128 (Mar. 15, 2024) .......................................................................23, 24

**Other Authorities**

Am. Bankers Ass'n et al., Request for Extension of ANPR on Credit Card Late
    Fees and Late Payments (June 24, 2022), https://www.regulations.
    gov/comment/CFPB-2022-0039-0002 .......................................................................10

Ashwin Vasan and Wei Zhang, *Americans Pay $120 billion in credit card interest
    and fees each year*, CFPB Blog (Jan 19, 2022),
    https://www.consumerfinance.gov/ about-us/blog/americans-pay-120-billion-
    in-credit-card-interest-and-fees-each-year/ ...............................................................9

Brian Schwartz and Dylan Tokar, CFPB to Close Office After Vought Tells Staff
   to Halt All Supervision, Wall St. J (Feb. 9, 2025). .................................................36

CFPB, *CFPB Proposes Rule to Rein in Excessive Credit Card Late Fees* (Feb. 1,
   2023), https://www.consumerfinance.gov/about-us/newsroom/cfpb-proposes-
   rule-to-rein-in-excessive-credit-card-late-fees/ .......................................................12

CFPB, *Credit Card Late Fees* (Mar. 29, 2022),
   https://files.consumerfinance.gov/f/documents/cfpb_credit-card-late-
   fees_report_2022-03.pdf ..........................................................................................10

CFPB, *The Hidden Cost of Junk Fees*, CFPB Blog (Feb. 2, 2022),
   https://www.consumerfinance.gov/about-us/blog/hidden-cost-junk-fees/ ................9

Director Rohit Chopra, *Prepared Remarks of CFPB Director Rohit Chopra on the
   Junk Fees RFI Press Call* (Jan. 26, 2022), https://www.consumer
   finance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-
   chopra-on-the-junk-fees-rfi-press-call/ .....................................................................9

Fed. R. Civ. P. 25 .................................................................................................................1

Fed. R. Civ. P. 56(a) ..........................................................................................................19

Fed. R. Civ. P. 56(c)(1)–(3) ...............................................................................................20

GAO, Civil Monetary Penalties: Federal Agencies' Compliance with the 2021
   Annual Inflation Adjustment Requirements, GAO-22-105596 (Apr. 28, 2022),
   https://www.gao.gov/ assets/gao-22-105596.pdf .......................................................7

U.S. Chamber, Comment Letter on Advance Notice of Proposed Rulemaking 9-
   10 (Aug. 1, 2022), available at https://www.regulations.gov/comment/ CFPB-
   2022-0039-0036 ......................................................................................................10

White House, *Fact Sheet: President Biden Highlights New Progress on His
   Competition Agenda* (Feb. 1, 2023), https://bidenwhitehouse.archives.gov/
   briefing-room/statements-releases/2023/02/01/fact-sheet-president-biden-
   highlights-new-progress-on-his-competition-agenda/ .............................................10

White House, *Remarks by President Biden at the White House Competition
   Council Meeting* (Feb. 1, 2023),
   https://bidenwhitehouse.archives.gov/briefing-room/speeches-
   remarks/2023/02/01/remarks-by-president-biden-at-the-white-house-
   competition-council-meeting/ ..................................................................................12

White House, *State of the Union Address* (Feb. 7, 2023), https://bidenwhitehouse.
   archives.gov/briefing-room/speeches-remarks/2023/02/07/remarks-of-
   president-joe-biden-state-of-the-union-address-as-prepared-for-delivery/.............12

# INTRODUCTION

This Court recently recognized that the Consumer Financial Protection Bureau ("CFPB") exceeded its statutory authority when it promulgated its credit card late fees rule. Opinion and Order, ECF 128 (denying, *inter alia*, Defendants' Motion to Dissolve Preliminary Injunction). The Credit Card Accountability Responsibility and Disclosure Act ("CARD Act") expressly recognizes that issuers may impose "penalty fee[s]" when customers violate their credit card agreements, so long as such fees are "reasonable and proportional to the omission or violation," 15 U.S.C. § 1665d(b), and the CFPB's Final Rule effectively prevents issuers from doing so. Plaintiffs now move this Court to grant summary judgment in favor of Plaintiffs, vacate the rule, declare it unlawful, and enter permanent injunctive relief for Plaintiffs' members.[1]

Although this Court's statutory holding is sufficient to warrant vacatur and, in combination with the injunctive factors, a permanent injunction, the Final Rule suffers from additional flaws that this Court may wish to address for the sake of judicial efficiency in any future appeal. Specifically, the Final Rule also runs afoul of the CARD Act because it prevents issuers not just from collecting a penalty fee but even from collecting their full costs as a result of late payments. And it violates the Truth in Lending Act ("TILA") because the Final Rule provides only a 60-day effective date, even though TILA demands that any rules requiring different disclosures to consumers "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d).

---

[1] On January 31, 2025, CFPB Director Rohit Chopra was removed from that position. Most recently, Office of Management and Budget Director Russell Vought was appointed to serve as the Acting Director. Pursuant to Federal Rule of Civil Procedure 25, Mr. Vought is substituted for Mr. Chopra as a defendant in his official capacity as Acting Director of the CFPB.

The Bureau also made serious errors in the course of its rulemaking process. It justified the amount of its "cost fee" by relying on nonpublic data from the Federal Reserve Board's Capital Assessments and Stress Testing survey (known as the "Y-14M data"). *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin*., 494 F.3d 188, 199 (D.C. Cir. 2007) ("Integral to [the APA's] requirements is the agency's duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.") (cleaned up). Even worse, the Y-14M data does not actually capture the same costs that the Bureau was trying to evaluate. In addition, the Bureau arbitrarily and capriciously analyzes deterrence, ignoring peer-reviewed studies and basic logic in pursuit of a pre-ordained conclusion that consumers simply are not deterred by late fees. And the Bureau failed to grapple with its own prediction that the Final Rule would create higher interest rates, less favorable credit card terms, and reduced access to credit, all to the detriment of the very consumers that the Final Rule purports to help.

Finally, the CFPB's regulatory excesses here are but a symptom of the fundamental separation-of-powers problem with the structure of its funding. This last, constitutional argument is different than the Appropriations Clause argument addressed by the Supreme Court. *See CFPB v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 437-38 (2024) (noting that the Appropriations Clause is a narrower constraint than the separation of powers and limiting its ruling to the Appropriations Clause question). Even if the Appropriations Clause does not constrain Congress's ability to set up a funding scheme like the CFPB's, in which the CFPB decides how much funding it should receive up to a statutory cap, the separation of powers does. Our Constitution prevents Congress from delegating its legislative powers to the Executive Branch without an "intelligible principle" to guide the Executive's exercise of that power. As the

Supreme Court has recognized, the CFPB "wields vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila Law v. CFPB*, 591 U.S. 197, 203 (2020). Deciding how much funding is "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)," 12 U.S.C. § 5497(a)(1), is a quintessential legislative power. And Congress has not provided enough of an intelligible principle to transform what would ordinarily be a legislative power into an executive one.

Vacatur of the Final Rule would be warranted for any of these reasons; Plaintiffs also respectfully suggest that injunctive relief would be appropriate here, given their uncontested showing of irreparable harm from being unable to impose a reasonable penalty fee and this Court's previous determination of the equities. Accordingly, Plaintiffs' motion for summary judgment should be granted and this Court should vacate the final rule, declare it unlawful, and enter a permanent injunction on behalf of Plaintiffs' members.

## BACKGROUND

### I.    Regulatory Framework

#### A.    The Truth in Lending Act and the CARD Act of 2009

Congress enacted TILA in 1968 to make the terms of consumer credit agreements more transparent and thereby enhance competition and the responsible use of credit. *See* 15 U.S.C. § 1601(a). TILA established a regime that is primarily disclosure-based, and credit card late fees have long been part of that regime.

Congress amended TILA in the CARD Act of 2009. In so doing, Congress expressly authorized the Board to create and maintain a regulatory regime that includes "penalty fees" for

late payments.  Specifically, the CARD Act added subsection (a) of Section 149 to require that the "penalty fee[s] or charge[s]" that issuers impose "in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee . . . be reasonable and proportional to such omission or violation."  CARD Act § 102(b)(1), 123 Stat. 1740 (codified as amended at 15 U.S.C. § 1665d).

Congress consciously chose to characterize these late fees as "penalty fees." Indeed, Congress had previously considered and rejected a legislative proposal that would have limited late fees to the costs that credit card issuers incur as a result of late payments.  *See, e.g.*, Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb. Affs., Apr. 29, 2009), available at https://www.congress.gov/bill/111th-congress/senate-bill/414/text?s=2&r=1#id657d1b39-583c-42fc-bd02-606c6a55414c (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related *to the cost to the card issuer* of such omission or violation") (emphasis added). And Congress implemented a cost-based approach in the Durbin Amendment: the same Congress that passed the CARD Act explicitly directed the Board to "establish standards for assessing whether the amount of any interchange transaction fee…is reasonable and proportional *to the cost incurred by the issuer* with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A) (emphasis added).

In the CARD Act that became law, however, Congress not only authorized "penalty fees" but also made clear that cost is only one of several factors that would go into establishing what late fee amount is reasonable and proportional to the violation of paying late.  Specifically, in establishing those standards, Congress required the Board to consider "(1) the cost incurred by

4

the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Board may deem necessary or appropriate." CARD Act § 102(b)(1), 123 Stat. 1740; *see* 15 U.S.C. § 1665d(c).

Congress also authorized the Board to set a late-fee safe harbor amount for "any penalty fee" "that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates." CARD Act § 102(b)(1), 123 Stat. 1740; *see* 15 U.S.C. § 1665d(e). And it directed the Board to promulgate regulations "to establish standards for assessing whether the amount of any penalty fee or charge described under subsection (a) is reasonable and proportional to the omission or violation to which the fee or charge relates." *Id.* § 1665d(b).

### B.    The Federal Reserve Board's Rulemaking

The Board implemented this section of the CARD Act by amending its Regulation Z. *See* Truth in Lending, 75 Fed. Reg. 37526 (June 29, 2010) (codified at 12 C.F.R. § 226.52(b)(1)(ii)(A)-(B), now codified in 12 C.F.R. Part 1026. The final regulation established a safe harbor for late fees based on all three criteria and a standard for amounts exceeding the safe harbor based solely on cost.

The Board ultimately concluded that the best means of accounting for all of the statutory factors, including deterrence and consumer conduct, was to establish a safe-harbor maximum of $25, and $35 for subsequent late fees within the next six billing cycles, which the Board would adjust annually for inflation. *Id.* at 37572; *id.* at 37573 ("the Board has revised the safe harbors in proposed § 226.52(b)(3) to better address concerns regarding deterrence and adopted those safe harbors in § 226.52(b)(1)(ii)"); *id.* at 37573-74 ("the safe harbors in § 226.52(b)(1)(ii) address consumer conduct . . . ").

5

The Board had initially proposed a provision that would have deemed a penalty fee reasonable and proportional "if the card issuer had determined that the dollar amount of the fee was reasonably necessary to deter that type of violation using an empirically derived, demonstrably and statistically sound model that reasonably estimated the effect of the amount of the fee on the frequency of violations." *Id*. at 37532. But the Board ultimately concluded that its proposal would "not provide card issuers with a meaningful ability to base penalty fees on deterrence," whereas the safe harbors would take deterrence into account while providing clarity and consistency. *Id.* at 37533.  The Board, in short, used the safe harbor "to better address concerns regarding deterrence."  *Id*. Similarly, the safe harbor addressed consumer conduct "by allowing issuers to impose higher penalty fees on consumers who violate the terms or other requirements of an account multiple times, while limiting the amount of the penalty fee for a consumer who engages in a single violation" and capping any penalty fee at the dollar amount associated with the violation. *Id.* at 37533-34. Finally, the Board believed that the amounts would "be generally sufficient to cover issuers' costs." *Id.* at 37532.

In light of its safe harbor, the Board's cost-based standard did not allow card issuers to take into account the deterrent effects of late fees or other factors relating to consumer conduct, and, indeed, the Board prohibited such consideration.  Instead, the Board established that an issuer could proceed outside the safe harbor and impose a higher fee if the issuer "has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of [the late payment]."  75 Fed. Reg. at 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)).  The Board required the issuer to revisit that determination annually. *Id.*  In response to commenters who argued that the CARD Act required the Board's standard to account for deterrence, *see* 15 U.S.C. § 1665(c), the Board responded that it had unbridled

discretion: the Act "only requires the Board to *consider* the listed factors. Thus, while these factors provide valuable guidance, the Board does not believe that Congress intended to limit the Board's discretion in the manner suggested by these commenters." 75 Fed. Reg. at 37532 n.18.

In addition, the Board clarified that card issuers could not consider losses as part of their costs, "including the cost of holding reserves against potential losses and the cost of funding delinquent accounts." *Id.* at 37585. The Board did not generally distinguish among the other types of costs that issuers could recoup, and thereby allowed issuers to factor many types of costs from late payments into their late fees. *Id*. at 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)).

The Board found that inflation adjustments would help account for "changes in issuers' costs and the deterrent effect of the safe harbor amounts." *Id.* at 37543. This was an unsurprising finding in light of Congress's similar determination in the Federal Civil Penalties Inflation Adjustment Act of 1990, which recognized that penalty fees must be adjusted for inflation to ensure that they continue to serve the purposes for which they are levied. Congress's 2015 amendment to that Act requires the Government Accountability Office ("GAO") to annually review agencies' compliance with the required annual inflation adjustments. *See, e.g.*, GAO, Civil Monetary Penalties: Federal Agencies' Compliance with the 2021 Annual Inflation Adjustment Requirements, GAO-22-105596 (Apr. 28, 2022), https://www.gao.gov/ assets/gao-22-105596.pdf. For more than a decade, the Board and CFPB directors did not touch that conclusion and followed this commonsense approach.

Congress soon after reassigned the responsibility to regulate late fees to the newly-created CFPB. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 1061(b)(1)(B), 1100A(2), 124 Stat. 1376, 2036, 2107 (2010). The CFPB adopted the Board's regulations. *See* Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22,

7

2011) (now codified in 12 C.F.R. Part 1026); Credit Card Penalty Fees (Regulation Z), 88 Fed.

Reg. 18906, 18908 (Mar. 29, 2023) (describing that standard being in place for a decade).  They

have been updated eight times for inflation by four different CPFB Directors:

| Safe Harbor (first late fee) | Safe Harbor (subsequent w/in 6 mos.) | Effective | Agency |
|---|---|---|---|
| $25 | $35 | August 22, 2010 through December 31, 2013 | Federal Reserve Board |
| $26 | $37 | January 1, 2014 through December 31, 2014 | CFPB under Director Cordray, appointed by President Obama |
| $27 | $38 | January 1, 2015 through December 31, 2015 | CFPB under Director Cordray |
| $27 | $37 | January 1, 2016 through June 26, 2016 | CFPB under Director Cordray |
| $27 | $38 | June 27, 2016 through December 31, 2016 | CFPB under Director Cordray |
| $27 | $38 | January 1, 2017 through December 31, 2018 | CFPB under Director Cordray |
| $28 | $39 | January 1, 2019 through December 31, 2019 | CFPB under Acting Director Mick Mulvaney, appointed by President Trump |
| $29 | $40 | January 1, 2020 through December 31, 2021 | CFPB under Director Kraninger, appointed by President Trump |
| $30 | $41 | January 1, 2022 through present | CFPB under Director Chopra, appointed by President Biden |
| $8 for larger issuers; $32 for smaller issuers | $8 for larger issuers; $43 for smaller issuers | Permanently for larger issuers upon Final Rule's effective date | CFPB under Director Chopra |

*See generally* CFPB, Truth in Lending (Regulation Z) Annual Threshold Adjustments (Credit

Cards, HOEPA, and Qualified Mortgages), https://www.consumerfinance.gov/ rules-policy/final-

rules/truth-lending-regulation-z-annual-threshold-adjustments-card-act-hoepa/ (last visited Feb.

19, 2025) (collecting annual adjustments).

C.    **The CFPB's Current Rulemaking**

1.    **The Biden Administration's Focus on "Junk Fees"**

In January 2022, the CFPB issued a bulletin characterizing late fees as "junk fees" and arguing that issuers charging the amount presumed reasonable under the CFPB's own regulations were "'herd[ing]' around common amounts, suggesting that competition is ineffective in driving down price." Ashwin Vasan and Wei Zhang, *Americans Pay $120 billion in credit card interest and fees each year*, CFPB Blog (Jan 19, 2022), https://www.consumerfinance.gov/ about-us/blog/americans-pay-120-billion-in-credit-card-interest-and-fees-each-year/. Just weeks later, the CFPB issued, in the form of a request for information, a call for consumers to "[s]hare [their] experiences," again characterizing late fees compliant with the CFPB's own regulations as "junk fees." CFPB, *The Hidden Cost of Junk Fees*, CFPB Blog (Feb. 2, 2022), https://www.consumerfinance.gov/about-us/blog/hidden-cost-junk-fees/. Then-Director Rohit Chopra argued that "junk fees often act as penalties, like with non-sufficient funds and credit card late fees, rather than compensation for a legitimate service." Director Rohit Chopra, *Prepared Remarks of CFPB Director Rohit Chopra on the Junk Fees RFI Press Call* (Jan. 26, 2022), https://www.consumer finance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-on-the-junk-fees-rfi-press-call/. Indeed, Director Chopra asserted that credit card late fees amounted to issuers "feast[ing] on their customers through fees." *Id.* Director Chopra made clear that the purpose of the request for information was "beginning the process of ending banks' reliance on these exploitative income streams and making prices and features clearer upfront." *Id.*

After issuing a report again classifying late fees as "junk fees," the CFPB issued an advance notice of proposed rulemaking on June 22, 2022, requesting, among other things, data

on card issuers' costs and the deterrent effects of late fees.  CFPB, *Credit Card Late Fees* (Mar. 29, 2022), https://files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees_report_2022-03.pdf. Despite receiving several requests for additional time, its own lengthy delay between Director Chopra's announcement of a late fee initiative and the advanced notice of proposed rulemaking, and questions by industry on how proprietary information would be treated by the agency, the CFPB gave commenters only 30 days to respond, with a short 10-day extension granted at the end of that 30 days.  Credit Card Late Fees and Late Payments, 87 Fed. Reg. 42662, 42662 (July 18, 2022) (extending comment period by 10 days). *See also, e.g.*, Am. Bankers Ass'n et al., Request for Extension of ANPR on Credit Card Late Fees and Late Payments (June 24, 2022), available at https://www.regulations. gov/comment/CFPB-2022-0039-0002 (requesting 60-day extension of original 30-day comment period); U.S. Chamber, Comment Letter on Advance Notice of Proposed Rulemaking 9-10 (Aug. 1, 2022), available at https://www.regulations.gov/comment/ CFPB-2022-0039-0036 (noting that the 40-day comment period was insufficient).

On February 1, 2023, President Biden announced a raft of new regulations and legislative proposals designed to fight so-called "junk fees."  One of them was the CFPB's proposed changes to its late-fee regulations.  *See* White House, *Fact Sheet: President Biden Highlights New Progress on His Competition Agenda* (Feb. 1, 2023), https://bidenwhitehouse.archives.gov/ briefing-room/statements-releases/2023/02/01/fact-sheet-president-biden-highlights-new-progress-on-his-competition-agenda/.

The CFPB proposed a rule that would reduce the late-fee safe harbor to $8 (for both first and subsequent late payments), would no longer adjust this amount for inflation, and would reduce the maximum cap on late fees to 25 percent of the missed minimum payment.  *See* 88

10

Fed. Reg. at 18906.  And for card issuers who chose to set late fees above the $8 safe harbor using the cost-analysis provisions, the proposed rule would still not include consideration of two of the three mandatory statutory factors and would prohibit them from including post-charge-off collection costs in setting those fees.  (Post-charge-off collection costs are incurred when trying to collect amounts owed after the issuer has written off an account.  *See id.* at 18913.)

The CFPB selected $8 because it "preliminarily determined that a late fee safe harbor amount of $8 for the first and subsequent violations would cover most issuers' costs from late payments" and it was concerned that the existing safe harbor amounts "far exceed card issuers' actual pre-charge-off collection costs resulting from late payment violations and thus are not reasonable and proportional."  88 Fed. Reg. at 18916, 18919-20.  To justify this amount, the CFPB pointed to non-public data from the Board's Capital Assessments and Stress Testing survey ("Y-14M data"), which (since 2021) collects data from financial holding companies with at least $100 billion in assets.  *See* Appx 225 (ABA Comment); Appx 262 (NAFCU Comment). The CFPB acknowledged that this change could "increase the frequency of late payments by some percentage, [but] . . . preliminarily determined that some cardholders may benefit from the proposed $8 safe harbor threshold amount in terms of a greater ability to repay revolving debt." 88 Fed. Reg. at 18919.  And it suggested that card issuers could facilitate timely payments in other ways, such as through "automatic payment and notification." *Id.*

The CFPB acknowledged that "issuers may respond to this reduction in revenue from late fees by adjusting interest rates or other card terms to offset the lost income," but it did not consider how such adjustments might harm the average American family who carries a balance on their credit card yet makes timely payments.  *Id.* at 18922.  Instead, the agency touted the

benefits only to the subset of consumers who violate the terms of their credit card agreements and pay late.  *See id.*

At a White House Competition Council meeting announcing the proposed rule, President Biden decried late fees as "a junk fee if there ever was one," that "can drain hundreds of dollars a year from the pockets of hardworking American families, especially—especially folks who are already struggling to make ends meet," but "not anymore, after today."  White House, *Remarks by President Biden at the White House Competition Council Meeting* (Feb. 1, 2023), https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2023/02/01/remarks-by-president-biden-at-the-white-house-competition-council-meeting/.  Director Chopra similarly accused credit card issuers of "exploit[ing] a regulatory loophole that has allowed them to escape scrutiny for charging an otherwise illegal junk fee."  CFPB, *CFPB Proposes Rule to Rein in Excessive Credit Card Late Fees* (Feb. 1, 2023), https://www.consumerfinance.gov/about-us/newsroom/cfpb-proposes-rule-to-rein-in-excessive-credit-card-late-fees/.  Of course, the alleged "loophole" was enacted by Congress in 2009, implemented by the Board in 2010, and has been administered by the CFPB for more than a decade since.

Six days later, President Biden touted the proposed rule in an address to a joint session of Congress: "My administration is also taking on 'junk' fees, those hidden surcharges too many businesses use to make you pay more. . . . We're cutting credit card late fees by 75 %, from $30 to $8."  White House, *State of the Union Address* (Feb. 7, 2023), https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2023/02/07/remarks-of-president-joe-biden-state-of-the-union-address-as-prepared-for-delivery/.

In sum, the CFPB launched a request for information that articulated its solution before receiving any feedback from consumers about the alleged problem.  The CFPB then announced

its Proposed Rule in a joint press conference with the White House, in which the rule was portrayed as a done deal.

### 2.    The Final Rule

Announced just two days before the 2024 State of the Union Address, the CFPB's final rule mirrors President Biden's announcement in substantial part.  Despite the volume of comments pointing out the flaws in its legal and policy analysis, the CFPB's Final Rule maintains an $8 safe harbor for larger card issuers (an estimated 95% of credit card accounts), for both first and subsequent payments, due to its focus solely on issuer costs (and, indeed, a limited set of such costs).  The Rule defines larger card issuers as those who, along with their affiliates, had at least one million open credit card accounts in the previous calendar year.  It also exempts its safe harbor amount from routine inflation adjustments

The CFPB selected $8 for the reduced safe harbor because it will cover pre-charge-off collection costs for Larger Card Issuers on average. *See* Final Rule, Appx 43; *see also* Proposed Rule, 88 Fed. Reg. at 18919 (reasoning that "a late fee of $8 for the first and subsequent violations is appropriate to cover pre-charge-off costs for [Larger] [C]ard [I]ssuers on average . . ."). And it made clear in the alternative—*i.e.*, in the circumstance that the $8 fee were enjoined or vacated—that it was separately repealing the existing safe harbor to move to a world in which late fees are based solely on cost analysis. *See* Appx 41.  The Bureau suggested that issuers could mitigate the harm from the lower safe harbor by increasing "other prices," such as interest rates, "account maintenance fee[s]," or "other card terms." Appx 83.

To be sure, the CFPB did discuss deterrence in setting the safe harbor amount: it claimed that lowering the safe harbor would not wholly undermine any deterrent effect of late fees, although it may lower it by an indeterminate amount. Appx 47. This conclusion is at odds with

13

the overwhelming weight of empirical evidence relating to the deterrent effect of fees, and it was made with no understanding of the actual effect the rule will have on deterrence. *Id.* ("the CFPB determines that the available evidence for Larger Card Issuers suggests that an $8 safe harbor amount will have a deterrent effect on late payments"); Appx 79 ("the CFPB finds that the available evidence and the CFPB's study of the Y-14 data of certain Larger Card Issuers indicate that the $8 safe harbor amount for the first and subsequent late payments will still have a deterrence effect on late payments, although that effect may be lessened to some extent, and other factors may be more relevant (or may become more relevant) toward creating deterrence").

The CFPB also did not distinguish in its safe harbor between cardholders who pay late one time and cardholders who repeatedly pay late. As the Board recognized in its 2010 Final Rule, a repeat violation is a "more serious form of consumer conduct than a single violation," 75 Fed. Reg. at 37533, so a penalty fee that is "reasonable and proportional" to the violation should be higher for a repeat offender. Yet the CFPB, unlike the Board, concluded that the penalty should be the same. This conclusion was based on no meaningful evidence or analysis, but simply the CFPB's belief that consumers do not understand or process higher late fees for subsequent violations. Final Rule, Appx 47. The Board had previously found that "multiple violations during a relatively short period can be associated with increased costs and credit risk." 75 Fed. Reg. at 37533.

To justify its new framework (and its premise that $8 is sufficient to cover the average issuer's pre-charge-off collection costs), the CFPB relied on analysis of non-public data from the Board's Capital Assessments and Stress Testing survey ("Y-14M data"), which (since 2021) collects data from financial holding companies with at least $100 billion in assets. Appx 19. Specifically, the CFPB appears to have analyzed a subsample of data reported on line 32 of

Schedule D.2 of the Y-14M survey, which provides the following instruction to responding banks: "Report costs incurred to collect problem credits. Include the total collection cost for delinquent, recovery, and bankrupt accounts." *See* Appx 8, Certified Admin. Record Index (listing "Federal Reserve Board, Reporting Forms (web database)" under "Sources and Other Materials Relied On But Not Produced"); Appx 446, Federal Reserve Form Y-14M. The Board provides no additional guidance on what should be included or excluded when calculating and reporting that amount. *See* BPI May 3, 2023 Comment, Appx 148-149. There is no standardization, and it is up to each filer to use its best judgment, which they exercise differently, as commentators explained to the CFPB. *E.g.*, BPI Comment, Appx 147-150; ABA Comment, Appx 217 n.47.

The Y-14M data also include only collection costs for delinquent, recovery, and bankrupt accounts, which do not appear to include costs associated with late payments that do not become delinquent (*i.e.*, that become current within 30 days), such as costs incurred for customer service representatives to speak to customers seeking information about their late payment or requesting fee waivers. Appx 225 (ABA Comment); Appx 262 (NAFCU Comment). Nor do these data necessarily account for costs not directly related to collections, such as the costs incurred to respond to customer service inquiries stemming from late payments (such as salaries, IT costs, and general overhead). Appx 217. The CFPB did not explain why those costs should be excluded, despite comment letters criticizing that decision.

The CFPB did not make the Y-14M data available to the public. Appx 19, 20, and 21. Nor did it accommodate requests to make a culled down or redacted version of the information available. Appx 21. And it did not provide sufficient technical details of its analysis to allow for public scrutiny. *Id.*; *see also* ECF 32, BPI Amicus Br. at 4.

As this discussion of the CFPB's reliance on the Y-14M data portends, the CFPB restricted its already myopic focus on costs to "pre-charge-off collection costs," both in the cost-based standard (which the CFPB purports to "clarif[y]" but leave unchanged) and in repealing the old safe harbor and setting the new one based on its assessment of issuers' costs.  As several commenters explained, the exclusion of post-charge-off collection costs is inconsistent with Congress's instruction that the CFPB consider "the cost incurred by the creditor." 15 U.S.C. § 1665d(c)(1). *E.g.*, Appx 145-146 (ABA Comment); Appx 169-171 (BPI Comment).  Collection costs, whether pre- or post-charge-off, are all incurred by the creditor as a result of the omission or violation at issue—the late payment.

The Final Rule provided only a 60-day effective date after publication in the Federal Register, instead of complying with the statutory requirement that any CFPB rules requiring disclosures different from those previously required "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d).

## II.    Procedural History

### A.    The Complaint and Original Preliminary Injunction Opinion

Plaintiffs filed the complaint in this case in March 2024, along with a motion for a preliminary injunction, challenging the Final Rule as violating the Constitution and the APA. ECF 1 & 3.  The Fifth Circuit had enjoined a different CFPB regulation based on the determination that the Bureau's funding mechanism violated Congress's authority under the Appropriations Clause of Article I to the United States Constitution.  *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 638 (5th Cir. 2022) ("*CFSA I*"), *rev'd by CFPB v. Cmty. Fin. Servs. Ass'n of Am. Ltd.*, 601 U.S. 416 (2024) ("*CFSA II*").  Importantly, although the Fifth Circuit rejected the plaintiffs' contention that CFPB's rulemaking authority had been

16

unconstitutionally delegated by Congress, the Fifth Circuit made clear that it did not consider the plaintiffs' distinct argument on appeal that the funding provisions also ran afoul of the nondelegation doctrine because it had not been presented to the district court. *Id*. at 633 n.6 ("Because the Plaintiffs did not raise their appropriations-based nondelegation argument in the district court, it is forfeited on appeal.") (citation omitted).

On May 10, 2024, this Court, bound by the Fifth Circuit's controlling precedent in *CFSA I*, issued an order preliminarily enjoining the Rule as unconstitutional based on, *inter alia*, the conclusion that "any regulations promulgated under [the CFPB's funding] regime are likely unconstitutional." Opinion and Order, ECF 82 at 5-6. On May 16, 2024, however, the Supreme Court reversed the Fifth Circuit's *CFSA I* ruling, holding that "[a]lthough there may be other constitutional checks on Congress' authority to create and fund an administrative agency, specifying the source and purpose is all the control the Appropriations Clause requires." *CFSA II*, 601 U.S. at 441.

### B.    The Subsequent Preliminary Injunction Opinion

In July 2024, following the Supreme Court's reversal, the CFPB filed its motion to dissolve this Court's preliminary injunction and lift the stay of the Final Rule's implementation. ECF 105 & 106. The CFPB contended that, because the Court's preliminary injunction was issued based upon likelihood of success citing the Fifth Circuit's now-reversed *CFSA I* Appropriations Clause holding, the CFPB should no longer be enjoined from enforcing the Final Rule. Plaintiffs opposed the CFPB's motion, arguing that the preliminary injunction and stay should be maintained because the Final Rule violates the CARD Act and TILA, and expressly reserving the right to press their separation-of-powers claim "at a later stage." Pls' Br. in Opp. to Defs' Mot. to Dissolve P.I., ECF 111 at 1 n.1.

17

The Court agreed with Plaintiffs and denied the CFPB's motion to dissolve the injunction. Opinion and Order, ECF 128. Applying the familiar preliminary injunction factors, the Court determined that "the Plaintiffs maintain a strong likelihood of success on the merits" because the "the Final Rule violates the statutory authority granted to the CFPB under the CARD Act." *Id*. at 12. Specifically, the Court found that "[a] plain language reading reveals that the Final Rule violates" the CARD Act, rejecting the CFPB's contention that fees to "cover pre-charge-off collection costs for Large Card Issuers on average" were sufficient for "penalty fees." *Id*. at 10. The Court explained that "[u]nlike a compensatory charge, a 'penalty fee' implies a purpose of deterrence." *Id*. (citing *Tull v. United States*, 481 U.S. 412, 422–23 (1987)). The Court also highlighted that "the deterrent effect of the penalty fees" is "one of the four factors that the CFPB 'shall consider' in establishing standards to ensure the penalty fees are reasonable and proportional." *Id*. at 11 (quoting 15 U.S.C. § 1665d(c)(2)). That requirement, the Court determined, "further confirms that 'penalty fees' includes the potential for card issuers to charge more than just enough to cover costs." *Id*. Moreover, the Court explained, "a cost-based fee and a penalty fee used for deterrence—the two are incompatible." *Id*. at 12 (citing *SEC v. Jarkesy*, 144 S. Ct. 2117, 2130 (2024)).

Having found that Plaintiffs "maintain a strong likelihood of success on the merits," the Court noted that the parties do not dispute the presence of irreparable harm and found that the balance of the equities and public interest favored the Plaintiffs "because 'there is generally no public interest in the perpetuation of unlawful agency action.'" ECF 128 at 12 (cleaning up and quoting *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021)). The Court thus denied the CFPB's motion to dissolve the preliminary injunction. *Id.* at 13.

Subsequently, and in accordance with the Court's scheduling order, the CFPB issued and served its Certified Administrative Record on January 9, 2025.[2]  ECF 134.

## ARGUMENT

The CARD Act, TILA, APA, and the Constitution all forbid the CFPB from promulgating the final rule.  The proper remedy for these violations is vacatur of the final rule, a declaration that the CFPB lacks authority to promulgate such a rule, and a permanent injunction preventing the CFPB from promulgating a similar such rule.  Although this Court need not resolve all of Plaintiffs' claims to support such relief, it may wish to consider ruling on several of Plaintiffs' arguments to "avoid protracting the proceedings by obviating the need for multiple appeals." *Weisgram v. Marley Co*., 528 U.S. 440, 452 n.9 (2000); *see Fed. Ins. Co. v. Northfield Ins. Co.*, 837 F.3d 548, 554 (5th Cir. 2016) (considering an "alternative claim in the interest of judicial economy"); *Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015) (deciding an "alternate and additional ground" for reaching the same judgment); *Cruz v. Braum's, Inc.*, No. 6:20-cv-00217, 2021 WL 979610, at *3 (E.D. Tex. Mar. 16) (Barker, J.) (same); *Chamber of Commerce v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023) (addressing a statutory claim raised in alternative to constitutional claim).

## I.    Plaintiffs are entitled to summary judgment on all claims.

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving

---

[2] The Certified *Index* of Contents for the Administrative Record is 1,903 pages long, owing to the voluminous comments submitted concerning the Notice of Proposed Rulemaking.  The Administrative Record includes 116,108 separate pdfs.  The first twelve pages of the Index are included in the Appendix to this motion.  Appx. 1-12.

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the Court may consider any evidence in the record, it need only consider materials cited by the parties. Fed. R. Civ. P. 56(c)(1)–(3); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (noting summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") (citation omitted).

In assessing if summary judgment is warranted, the Court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Cunningham v. Circle 8 Crane Servs., LLC*, 64 F.4th 597, 600 (5th Cir. 2023) (citation omitted). Nevertheless, "[s]ummary judgment is appropriate when 'the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Edwards v. Oliver*, 31 F.4th 925, 929 (5th Cir. 2022) (quoting *Celotex*, 477 U.S. at 323).

In this case, Plaintiffs are entitled to summary judgment on every claim. The Final Rule violates the CARD Act by, most prominently, transforming that Act's authorization of a "penalty fee" into a prohibition of anything other than a "cost fee." The Final Rule violates TILA by setting an effective date of sixty days, rather than the mandated six month minimum. The Final Rule violates the APA because the CFPB failed to allow the public to access data on which the CFPB relied, arbitrarily and capriciously analyzed deterrence, and failed to consider the negative effects of the Final Rule on consumers. And last, but not least, the Final Rule violates the separation of powers by unlawfully delegating to the CFPB the legislative authority to draw whatever funds are "reasonably necessary" for the CFPB.

20

A.    **The Final Rule violates the CARD Act.**

The Court has already ruled that the Final Rule violates the CARD Act. Opinion and Order, ECF 128 at 12.  The Court's ruling was correct. "[A]gencies are creatures of statute" and "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022).  The "best evidence" of Congress's intent is the statutory text. *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012).  In the CARD Act, Congress authorized issuers to collect a "penalty fee" that is "reasonable and proportional to [an] omission or [a] violation" of the cardholder agreement, and it allowed the CFPB to create a safe harbor for such a "penalty fee."  15 U.S.C. § 1665d(e).  The Final Rule is inconsistent with that statutory text in several ways.

1.    **The Final Rule misconstrues the CARD Act's text that issuers may charge a "penalty fee" for the "violation of the cardholder agreement," and instead allows only for a "cost fee."**

The first problem with the Final Rule is that it does not allow issuers to collect a reasonable and proportional "penalty fee" for the violation of paying late.  The CARD Act expressly permits card issuers to charge a "penalty fee" for a "violation" when a cardholder fails to make a required payment by the due date. 15 U.S.C. § 1665d(a).  A "penalty fee" is not solely compensatory, but more akin to special damages that aim to deter violations and address cardholder conduct.  *See Tull v. United States*, 481 U.S. 412, 422-23 (1987) (civil penalties reflect conduct and deterrence, not just compensation); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 947 (D.C. Cir. 1991) (a penalty is "a pecuniary form of punishment" that "seeks to deter" rather than provide "dollar-for-dollar recompense"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (punitive damages seek deterrence by supplementing compensatory damages).

21

Indeed, the Supreme Court in *SEC v. Jarkesy*, recently discussed at length that "civil penalties" are "designed to punish and deter, not to compensate." 603 U.S. 109, 125 (2024). "Civil penalties," in the Supreme Court's view, concern "culpability, deterrence, and recidivism," and are to be contrasted with monetary relief that merely seeks to "restore the status quo." *Id.* at 124–25. By its plain meaning, the term "penalty," which Congress used to describe a credit card late fee, must encompass more than issuer costs. Otherwise, Congress would have used that term.

Congress's enumeration of statutory criteria for the CFPB confirms that a "penalty fee" is not a "cost fee." In identifying the factors relevant to assessing the reasonableness and proportionality of such a fee, Congress specifically listed not only the "cost incurred by the creditor from [an] omission or [a] violation" of the cardholder agreement, but also "deterrence of such omission or violation by the cardholder" and "the conduct of the cardholder." 15 U.S.C. § 1665d(c). Such criteria go beyond simply restoring the status quo by recouping issuer costs. *Jarkesy*, 603 U.S. at 124-25.

The nature of the "penalty fee" is further confirmed by the fact that the very same Congress that enacted the CARD Act expressly directed a different agency to focus exclusively on cost to determine whether a different fee is reasonable and proportional. The Durbin Amendment provides that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional *to the cost incurred by the issuer with respect to the transaction.*" 15 U.S.C. § 1693o-2(a)(2) (emphasis added); *see also* 51 U.S.C. § 60125(a)(1) (same Congress enacting statute providing for a "reasonable and proportionate share of fixed, platform, data transmission, and launch costs"). That the same Congress used different language in the provision here

confirms that, to Congress, a "penalty fee" is not a "cost fee."  Congress knew how to limit issuers to charging fees based solely on costs and did not do so here.

Indeed, Congress actually declined to enact an earlier version of the CARD Act that would have authorized late fees "reasonably related *to the cost* to the card issuer of such omission or violation."  Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. On Banking, Hous., & Urb. Affs., Apr. 29, 2009) (emphasis added).  It would be surprising if an agency could take the position that the statutory text Congress enacted has the same meaning as the statutory text that Congress rejected.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147–48 (2000).

The statutory text and context are thus clear: Congress intended to authorize issuers to collect a "penalty fee" that is reasonable and proportional to the violation.  A penalty fee must, by its nature, deter the violation, account for the conduct of the violation, and compensate the issuer for costs incurred as a result of the violation.  That conclusion is not only dictated by the statutory text, but it is also logical, for penalty fees encourage timely payment and responsible credit card use, which are critical for banks to engage responsibly in credit card lending.

Yet, despite the CARD Act's mandate, the Final Rule does not allow issuers to collect such penalty fees. Instead, the Final Rule allows only much lower fees to recoup (a subset of) the costs issuers incur as a result of late payments.  Specifically, the CFPB lowered the safe harbor to $8 because it believed that amount would "cover pre-charge-off collection costs for Larger Card Issuers on average."  89 Fed. Reg. 19128,  19162 (Mar. 15, 2024).  This implicit substitution of "cost fee" for "penalty fee" was intentional: the CFPB explicitly states that its new rule includes a "safe harbor amount set based on costs," that "costs are the best guide to what constitutes a

'reasonable and proportional' fee" and, indeed, that the other factors of "deterrence and consumer conduct" can only "help corroborate a safe harbor amount set based on costs." *Id*.

The CFPB asserts in the Final Rule that "the cost factor deserves the most weight of th[e statutory] factors in setting the precise late fee safe harbor amount because it is most closely correlated to the consequences to the issuer of a consumer's late payment." 89 Fed. Reg. at 19162. But Congress authorized reasonable and proportional "penalty fee[s]" for violations and directed the CFPB to consider not just the "consequences to the issuer" but also deterrence of violations and the conduct of the cardholder. Congress thought the consequences to the issuer were not the only relevant factor in assessing fees but rather that violating a cardholder agreement is conduct that should be deterred and reasonably could generate a penalty.

It is important to take a step back regarding what the CFPB has done. The Federal Reserve adopted the 2010 cost-based standard for late fees in part *because* the safe harbor captured the other two statutory criteria of deterrence and cardholder conduct that make up a "penalty fee." 75 Fed. Reg. at 37533; *see* 12 C.F.R. § 226.52(b)(1)(ii). Now, the CFPB has made the safe harbor turn only on cost as well. That is not what the statute authorized the CFPB to do. A fair reading of the Final Rule suggests that the CFPB simply disagrees with Congress's determination that "penalty fees" for late payments based on deterrence and cardholder conduct are appropriate. That judgment is beyond the CFPB's authority.

**2.    The Final Rule conflicts with the CARD Act's text on "cost."**

The CARD Act requires that the CFPB's penalty-fee standard take account of "the cost incurred by the creditor from [the] omission or violation" for which the fee is charged. 15 U.S.C. § 1665d(c)(1). The Final Rule, though, draws an arbitrary line, disallowing consideration of any costs incurred by issuers after an account is charged off. *See* 89 Fed. Reg. at 19148. This line-

24

drawing finds no support in the statute.  Indeed, the Federal Reserve recognized that "collections generally continue after the account has been charged off" so that "an amount that has been charged off is not necessarily a total loss."  75 Fed. Reg. at 37538 n.35.  Thus, the Federal Reserve allowed issuers to consider "the collection of late payments" as part of their costs.  *Id.* at 37586.  Now, the CFPB seeks to arbitrarily limit issuers to only "pre-charge-off collection costs."

If Congress had wanted the agency to distinguish between different types of costs, it knew how to say as much.  In Dodd-Frank, for example, Congress tasked the Federal Reserve with promulgating standards for "whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A).  In doing so, it required the Board to "distinguish between (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered . . . ; and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered."  *Id.* § 1693o-2(a)(4)(B).  Despite the striking similarity in statutory structure, Congress made no such distinction in the penalty-fee section of the CARD Act.  The CFPB may disagree with Congress's judgment, but it is not empowered to second-guess it.

The CFPB has argued that "post-charge-off costs are more appropriately attributed to the fact that a consumer has stopped paying entirely—not that a consumer may have initially missed the payment deadline."  CFPB Br., ECF 106 at 19.  But regardless of whether an issuer collects a missed payment before an account is charged off or after, the violation precipitating its collection costs is the same: failing to make the required payment by the deadline.  Both pre- and post-

charge-off collection costs are "cost[s] incurred by the creditor *from* [that] omission or violation." 15 U.S.C. § 1665d(c)(1) (emphasis added).

The CFPB also argued that the Final Rule is a mere "clarification," but the change speaks for itself: under the Federal Reserve's rule, costs from "the collection of late payments" counted; under the Final Rule, only collection costs incurred "pre-charge-off" count. The CFPB again misinterprets the statute.

### B.     The Final Rule violates the Truth in Lending Act's effective date requirement.

TILA provides that rules "requiring any disclosure which differs from the disclosures previously required by this part . . . shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). Here, the CFPB admits that, under the Final Rule, issuers will "have to disclose [the] new amount" they charge as a penalty for a late payment. CFPB Br., ECF 106 at 20. Yet the Final Rule set its effective date 60 days after publication in the Federal Register. That was a clear violation of TILA.

Against this straightforward argument, the CFPB has claimed in its prior briefing to this Court (but not in the Final Rule) that disclosure of these new amounts "is not a new required disclosure." CFPB Br., ECF 106 at 20. If the CFPB means to argue that the Final Rule escapes this TILA provision because it does not require the disclosure of new categories of information, it points to no support for that reading. Rather, the plain text of the statute resolves the issue. A rulemaking that requires issuers to change their disclosures is a rulemaking that "requir[es] any disclosure which differs from the disclosures previously required." 15 U.S.C. § 1604(d). The Final Rule's effective date violates this provision: "any" does not mean "some." The statutory context also clearly suggests that regulations requiring alteration of the amount of particularly disclosed fees would qualify. *See, e.g.*, 15 U.S.C. § 1602(v) (defining the more specific term

26

"material disclosures" to include specific aspects of disclosures like "the annual percentage rate" and "the amount of the finance charge" and "the number and amount of payments"); *id.* § 1602(aa) ("The disclosure of an amount or percentage which is greater than the amount or percentage required to be disclosed under this subchapter does not in itself constitute a violation of this subchapter."). And the CFPB was well aware that issuers would be required to lower their late fees (and associated disclosures) in light of the changed safe harbor. *See* Final Rule, Appx 74.

**C.    The Final Rule violates the APA.**

The APA directs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022). "An agency rule is arbitrary and capricious if: 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Rest. L. Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 175 (5th Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

**1.    The Final Rule's reliance on non-public data was procedurally improper and arbitrary and capricious.**

"Integral to [the APA's] requirements is the agency's duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules . . . . An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Owner-*

27

*Operator Indep. Drivers Ass'n, Inc.*, 494 F.3d at 199 (cleaned up).  In addition, an agency action

qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained," *FCC v.*

*Prometheus Radio Project*, 592 U.S. 414, 423 (2021), including when the agency fails to respond

to important issues raised by comments submitted in the notice and comment period.  *Ohio v.*

*EPA*, 603 U.S. 279, 293–94 (2024). The CFPB violated these requirements with respect to its

reliance on the Y-14M data.

To justify its new framework (and its premise that $8 is sufficient to cover the average

issuer's pre-charge-off collection costs), the CFPB relied on analysis of non-public data from the

Board's Capital Assessments and Stress Testing survey ("Y-14M data"), which (since 2021)

collects data from financial holding companies with at least $100 billion in assets.  Appx 19.

Specifically, the CFPB appears to have analyzed a subsample of data reported on line 32 of

Schedule D.2 of the Y-14M survey, which provides the following instruction to responding

banks: "Report costs incurred to collect problem credits. Include the total collection cost for

delinquent, recovery, and bankrupt accounts."  *See* Appx 8, Certified Admin. Record Index

(listing "Federal Reserve Board, Reporting Forms (web database)" under "Sources and Other

Materials Relied On But Not Produced"); Appx 446, Federal Reserve Form Y-14M.

The first problem with the CFPB's reliance on Y-14M data is that the CFPB failed to

make it (or even a redacted portion of it) public.  Appx 19, 20, 21.  Compounding that error, the

CFPB failed to make sufficient technical analyses of the Y-14M data public to enable meaningful

comment. This is a clear procedural violation.  *See* ECF 32, BPI Amicus Br. at 4.

The second problem with the CFPB's reliance on Y-14M data is that the Y-14M data

simply does not mean what the CFPB says it means and the CFPB failed to respond to comments

making that clear.  Line 32 of Schedule D.2 of the Y-14M survey asks for "costs incurred to

collect problem credits" but provides no additional guidance on what should be included or excluded when calculating and reporting that amount. Appx 446. Filers use their judgment to fill in that gap. Because the information provided is a single totaled number for each category, the CFPB lacks the data to understand whether the factors supporting those totaled numbers are consistent between banks, whether different banks include different factors in different categories, or exactly what costs a bank is including and not including in its numbers. *See* BPI May 3, 2023 Comment, Appx 148-149.

Indeed, several commenters explained how the CFPB's reliance on the Y-14M data— which are collected to aid the Board's stress-test models and not to provide detailed cost data— likely caused the CFPB to significantly understate the true costs associated with late payments. *E.g.*, BPI Comment, Appx 147-150; *see also* ECF 32, BPI Amicus Br. at 10. For example, Plaintiff ABA reported that, due to ambiguity in the Y-14M instructions, its members do not consistently include on line 32 all costs such as shared, fixed, or overhead costs) properly attributable to late payments. Appx 217 n.47. The Y-14M data also include only collection costs for delinquent, recovery, and bankrupt accounts, which would not include costs associated with late payments on accounts that do not become delinquent (i.e., that become current within 30 days), such as costs incurred for customer service representatives to speak to customers seeking information about their late payment or requesting fee waivers. Appx 225 (ABA Comment); Appx 262 (NAFCU Comment). Nor do these data necessarily account for costs not directly related to collections, such as the costs incurred to respond to customer service inquiries stemming from late payments (such as salaries, IT costs, and general overhead). Appx 217.

Finally, the limited timeframe that the CFPB appears to have used for its analysis of the Y-14M data likely understates the volatility of card issuers' cost-to-fee ratios pertaining to late

fees, which can change substantially over time depending on economic conditions and other factors. In particular, the CFPB relied on data from 2016 to 2022, a period of relatively low credit card delinquency. Appx 156-157. In such periods, issuers enjoy lower collection costs. Consequently, the CFPB's analysis is based in part on a time period that would underestimate issuers' collection costs.

It is possible that the CFPB's analyses of the Y-14M data were flawed in additional ways (for example, larger issuers tend to lend to customers with better credit scores), but it is impossible to know in light of the CFPB's procedural failure to make them or a redacted version of them, or the technical analyses of them, public. And the CFPB did not sufficiently explain why it chose to use this flawed data despite its other avenues for obtaining more relevant data.

Accordingly, the Final Rule's issuance was arbitrary and capricious in violation of the APA. *Prometheus Radio Project*, 592 U.S. at 423; *Ohio v. EPA*, 603 U.S. at 293–94.

### 2. The CFPB analysis of deterrence was arbitrary and capricious.

If the CFPB properly interpreted the statute and relied on appropriate data, it would have had to conclude that the new standard does not in fact allow for the recovery of a "reasonable and proportional" penalty fee. In other words, the CFPB "entirely failed to consider an important aspect of the problem," *State Farm Mut. Auto. Ins.*, 463 U.S at 43, and its conclusion was neither "reasonable [nor] reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

Strong empirical evidence, including peer-reviewed research, suggests that reducing late fees to $8—the amount that the CFPB believes would allow issuers to recover a subset of their costs—would significantly increase the incidence of late payments. Appx 164, 169-170, 209, & 259. *See, e.g.*, Daniel Grodzicki et al., Consumer Demand for Credit Card Services, J. of Fin.

Servs. Res. (Apr. 2022) (available at <https://www.researchgate.net/publication/360184927_

Consumer_Demand_for_Credit_Card_Services>) (last visited Feb. 19, 2025; Daniel Schwartz,

The Rise of a Nudge: Field Experiment and Machine Learning on Minimum and Full Credit

Card Payments, in NA – Advances in Consumer Research, Volume 49 (Tonya Williams Bradford

et al., eds., 2021) (available at *https://acr.memberclicks.net/assets/docs/vol49.pdf*>) (last visited

Feb. 19, 2025; John Gathergood et al., How Do Consumers Avoid Penalty Fees? Evidence From

Credit Cards, SSRN (Dec. 2019) (available at <https://papers.ssrn.com/sol3/papers.cfm?

abstract_id=2960004>) (last visited Feb. 19, 2025; Sumit Agarwal et al., Learning in the Credit

Card Market, NBER (Apr. 2013) (available at <https://papers.ssrn.com/sol3/papers.cfm?abstract

_id =1091623>) (last visited Feb. 19, 2025).

      In its rush to promulgate a rule, the CFPB summarily disregarded these peer reviewed

studies in favor of its own internal study, which relied on confidential data that could not be

subjected to scrutiny during the comment period. *See* ECF 32, BPI Amicus Br. at 16.  The CFPB

took the position that "the prevalence of late payments is not highly sensitive to the level of late

fees at the current order of magnitude," but its only support for that position was a flawed

analysis from of a subset of the largest issuers (the Y-14M data) asking whether cardholders who

paid late were more likely to pay on time seven months later, when the maximum fee was $30,

compared to six months later, when the maximum fee was $41. Appx 48.

      As several commenters pointed out, this analysis was seriously flawed. *E.g.*, Appx 174-

175 (BPI); Appx 213 (ABA); and Appx 259-260 (NAFCU).   Whether a cardholder who has

already paid late will miss another payment after the fee drops from $41 to $30 is an entirely

different question from whether a cardholder who has not previously paid late will miss a first

payment after the fee drops from $30 to $8.  Appx 213.  The cardholders are different (one has

already incurred a late fee and the other has not); the reductions are different (an $11 reduction versus a $22 reduction); and the magnitudes of the late fee are different ($30 versus $8). *Ibid.* Assuming that the incentive effects are equivalent in these circumstances is a fundamental—and fatal—analytical flaw.

In addition, the CFPB presumed that card issuers could implement late fees outside of the new safe harbor if their costs warrant it. Appx 15. The implication of that assumption is that even if the CFPB erred in lowering the safe harbor to $8, it would make little difference. But this conclusion understates the costs card issuers will incur to determine (and potentially defend) a cost-based late fee outside of the safe harbor (costs that the CFPB never seeks to quantify), understates the benefits of certainty– both for issuers and consumers – that come with a card issuer's ability to rely on the safe harbor, and entirely removes the concepts of deterrence and cardholder conduct from the analysis.

The failures in the CFPB's analysis of deterrence are perhaps most stark in its distinction between larger and smaller issuers. The CFPB provides no explanation for why there is any reason to think that a $32 late fee is reasonable and proportional to the violation of paying late when one obtains one's credit card from an issuer with less than one million open credit card accounts but not when one obtains a credit card from an issuer with more than one million open credit card accounts. Even assuming that smaller issuers have some differences in their ability to recoup costs due to different economies of scale, the statutory language is keyed to the violation, not solely to costs. And nothing in the CARD Act suggests that the CFPB is authorized to maintain standards for penalty fees that account for all of the penalty factors for one subset of issuers but not for another. "[I]f there is an explanation, it does not appear in the final rule." *Ohio v. Env't Prot. Agency*, 603 U.S. at 293–94. Accordingly, the CFPB cannot show that the

Final Rule was "reasonably explained," *Prometheus Radio Project*, 592 U.S. at 423, or that it supplied "a satisfactory explanation for its action." *State Farm Mut. Automobile Ins. Co.*, 463 U.S. at 43. The Final Rule is therefore arbitrary and capricious. *Accord Ohio v. Env't Prot. Agency*, 603 U.S. at 293–94.

> ### 3. The Final Rule fails to consider that it will create higher interest rates and reduced access to credit, to the detriment of consumers.

An agency behaves arbitrarily and capriciously when it "entirely failed to consider an important aspect of the problem." *Rest. L. Ctr.*, 120 F.4th at 175 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43). Congress has specifically declared that the effect of a CFPB rulemaking on consumers, including consumers' access to financial products (which would include credit cards), is an important consideration for the CFPB. *See* Dodd-Frank Act, 12 U.S.C. § 5512(b)(2)(A)(i) (requiring, among other things, that the CFPB consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule").

Here, the CFPB acknowledged that its Final Rule on credit card fees does not arise in a vacuum, in several respects. First, "issuers may respond to this reduction in revenue from late fees by adjusting interest rates or other card terms to offset the lost income." *See id.* at 18922. Indeed, the CFBP acknowledged that there may be "increases in the interest rate, increases in the amount of other fees or changes in rewards." *Id.* at 19,191. Second, "it is also possible that some consumers' access to credit could fall if issuers could adequately offset lost fee revenue expected from them only by increasing APRs to a point at which a particular card is not viable." *Id.* at 19,192. But the CFPB simply refused to consider how these consequences might harm the average American family who carries a balance on their credit card yet makes timely payments. *Id.*

33

Instead, the agency touted the benefits only to the subset of consumers who violate the terms of their credit card agreements and pay late. *See id.* But even those consumers are unlikely to benefit in the long run. While each late fee will be lower, the other consequences—such as increased penalty rates and restricted credit access—could make it even harder to pay for life's necessities.

Even assuming that late-paying cardholders would see a net benefit, redistributing the costs of their late payments to a broader group of cardholders—while simultaneously increasing those costs by increasing the frequency of late payments—does not ultimately benefit the public at large. It merely redistributes money from one group to another while increasing inefficiency and volatility in the credit card market. The Final Rule essentially ignores these harms.

### D.     The Final Rule violates the United States Constitution.

Finally, in addition to all of the statutory issues with the Final Rule, the CFPB itself is a veritable issue-spotter of constitutional law violations. Two of those challenges already have been resolved. In *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the Supreme Court determined that the CFPB's single-director structure "violate[d] the separation of powers." In *CFSA II*, by contrast, the Supreme Court concluded that the CFPB's funding structure did not run afoul of Article I's Appropriations Clause. But the Supreme Court has not yet addressed whether the CFPB's structure violates the separation of powers. *CFSA I*, 51 F.4th at 633 n.6. Accordingly, no precedent from the Supreme Court or the Fifth Circuit has decided the specific question whether Congress unconstitutionally delegated its appropriations power to the CFPB's director without a sufficient intelligible principle.

Under current Supreme Court precedent, Congress violates the nondelegation doctrine when it delegates one of its powers to the Executive Branch without an "intelligible principle" to

34

guide the Executive's exercise of that power.  A majority of the current Justices on the Supreme Court have expressed skepticism of this test.  *See* 588 U.S. 128 at 164 (Gorsuch, J. joined by Roberts, C.J., and Thomas, J., dissenting; *id.* at 148–49 (Alito, J., concurring in judgment but noting agreement with the dissent that the Supreme Court should be reconsidered); and *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J. stating support for *Gundy* dissent in order denying petition for certiorari).  And the Supreme Court has now granted a writ of certiorari to review a nondelegation case this Term, which could provide an opportunity for the Court to reconsider that doctrine.  *See Federal Communications Commission v. Consumers' Research*, No. 24-354 (S. Ct.).

Nonetheless, the Supreme Court's current "intelligible-principle test requires Congress to set out guidance that 'delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'"  *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 620 (5th Cir. 2024) (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989)).  Although those standards "are not demanding," the Fifth Circuit has made clear "that does not mean [the courts] must rubber-stamp all delegations of legislative power."  *Mayfield*, 117 F.4th at 620–21 (quoting *Gundy v. United States*, 588 U.S. 128, 146 (2019) and *Consumers' Rsch v. FCC*, 109 F.4th 446, 462 (5th Cir. 2024)).

The CFPB's funding structure fails the intelligible-principle test.  Congress vested the CFPB with "vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy."  *Seila Law*, 591 U.S. at 203.  But it then authorized the Director to requisition the funds that he believes "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)."  12 U.S.C. § 5497(a).

While there is a statutory cap linked to a percentage of the "total operating expenses of the Federal Reserve System," *id*. § 2(A), the statute makes the extraordinary limitation that "[t]he funds derived from the Federal Reserve System pursuant to this subsection *shall not be subject to review* by the Committees on Appropriations of the House of Representatives and the Senate." *Id*. § 3 (emphasis added).  In other words, the Act not only delegates to the CFPB's Director the discretion over what is "reasonably necessary" for funding an agency with vast authority over the American economy but then expressly bars *Congress* from reviewing "[t]he funds derived." *Id*. That enormous delegation squarely hands to the Director Congress's Appropriation Power and then expressly disclaims further Congressional involvement.[3]

Accordingly, the funding provisions violate the Constitution, even putting aside the Appropriations Clause.

## II. Plaintiffs are entitled to vacatur, declaratory relief, and a permanent injunction.

As previewed during the preliminary injunction proceedings, *see* ECF 111 at 16, the summary judgment stage of this case is the proper phase for crafting a remedy.  Under established Fifth Circuit law, Plaintiffs are entitled to vacatur of the Final Rule, declaratory relief, and a permanent injunction.

### A.    This Court should set aside the Final Rule.

The APA requires courts to "hold unlawful and set aside" agency actions that violate its commands.  5 U.S.C. § 706(2).  The Fifth Circuit has held that vacatur is an appropriate remedy for the CFPB's violations of the Constitution, *see* 51 F.4th at 643, and it is an "ordinary result"

---

[3] This month, the Acting Director of the Bureau notified the Federal Reserve that the agency will not be taking its next draw of funding.  *See* Brian Schwartz and Dylan Tokar, CFPB to Close Office After Vought Tells Staff to Halt All Supervision, Wall St. J (Feb. 9, 2025).

when a rule is substantively or procedurally unlawful, *see Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see, e.g.*, *Basinkeeper v. U.S. Army Corps of Eng'rs*, 715 F. App'x 399, 402 n.3 (5th Cir. 2018).  Accordingly, vacatur is the important first step for a remedy in this case.

      **B.**      **This Court should declare the Final Rule unlawful and enter a permanent injunction.**

In addition, this Court should issue declaratory and injunctive relief.  The Declaratory Judgment Act allows a reviewing court to "declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).  Declaratory relief is a common and important remedy for violations of law like those advanced here.  *See Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 388 (5th Cir. 2003).

A permanent injunction is also proper if the plaintiff shows: "(1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest."  *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *see also eBay*, 547 U.S. at 391.  "[A] plaintiff seeking a permanent injunction must demonstrate actual success on the merits."  *Franciscan Alliance, Inc. v. Becerra*, 553 F. Supp. 3d 361, 375 (N.D. Tex..2021) (internal quotation marks and citation omitted).  The first factor is satisfied due to the CFPB's statutory and constitutional violations.

With respect to the second factor, this Court has recognized on multiple occasions that Plaintiffs' members would face irreparable injury from the Final Rule's implementation, and the CFPB has never contested this point. Opinion and Order, ECF 128 at 11.  Accordingly, for the same reasons articulated in Plaintiffs' prior briefing and as recognized by this Court's prior

orders, the Court should find that enforcement of the Final Rule would impose irreparable harm on Plaintiffs. *Id.* at 12.

The third and fourth factors merge in cases against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[E]ven if it were necessary for the Court to revisit [the balance of the equities and public interest]—which it is not, given nothing has changed since its previous order—such analysis clearly reveals that the balance of equities and public interest do not favor the CFPB because 'there is generally no public interest in the perpetuation of unlawful agency action.'" Opinion and Order, ECF 128 at 12 (cleaning up and quoting *Wages & White Lion*, 16 F.4th at 1143). Accordingly, each factor weighs in favor of permanently enjoining the CFPB from enforcing the Final Rule.

In other cases, and notwithstanding the fact that the four-factor test is satisfied, the CFPB has claimed that injunctive relief is merely duplicative of vacatur and therefore not appropriate. *See Chamber of Commerce v. CFPB*, 691 F. Supp. 3d 730, 745 (Sept. 8, 2023) (issuing injunctive relief in challenge to CFPB UDAAP manual). That is wrong.

Courts routinely grant both vacatur and injunctive relief. *E.g.*, *Franciscan All. v. Becerra*, 553 F. Supp. 3d 361, 377 (N.D. Tex. 2021) (rejecting the government's argument that a permanent injunction was duplicative with vacatur), *aff'd in relevant part*, 47 F.4th 368, 377-80 (5th Cir. 2022); *Texas v. United States*, 50 F.4th 498, 530-31(2022) (affirming the district court's grant of both vacatur and an injunction); *Shell Offshore v. Babbitt*, 61 F. Supp. 2d 520, 529 (W.D. La. 1999) (both setting aside an order and enjoining the agency from enforcing it), *aff'd in relevant part*, 238 F.3d 622, 630-31 (5th Cir. 2011); *NAM v. SEC*, 631 F. Supp. 3d 423, 431 (W.D. Tex. 2022) (following "the ordinary practice" of granting both vacatur and an injunction). There is no legal support for the CFPB's previous argument that the two remedies are

incompatible. And here, such relief is particularly important given the irreparable harm that would result if the CFPB were to prohibit issuers from recovering a reasonable penalty fee. *See Chamber of Commerce v. CFPB*, 691 F. Supp. 3d at 745 (issuing injunction to restrain officials from "conduct based on the disputed agency rule").

## CONCLUSION

The Final Rule violates the CARD Act, TILA, and the APA, not to mention the separation of powers. The Court should therefore grant summary judgment to Plaintiffs, vacate the Final Rule, and issue declaratory and injunctive relief for Plaintiffs' members.

Dated: February 20, 2025                      Respectfully submitted,

                                              /s/ *Michael Murray*
                                              Michael Murray (*Pro Hac Vice*)
                                              D.C. Bar No. 1001680
                                              michaelmurray@paulhastings.com
                                              T. Benton York (*Pro Hac Vice*)
                                              D.C. Bar No. 230580
                                              bentonyork@paulhastings.com
                                              PAUL HASTINGS LLP
                                              2050 M Street NW
                                              Washington, DC 20036
                                              (202) 551-1730

                                              /s/ *Derek Carson*
                                              Philip Vickers
                                              Texas Bar No. 24051699
                                              pvickers@canteyhanger.com
                                              Derek Carson
                                              Texas Bar No. 24085240
                                              dcarson@canteyhanger.com
                                              CANTEY HANGER LLP
                                              600 West 6th Street, Suite 300
                                              Fort Worth, TX 76102
                                              (817) 877-2800

                                              ***Attorneys for Plaintiffs***

Thomas Pinder (*Pro Hac Vice*)
D.C. Bar No. 451114
tpinder@aba.com
Andrew Doersam (*Pro Hac Vice*)
D.C. Bar No. 1779883
adoersam@aba.com
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave. NW
Washington, DC 20036

*Attorneys for Plaintiff American Bankers Association*

Jennifer B. Dickey (*Pro Hac Vice*)
D.C. Bar No. 1017247
jdickey@uschamber.com
Maria C. Monaghan (*Pro Hac Vice*)
D.C. Bar No. 90002227
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

**CERTIFICATE OF SERVICE**

I certify that on February 20, 2025, counsel for Plaintiffs caused the foregoing to be served on counsel for Defendants via the Court's ECF System.

/s/ *Michael Murray*
Michael Murray
*Counsel for Plaintiffs*

41